**No. 24-2937**
_____

UNITED STATES COURT OF APPEALS
FOR THE NINTH CIRCUIT
———

**UNITED STATES OF AMERICA,**

Plaintiff-Appellee,

v.

**EDWIN CUADRADO, JR.,**

Defendant-Appellant.

———

Appeal from the
United States District Court
for the Southern District of California
Honorable Larry Alan Burns, Presiding,
No. 23-CR-1855-TWR

———

**APPELLANT'S OPENING BRIEF**
_____

KATIE HURRELBRINK
FEDERAL DEFENDERS OF SAN DIEGO, INC.
225 Broadway, Suite 900
San Diego, CA 92101
(619) 234-8467
Katie_Hurrelbrink@fd.org

Attorneys for Mr. Cuadrado

## TABLE OF CONTENTS

TABLE OF AUTHORITIES ................................................................................ iv

INTRODUCTION ............................................................................................ 1

STATEMENT OF JURISDICTION .................................................................... 3

BAIL STATUS ................................................................................................ 3

RELEVANT LEGAL PROVISIONS .................................................................... 3

ISSUES PRESENTED ...................................................................................... 4

STATEMENT OF THE CASE ............................................................................ 5

    I.   After his arrest for assaulting a co-worker, Mr. Cuadrado was diagnosed with schizophrenia for the first time. ............... 5

        A.   Despite decades-long struggles with delusions and hallucinations, Mr. Cuadrado secured a job at the post office—but the delusions continued. ........... 5

        B.   Surrounded by three supervisors, a panicked Mr. Cuadrado wounded one supervisor with a box cutter. ................................................................ 7

        C.   Mr. Cuadrado's symptoms continued in jail until he was diagnosed with schizophrenia and prescribed medication. .......................................... 11

        D.   At trial, both defense expert Dr. Victoroff and jail psychologist Dr. Griswold testified that Mr. Cuadrado had schizophrenia. ............................... 13

    II.  Government expert Dr. Badre was fired from U.C. San Diego after falsely testifying that he was Director of Forensic Training. ...................................................... 16

        A.   Dr. Badre claimed to be a forensic specialist skilled at assessing credibility, but the court excluded many of his opinions on reliability grounds. ...................................................... 16

i

B.  Dr. Badre repeatedly violated the court's exclusion orders, including by opining that Mr. Cuadrado was not credible and that he smoked meth immediately after the altercation. ........ 22

C.  The prosecutor's closing stressed Dr. Badre's status as Director of Forensic Training and his expertise in evaluating credibility. ........................... 26

D.  Prosecutors learned that the Director of Forensic Training position did not exist, but they failed to inform the jury. ........................................... 28

III.  The court denied a new trial motion, but opined that Dr. Badre's "bias was . . . manifest" and that Mr. Cuadrado had schizophrenia. ............................... 30

SUMMARY OF ARGUMENT ....................................................... 31

ARGUMENT ....................................................................... 33

I.  Dr. Badre's false or misleading trial testimony warrants a new trial. ................................................... 33

A.  The standard of review is de novo. ............................ 33

B.  Dr. Badre's testimony was outright false, and even on the government's "informal title" theory, it would still be extremely misleading. ..................... 34

C.  The government knew or should have known that the testimony was false or misleading. ..................... 36

D.  The *Napue* violation was material. ........................... 38

II.  Dr. Badre repeatedly testified that Mr. Cuadrado was not credible, including by gesturing toward a "long list" of facts not in evidence. ........................................ 43

A.  The standard of review is abuse of discretion. ............ 43

B.  The district court abused its discretion because circuit precedent squarely prohibits experts from commenting on credibility. ................................... 44

ii

III. Dr. Badre testified that Mr. Cuadrado was videoed smoking meth immediately after the altercation, even though the court repeatedly deemed that opinion unreliable. ................................................................ 49

    A.   The standard of review is abuse of discretion. ............ 49

    B.   The court abused its discretion because Rule 702 requires courts to exclude unreliable expert opinions. ................................................................ 49

IV. The district court made no reliability findings about Dr. Badre's remaining opinions, and the error was not harmless because several of those opinions were unreliable. ................................................................ 54

    A.   The standard of review is abuse of discretion. ............ 54

    B.   District courts automatically abuse their discretion when they fail to make explicit reliability findings before admitting expert testimony. ................................................................ 54

    C.   The government cannot prove that the error was harmless, because many of Dr. Badre's opinions were unreliable. ................................................ 57

V. If necessary, this Court should evaluate these claims for cumulative error. ................................................ 62

VI. Though foreclosed by circuit precedent, Mr. Cuadrado preserves for further review the argument that assault is a specific intent crime. ................................................ 63

CONCLUSION ................................................................ 64

iii

## TABLE OF AUTHORITIES

**Cases**                                                           **Page(s)**

*Clements v. Madden,*
    112 F.4th 792 (9th Cir. 2024) .............................................. 32, 38, 42, 43

*Daubert v. Merrell Dow Pharms., Inc.,*
    509 U.S. 579 (1993) .................................................................. passim

*Dickey v. Davis,*
    69 F.4th 624 (9th Cir. 2023) ................................................................ 40

*Hayes v. Brown,*
    399 F.3d 972 (9th Cir. 2005) (en banc) .......................................... 34, 36

*Kyles v. Whitley,*
    514 U.S. 419 (1995) ................................................................................ 38

*Morris v. Ylst,*
    447 F.3d 735 (9th Cir. 2006) ........................................................... 36, 37

*Mukhtar v. California State Univ.,*
    299 F.3d 1053 (9th Cir. 2002) ............................................................. 43

*Napue v. Illinois,*
    360 U.S. 264 (1959) .................................................................. *passim*

*Nichols v. Am. Nat. Ins. Co.,*
    154 F.3d 875 (8th Cir. 1998) .............................................................. 48

*Panah v. Chappell,*
    935 F.3d 657 (9th Cir. 2019) ..................................................... *passim*

*Phillips v. Ornoski,*
    673 F.3d 1168 (9th Cir. 2012) ............................................................. 34

iv

*Reed v. Lieurance,*
    863 F.3d 1196 (9th Cir. 2017)................................................44

*Sivak v. Hardison,*
    658 F.3d 898 (9th Cir. 2011)................................................41

*Smith v. Arizona,*
    602 U.S. 779 (2024)................................................53

*Soto v. Ryan,*
    760 F.3d 947 (9th Cir. 2014)................................................36

*United States v. Alli,*
    344 F.3d 1002 (9th Cir. 2003)................................................42

*United States v. Binder,*
    769 F.2d 595 (9th Cir. 1985)................................................44, 45, 46

*United States v. Candoli,*
    870 F.2d 496 (9th Cir. 1989)................................................32, 44, 45

*United States v. Caruana,*
    652 F.2d 220 (1st Cir. 1981)................................................63

*United States v. Dorsey,*
    677 F.3d 944 (9th Cir. 2012)................................................47

*United States v. Frederick,*
    78 F.3d 1370 (9th Cir. 1996)................................................62

*United States v. Gonzalez–Maldonado,*
    115 F.3d 9 (1st Cir. 1997)................................................62

*United States v. Hanna,*
    293 F.3d 1080 (9th Cir. 2002)................................................62

*United States v. Hinkson,*
  585 F.3d 1247 (9th Cir. 2009)..........................................................49, 52

*United States v. Holguin,*
  51 F.4th 841 (9th Cir. 2022) ................................................*passim*

*United States v. Inzunza,*
  638 F.3d 1006 (9th Cir. 2011)..............................................................33

*United States v. Irons,*
  31 F.4th 702 (9th Cir. 2022) ................................................................55

*United States v. Jim,*
  865 F.2d 211 (9th Cir. 1989)................................................................63

*United States v. Komisaruk,*
  885 F.2d 490 (9th Cir. 1989)................................................................44

*United States v. LaPage,*
  231 F.3d 488 (9th Cir. 2000)................................................................42

*United States v. Lopez,*
  913 F.3d 807 (9th Cir. 2019)................................................................44

*United States v. Preston,*
  873 F.3d 829 (9th Cir. 2017)................................................................63

*United States v. Rahm,*
  993 F.2d 1405 (9th Cir. 1993)..............................................................62

*United States v. Rodriguez,*
  766 F.3d 970 (9th Cir. 2014)................................................................33

*United States v. Ruvalcaba-Garcia,*
  923 F.3d 1183 (9th Cir. 2019)........................................................55, 57

*United States v. Shay,*
  57 F.3d 126 (1st Cir. 1995) ....................................................45

*United States v. Simmonds,*
  931 F.2d 685 (10th Cir. 1991).............................................63

*United States v. Taylor,*
  680 F.2d 378 (5th Cir. 1982).............................................63

*United States v. Valencia-Lopez,*
  971 F.3d 891 (9th Cir. 2020).........................................*passim*

## Statutes and Rules         Page(s)

18 U.S.C. § 111............................................................*passim*

18 U.S.C. § 3231.....................................................................3

28 U.S.C. § 41 .......................................................................3

28 U.S.C. § 84(d) ...................................................................3

28 U.S.C. § 1291.....................................................................3

28 U.S.C. § 1294.....................................................................3

Fed. R. App. P. 4 ..................................................................3

Fed. R. Evid. 702.............................................................*passim*

Fed. R. Evid. 806.................................................................45

## Constitutional Provisions       Page(s)

U.S. Const. amend. V ...........................................................4

## INTRODUCTION

This appeal revolves around Edwin Cuadrado's insanity defense and the government expert hired to rebut it, Dr. Nicholas Badre. Mr. Cuadrado has experienced delusions and hallucinations since childhood. Paranoia followed him into his job at the post office, where he became convinced that his supervisors had bugged him, followed him, and assaulted him. So when three supervisors surrounded his truck, he was sure they were there to kill him. He fought his way out with a box cutter, injuring a postal employee in the process.

In jail, he came under a psychiatrist's care for the first time in his life. After observing him for six months, she diagnosed him with schizophrenia. A defense expert agreed. And after hearing all the evidence, the court, too, concluded that there was "no question" Mr. Cuardrado had schizophrenia. 2-ER-89.

Dr. Badre, however, told the jury otherwise. He thought that Mr. Cuadrado did not have schizophrenia, but just used methamphetamine. Dr. Badre billed himself as a special kind of psychiatrist: He said he was a "forensic" psychiatrist, whose experience allowed him to tell if someone was lying. But despite assuming the label, he claimed only one peer-recognized credential in the field: He had been named the Director of Forensic Training at the University of California at San Diego ("UCSD").

1

Dr. Badre said that his forensic skills gave him some remarkable abilities. He could tell, just by watching videos of Mr. Cuadrado performing mundane activities, that Mr. Cuadrado was not experiencing schizophrenia symptoms during the assault. He could infer, based on third-hand witness statements about years-old events, that Mr. Cuadrado had lied to him during their interview. And any time in the last decade that Mr. Cuadrado acted angrily or impulsively, Dr. Badre assumed Mr. Cuadrado was high. He even thought he saw Mr. Cuadrado smoking meth on a video taken shortly after the assault.

Pretrial, the court excluded many of these opinions, finding that they were unreliable or usurped the jury's role. But Dr. Badre violated the court's exclusion orders at trial, including by testifying that Mr. Cuadrado was not credible and that he smoked meth on video.

Meanwhile, administrators at UCSD learned about Dr. Badre's testimony. They discovered that he had misrepresented his credentials: He held no professorship at UCSD, let alone a directorship. He was just a volunteer lecturer. He was immediately referred for potential termination from his volunteer role.

But when the defense tried to cross Dr. Badre about it, he doubled down on being the Director of Forensic Training. And despite learning about the falsehoods, the prosecutors never corrected them. Instead, they emphasized that title and Dr. Badre's forensic bona fides in closing.

2

All told, Dr. Badre misrepresented his credentials. He violated exclusion orders. And he provided testimony that the court deemed unreliable, or that the court did not evaluate for reliability at all. Ultimately, he used this unreliable testimony and undue authority to tell the jury that Mr. Cuadrado did not have schizophrenia—when, in fact, he does. This Court must reverse.

## STATEMENT OF JURISDICTION

The district court had original jurisdiction under 18 U.S.C. § 3231. This Court has jurisdiction from a final order entered in the Southern District of California. *See* 28 U.S.C. §§ 41, 84(d) 1291, 1294(1). Mr. Cuadrado filed a timely notice of appeal on May 8, 2024. Excerpts of Record ("ER") 2-ER-264; Fed. R. App. P. 4(b)(1).

## BAIL STATUS

Mr. Cuadrado is in prison. His projected release date is December 2, 2027.

## RELEVANT LEGAL PROVISIONS

Federal Rule of Evidence 702 provides,

> A witness who is qualified as an expert by knowledge, skill, experience, training, or education may testify in the form of an opinion or otherwise if the proponent demonstrates to the court that it is more likely than not that:
>
> **(a)** the expert's scientific, technical, or other specialized knowledge will help the trier of fact to understand the evidence or to determine a fact in issue;

**(b)** the testimony is based on sufficient facts or data;

**(c)** the testimony is the product of reliable principles and methods; and

**(d)** the expert's opinion reflects a reliable application of the principles and methods to the facts of the case.

The Fifth Amendment's Due Process Clause states that "[n]o person shall be . . . deprived of life, liberty, or property without due process of law."

## Issues Presented

This appeal asks whether any of the following require reversal:

I.   Dr. Badre's misrepresentations about his professional credentials.

II.  Dr. Badre's repeated statements that Mr. Cuadrado was not credible.

III. Dr. Badre's opinion—deemed unreliable by the district court—that Mr. Cuadrado smoked methamphetamine immediately after the alleged assault.

IV.  The court's failure to make any reliability findings before admitting Dr. Badre's testimony.

V.   The cumulative impact of errors I-IV.

VI.  For preservation only, the court's determination that 18 U.S.C. § 111 is a general intent crime.

STATEMENT OF THE CASE

## I. After his arrest for assaulting a co-worker, Mr. Cuadrado was diagnosed with schizophrenia for the first time.

On August 30, 2023, Edwin Cuadrado was arrested for assaulting Benjamin Aficial, a U.S. Postal Service ("USPS") employee. 18 U.S.C. § 111(a), (b). Soon after, Mr. Cuadrado met with jail psychologist Dr. Shannon Griswold—his first time ever receiving psychiatric care. 4-ER-667. She diagnosed him with schizophrenia. 4-ER-730. That diagnosis would come to shape the course of his federal trial.

### A. Despite decades-long struggles with delusions and hallucinations, Mr. Cuadrado secured a job at the post office—but the delusions continued.

Though Mr. Cuadrado would have to wait until 2023 for a diagnosis, his symptoms began much earlier. He was about 12 years old when he first told his mom that he was hearing voices. 4-ER-671. By age 14, he was making bizarre statements and acting paranoid. 4-ER-671. He could hear authority figures whispering to him. 4-ER-664. He warned his mom not to leave the house and told her that the phone, TV, house, and car were bugged. 4-ER-664. He thought he was being watched from satellites in the sky and that passersby could hear his thoughts. 4-ER-664. As the voices became more threatening, he began to suspect that whomever was surveilling him meant to do him harm. 4-ER-665. Despite these warning signs, Mr. Cuadrado never received

5

psychiatric help, 4-ER-667—the all-to-common result of financial and stigmatic barriers to seeking care, 4-ER-669.

As an adult, Mr. Cuadrado functioned in some areas of his life while struggling in others. 4-ER-668, 673. He was forced to leave his mom's house after altercations with his sister (herself diagnosed with bipolar). 2-ER-103, 105. By 2023, he was living in his car. 2-ER-105. But he successfully landed a job at USPS. He was on his seventh year as a postal employee in 2023. 3-ER-376.

By that time, however, his symptoms had begun to assert themselves at work. He began filing strange complaints. One alleged that co-workers watched him in the changing room. 4-ER-521. Others claimed that someone at USPS had bugged his postal vehicle, 4-ER-519, or that his truck was listening to him, 4-ER-599. Co-workers sometimes saw him talking to himself, 4-ER-756, or to the sky, 4-ER-519.

Many of his delusions concerned his supervisors. He complained to co-workers that supervisors were harassing and watching him. 4-ER-757. He told his mom that the supervisors spoke to him through car speakers, and that they planted cameras to try to catch him naked. 4-ER-666. When the gas light came on in his car, a voice would say, "You've got to get to work." 4-ER-666. He began unplugging his car battery at night, thinking that that would disrupt the monitoring. 4-ER-666. But if a plane flew over him afterward, he assumed it was there to

6

reestablish surveillance. 4-ER-666. Mr. Cuadrado even came to believe that his supervisors had assaulted him in the past. 4-ER-686.

As his paranoia began affecting his workplace behavior, some of his delusions became self-fulfilling prophecies. Co-workers really did start talking about him behind his back. 4-ER-744. They would point at him and call him "[t]he crazy guy" or "the lunatic." 4-ER-745. His supervisor, Jose Rodriguez, joined in, calling him names and laughing at him. 4-ER-745-746. Customers didn't like Mr. Cuadrado, either. Amazon had recently requested that he not visit their facility after conflicts with their security staff. 3-ER-485.

All this subjected Mr. Cuadrado to extra scrutiny from management—exactly what his delusions told him to expect. Just a few hours before the assault, USPS supervisor Benjamin Aficial sent an email to Mr. Rodriguez about Mr. Cuadrado: "What are we going to do about this driver?" 4-ER-619.

**B.  Surrounded by three supervisors, a panicked Mr. Cuadrado wounded one supervisor with a box cutter.**

August 25—the day of the altercation—began normally enough. Mr. Cuadrado started his shift in the afternoon. 3-ER-484.

Around 5:30pm, he took his meal break. 3-ER-456. He decided to stop at a Shell gas station near the USPS distribution center. That Shell receives a "constant" flow of USPS employees, many of whom park

7

their large vehicles on the side of the road. 3-ER-452. Though common practice, parking illegally and leaving mail unattended violates USPS rules. 3-ER-489, 563.

Shell station employee Christina Quintero was working in the convenience store that afternoon. 3-ER-438. Ms. Quintero knew Mr. Cuadrado. He came in often. 4-ER-737. She had frequently observed him behaving oddly. He would mumble to himself and look around cautiously, and he once told her that someone was following him. 3-ER-453-454.

As Mr. Cuadrado made his way to the drink cooler, Ms. Quintero saw someone march into the store and approach Mr. Cuadrado authoritatively—"like a federal police officer," with "just a very strong demeanor," she would later recall. 4-ER-438. It was Mr. Cuadrado's supervisor, Mr. Rodriguez. 4-ER-438. Mr. Rodriguez's shift had ended at 3:30pm, but he left work late. 3-ER-514. He was on his way home when he spotted Mr. Cuadrado's truck and decided to enforce the rules. 3-ER-490. On entering the store, Mr. Rodriguez walked up to Mr. Cuadrado and said, "You need to move that truck. You can't be here." 3-ER-439.[1] Mr. Cuardrado said he was on his lunch but otherwise remained calm. 3-ER-440-442.

---

[1] Mr. Rodriguez would later testify that Mr. Cuadrado initiated the conflict, immediately "going off on" him and "cussing on" him. 3-ER-492. But both surveillance video and Ms. Quintero's testimony showed that this was not true. 3-ER-439-444, 521-526.

Mr. Cuadrado checked out. "Rodriguez was, like, still, like, right behind him, like, kind of, like, harassing him," Ms. Quintero would remember. 3-ER-444. Mr. Cuadrado left the store. 3-ER-444. Mr. Rodriguez followed close behind. 3-ER-456-457.

Finally, outside the store, Mr. Cuadrado turned around. He pushed Mr. Rodriguez. 3-ER-450. "You guys followed me," he said. "You guys put a camera on me." 3-ER-517. He told Mr. Rodriguez to quit following him and his family. 3-ER-456. He then took the soda he had just purchased and threw it at Mr. Rodriguez's car. 3-ER-444.

At that point, Mr. Rodriguez ordered Mr. Cuadrado to return to the distribution center. 3-ER-494. Mr. Cuadrado got in the truck and headed that way, with Mr. Rodriguez in pursuit. 3-ER-496. Mr. Cuadrado drove "erratically," running a stop sign and whipping around a corner. 3-ER-496. On the way, Mr. Rodriguez called the center for assistance. 3-ER-497. Mr. Aficial and one other supervisor agreed to meet him in the parking lot. 4-ER-576, 607. As they would later admit, this was not the normal protocol for disciplinary actions. 4-ER-595, 619.

Back at the distribution center, the three supervisors converged on Mr. Cuadrado's truck. 4-ER-580-582. They told him to halt. He complied. 4-ER-580. The supervisors huddled around the driver's side door, three or four feet away. 4-ER-598-599. Mr. Cuadrado opened the door. He yelled, "Stop bugging my phone. J-Rod"—meaning, Mr. Rodriguez—"stop following me." 4-ER-598. The supervisors ordered

9

him to hand over his badge. 4-ER-596. He refused. 4-ER-596. Mr. Rodriguez told Mr. Cuadrado to get down from the truck. 4-ER-621.

When Mr. Cuadrado finally did come down, he pushed Mr. Rodriguez away from him. 3-ER-506. He then reached into his pocket and pulled out a pocketknife, 3-ER-543, which he normally used as a box cutter, 3-ER-384. He started swinging it at the three supervisors. 3-ER-506-507. On seeing the knife, one supervisor picked up two rocks and headed back towards Mr. Caudrado. 4-ER-587. As the supervisor approached, he saw Mr. Aficial fall against the truck while Mr. Cuadrado swung the knife toward him. 4-ER-588; 3-ER-541-542.[2] The knife made contact, slicing Mr. Aficial across the head. 4-ER-613.

The supervisors scattered. 3-ER-541, 4-ER-613. Mr. Cuadrado returned to his minivan and left. 3-ER-425-426.

He was arrested five days later. Post-arrest, Mr. Cuadrado gave a much different account of the encounter. He did not think the supervisors were there for discipline. Instead, he "felt like he was going to be killed." 3-ER-381. He remembered that the supervisors were "red faced" and "hot." 3-ER-381. He felt "boxed in." 3-ER-381. As they moved closer, Mr. Cuadrado decided to try "to push his way out to escape." 3-ER-382. But "they were still closing in." 3-ER-382. Finally, believing

---

[2] Mr. Aficial claimed that Mr. Cuadrado threw him against the truck. 4-ER-613. But both Mr. Rodriguez on the day of the altercation and the third supervisor at trial said that Mr. Aficial fell or crashed into the truck. 4-ER-588; 3-ER-541-542.

that Mr. Aficial was trying to grab him, Mr. Cuadrado lunged for his hand. 3-ER-382-383. But Mr. Cuadrado missed and hit him in the head instead.

Mr. Cuadrado expressed profound remorse. 2-ER-105. That's why he threw the knife away. He "didn't want anything to do with it" after the altercation. 3-ER-373. But when asked if Mr. Cuadrado wanted to write an apology letter, he said he would do so only if the charges were dropped. He explained why he hesitated to apologize unconditionally. On the one hand, "I do – I do – I would like to apologize, but it is – like my girls – they don't look at me like it is okay. It is like they died inside, and it is really freaking – it is horrible," he said. 3-ER-380. But on the other hand, he believed he was reacting to a genuine threat: "I feel horrible. I was like, 'Why are you doing this?' I, you know – but I have never been attacked like that, either." 3-ER-380.

### C. Mr. Cuadrado's symptoms continued in jail until he was diagnosed with schizophrenia and prescribed medication.

Mr. Cuadrado was booked into jail. There, his strange behavior quickly caught Dr. Griswold's attention. 4-ER-734.

By that point, however, another important fact had emerged: Mr. Cuadrado had recently used methamphetamine. (This is unsurprising, as having schizophrenia increases the likelihood of drug use. 4-ER-693.) Mr. Cuadrado told doctors that he used meth about

11

twice a month, including to stay awake at work. 4-ER-698. Post-arrest, he admitted that he used two days before the altercation, as well as four days after. 4-ER-676, 732. And he said that he once burned his hands trying to make meth. 4-ER-803. He made clear, however, that he had not used on August 25. 4-ER-676-677.

Given this drug history, Dr. Griswold waited to see whether his symptoms would dissipate. 4-ER-734. In the meantime, staff assessed him for withdrawal. 4-ER-741. He displayed no withdrawal symptoms. 4-ER-741. Yet, a week later, he still "wasn't doing very well." 4-ER-734. He continued having delusions, paranoia, and auditory hallucinations. 4-ER-730.

About two weeks after arrest, Dr. Griswold placed him on antipsychotic medication. 4-ER-731, 737. This time, she saw a "definite[]" improvement. 4-ER-732. But paranoid delusions—a particularly treatment-resistant schizophrenia symptom—still cropped up. 4-ER-732. After observing Mr. Cuadrado for six months, Dr. Griswold officially diagnosed him with schizophrenia. 4-ER-729-731.

She ruled out substance-induced psychosis. 4-ER-731. She noted that Mr. Cuadrado was enrolled in drug treatment, and while it is not impossible to obtain drugs in custody, she saw no signs of drug use. 4-ER-731, 739-741.

12

### D. At trial, both defense expert Dr. Victoroff and jail psychologist Dr. Griswold testified that Mr. Cuadrado had schizophrenia.

Mr. Cuadrado notified that government that he would raise an insanity defense to the assault charge. Both sides hired experts.

The defense hired Dr. Jeff Victoroff. Dr. Victoroff interviewed Mr. Cuadrado's mom about the long history of hallucinations and delusions. 4-ER-662-663. He listened to Mr. Cuadrado describe his work-related delusions, and he observed that that account gelled with comments Mr. Cuadrado had made to his mother, to coworkers, and in workplace complaints. 4-ER-662. And he noted Mr. Cuadrado's continued symptoms in jail and improvement with medication. 4-ER-670-671. He, too, diagnosed Mr. Cuadrado with schizophrenia. 4-ER-671.

Dr. Victoroff did not think methamphetamine could explain these facts. 4-ER-676. Dr. Victoroff noted that methamphetamine's effects last only while the person is acutely intoxicated. 4-ER-632. And meth has a half-life of no more than 15 hours, meaning that Mr. Cuadrado's usage two days before the altercation could not have impacted his behavior that day. 4-ER-677-678. Dr. Victoroff agreed that "really, really heavy user[s]" could have meth-induced brain damage. 4-ER-632. But heavy usage leaves other visible marks, like abnormal weight loss, age-inappropriate wrinkles, and "meth mouth" (rotting teeth). 4-ER-676. Mr. Cuadrado did not have any of those markers. 4-ER-676.

13

Finally, meth use could not explain why Mr. Cuadrado had experienced symptoms starting from age 12, when he likely wasn't using meth, and continuing through incarceration, when he also likely wasn't using. Schizophrenia could. 4-ER-678-679.

Though Mr. Cuadrado had no prior diagnosis, Dr. Victoroff did not think that was unusual. As he explained, schizophrenia varies in severity. 4-ER-668. Even a doctor could "[p]ractically never" tell that someone had schizophrenia just by "see[ing] [them] in action." 4-ER-674-675. And many people with schizophrenia act normally enough to get by. About half can hold down jobs, for example. 4-ER-669.

Because some people with schizophrenia can function without psychiatric care—and because of stigma, cultural resistance to psychiatric care, and financial barriers—many are never diagnosed. 4-ER-668-670. True, about 90% of schizophrenia sufferers who *do* seek care are diagnosed before age 30. 4-ER-707. But scientists get very different numbers when they administer psychiatric exams to random sample populations, including those who would never seek care on their own. About half of people diagnosed with schizophrenia in these random-sample studies had never received a previous diagnosis. 4-ER-707. These studies have led scientists to conclude that about 50% of schizophrenia sufferers live their whole lives without ever being diagnosed. 4-ER-707. In Dr. Victoroff's view, Mr. Cuadrado fit this

14

profile—never having seen a psychiatrist, functioning at a basic level, and therefore remaining undiagnosed for decades. 4-ER-668-670.

Finally, Dr. Victoroff was not surprised that Mr. Cuadrado's delusions reacted explosively with the supervisors' actions. Occurrences that seem to confirm delusions can amplify schizophrenia symptoms, 4-ER-682—hence why paranoid psychosis is the mental condition most likely to cause violence, 4-ER-691-692. And here, Mr. Rodriguez unknowingly played into Mr. Cuadrado's delusions. 4-ER-682-686. He showed up, after his shift was supposed to have ended, where Mr. Cuadrado happened to be. He followed Mr. Cuadrado around the store, to the parking lot, and back to the distribution center. And he converged with two other supervisors on Mr. Cuadrado's truck—not the norm for innocuous disciplinary actions. If you had Mr. Cuadrado's delusions, those behaviors "would confirm your false perception that your boss or your supervisors . . . are in fact following you." 4-ER-684.

Furthermore, Mr. Cuadrado had long linked surveillance with threats of harm. Since childhood, he had "express[ed] fear of being harmed by whoever it was that he imagined was monitoring him." 4-ER-665. And he delusionally believed that supervisors had in fact assaulted him previously. 4-ER-686. Mr. Cuadrado expressed those same fears of physical harm when supervisors surrounded him on August 25. 4-ER-686-687. Dr. Victoroff thus concluded that Mr. Cuadrado likely believed he was defending himself. 4-ER-687-688.

15

In addition to calling Dr. Victoroff, the defense subpoenaed Dr. Griswold. She confirmed her diagnosis. 4-ER-729-731.

## II. Government expert Dr. Badre was fired from U.C. San Diego after falsely testifying that he was Director of Forensic Training.

To rebut these diagnoses, the government hired Dr. Nicholas Badre. Dr. Badre had a very different opinion: He thought that Mr. Cuadrado did not have schizophrenia, but just used methamphetamine. 4-ER-793. And he arrived at this conclusion based largely on his belief that Mr. Cuadrado was not credible.

### A. Dr. Badre claimed to be a forensic specialist skilled at assessing credibility, but the court excluded many of his opinions on reliability grounds.

Dr. Badre claimed to be a specialist in evaluating credibility. As he explained at trial, he practiced "forensic medicine," not "clinical medicine": "My goal is not to help the patient," he said, but "to provide the most accurate answer for the court." 4 -ER-778. Unlike a regular doctor, then, he did not assume that patients were telling the truth. Rather than "take the individual's word for it," he asked whether "there are things in the record that are sort of inconsistent." 4-ER-787.

Despite adopting the forensic psychiatrist label, however, Dr. Badre had few peer-recognized credentials in the field. He had not completed a forensic psychiatry fellowship. 5-ER-878. He was not board certified in forensic psychiatry. 4-ER-779; *see also* 2-ER-126. And he

16

had not published peer-reviewed forensic articles. 5-ER-887-889; *see also* 2-ER-157. Instead, he gained forensic psychiatry experience by doing evaluations for court cases, 4-ER-777-778, just as Dr. Victoroff had, 4-ER-633-634.

But there was one forensic credential that Dr. Badre claimed to have received from his peers. According to the resume submitted to the defense, UCSD had named Dr. Badre "Director of forensic training & Assistant Clinical Professor." 4-ER-156.

As part of his forensic expertise, Dr. Badre claimed that he could intuit whether someone was lying. He explained at trial that when it comes to "determin[ing] . . . someone's credibility," "the most important thing is clinical experience"—instincts honed from seeing "thousands of individuals with schizophrenia" and "thousands of people who are intoxicated on methamphetamine." 4-ER-787-788, That experience, he said, was even more reliable than the Diagnostic and Statistical Manual of Mental Disorders ("DSM"): "It's actually not the gold standard," he said. "[A] lot of us who have more experienced work on forensic settings have other ways to be able to assess disorder." 4-ER-803.

Even before trial, however, defense in-limine motions had already identified serious problems with how Dr. Badre deployed his supposed "innate" "lie-detecting . . . sense." 2-ER-205 (defense characterization). For one thing, Dr. Badre claimed to be able to do what, in Dr. Victoroff's

17

view, amounted to the impossible: He purported to diagnose Mr. Cuadrado's mental state based on video clips.

No video clearly showed the alleged assault. But USPS footage depicted Mr. Cuadrado briefly walking or driving before or after the altercation. Exhibits ("Exh") 16A, B, C, F.[3] Security cameras also captured the Shell station run-in, but the video was dark, grainy, and sped up. Exh-15A.



*Shell station.* Exh-15A.



*USPS parking lot example.* Exh-16A.

In Dr. Victoroff's view, it would be "impossible" to "diagnose anything" from these videos. 4-ER-680. Dr. Badre, however, inferred from the videos that Mr. Cuadrado was not experiencing schizophrenia symptoms and did not fear his supervisors. 6-ER-1012-1013.

Other security footage supposedly bolstered Dr. Badre's belief that Mr. Cuadrado used meth on August 25. Immediately after the altercation, Mr. Cuadrado went to his rented storage unit. 3-ER-429-

---

[3] Exhibit cites refer to the video exhibits transmitted with Mr. Cuadrado's Motion for Leave to Lodge Physical Exhibits.



*Storage facility.* Exh-17B.

430. He appears in the storage facility's security footage, smoking a pipe. 2-ER-234. Dr. Badre claimed that he could tell Mr. Cuadrado was smoking meth, not—for example—tobacco or marijuana. 6-ER-1015.

In addition to interpreting video, Dr. Badre read investigative reports about both the post office altercation and other events in Mr. Cuadrado's life. 6-ER-1011-1012. Whenever a report contained a witness statement contradicting something Mr. Cuadrado said, Dr. Badre would assume that Mr. Cuadrado was lying. For instance, Dr. Badre said that Mr. Cuadrado had lied about a 2008 arrest, a 2014 drug test detecting marijuana, and 2020 family conflicts—all without interviewing anyone with first-hand knowledge. 6-ER-1033.

When it came to third-hand witness accounts of the assault itself, Dr. Badre even used omissions to discount Mr. Cuadrado's credibility. After reviewing each supervisor's statements, he said he did "not note evidence" that Mr. Cuadrado was experiencing paranoid delusions. 6-ER-1013-1015. He did not talk to the supervisors, let alone ask targeted questions about whether Mr. Cuadrado was displaying symptoms.

On top of these credibility findings, Dr. Badre claimed to see signs of longstanding meth use. He identified episodes of "anger and impulsivity" dating back to 2008, over a decade before the altercation. 6-ER-1035. He assumed that these episodes took place because Mr. Cuadrado was high, even when there was no evidence that he was using meth around that time. 6-ER-1035.

Given these and other deficiencies, the defense argued that "Dr. Badre's conclusions do not appear to be 'the product of reliable principles and methods,' nor does it appear that he has reliably applied the principles and methods to the facts of the case." 2-ER-261 (quoting Fed. R. Evid. 702). The defense also noted that express reliability findings must be made before a court can admit expert testimony. 2-ER-261-262. The defense asked for a *Daubert* hearing to evaluate the opinions' reliability. 2-ER-262.[4]

At the in-limine hearing, the court agreed with many defense critiques. First, the court ruled that while Dr. Badre could point out inconsistencies, he could not comment on Mr. Cuadrado's credibility. "That's not a proper opinion coming from another witness, the credibility of a different witness or the defendant in this case. That's an ultimate issue for the jury." 4-ER-206; *see also* 4-ER-176 (Defense: "I

---

[4] Separately, the defense moved in limine to present a diminished capacity defense. Doc. 38 at 16. The defense acknowledged that circuit precedent foreclosed that request, as this Court has deemed 18 U.S.C. § 111 a general intent crime. *Id.*

believe you also ruled for him not to comment on Mr. Cuadrado's credibility." Court: "Right. That's right.").

Second, the court ordered Dr. Badre not to opine that Mr. Cuadrado was smoking meth at the storage facility. That opinion was "tenuous" and "way out there," as there was no "evidence that reliably demonstrates" that he was smoking meth. 2-ER-234-236.

Third, the court barred Dr. Badre from making credibility determinations based on third-hand reports. To the court, multiple layers of hearsay "heighten[] the level of [] unreliability." 2-ER-202. "[T]here has to be some modicum of reliability, and that would come from a first-person account." 2-ER-202.

Fourth, he prohibited Dr. Badre from opining that Mr. Cuadrado was high in the past without evidence of meth use. "I don't find that there's a reliable basis for him to conclude, in the absence of evidence that the defendant was using methamphetamine at the time [of] whatever prior incident you're talking about, had anything to do with methamphetamine aggression." 2-ER-221.

The defense reiterated that all of these findings raised "concern about the reliability of the information that Dr. Badre used to reach his conclusions." 2-ER-209. After all, even if these unreliable inferences were never conveyed to the jury, they still formed the basis for Dr. Badre's ultimate conclusions. But the court declined to hold a

*Daubert* hearing and did not make any reliability findings about

Dr. Badre's opinions. 2-ER-208-210.

**B.** **Dr. Badre repeatedly violated the court's exclusion orders, including by opining that Mr. Cuadrado was not credible and that he smoked meth immediately after the altercation.**

At trial, Dr. Badre opened his testimony by emphasizing his forensic skills, especially his directorship at UCSD. "At UCSD, I am a Director of Forensic Training," he said. 4-ER-775-776. That entailed serving as "a professor at UCSD," "teach[ing] the physicians who are going to become psychiatrists how to do forensic psychiatry." 4-ER-776. "I teach a whole course," he continued, before repeating, "I'm the Director of Forensic Training." 4-ER-776. He would return to this theme on cross. He admitted that he lacked other recognized forensic credentials, but immediately reminded the jury, "I'm the Director of Forensic Training at UCSD." 4-ER-878.

After hearing Dr. Badre's credentials, the court found that he "has the background, experience, and training that will allow him to opine on the subject matter at issue in this case." 4-ER-770. The court did not make a finding about whether Dr. Badre's opinions were reliable.

Dr. Badre then testified to his three main conclusions. First, he did not trust Mr. Cuadrado's description of his schizophrenia symptoms. According to Dr. Badre, Mr. Cuadrado said during their interview that he was having auditory hallucinations. 4-ER-778. But Dr. Badre could

22

tell by looking at him that that was not true. 4-ER-788-789; *but see* 4-ER-674 (Dr. Victoroff opining that doctors can "[p]ractically never" discern visually whether someone is having schizophrenia symptoms). He therefore administered the M-FAST test, which was designed to detect malingering. 4-ER-789. The results convinced him that, though not malingering, Mr. Cuadrado was still "exaggerating" his symptoms. 4-ER-790; *but see* 5-ER-890-895 (defense counsel confronting Dr. Badre with studies showing false positives on the M-FAST for schizophrenia patients). Finally, he thought that if Mr. Cuadrado really had schizophrenia, he would have been diagnosed earlier and would not have gotten a job. 4-ER-813.

Second, Dr. Badre thought Mr. Cuadrado lied about his meth use. With others, Mr. Cuadrado had openly discussed using meth. *See supra*, Section I.C. But Dr. Badre claimed that during their interview, Mr. Cuadrado said he used meth only three times in his life—a sign that he minimized his usage. 4-ER-803. Dr. Badre also said that the stabbing itself suggested meth use, as meth causes violence while schizophrenia does not. 4-ER-800, 814; *but see* 4-ER-693 (Dr. Victoroff noting that the association between schizophrenia and violence is "just a medical fact"). And he brushed off Dr. Victoroff's claim that meth has a 15-hour half-life, because Dr. Badre believed he had witnessed arrestees in detox cells acting high two to three weeks later. 4-ER-801; *but see* 4-ER-741 (Mr. Cuadrado experienced no detox symptoms) Thus,

in Dr. Badre's view, Mr. Cuadrado likely committed the assault because he was either acutely intoxicated or suffering the effects of past usage. 4-ER-795, 809.

Third, Dr. Badre thought that Mr. Cuadrado appreciated the wrongfulness of his actions. Dr. Badre stressed that Mr. Cuadrado threw away the box cutter and did not call the police to report the supervisors' attack. 4-ER-824. And he noted that, in any case, being followed and bugged isn't a good reason to stab someone. 4-ER-822; *but see* 4-ER-686-688 (Dr. Victoroff observing that Mr. Cuadrado associated surveillance with threats of physical harm).

In large part, however, Dr. Badre relied on his review of videos and witness statements. Asked, "Did you find that the defendant possessed a delusion that people were out to kill him?" Dr. Badre immediately responded by asking to "speak to the videos." 4-ER-823. "At the Shell Gas Station," he opined, "I don't see him scared. I see him going toward an individual." 4-ER-823. The defense objected but was overruled. "At the storage facility," Dr. Badre continued, "I don't see him being scared." 4-ER-824. And though Dr. Badre did not have video of the altercation, he found that Mr. Cuadrado likely didn't fear for his life then, either, because Dr. Badre "did not see a witness saying that." 4-ER-823. (He did not explain how a supervisor could have "witness[ed]" Mr. Cuadrado's delusions.)

24

Throughout, Dr. Badre bolstered his conclusions by referring back to his forensic psychiatrist bona fides. *See*, *e.g.*, 4-ER-788 ("A big difference between forensic care and clinical care is that I don't just write down, 'You're hearing voices.'"); 4-ER-797 ("As a forensic evaluator, I have videos of him in his truck . . . [with] no earplugs."); 4-ER-918 ("I think [Dr. Griswold] did what clinicians do. Contrary to a forensic evaluator, you don't spend as much time checking to see if what the individual's reporting to you is consistent with the record[.]").

During his testimony, Dr. Badre repeatedly violated the court's pretrial orders excluding his unreliable or inappropriate opinions. He testified several times that Mr. Cuadrado was not credible. 4-ER-803, 805, 813, 852, 907-908. He described the storage facility video—which the jury never saw—and opined that Mr. Cuadrado was likely smoking meth. 4-ER-806-807. And while he did not testify directly to the third-hand witness accounts, he made sure the jury knew that he had other, undisclosed reasons to doubt Mr. Cuadrado's credibility. *E.g.*, 4-ER-853-854 ("I made a long list of things he said that I did not think were credible. I spoke about some of them today.") Finally, he told the jury that he had identified "many times in [Mr. Cuadrado's] past where [he] s[aw] aggressivity or violence" associated with meth use. 4-ER-818. Though the defense objected to many of these violations, 4-ER-790, 806-807, 813, 818, only one—to the past instances of aggression—was sustained, 4-ER-818.

25

Finally, during the proceedings, Dr. Badre behaved strangely for an expert witness. Even before trial, he had attended pretrial court hearings in which he had no involvement. 4-ER-832. At trial, he admitted to helping write Dr. Victoroff's cross-examination. 4-ER-825. He proved so evasive and combative on cross that the court itself took note. 4-ER-860; 2-ER-52. And even the prosecutors felt moved to twice acknowledge that Dr. Badre was "passionate" about the case. 4-ER-824 ("I know you're very passionate about this case[.]"); 5-ER-947 ("Dr. Badre takes this very seriously. You saw how passionate he is.").

## C. The prosecutor's closing stressed Dr. Badre's status as Director of Forensic Training and his expertise in evaluating credibility.

Dr. Badre's testimony spilled over into a second day. Overnight, the Vice Chair of Education and Training at UCSD happened to hear about Dr. Badre's testimony. He knew that many of Dr. Badre's claims about his UCSD position were untrue. 2-ER-170.

Dr. Badre was not a UCSD professor, or even an adjunct. He had just volunteered to give lectures. Accordingly, as Dr. Badre's appointment letter made clear, the only title he was allowed to use was Voluntary Assistant Clinical Professor. 4-ER-126-127, 170. Nor did Dr. Badre teach a course. UCSD does not have forensic training courses. 4-ER-126. Most importantly, Dr. Badre was not the Director of Forensic

26

Training. UCSD has no such position, because it has no forensic training program in the first place. 4-ER-126-127.

Eight minutes before defense counsel resumed cross-examination, 2-ER-135, the Vice Chair emailed her to confirm that Dr. Badre was not Director of Forensic Training. 2-ER-170-171. He said he had "verified" as much "with our Director of Residency Training, Division Chief of Psychiatry, Vice Chair of Administration, and Department Chair." 2-ER-170. And he noted that "[i]f Dr. Badre is misrepresenting his status or affiliation within our department, we will terminate his affiliation immediately. This matter has been referred to our Legal Counsel and Department Chair for follow up." 2-ER-170. He also attached Dr. Badre's voluntary appointment letter. 2-ER-168.

With the last-minute email in hand, defense counsel tried to cross-examine Dr. Badre about his misrepresentations. Dr. Badre and the prosecutors each had a screen for viewing exhibits, and defense counsel projected the Vice Chair's email onto both of them. 2-ER-135-136. On cross, Dr. Badre admitted that he was a volunteer, meaning that he was unsalaried and that he worked less than part time. 4-ER-879. But he doubled down on being the Director of Forensic Training. He testified that "the program director of the psychiatry residency" had given him that title. 4-ER-882. But when defense counsel tried to cross-examine him with the Vice Chair's email—including the Director of Residency

Training's agreement that Dr. Badre held no such title—the government successfully objected to hearsay. 4-ER-882-886.

**D.    Prosecutors learned that the Director of Forensic Training position did not exist, but they failed to inform the jury.**

The parties closed immediately after Dr. Badre's testimony. The government's closing emphasized Dr. Badre's status as a forensic psychiatrist, and specifically, as Director of Forensic Training.

"Dr. Badre is the only person who offered a forensic opinion in this case," the government declared. "He is the Director of Forensic Training at UCSD[.]" 5-ER-947. A PowerPoint slide reading "Director of Forensic Training" flashed on the courtroom screens—the only credential highlighted on the slide. 2-ER-136. Per the prosecutor, that's what made Dr. Badre's opinions more reliable than Dr. Victoroff's and Dr. Griswold's. "Forensic psychiatry is different than clinical psychiatry," he said. "You cannot rely solely on what someone tells you[.]" 5-ER-948. Instead, Dr. Badre had subjected Mr. Cuadrado's claims to "scrutiny," including by checking his account against "witness reports, videos, [and] the defendant's employment file." 4-ER-948. And based on Dr. Badre's extensive "experience," he knew that Mr. Cuadrado's "behavior is consistent with meth – with substance abuse disorder[.]" 5-ER-949.

After closings, defense counsel emailed the prosecutors about Dr. Badre's misrepresentations. 2-ER-147. She reminded them of their obligation under *Napue v. Illinois*, 360 U.S. 264 (1959), to affirmatively correct false testimony. 2-ER-147. She also attached the Vice Chair's email and provided his phone number. 2-ER-147. The prosecutor denied that Dr. Badre had done anything wrong and said that the defense had corrected any problem on cross. 2-ER-115. But she invited the defense to raise the issue with the court. 2-ER-115. Defense counsel did so by emailing the courtroom deputy. 2-ER-172. Over an hour later, the courtroom deputy responded that the court did not want to disturb the jury but that the defense could file a motion. 2-ER-172.

Meanwhile, the prosecutors received two emails claiming that Dr. Badre really was the Director of Forensic Training. One of these supporters asserted that "Dr. Badre replaced me as director in 2020." 2-ER-117. The other said that Dr. Badre could "absolutely" call himself Director of Forensic Training. 2-ER-119. Neither supporter claimed to hold any current position at UCSD. 2-ER-117-119.

Eventually, the prosecutor called the Vice Chair directly. 4-ER-127. After hearing him out, the prosecutor "informed [him] that she would correct the misrepresentation made during Dr. Badre's testimony." 4-ER-127 (Vice Chair's declaration). But instead of contacting the court, the prosecutor called defense counsel. She said that if the defense drafted a stipulation, she would consider joining. 4-

ER-137. But twenty minutes later—over three hours after the defense first raised *Napue* with the government—the jury returned a guilty verdict. 2-ER-137.

Three days after that, UCSD terminated Dr. Badre from his volunteer position. 2-ER-127.

## III. The court denied a new trial motion, but opined that Dr. Badre's "bias was . . . manifest" and that Mr. Cuadrado had schizophrenia.

The defense filed a new trial motion based on *Napue*. 2-ER-128. The court denied it.

First off, the court did not think that Dr. Badre's testimony was false. By that point, even the government had conceded that "there is no one at UCSD with the title of Director of Forensic Training." 2-ER-65. And the court agreed that there was "no such official title." 2-ER-71. But the court thought the emails from Dr. Badre's supporters showed that the title was used informally. 2-ER-71.

Secondly, the court thought that the jury probably reached their verdict based on the videos and supervisor testimony, "not what some doctor is saying." 2-ER-74. To the court's mind, Dr. Badre was not "the best witness." 2-ER-52. He was "adversarial" and "overly eager," and he couldn't "leave the lawyering to the lawyers." 2-ER-52. In short, his "bias was sort of manifest." 2-ER-52. But the court admitted that it was "more skeptical than I think most people that forensic psychiatry

30

carries the day[.]" 2-ER-73. Others might "say, oh, judge, you are just jaded about psychiatric testimony. Maybe I am a little bit[.]" 2-ER-77.

Despite this self-professed skepticism, there was one psychiatric conclusion the court could not discount: "I don't think there is any question that [Mr. Cuadrado] was schizophrenic." 2-ER-74. The court thought that "sometimes mental disorders are made up." 2-ER-89. But in Mr. Cuadrado's case, "there is plenty of evidence that predates this incident" pointing to schizophrenia. 2-ER-89. So, for the court, "[t]here is no question in my mind—and I don't even think the government contests—that he was, and is, suffering from schizophrenia." 2-ER-89. Based in part on schizophrenia's likely role in the assault, the court varied downward to impose a 60-month sentence. 2-ER-96.

This appeal follows.

## SUMMARY OF ARGUMENT

Four errors, individually or cumulatively, require reversal.

First, under *Napue*, Dr. Badre's false claim to be the Director of Forensic Training merits a new trial. Dr. Badre's testimony about the directorship was extremely "misleading," if not outright "false." *Panah v. Chappell*, 935 F.3d 657, 664 (9th Cir. 2019). The prosecutors knew or should have known that from the Vice Chair, who confirmed the falsehood with four other administrators and referred Dr. Badre for potential termination. And *Napue*'s materiality test is "considerably

less demanding than other materiality standards," asking if there is "*any*" reasonable likelihood that the falsehood "*could have*" affected the verdict. *Clements v. Madden*, 112 F.4th 792, 802 (9th Cir. 2024) (emphasis original). The falsehood here undermined both the substantive authority and the credibility of Dr. Badre's testimony, easily clearing that low bar.

Second, Dr. Badre repeatedly and explicitly testified that Mr. Cuadrado was not credible. He even gestured toward excluded evidence by telling the jury that he made a "long list" of undisclosed reasons to doubt Mr. Cuadrado. 4-ER-790, 853-854. That directly violated this Court's rule that "[a]n expert witness is not permitted to testify specifically to a witness' credibility." *United States v. Candoli*, 870 F.2d 496, 506 (9th Cir. 1989).

Third, Dr. Badre testified that Mr. Cuadrado was caught on tape smoking methamphetamine immediately after the altercation. Before and after that testimony, the court found that that opinion was not "reliabl[e]" or "credible." 2-ER-234-236; 4-ER-858. But to the jury, the court said that it was "in evidence" as "a basis for [Dr. Badre's] opinion." 4-ER-806-807. This violated Rule 702, which requires judges to exclude unreliable expert opinions. Fed. R. Evid. 702(c)-(d). And it was extremely prejudicial, because it suggested that Mr. Cuadrado lied about his drug use and could have been high during the assault.

Fourth, the court did not make any reliability findings about Dr. Badre's testimony, meaning that it "necessarily abuse[d] its discretion." *United States v. Valencia-Lopez*, 971 F.3d 891, 900–01 (9th Cir. 2020). And the government cannot meet its burden to show that Dr. Badre's opinions were reliable under Rule 702.

Mr. Cuadrado also preserves the claim that 18 U.S.C. § 111 is a specific intent crime, to which he could have raised a diminished capacity defense.

## ARGUMENT

The district court made four major errors relating to Dr. Badre's testimony. Alone or cumulatively, these errors warrant reversal.

## I. Dr. Badre's false or misleading trial testimony warrants a new trial.

First, the district court failed to order a new trial after Dr. Badre misrepresented his credentials. That was error under *Napue*.

### A. The standard of review is de novo.

Courts "review de novo the district court's denial of a new trial based on an asserted *Mooney–Napue* violation." *United States v. Rodriguez*, 766 F.3d 970, 980 (9th Cir. 2014); *accord United States v. Inzunza*, 638 F.3d 1006, 1020 (9th Cir. 2011).

**B. Dr. Badre's testimony was outright false, and even on the government's "informal title" theory, it would still be extremely misleading.**

"In *Napue*, the Supreme Court held that 'a conviction obtained through use of false evidence, known to be such by representatives of the State, must fall under the Fourteenth Amendment.'" *Panah*, 935 F.3d at 664 (quoting *Napue*, 360 U.S. at 269). A successful *Napue* claim has three elements. *Id*.

"First, the testimony or evidence in question must have been false or misleading." *Id*. Testimony can be false or misleading even if it is not "knowingly false or perjured." *Phillips v. Ornoski*, 673 F.3d 1168, 1184 (9th Cir. 2012); *accord Hayes v. Brown*, 399 F.3d 972, 981 (9th Cir. 2005) (en banc).

Here, Dr. Badre's claim to be Director of Forensic Training was outright "false." *Panah*, 935 F.3d at 664. Five administrators—the Vice Chair of Education and Training, the Division Chief of Psychiatry, the Vice Chair of Administration, the Department Chair, and the Director of Residency Training—agreed that the position did not exist. 2-ER-170. After Dr. Badre's directorship claim came to light, he was immediately referred to legal for potential termination. 2-ER-170. And he was terminated three days later. 2-ER-127. Thus, as the prosecutor ultimately conceded, "There is no dispute that there is no one at UCSD with the title of Director of Forensic Training." 2-ER-65.

34

When confronted on cross, Dr. Badre gave more false testimony. Doubling down on the directorship title, he claimed that he received it from "the program director of the psychiatry residency." 4-ER-882. But the Vice Chair had confirmed with the Director of Residency Training that Dr. Badre held no directorship. 2-ER-170. And later on, one of Dr. Badre's supporters implied that *he* had passed on the title 2-ER-117. That supporter had never been the director of the psychiatry residency. 2-ER-63, 66.

Despite all this, the court reasoned that Dr. Badre's testimony was not false because he held the position in some unofficial way. 2-ER-71. Even if that were the case (and there is scant evidence that it is), Dr. Badre's testimony would still be extraordinarily "misleading." *Panah*, 935 F.3d at 664. Testimony is misleading if, "taken as a whole," it "g[ives] the jury [a] false impression." *Id*. at 664 (simplified).

Here, Dr. Badre gave the jury the impression that he held an official directorship at UCSD. They were never told that the university had not authorized the title. They were never told that, in the administration's view, claiming the title was a breach so serious that UCSD immediately launched a termination investigation. Instead, both Dr. Badre and the government told the jury that he was "the Director of Forensic Training at UCSD," full stop. *E.g.*, 4-ER-775-776; 5-ER-947. And to bolster that testimony, Dr. Badre testified—falsely—that

35

someone with formal authority (the program director of the psychiatry residency) gave him the directorship. 4-ER-882.

Thus, the testimony was false or, at a minimum, extremely misleading.

### C. The government knew or should have known that the testimony was false or misleading.

"Second, the State must have known or should have known that [the testimony] was false or misleading." *Panah*, 935 F.3d at 664. Importantly, the "onus" is not "on defense counsel to expose false or misleading testimony." *Soto v. Ryan*, 760 F.3d 947, 969 n.11 (9th Cir. 2014). Instead, *Napue* imposes an "affirmative duty on the part of the prosecution to correct false testimony at trial." *Hayes*, 399 F.3d at 981.

Here, the prosecutors knew or should have known that the testimony was false as soon as they saw the Vice Chair's email, which was projected on their courtroom screens during Dr. Badre's cross-examination. 2-ER-135-136. Upon seeing that five administrators thought Dr. Badre's testimony was false and he had been referred for possible termination, 2-ER-170, no conscientious prosecutor would think that the testimony was in fact true. At that moment, *Napue* obligations triggered.

If any doubt remained (and none should have), the prosecutor had a "duty to investigate." *Morris v. Ylst*, 447 F.3d 735, 744 (9th Cir. 2006). "A prosecutor cannot avoid [their *Napue*] obligation by refusing to

36

search for the truth and remaining willfully ignorant of the facts." *Id*. And here, immediately after closing—over three hours before the jury returned their verdict—prosecutors had the Vice Chair's email in hand. 2-ER-115-116, 137. They soon received his phone number. 2-ER-115. And during a subsequent call with the Vice Chair, the prosecutor said she "would correct the misrepresentation made during Dr. Badre's testimony." 2-ER-127. At that point, any conceivable doubt should have been resolved.

Finally, no conscientious prosecutor would have disregarded five top-tier faculty members' forceful repudiation of Dr. Badre's claims, just because two random people supported him. Neither of Dr. Badre's supporters claimed to have any current UCSD affiliation, let alone any power to confer titles. One identified himself only as "Dr. Lehman." 2-ER-119. The other said only that he was the former Director of Forensic Training, 2-ER-117, a title that—per five university administrators—did not exist, 2-ER-170. Despite relying on these supporters' representations, the prosecutors performed no "investigat[ion]" to validate their claims but remained "willfully ignorant" of who these people were. *Morris*, 447 F.3d at 744. Even by the new trial hearing weeks later, the prosecutors could not answer basic questions about what positions, if any, these supporters ever occupied. 2-ER-65-66. No conscientious prosecutor would have disregarded overwhelming

37

evidence of false testimony based on these emails, particularly without doing due diligence.

After all this, the prosecutors really should have known that the testimony was "false." *Panah*, 935 F.3d at 664. But without question, they should have known it was "misleading." *Id*. They therefore had a duty to correct Dr. Badre's testimony.

### D.    The *Napue* violation was material.

Finally, the violation was material. Importantly, "the standard for materiality under *Napue* is considerably less demanding than other materiality standards on constitutional claims arising from criminal cases." *Clements*, 112 F.4th at 802 (simplified). "In *Brady* cases, for example, [courts] ask if there is a reasonable probability that," absent the violation, "the result of the proceeding *would have* been different." *Id*. (emphasis original) (simplified). Even that burden falls below a preponderance. *Kyles v. Whitley*, 514 U.S. 419, 434 (1995). But *Napue*'s bar is lower still: Reversal is required if there is "*any* reasonable likelihood that the false testimony *could have* affected the judgment of the jury." *Clements*, 112 F.4th at 802 (simplified).

Here, Dr. Badre's misrepresentation was material both to the merits and to credibility. First, on the merits, the falsehood played in to the prosecution's main strategy: to paint Dr. Badre "the only person who offered a forensic opinion." 5-ER-947. That was their argument for

38

trusting Dr. Badre over Drs. Victoroff and Griswold. 5-ER-947. But deploying that strategy was no simple task. Dr. Victoroff testified that he, too, rendered a forensic opinion. 4-ER-709-710. And for the most part, Dr. Badre did not have any peer-recognized credentials to elevate him above Dr. Victoroff. He completed no forensic psychiatry residency or board certification. 5-ER-779, 878; *see also* 2-ER-126. And he wrote no peer-reviewed articles in the field. 5-ER-887-889; *see also* 2-ER-157. He gained forensic experience by performing assessments for the courts, 4-ER-777-778—exactly what Dr. Victoroff did, 4-ER-633-634.

The big difference between them was Dr. Badre's supposed position as the Director of Forensic Training. This was the first credential Dr. Badre reviewed in detail on direct. 4-ER-775-776. When the defense brought up his failure to complete a forensic fellowship, he countered by citing his directorship. 4-ER-878. And the directorship was the only credential the government highlighted during closing, including by displaying it on a PowerPoint slide. 5-ER-947; 2-ER-136. This emphasis made sense. The Director position was the only forensic credential bestowed by Dr. Badre's professional peers—not just himself or a court.

In truth, however, no one at the academy had bestowed that credential. The school had just let him voluntarily give some lectures. 2-ER-126-127. If the jury had known that, they may well have declined to trust Dr. Badre over two other, equally credentialed doctors.

39

Second, Dr. Badre's misrepresentations bore on credibility. False testimony can require reversal even if it "goes only to the credibility of the witness," *Napue*, 360 U.S. at 269, as it did "[i]n *Napue* itself." *Dickey v. Davis*, 69 F.4th 624, 642 (9th Cir. 2023).

For Dr. Badre, credibility was key. To believe much of his testimony, the jury had to buy into his "innate" "lie-detecting . . . sense." 2-ER-205 (defense characterization). Dr. Badre told the jury that his "clinical experience" as a forensic practitioner gave him special intuition. 4-ER-787-788. He could tell whether Mr. Cuadrado was experiencing symptoms, just by watching a video of him crossing the parking lot. 4-ER-817. He knew whether Mr. Cuadrado faked symptoms during their interview, just by looking at him. 4-ER-788-789. He had made a "long list" of other reasons to doubt Mr. Cuadrado, which the jury had not heard, 4-ER-853-854, and had watched Mr. Cuadrado smoke meth on a video, which the jury had not seen. 4-ER-806-807. The jury could not independently verify any of these claims. Dr. Badre's entire pitch was that forensic psychiatrists can see what laypeople—and even other doctors—cannot. 4-ER-787-788; 4-ER-918. So, the jury just had to decide whether or not to trust him.

Exposing Dr. Badre's falsehoods would have undermined these claims' credibility, irrespective of whether Dr. Badre was consciously lying. Importantly, credibility is not just about perjury. It encompasses things like memory, bias, reasonableness, and "any other factors that

40

bear on believability." 5-ER-996 (jury instruction). That can include exaggerating. That was Dr. Badre's point about Mr. Cuadrado: He thought Mr. Cuadrado was unreliable, not because he lied about symptoms, but because he supposedly "exaggerat[ed]" them. 4-ER-790. And here, Dr. Badre wanted the jury to believe that his own internal lie-detector was better than Dr. Victoroff's, better than Dr. Griswold's, better than the DSM, better than their own eyes. If the jury knew that Dr. Badre had an overinflated sense of his professional achievement— that he could not be trusted even to reliably report his own professional background—they might have thought twice about believing those grandiose claims.

The court's reasons for concluding otherwise do not clear *Napue*'s high bar for immateriality. First, cross-examination did not cure the error. Even "thorough[] cross-examin[ation]" is an "inadequate substitute for hard evidence" of falsehood, especially when the witness "refuse[s] to admit" the truth. *Sivak v. Hardison*, 658 F.3d 898, 915 (9th Cir. 2011). Here, on cross, Dr. Badre doubled down on being the Director of Forensic Training. 2-ER-882.

And counsel was unable to respond with hard evidence, because the prosecutor objected to hearsay. 2-ER-882-883. In such circumstances, "the government's duty to correct perjury by its witnesses is not discharged merely because . . . the jury may figure out[] that the testimony is false." *United States v. LaPage*, 231 F.3d 488, 492

41

(9th Cir. 2000). Furthermore, "[t]he jury understands defense counsel's duty of advocacy and frequently listens to defense counsel with skepticism." *Id*. Thus, irrespective of "defense counsel's efforts on cross-examination, the government ha[s] an independent obligation immediately to take steps to correct known misstatements of its witnesses." *United States v. Alli*, 344 F.3d 1002, 1007 (9th Cir. 2003). Prosecutors did not do that here.

Second, though Dr. Badre's misrepresentations struck the court as minor, a jury could have found them much more troubling. The court had a "tomato, tomahto" view of the testimony: Sure, he wasn't *technically* a program director, but he still gave those lectures. 2-ER-71-72. But as a fully informed jury would know, UCSD had a totally different opinion. The Vice Chair considered the breach so serious that he immediately referred the matter to legal counsel for possible termination. 2-ER-170. Again, the *Napue* standard asks only whether there is "*any*" reasonable likelihood that this misrepresentation "*could have*" affected the verdict. *Clements*, 112 F.4th at 802. And here, there is at least some chance that a jury would agree with the administration that Dr. Badre committed a serious act of academic dishonesty.

Third, this Court must not assume—as the district court did—that the jury ignored psychiatric testimony and relied on their own impressions of the video evidence. True, the court saw through Dr. Badre's "manifest[ly]" "biased" opinions. 2-ER-52. But the judge

42

himself admitted that he was "jaded" about psychiatry, and thus, "more skeptical than I think most people" about the psychiatric testimony. 2-ER-73, 77. By the judge's own admission, then, "most people" on the jury would not be so dubious. Nor would a typical jury have the sophistication to question experts' overblown claims, the way an experienced trial judge would. To the contrary, jurors are susceptible to the "aura of authority experts often exude, which can lead juries to give" such testimony "more weight." *Mukhtar v. California State Univ.*, 299 F.3d 1053, 1063–64 (9th Cir. 2002), *overruled in other part by United States v. Bacon*, 979 F.3d 766 (9th Cir. 2020).

For all these reasons, there is at least some "reasonable likelihood that the false testimony *could have* affected the judgment of the jury." *Clements*, 112 F.4th at 802. This Court must reverse.

## II. Dr. Badre repeatedly testified that Mr. Cuadrado was not credible, including by gesturing toward a "long list" of facts not in evidence.

A second error requires reversal: Dr. Badre violated this Court's precedent by repeatedly and explicitly opining on Mr. Cuadrado's credibility, including by referencing facts not in evidence.

### A. The standard of review is abuse of discretion.

This Court "review[s] the district court's decision to admit expert testimony for an abuse of discretion." *United States v. Holguin*, 51 F.4th 841, 852 (9th Cir. 2022). "[A]n error of law . . . constitutes an abuse of

43

discretion," *United States v. Lopez*, 913 F.3d 807, 825 (9th Cir. 2019), including when a decision to admit or exclude expert testimony violates circuit precedent, *see id*. at 815–25.

**B.  The district court abused its discretion because circuit precedent squarely prohibits experts from commenting on credibility.**

This Court has long made clear that "[a]n expert witness is not permitted to testify specifically to a witness' credibility." *Candoli*, 870 F.2d at 506; *accord Reed v. Lieurance*, 863 F.3d 1196, 1209 (9th Cir. 2017); *United States v. Komisaruk*, 885 F.2d 490, 494 (9th Cir. 1989); *United States v. Binder*, 769 F.2d 595, 602 (9th Cir. 1985), *overruled in other part by United States v. Morales*, 108 F.3d 1031 (9th Cir. 1997).

For good reason. Under Rule 702(a), "[e]xpert witnesses may testify" only "if their testimony will assist the trier of fact in understanding the evidence or determining a fact in issue." *Binder*, 769 F.2d at 602. But juries do not need help evaluating credibility; judging credibility is their quintessential function. *Candoli*, 870 F.2d at 506. Because such testimony serves only to "invade[] the province of the jury," it must be excluded. *Binder*, 769 F.2d at 602. Thus, it does not matter whether—as the district court found—credibility assessments play a legitimate or recognized role in forensic analysis. 2-ER-46. Even if expert credibility opinions are reliable or scientifically appropriate,

they are still inadmissible because they do not help the jury. Fed. R. Evid. 702(a).

Here, Mr. Cuadrado did not testify live at trial. But both sides admitted hearsay statements from his post-arrest and psychiatric interviews. *E.g.*, 3-ER-380-383; 4-ER-802-803. Those statements' credibility was central to both sides' trial strategy. Mr. Cuadrado's insanity defense turned primarily on his accounts of his drug use and psychiatric symptoms, *e.g.*, 5-ER-973-975, and the government's rebuttal strategy involved questioning those accounts' veracity, 5-ER-948-949. Under Rule 806, such hearsay declarants' "credibility may be attacked" only by "evidence that would be admissible for those purposes if the declarant had testified as a witness." Fed. R. Evid. 806; *see also United States v. Shay*, 57 F.3d 126, 132 (1st Cir. 1995) (noting that this rule applies to party-opponent statements). But even without Rule 806, the logic of *Binder* and *Candoli* would still apply with equal force to the hearsay statements: Because the jury was perfectly capable of judging those statements' credibility without Dr. Badre's help, his opinions were inadmissible under Rule 702(a).

The defense therefore moved in limine to exclude such opinions. 2-ER-260-261. And the court ordered Dr. Badre not to comment on Mr. Cuadrado's credibility. 4-ER-176, 206.

Yet, at trial, Dr. Badre commented on credibility again and again. The first time he commented on credibility, the defense objected, but

45

the objection was overruled. 4-ER-790. So, he kept doing it: "I already had a credibility problem [with Mr. Cuadrado]." 4-ER-803. "[B]e mindful that I did not think [Mr. Cuadrado] was credible." 4-ER-806. "He has a credibility problem when I interviewed him." 4-ER-813. "My concern was his credibility." 5-ER-907. "I did not find [his statements about symptoms] particularly supportive of his position, considering that, when I saw him, he made statements that were not credible." 5-ER-908. He even claimed to have used the M-FAST—a tool designed to detect malingering or exaggerated psychiatric symptoms—to "screen [Mr. Cuadrado] for credibility." 4-ER-852. The defense tried objecting again but was still overruled. 4-ER-813.

This testimony was plainly inadmissible, as it "was not limited to references to psychological literature or experience or to a discussion of a class of [persons] generally." *Binder*, 769 F.2d at 602. "Rather, [Dr. Badre] testified that th[is] particular [person] in this particular case could [not] be believed." *Id*. Thus, "[t]he jury in effect was impermissibly being asked to accept [Dr. Badre's] determination that th[is] particular witness[] w[as] [un]truthful." *Id*.

It gets worse. Dr. Badre told the jury not once, but twice, that he had only revealed some of the many reasons to doubt Mr. Cuadrado. After testifying to his clinical tests and observations on direct, he added, "As far as when [Mr. Cuadrado] exaggerated, I'm telling you now I wrote in my report there were some things that he did that were not

46

credible. Those were some of them." 4-ER-790. The defense objected but was overruled. Later on, Dr. Badre repeated the point: "I made a long list of things he said that I did not think were credible. I spoke about some of them today." 4-ER-853-854.

These comments were especially damaging for two reasons. First, there is a good reason why Dr. Badre did not disclose his "long list" of doubts about Mr. Cuadrado: The court had excluded many of them as unreliable. 2-ER-202. Dr. Badre's not-so-subtle allusions therefore reintroduced unreliable evidence through the back door. Second, having no idea what was on this "long list," the jury could not second-guess Dr. Badre's claim that other facts undermined Mr. Cuadrado's credibility. Instead, the jury was invited to blindly trust Dr. Badre, secure in the knowledge that he knew more than they. *Cf. United States v. Dorsey*, 677 F.3d 944, 954 (9th Cir. 2012) (noting that vouching is especially prejudicial when it "implies that the prosecutor has extra-record knowledge of . . . the witness's truthfulness").

Finally, Dr. Badre exacerbated the problem by linking his credibility assessments to his expertise. Asked how he sussed out "someone's credibility," Dr. Badre replied, "Honestly, the most important thing is the clinical experience. I have seen you know, thousands of individuals with schizophrenia. I've treated thousands of people who are intoxicated on methamphetamine. That's honestly the best." 4-ER-787-788. Expert credibility testimony always "create[s] a

47

serious danger of confusing or misleading the jury, causing it to substitute the expert's credibility assessment for its own common sense determination." *Nichols v. Am. Nat. Ins. Co.*, 154 F.3d 875, 883 (8th Cir. 1998) (simplified). But given Dr. Badre's professed mastery over the subject, jurors without his "thousands" of "clinical experience[s]" were even more likely to defer.

In all these respects, this case is highly analogous to *Nichols*. There, an employer hired a psychiatrist to evaluate a Title VII plaintiff. 154 F.3d at 878. Similar to Dr. Badre, the psychiatrist in *Nichols* "testified that she needed 'to interpret and weigh' what Nichols said or she could 'get a very skewed and inaccurate view of what actually happened.'" *Id*. at 883. Like Dr. Badre, she therefore "sought to answer the very question at the heart of the jury's task—could Nichols be believed?" *Id*. And similar to Dr. Badre, she answered no, telling the jury that "Nichols was a malingerer motivated by financial gain." *Id*. Like Dr. Badre, then, she ended up "comment[ing] on Nichols' reliability in the guise of a medical opinion," putting her "impressively qualified expert's stamp of untruthfulness on Nichols' story" and thereby "straying beyond the scope of proper expert testimony." *Id*. (simplified). Like the Eighth Circuit did, this Court should reverse.

### III. Dr. Badre testified that Mr. Cuadrado was videoed smoking meth immediately after the altercation, even though the court repeatedly deemed that opinion unreliable.

There was a third, major problem with Dr. Badre's trial testimony. He testified that surveillance footage from immediately after the altercation showed Mr. Cuadrado smoking methamphetamine— even though the court deemed that opinion unreliable. Because unreliable opinions are inadmissible under Rule 702(c)-(d), and this opinion was extremely prejudicial, this was reversible error.

### A. The standard of review is abuse of discretion.

This Court "review[s] the district court's decision to admit expert testimony for an abuse of discretion." *Holguin*, 51 F.4th at 852. If the court failed to "identif[y] the correct legal rule to apply to the relief requested," then this Court "must conclude it abused its discretion." *United States v. Hinkson*, 585 F.3d 1247, 1262 (9th Cir. 2009).

### B. The court abused its discretion because Rule 702 requires courts to exclude unreliable expert opinions.

Rule 702 provides that an expert may testify to a particular "opinion" only if the court finds "that it is more likely than not that . . . (c) the testimony is the product of reliable principles and methods; and (d) the expert's opinion reflects a reliable application of the principles and methods to the facts of the case." Fed. R. Evid. 702(c)-(d). As the Supreme Court first established in *Daubert v. Merrell Dow Pharms.,*

49

*Inc.,* 509 U.S. 579, 589 (1993), these prerequisites vest courts with "an unwavering gatekeeping obligation to determine the reliability of [an expert's] testimony" before admitting it. *Valencia-Lopez*, 971 F.3d at 899. Accordingly, when a court does not "appropriately determine[] that the testimony was reliable" before its admission, the court abuses its discretion. *Id.* at 898; *see also infra*, Section IV.B (collecting cases about the need for express reliability findings).

Yet, Dr. Badre was permitted to give an opinion that the court itself deemed unreliable. About 20 minutes after the altercation, Mr. Cuadrado went to his storage unit. 3-ER-430. In security footage from that day, Mr. Cuadrado stands in the corner of the frame and smokes something. Exh-17B. Dr. Badre claimed that he could tell Mr. Cuadrado was smoking methamphetamine. 6-ER-1015.

At the in-limine hearing, the defense pointed out that it was impossible to know that Mr. Cuadardo was smoking meth—the same pipes were sold for smoking marijuana and could be used for other substances. 2-ER-236.

The court agreed. First off, the court doubted Dr. Badre's psychiatric expertise let him draw that conclusion: "What would he say," the court asked, "that 'I've seen other videos of methamphetamine addicts from 30 feet away, and this is how they . . . act[?]'" 2-ER-235. Secondly, the court found the methamphetamine inference unreliable, calling it "tenuous" and "way out there." 2-ER-234-235. "[A]bsent some

50

greater foundation that supports, you know, the reliability of an opinion that this happened to be a controlled substance that he was smoking as opposed to a cigarette or something else, I won't allow him to testify to that," the court said. 2-ER-235. And later: "[I]n the absence of, you know, some kind of evidence that reliably demonstrates that it was a pipe or that what was in it was methamphetamine, I'm not going to permit him to testify that that was methamphetamine ingestion." 2-ER-236. The court therefore ordered the prosecutor to "[t]ell him that's out as a basis for his opinion and is otherwise not admissible." 2-ER-836.

At trial, however, Dr. Badre ignored this admonition and testified about the video anyway. Explaining why he thought meth-induced psychosis better explained Mr. Cuadrado's symptoms, he said, "[W]hen I saw a video of him later on, I thought it was more likely than not-- [objection, overruled] I don't know for a fact that what he was smoking was methamphetamine-- [objection, overruled] But it was a glass pipe that he was smoking in a place where I know that he has used drugs. He told me that he has used methamphetamine. He had told me he doesn't use other drugs. So either he was not being sort of forthright there or he was not being forthright about his use of other drugs." 4-ER-806-807. Dr. Badre then emphasized that the video was taken "very shortly after the incident." 4-ER-807.

In between, the defense strenuously objected, but the court said to "stop interrupting." 2-ER-807. "[T]hese are all things that [Dr. Badre]

51

took into consideration that are now in evidence that are a basis for his opinion." 2-ER-806.

Shortly after, outside the jury's presence, the prosecutors asked to admit the actual video. The court declined, stating, "[T]here's no credible evidence that what he was smoking was a narcotic." 4-ER-858.

Given these findings, the court plainly did not determine that this opinion flowed from a reliable application of reliable psychiatric expertise—or applied psychiatric expertise at all. *See* Fed. R. Evid. 702(c)-(d). Quite the opposite: The court found, both before and after Dr. Badre's testimony, that that opinion was *not* reliable. Worse yet, despite saying outside the jury's presence that it was "out as a basis for [Dr. Badre's] opinion," 2-ER-236, the court said in front of the jury that it was both "a basis for his opinion" and "in evidence." 2-ER-806. The court so ruled because it erroneously thought Dr. Badre could testify to anything he "took into consideration" in forming his opinion. 2-ER-806. But that's not the test—Rule 702 says that only reliable opinions are admissible. The court therefore applied the wrong legal standard, an automatic abuse of discretion. *Hinkson*, 585 F.3d at 1262.

This error was extremely prejudicial. First off, if Mr. Cuadrado really were caught on video smoking meth right after the altercation, this would be hard evidence that Mr. Cuadrado had lied about not using drugs on August 25. 4-ER-676-677. That would bolster the credibility-based centerpiece of Dr. Badre's analysis. *E.g.*, 4-ER-803.

Additionally, it would strongly suggest that Mr. Cuadrado had access to meth and paraphernalia on August 25, indicating that he had the means and opportunity to smoke it beforehand. That matters, because at trial, the government argued that Mr. Cuadrado may have been "acute[ly]" intoxicated during the fight. 5-ER-978; *see also* 4-ER-717-720 (crossing Dr. Victoroff on this theory). And while the parties' experts disputed whether two-day-old use would have affected his behavior, both agreed that any "acute intoxication" would have an impact. 4-ER-717-720. By opining that Mr. Cuadardo likely used meth immediately after the incident, Dr. Badre made it appear much more likely that Mr. Cuadrado was high during the altercation.

Lastly, because the video was (properly) excluded, the jury could not make their own judgment about what the video depicted. They had to accept Dr. Badre's opinion about it—especially after the court said that that opinion was "now in evidence." 2-ER-806.

On a final note, the court seemed to think that there was no harm in letting Dr. Badre describe the video because the testimony was not offered for its truth—it just explained Dr. Badre's opinion. 4-ER-859. But the Supreme Court recently held that evidence admitted to explain an expert opinion is indeed offered for its truth. *Smith v. Arizona*, 602 U.S. 779, 795 (2024).

Thus, this extremely prejudicial error also requires reversal.

**IV.   The district court made no reliability findings about Dr. Badre's remaining opinions, and the error was not harmless because several of those opinions were unreliable.**

Finally, this Court must reverse because the court failed to make reliability findings about Dr. Badre's other opinions. The government cannot meet its burden to show that that error was harmless, because— as the defense pointed out at the in-limine stage—there were many reliability issues with Dr. Badre's opinions.

### A.   The standard of review is abuse of discretion.

This Court "review[s] the district court's decision to admit expert testimony for an abuse of discretion." *Holguin*, 51 F.4th at 852. "[A] district court abdicates its gatekeeping role, and necessarily abuses its discretion, when it makes no reliability findings." *Valencia-Lopez*, 971 F.3d at 898.

### B.   District courts automatically abuse their discretion when they fail to make explicit reliability findings before admitting expert testimony.

As noted above, Rule 702 and *Daubert* require judges to evaluate expert opinions' reliability before admitting them. Rule 702 not only requires that the *witness* be "qualified as an expert" by virtue of their knowledge, experience, or education. The experts' individual *opinions* must also (1) involve "specialized knowledge [that] will help the trier of fact to understand the evidence or to determine a fact in issue," (2) be "based on sufficient facts or data," (3) be "the product of reliable

principles and methods," and (4) "reflect[] a reliable application of the principles and methods to the facts of the case." Fed. R. Evid. 702.

Accordingly, this Court distinguishes between an expert's "general qualifications," on the one hand, and whether they have a "reliable basis for [a particular] opinion," on the other. *Valencia-Lopez*, 971 F.3d at 900–01. Even impeccable "qualifications and experience . . . cannot establish the reliability and thus the admissibility of the expert testimony at issue." *Id.* at 900. Instead, courts must evaluate "*how* [the expert's] expertise lent itself to that conclusion," asking whether "reliable principles and methods underlie the particular conclusions offered." *Id.* (simplified).

Finally, "[t]o satisfy its gatekeeping duty under *Daubert*, the court must make an explicit reliability finding." *United States v. Ruvalcaba-Garcia*, 923 F.3d 1183, 1190 (9th Cir. 2019) (simplified). "[A]n implicit finding of reliability . . . is not sufficient." *Id.* (simplified); *accord Holguin*, 51 F.4th at 851 ("Reliability findings must be made explicit on the record—an implicit finding does not suffice."). A court therefore "necessarily abuses its discretion when it makes no reliability findings." *United States v. Irons*, 31 F.4th 702, 716 (9th Cir. 2022) (simplified).

Here, the court made no express findings about Dr. Badre's opinions' reliability, even though the defense raised reliability issues. The defense's in-limine motions argued that "Dr. Badre's conclusions do not appear to be 'the product of reliable principles and methods,' nor

does it appear that he has reliably applied the principles and methods to the facts of the case." 2-ER-261 (quoting Fed. R. Evid. 702). The defense then quoted circuit precedent requiring explicit reliability findings. 2-ER-261-262. At the in-limine hearing, the defense reiterated the "concern about the reliability of the information that Dr. Badre used to reach his conclusions." 2-ER-209.[5] And both in the motion and at the in-limine hearing, the defense singled out particular areas of concern. *See supra*, Facts Section II.A (reviewing these in detail).

Yet, the court never found that Dr. Badre's opinions were reliable. Instead, it found only that "Dr. Badre has the background, experience, and training that will allow him to opine on the subject matter at issue in this case." 4-ER-770. That was insufficient, because again, "qualifications and experience . . . cannot establish the reliability and thus the admissibility of the expert testimony." *Valencia-Lopez*, 971 F.3d at 900. By making findings solely about Dr. Badre's credentials, while failing to make any findings about his opinions' reliability, the court automatically abused its discretion.

---

[5] The defense also requested a *Daubert* hearing but was denied. 2-ER-208-210. To be clear, this appeal does not challenge the court's decision not to hold a separate hearing. Courts have discretion over whether to hold a *Daubert* hearing or to make reliability assessments based on the available information. *Holguin*, 51 F.4th at 852. Here, then, the court was free to make reliability determinations based on Dr. Badre's report. But the court did not have discretion to omit reliability findings altogether. That's where the abuse of discretion lay.

**C.  The government cannot prove that the error was harmless, because many of Dr. Badre's opinions were unreliable.**

When a court fails to make an explicit reliability finding, "[t]he government bears the burden to show harmlessness," *Ruvalcaba-Garcia*, 923 F.3d at 1190, and this Court "begin[s] with the presumption of prejudice." *Valencia-Lopez*, 971 F.3d at 902. To rebut that presumption, the government must show that "the admitted expert testimony [was] relevant and reliable under *Daubert* based on the record established by the district court," or else that the opinions did not affect the verdict. *Id*. And here, though some of Dr. Badre's opinions were likely appropriate under *Daubert*, many others were not.

As an initial matter, the court agreed with the defense that two components of Dr. Badre's expert analysis (in addition to the meth footage opinion discussed, *supra*) were not reliable. First, Dr. Badre based many of his credibility assessments on third-hand witness statements contained in investigative reports. 6-ER-1033. To the court, that approach lacked the "modicum of reliability" that "would come from a first-person account." 2-ER-202. Second, Dr. Badre assumed that expressions of "anger and impulsivity" Mr. Cuadrado's past—some occurring more than a decade before the post office altercation—probably resulted from meth use. 6-ER-1035. The court "d[idn]'t find that there's a reliable basis for [Dr. Badre] to conclude, in the absence of evidence that the defendant was using methamphetamine at the time

57

[of] whatever prior incident you're talking about, had anything to do with methamphetamine aggression." 2-ER-221.

Yet, the only relief the court granted was to prohibit Dr. Badre from testifying to these particular findings. The court still let Dr. Badre testify to the ultimate conclusions that the findings supported—namely, that Mr. Cuadrado was a liar and a longtime meth user. It was clear that those conclusions flowed, at least in part, from the unreliable findings. Not only did Dr. Badre's expert report say as much. 6-ER-1033, 1035. Dr. Badre also worked to get around the court's exclusion order at trial, either alluding to or directly testifying about the unreliable opinions. *E.g.*, 4-ER-818, 853. Clearly, then, he felt that these opinions were critical to understanding his analysis. Because the record does not rule out the possibility that Dr. Badre's unreliable methods infected his bottom-line conclusions, the government cannot meet its burden on harmlessness.

Additionally, the court let Dr. Badre testify to another dubious set of opinions: Dr. Badre opined about Mr. Cuadrado's schizophrenia symptoms and emotional state based on blurry, brief, or distant security footage. There is no basis in the record to believe that these opinions derived from a reliable application of psychiatric expertise.

58

At trial, Dr. Badre testified about Mr. Cuadrado's emotional and psychological state based on security footage from the Shell station, the post office parking lot, and the storage facility. The Shell station footage is dark, blurry, and sped up (i.e., not in real time):



Exh-15A.

The remaining footage depicts Mr. Cuadrado walking, driving, or standing, usually from a distance.






59

 

From top to bottom, left to right: Exhs-16A, 16B, 16C, 16F, 17A, 17B.

Based on these videos, Dr. Badre made two sets of unreliable claims. *First*, Dr. Badre claimed that he could tell Mr. Cuadardo was not experiencing schizophrenia symptoms. He inferred from the Shell Station video that Mr. Cuadardo "was not hearing voices," and "seem[ed] not to be psychotic." 4-ER-809. From watching Mr. Cuadrado walk around the postal facility, he determined that Mr. Cuadrado "seems kind of ok," which is "not consistent with an episode of psychosis." 4-ER-817. And he opined, based on video of Mr. Cuadrado swiping his badge to enter the facility, that he was driving much more "appropriately" than would be "expected" "if he is hearing voices on that day." 4-ER-797. (In fact, Mr. Rodriguez testified that Mr. Cuadrado *was* driving erratically moments before that video was taken, 3-ER-496, starkly illustrating the problem with drawing broad conclusions from 40-second clips.) From these datapoints, Dr. Badre inferred that Mr. Cuadrado probably was not experiencing schizophrenia symptoms on August 25. 4-ER-796-797, 817.

Dr. Victoroff explained the obvious problem with that approach. Already, doctors can rarely tell whether someone has schizophrenia just by looking at them. 4-ER-674-675. But basing any such diagnosis on brief, blurry, or distant videos of mundane activity adds a whole other layer of unreliability. "There's nothing on the videos that could be interpreted as evidence of any sort of mental illness," Dr. Victoroff said. "You just see a man, from a distance, walking. So, you know, it's just impossible to diagnose anything based on that information." 4-ER-680.

*Second*, Dr. Badre claimed he could tell from these clips that Mr. Cuadrado was not afraid of his supervisors. This came up when the prosecutor asked Dr. Badre one of the most important questions for the jury to decide: "Did you find that the defendant possessed a delusion that people were out to kill him?" Dr. Badre immediately responded by asking to "speak to the videos." 4-ER-823. "At the Shell Gas Station," he opined, "I don't see him scared. I see him going toward an individual." 4-ER-823. The defense objected but was overruled. "At the storage facility," Dr. Badre continued, "I don't see him being scared." 4-ER-824.

There is no evidence in the record that those opinions represent a reliable application of psychiatric expertise. That's because there is no evidence that psychiatrists have special competence to reliably assess emotions from video clips, beyond what any lay person could do. And whether psychiatrists are on equal footing with lay people in this respect really matters, because—as noted *supra*, Section II.B—experts

61

may not opine on subjects "within jurors' common understanding." *United States v. Rahm*, 993 F.2d 1405, 1413 (9th Cir. 1993) (simplified). While such testimony has "little probative value," "the risk of unfair prejudice is real." *United States v. Hanna*, 293 F.3d 1080, 1087 (9th Cir. 2002) (quoting *United States v. Gonzalez–Maldonado*, 115 F.3d 9, 18 (1st Cir. 1997)). "By appearing to put the expert's stamp of approval on the government's theory, such testimony might unduly influence the jury's own assessment of the inference that is being urged." *Id.* (quoting *Gonzalez–Maldonado*, 115 F.3d at 18).

Without evidence that psychiatrists are better than ordinary people at assessing basic human emotions, Dr. Badre's opinions served only to invade the jury's province under the guise of expertise. For this reason, too, the government cannot meet its burden to prove harmlessness.

## V. If necessary, this Court should evaluate these claims for cumulative error.

Finally, though each of the errors above merit reversal, this Court may also consider their cumulative impact. "Where, as here, there are a number of errors at trial, a balkanized, issue-by-issue harmless error review is far less effective than analyzing the overall effect of all the errors in the context of the evidence introduced at trial against the defendant." *United States v. Frederick*, 78 F.3d 1370, 1380 (9th Cir. 1996) (simplified). Rather than "decide the prejudice caused by any of

these individual errors," cumulative error lets the Court consider whether the errors' combined effect caused prejudice. *United States v. Preston*, 873 F.3d 829, 835 (9th Cir. 2017). Cumulative error analysis is appropriate here because "the errors" relating to Dr. Badre's testimony "were not isolated" but bore a "symmetry such that they amplif[ied] each other." *Id.* at 845–46. Individually, but especially taken together, these errors deprived Mr. Cuadardo of a fair trial and warrant reversal.

## VI. Though foreclosed by circuit precedent, Mr. Cuadrado preserves for further review the argument that assault is a specific intent crime.

Below, Mr. Cuadrado moved in limine to present a diminished capacity defense. Doc. 38 at 16. But the request was denied because circuit precedent holds that18 U.S.C. § 111 is a general intent crime, precluding diminished capacity defenses. *See United States v. Jim*, 865 F.2d 211, 215 (9th Cir. 1989). Several other circuits, however, have held otherwise. *See United States v. Simmonds*, 931 F.2d 685, 687 (10th Cir. 1991); *United States v. Caruana*, 652 F.2d 220, 221 (1st Cir. 1981); *United States v. Taylor*, 680 F.2d 378, 381 (5th Cir. 1982). Mr. Cuadrado therefore preserves for further review the claim that assault is a specific intent crime.

## CONCLUSION

For all these reasons, this Court must reverse.

Respectfully submitted,

DATED: February 24, 2025    *s/Katie Hurrelbrink*

Katie Hurrelbrink
Federal Defenders of San Diego, Inc.
225 Broadway, Suite 900
San Diego, California 92101
619.234.8467
Katie_Hurrelbrink@fd.org

Attorneys for Mr. Cuadrado

## CERTIFICATE OF RELATED CASES

The defendant in *United States v. Shofler*, No.23-3450, relied on the record in this case to challenge Dr. Badre's testimony in his sentencing proceedings. Undersigned counsel is unaware of any other related cases.

Respectfully submitted,

DATED: February 24, 2025    *s/Katie Hurrelbrink*
Katie Hurrelbrink
Federal Defenders of San Diego, Inc.
225 Broadway, Suite 900
San Diego, California 92101
619.234.8467
Katie_Hurrelbrink@fd.org

Attorneys for Mr. Cuadrado

# CERTIFICATE OF COMPLIANCE

This brief contains 13,893 words, excluding the items exempted by Fed. R. App. P. 32(f). This brief's type size and typeface comply with Fed. R. App. P. 32(a)(5) and (6). I certify that this brief complies with the word limit of 9th Cir. Rule 32-1.

Respectfully submitted,

DATED: February 24, 2025

*s/Katie Hurrelbrink*
Katie Hurrelbrink
Federal Defenders of San Diego, Inc.
225 Broadway, Suite 900
San Diego, California 92101
619.234.8467
Katie_Hurrelbrink@fd.org

Attorneys for Mr. Cuadrado