No. 24-2937

# 𝖀𝖓𝖎𝖙𝖊𝖉 𝕾𝖙𝖆𝖙𝖊𝖘 𝕮𝖔𝖚𝖗𝖙 𝖔𝖋 𝕬𝖕𝖕𝖊𝖆𝖑𝖘

FOR THE NINTH CIRCUIT

───────────────

UNITED STATES OF AMERICA,

PLAINTIFF-APPELLEE

*v.*

EDWIN CUADRADO, JR.,

DEFENDANT-APPELLANT

───────────────

*On Appeal from the United States District Court*
*for the Southern District of California*
*23CR1855-TWR*

───────────────

**SUPPLEMENTAL EXCERPTS OF RECORD**

───────────────

ADAM GORDON
 *United States Attorney*

DANIEL E. ZIPP
 *Assistant U.S. Attorney*
 *Chief, Appellate Section*
 *Criminal Division*

*880 Front St., Rm. 6293*
*San Diego, CA 92101*
*(619) 546-8463*

# TABLE OF CONTENTS

Page

Government's Exhibit List
03/01/2024 (ECF 60) ...................................................... 3

Government Exhibit 1, Photo - Truck (side)
03/01/2024 (ECF 60) ...................................................... 7

Government Exhibit 2, Photo - Truck (front)
03/01/2024 (ECF 60) ...................................................... 8

Government Exhibit 5, Photo - Bandaged and Blood
03/01/2024 (ECF 60) ...................................................... 9

Government Exhibit 6, Photo - Head Wound (unstitched)
03/01/2024 (ECF 60) ...................................................... 10

Government Exhibit 8, Photo - Head Wound (Stitched back)
03/01/2024 (ECF 60) ...................................................... 11

Government Exhibit 9, Photo - Knife and belongings
03/01/2024 (ECF 60) ...................................................... 12

Government Exhibit 10, Photo - Knife (SDPD (photo)
03/01/2024 (ECF 60) ...................................................... 13

Government Exhibit 14, Photo - Overhead Map of Postal
Facility, 03/01/2024 (ECF 60) ...................................... 14

Government Exhibit 19, Photo - Aficial bruises
03/01/2024 (ECF 60) ...................................................... 15

United States' Response in Opposition to Defendant's Motion
for New Trial, 04/17/2024 (ECF 75) .................................. 16

Reporter's Transcript of Motion for New Trial/Sentencing
Hearing, 04/29/2024 (ECF 101) ...................................... 56

## United States v. Edwin Cuadrado
## Case No. 23CR1855-LAB
## UNITED STATES' EXHIBIT LIST

FILED

MAR – 1 2024

CLERK, U.S. DISTRICT COURT
SOUTHERN DISTRICT OF CALIFORNIA
BY                              DEPUTY

| Exhibit No. | Offered by (P/D/I) | Description |
|---|---|---|
| 1 | **Plaintiff** | Photo - Truck (side)  *M/R 2/28/2024* |
| 2 | **Plaintiff** | Photo - Truck (front)  *M/R 2/28/2024* |
| 3 | **Plaintiff** | Photo - Aficial  *M/R 2/28/2024* |
| 5 | **Plaintiff** | Photo - Bandaged and Blood  *M/R 2/28/2024* |
| 6 | **Plaintiff** | Photo - Head Wound (unstitched)  *M/R 2/28/2024* |
| 8 | **Plaintiff** | Photo - Head Wound (Stitched Back)  *M/R 2/28/2024* |
| 9 | **Plaintiff** | Photo - Knife and belongings  *m/R 2/28/2024* |
| 10 | **Plaintiff** | Photo - Knife (SDPD photo)  *m/R 2/28/2024* |
| 11 | **Plaintiff** | Photo - Pipe + Meth |
| 12 | **Plaintiff** | Photo - Meth |
| 13 | **Plaintiff** | Photo - Pipe |
| 14 | **Plaintiff** | Photo - Overhead Map of Postal Facility  *M/R 2/28/24* |
| 15 | **Plaintiff** | DISC - Shell Gas Station |
| 15A | **Plaintiff** | Video Clip – Shell Gas Station (outside)  *M/R 2/28/24* |
| 15B | **Plaintiff** | Video Clip – Shell Store  *M/R 2/28/24* |
| 16 | **Plaintiff** | DISC - USPS Video |

*2/29/2024*

*15C   Video Clip - Shell Station inside   M/R*   SER-003

| Exhibit No. | Offered by (P/D/I) | Description |
|---|---|---|
| 16A | Plaintiff | Video Clip - USPS Employee Parking (northwest) *M/R 2/28/2024* |
| 16B | Plaintiff | Video Clip - USPS Truck Gated (inbound lane) *M/R 2/28/2024* |
| 16C | Plaintiff | Video Clip – USPS Employee Parking (Northwest) *M/R 2/28/2024* |
| 16D | Plaintiff | Video Clip – USPS Employee Parking (Southeast) *M/R 2/28/2024* |
| 16E | Plaintiff | Video Clip – USPS *M/R 2/28/2024* |
| 16F | Plaintiff | Video Clip – USPS Employee Parking *M/R 2/28/2024* |
| 16G | Plaintiff | Video Clip - USPS Outbound Gate *M/R 2/28/2024* |
| 16H | Plaintiff | Video Clip – USPS Outbound Gate (Close up) *M/R 2/28/2024* |
| 17 | Plaintiff | DISC - Trojan Video |
| 17A | Plaintiff | Video Clip – Trojan Storage Cuadrado and male |
| 17B | Plaintiff | Video Clip – Trojan Storage Cuadrado and others |
| 18 | Plaintiff | DISC - Post Arrest *2/23/24 Marked* |
| 18A | Plaintiff | Clips – Post Arrest 1 |
| 18B | Plaintiff | Clips – Post Arrest 2 |
| 18C | Plaintiff | Clips – Post Arrest 3 |

Case No.: 23CR1855-LAB

SER-004

| Exhibit No. | Offered by (P/D/I) | Description |
|---|---|---|
| 18D | Plaintiff | Clips – Post Arrest 4 |
| 18E | Plaintiff | Clips – Post Arrest 5 |
| 18F | Plaintiff | Clips – Post Arrest 6 |
| 18G | Plaintiff | Clips – Post Arrest7 |
| 18H | Plaintiff | Clips – Post Arrest 8 |
| 18I | Plaintiff | Clips – Post Arrest 9 |
| 18J | Plaintiff | Clips – Post Arrest 10    2/28/24 M/R |
| 18K | Plaintiff | Clips – Post Arrest 11    2/28/24 M/R |
| 18L | Plaintiff | Clips – Post Arrest 12    2/28/24 M/R |
| 18M | Plaintiff | Clips – Post Arrest 13    2/28/24 M/R |
| 18N | Plaintiff | Clips – Post Arrest 14    2/28/24 M/R |
| 18O | Plaintiff | Clips – Post Arrest 15 |
| 19 | Plaintiff | Photo – Aficial bruises    2/29/2024 M/R |
| 20 | Plaintiff | Stipulation of Fact – Tojan Storage (17A – 17B) |
| 21 | Plaintiff | Stipulation of Fact - Shell Gas Station and USPS Surv. (15-A – 15B; 16A – 16H)    2/28/24 M/R |
| 22 | Plaintiff | Demonstrative – Drug Lab Exam |

Case No.: 23CR1855-LAB

| Exhibit No. | Offered by (P/D/I) | Description |
|---|---|---|
| 23 | **Plaintiff** | Physical Evidence – Knife |
| 24 | **Plaintiff** | Physical Evidence – Pipe |
| 25 | **Plaintiff** | Physical Evidence – Meth |

η0    SDPD Ignacio Aguilar Report

η2    N/R    Photo of Jose Rodriguez vehicle 2/29/2024

Case No.: 23CR1855-LAB

SER-006



EC-PHOTOS-000000

SER-007



EC-PHOTOS-000000

SER-008



2023-08-25 18:20:31 -0700
AXON BODY 3 X6030669Y

SER-009




EC-PHOTOS-000041
SER-011



SER-012

WARNING
Extremely Sharp Blade

SER-013



SER-014



SER-015

TARA K. MCGRATH
United States Attorney
JAMES REDD
Missouri Bar No. 66172
ALICIA P. WILLIAMS
California Bar No. 262823
Assistant U.S. Attorneys
United States Attorney's Office
880 Front Street, Room 6293
San Diego, CA 92101
(619) 546-9661

Attorneys for the United States of America

# UNITED STATES DISTRICT COURT

## SOUTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| UNITED STATES OF AMERICA, | Case No. 23-CR-1855-LAB |
| Plaintiff, | UNITED STATES' RESPONSE IN OPPOSITION TO DEFENDANT'S MOTION FOR NEW TRIAL |
| v. | |
| EDWIN CUADRADO JR, | DATE: April 29, 2024 TIME: 10:00 a.m. |
| Defendant. | |

This trial was not an expert battle. Defendant was convicted of a well-documented and disturbingly vicious stabbing of a United States Postal Service employee. After a trial consisting of testimony from 16 witnesses, Defendant now moves for a new trial under *Napue* based on a claim that one of the government's rebuttal witnesses used the wrong title—"Director of Forensic Training"—when describing a voluntary and unpaid teaching position. This argument fails because the testimony was not false. Indeed, the defense did not object to that title being referenced during the government's closing nor did the defense argue in its closing that the testimony was false. In addition to the testimony not being false, the Defendant cannot make the additional showings required by *Napue* that the government knew the testimony was false and failed to cure the false testimony nor that the testimony regarding the four-word title was material to the jury's verdict. Here, the

1  defense cross-examined the witness in front of the jury using the very materials it presents
2  to support its argument for a new trial and the parties do not dispute the witness the
3  truthfully testified when answering the defense on cross.

4      The motion for a new trial is also based on claims that portions of the expert testimony
5  were not properly noticed under Rule 16, and that certain testimony impermissibly
6  addressed either Defendant's credibility or the ultimate issue. Those arguments also fail.
7  The forensic psychiatrist's testimony regarding Defendant's credibility was given solely in
8  the context of the professional methodology used to develop an opinion as to the proper
9  diagnosis for Defendant in this case. That credibility testimony was proper and aided the
10 jury in evaluating the expert's opinion and determining weight it should be given. Further,
11 the expert testimony Defendant challenges was properly notice under Rule 16 and did not
12 include an opinion on the ultimate issue.

13     Defendant's motion should be denied.

## RELEVANT FACTS

15     Defendant was charged with assaulting United States Postal Service (USPS) employee
16 Benjamin Aficial ("Aficial") on August 25, 2023, by stabbing Aficial in the head, in
17 violation of 18 U.S.C. §111(a)(1) and (b). Doc. 16 (indictment). Defendant pleaded not
18 guilty and later provided notice that he would contend at trial that he was insane at the time
19 of the assault. Doc. 18 (arraignment minute entry); Doc. 22 (insanity notice).

20 **I. Pretrial expert discovery.**

21     The defense hired clinical neurologist and clinical psychologist Dr. Jeffrey Victoroff.
22 In his nine-page report, Victoroff diagnosed Defendant with schizophrenia and opined that
23 that Defendant's mental disorder likely interfered with Defendant's ability to appreciate
24 the nature and quality of his acts when he stabbed Aficial. *See* Doc. 67-3 (Victoroff report)
25 Regarding Defendant's methamphetamine use, Victoroff acknowledged his opinion was
26 based on a review of medical records in which Defendant admitted to jail doctors that he
27 used methamphetamine to stay awake at work at USPS and reports showing that Defendant
28 possessed methamphetamine when he was arrested after stabbing Aficial. *See id.* at 1, 7.

1   Victoroff's report also states that Defendant told Victoroff he had used methamphetamine

2   two days before stabbing Aficial. *Id.* at 4. Victoroff nevertheless characterized Defendant's

3   methamphetamine use as rare before opining there was no causal role between Defendant's

4   methamphetamine use and Defendant stabbing Aficial. *Id.* at 8.

5       The government hired forensic psychiatrist Dr. Nicolas Badre as a rebuttal witness and

6   provided the attendant expert disclosure required under Rule 16. *See* Doc. 33 (Badre Expert

7   Notice). Badre's resume and curriculum vitae were produced to the defense on December

8   13, 2023. Doc. 67 at 3; Doc. 67-4. Badre's resume lists his extensive credentials in the field

9   of forensic psychiatry. Doc. 67-4. Those credentials include his professional experience

10  working for years in San Diego County's Forensic Evaluation Unit, running his private

11  forensic psychiatry practice, and serving as the Lead Psychiatrist for the San Diego Jails.

12  *Id.* at 2. Badre's resume also lists his consultantship experiences and academic experiences,

13  including working as the "Director of forensic training and Assistant Clinical Professor" at

14  UCSD beginning in 2021. *Id.*

15      On January 25, 2024, the government provided Defendant's attorneys a 28-page report

16  followed on January 26, 2024 with a 4-page addendum detailing the bases for Badre's

17  opinion. *See* Doc. 67-5. Upon review of the case materials, Badre opined that Defendant's

18  primary condition at the time of the offense was methamphetamine use disorder, that

19  Defendant could understand the nature and quality of his act, and Defendant was also

20  capable of distinguishing right from wrong when he stabbed Aficial. *Id.* at 26.

21      On February 26, 2024—just two days before trial—Defendant was allowed to notice

22  Dr. Shannon Griswold as a second expert over the government's objection. The defense

23  provided Griswold's CV to the government after the first day of trial. *See* Doc. 67-6.

24  Griswold was one of the clinical psychologists that observed Defendant while he was in

25  federal custody awaiting trial. Doc. 73 (Griswold transcript) at 10–11. While dealing with

26  Defendant, Griswold diagnosed Defendant with schizophrenia and was permitted to testify

27  at trial regarding her diagnosis. *Id.* at 11.

28  //

**II. The government's case-in-chief**

Trial began on February 28, 2024. The government's case-in-chief consisted of nine fact witnesses. Doc. 59 (witness list). Three of those witnesses were members of the San Diego Police Department involved in various stages of the investigation, including responding to the scene of the stabbing and documenting Aficial's injuries, arresting Defendant and seizing a knife from Defendant, and conducting Defendant's recorded post-arrest interview. The government also called two witnesses from the United States Postal Inspection Service to testify regarding surveillance footage recovered from the scene of the stabbing and surveillance footage from a nearby gas station.

The government ended its case with USPS employees Jose Rodriguez, Chester Perkins, and Benjamin Aficial. Each of those men were attacked by Defendant with a knife in the postal parking lot on August 25, 2023. Perkins, Aficial, and Rodriguez testified that as they stood on the ground asking for Defendant to exit the tractor trailer to speak with them, Defendant opened the door of his USPS tractor trailer and attacked them. They each testified that Defendant brandished a knife, which prompted them to flee. Aficial testified Defendant stabbed him in the head, which was corroborated by Perkins and Rodriguez.

**III.   The Defendant's case-in-chief.**

Defendant's case-in-chief consisted of five witnesses, including Drs. Victoroff and Griswold to testify in support of his affirmative insanity defense.

Victoroff testified that he is a clinical neurologist and neuropsychologist with no training in forensic psychiatry since either 1984 or 1985—roughly 40 years ago. Doc. 66 (Victoroff transcript) at 62–63. When asked on cross-examination whether he conducted a forensic exam in this case, Victoroff stated forensic psychiatry "is not [his] field" but he "believes" by virtue of being hired for this case he performed a forensic exam. *Id.* at 62. Victoroff testified he does "probably about two" forensic evaluations per year, thinks he has testified on the issue of insanity three times, and has never been tendered as an expert in forensic psychiatry expert in a criminal case. *Id.* at 64.

After agreeing that the truth-finding mandate of forensic psychiatry is one way of

distinguishing it as a discipline from evaluating patients in a clinical practice, Victoroff admitted he did not, during his 3.5-hour interview with Defendant, conduct any "neuropsychological" or "paper-and-pencil" tests to screen or evaluate the Defendant for malingering to help determine the truth of information Defendant self-reported while being interviewed for the purpose of his insanity defense. *Id.* at 67–68, 71–72. Rather, regarding Defendant's methamphetamine use, Victoroff admitted that he accepted Defendant's stated infrequent methamphetamine use as being true without any further inquiry while also acknowledging: (1) psychosis from methamphetamine use and schizophrenia present similarly; (2) that individuals commonly suffer from both substance abuse disorders and schizophrenia simultaneously; and (3) the number of people reporting violence as an outcome of their methamphetamine use is "definitely elevated." *See id.* at 46–47, 69–70. Indeed, Victoroff acknowledged Defendant was a "substance abuser" and that Defendant has substance use disorder.

> **Q.** So it is your testimony here today that he has a substance use disorder?
> **A.** I believe so, yes.

(*id.* at 50, 66) but in view of the record and Defendant's methamphetamine use, Victoroff still "forgot to ask" Defendant when he began using methamphetamine. *Id.* at 50.

On cross, Victoroff conceded that if Defendant minimized his methamphetamine use when he self-reported to Victoroff then he would not be able to differentiate between psychosis that was induced by methamphetamine from psychosis that was induced by schizophrenia. *Id.* at 73.

Next, the defense called Dr. Shannon Griswold. Griswold testified that she is a clinical psychologist employed by the Bureau of Prisons and had treated Defendant in jail for about six months. Doc. 73 at 4, 11. Griswold diagnosed Defendant with schizophrenia. *Id.* at 11. During *voir dire*, Griswold testified she is not a forensic psychiatrist and has no training in forensic psychiatry. *Id.* at 7. Griswold also admitted her work as a treating psychologist is different than work of a forensic psychiatrist and that she did not evaluate Defendant regarding his mental state on August 25, 2023. *Id.* at 9. Regarding methamphetamine use, Griswold testified the psychosis Defendant presented when she first saw him on August

31, 2023 could have been from either schizophrenia or methamphetamine use. *Id.* at 15. Dr. Griswold agreed malingering is a concern in forensic exams because it is possible that individuals being examined for mental health concerns may not truthfully represent their symptoms or experiences to the professionals examining them. *Id.* at 21. Finally, Dr. Griswold confirmed Defendant has never been forensically examined by the Bureau of Prisons and that she has no opinion on whether Defendant was suffering from any psychosis on August 25, 2023. *Id.* at 21–22. Instead, Dr. Griswold agreed it would not be appropriate for her to give such an opinion in this case. *Id.*

**IV.    The government's rebuttal case.**

The government's rebuttal case consisted of two witnesses, including forensic psychiatrist Dr. Nicolas Badre.

Badre's testimony began with his forensic psychiatry background and credentials in that particular discipline, which included performing forensic evaluations for courts in San Diego County, running a private forensic psychiatry practice, and teaching at both UCSD and the University of San Diego. Doc. 62 (Badre transcript) at 3–8. Regarding his work at UCSD, Badre testified he is the "Director of Forensic Training" and went on to explain to the jury what that work involves:

> **Q.**  And what do you teach at UCSD and UC- -- USD?
> **A.**  At UCSD -- sorry. In San Diego, the universities – they all have the same acronyms. At UCSD, I am a Director of Forensic Training. That means that I teach the physicians who are going to become psychiatrists how to do forensic psychiatry. I teach a whole course. I'm the Director of Forensic Training. I believe it's -- it changes a bit from year to year, but 14 to 16 lectures on how to conduct forensic assessments.

*Id.* at 4. Badre even distinguished for the jury the nature of his director responsibilities at UCSD from his teaching-only responsibilities. *Id.* ("I also teach other classes. So I'm not the director of them.").

Badre went on to explain his work as a forensic psychiatrist is "[a]lmost entirely" in the criminal context and that he does "about 200 forensic evaluations a year." *Id.* at 6–7. Badre stated that he has testified approximately 40 times as an expert witness—mostly as a

1  forensic psychiatrist. *Id.* at 8.Badre's testimony distinguished a forensic interview from a
2  clinical interview.

3    **Q.** What does a psychiatric interview entail -- or forensic psychiatric interview
4         entail?

5    **A.** The difference between a forensic -- you mentioned forensic interview -- versus
6         just sort of a clinical interview is, in forensic, we don't take the -- the
7         individual's word for it. If there are things in the record that are sort of
          inconsistent, then we try to sort of explain that or try to address that. That's
          really the big difference between clinical care and forensic care.

8  *Id.* at 14–15. After explaining that important distinction, Badre gave an example of how
9  his forensic process of evaluating the Defendant materially differed from the clinicians—
10 Victoroff and Griswold—who had testified in the defense case. *Id.* at 16. The example
11 Badre provided was his use of the M-FAST test, which forensic psychiatrists commonly
12 use to assess whether individuals are malingering—i.e., feigning or exaggerating their
13 symptoms of reported mental illness.
14

15   **Q.** And what is the M-FAST?
16   **A.** An M-FAST is a test that I thought was particularly well-suited for the
          defendant. Could I first explain how I came to want to use that test?

17   **Q.** Yes.
18   **A.** So I spoke to Mr. Cuadrado for about three and a half hours. And about two and
19        a half hours in or so, he tells me that he is hearing voices. Now, a big difference
20        between forensic care and clinical care is that I don't just write down, "You're
          hearing voices." One of the things I ask oftentimes -- and I did so in this case --
21        is, "Are you hearing voices right now?"

22        The thing is I know for a fact that he's not hearing voices right now. If you're
23        hearing voices right now, you're distracted. You're not able to concentrate. You
24        are confused. It is quite readily visible to the majority of individuals. Ongoing
          auditory hallucinations are quite striking as a thing. I've spoken to him, at this
25        point, for two and a half hours. He's intelligent. He's eloquent. He's putting
26        sentences together. It is incompatible. So at this point in my interview, I am quite
          confident that we have some sort of mismatch happening here.
27
28        So what I did was I gave him a test that is very commonly used. Actually, some
          individuals -- some professors recommend that it should be used widely in

psychiatry as a test of malingering, and this is the M-FAST. It's probably the most common test of malingering, and it's well-suited in this case.

The M-FAST is 25 questions, which are very exaggerated versions of mental illness. So it sort of sounds like mental illness except it's so extreme that people with mental illness wouldn't say, "Yes" to them, if you actually, genuinely have mental illness.

And so the more of them you test positive, the more likely you are to be malingering, "malingering" being exaggerating, feigning mental illness, not being credible. Those are all sort of interchangeable concepts and terms.

Mr. Cuadrado scored 10. The cutoff is 5. So that was twice as much as would be necessary to be positive; and therefore, I thought that I had very conclusive

evidence that, at least during the interview that I had with him, he was exaggerating symptoms of mental illness.

**Q.** So it was your determination that he was exaggerating symptoms of mental illness; correct?

**A.** Exactly.

*Id.* at 16–18.

Badre similarly described the professional scrutiny he applied to Defendant's self-reported methamphetamine use.

**Q.** I want to talk about -- were you able to rule out substance use disorder?
**A.** No.

**Q.** And tell us why you were not able to rule out substance use disorder.
**A.** Well, there was a lot of evidence that Mr. Cuadrado had a significant use of methamphetamine. There was a report. The first thing he said when he gave -- my understanding, when he went to MCC, the jail, was he said that he was using methamphetamine at work. That's the – that's – that's a -- if you use it at work to wake up, that's quite common use.

There is the fact that he told Victoroff that he had used two days prior. There was the fact that he told me that he had only used three times in his life, which is inconsistent with what he told Dr. Coleman and Dr. Victoroff. So I already had a credibility problem here. There was the fact that he had told the police officer that he had burned his hand when he was trying to manufacture methamphetamine.

When I took that information together, with the knowledge I have that such a large number of individuals arrested in San Diego County use methamphetamine and that the common use of methamphetamine is very regular use, I was fairly confident that he had a methamphetamine use disorder.

Doc. 62 at 30–31. Badre testified that based on his review and evaluation of the case file, he diagnosed Defendant with methamphetamine use disorder. *Id.* at 18.

Badre was cross-examined over a two-day period. *See* Docs. 62–63. On the second day of cross-examination, Defendant's attorneys questioned Badre about his teaching position at UCSD.

> **Q.** Okay. You're the Director of Forensic Training. Now, as the director of – I'd like to talk to you about your position at UCSD. You are an assistant voluntary professor?
> **A.** Exactly.
>
> **Q.** And as an assistant voluntary professor, you give classes as -- or lectures -- excuse me -- as part of their voluntary clinical professor series?
> **A.** Exactly. I don't get paid for that work.
>
> **Q.** Okay. So it's unsalaried?
> **A.** Exactly.
>
> **Q.** It's voluntary?
> **A.** Yeah.
>
> **Q.** It's part-time?
> **A.** Less than that, you would say.
>
> **Q.** Less than that?
> **A.** Yeah.

Doc. 63 (Badre transcript) at 4–5. During cross-examination, Badre made clear that while he works at UCSD on a voluntary and unsalaried basis, his forensic psychiatry lectures mainly comprise the forensic psychiatry course required for psychiatry residents to graduate from UCSD. *Id.* at 10–11. ("It is still the requirement for all graduating psychiatry residents to complete a course in forensic psychiatry that includes pretty much exactly the

1  14 lectures I give.").

2  The defense marked two documents for identification during their cross examination

3  of Badre relating to his work at UCSD. Those documents were not provided to the

4  government in pretrial discovery nor were copies provided to the government during trial.

5  Instead, the defense attorneys briefly displayed them on monitors located on the witness

6  stand and counsel table while simultaneously questioning Badre regarding their supposed

7  significance. *See* Doc. 62 at 6, 8. When crossed on a letter appointing him to teach forensic

8  psychiatry at UCSD (Doc. 67-7), Badre correctly explained the letter's significance.

9
10  **Q.** Okay. And it says that your title is -- your official title is voluntary assistant
    clinical professor; correct?
11  **A:** Yes.

12  **Q.** Okay. And it says that the title should not be used to suggest that your practice
    is affiliated with the University of California?
13  **A.** Oh. I see what you mean. So it should not be – to understand that, when I am
14  conducting other work, or when I see patients in my private office -- that I'm
    doing that under the prospect of UCSD. That is what it's meant to imply, and
15  that is correct.

16
17  **Q.** Okay.
    **A.** So I'm not working in this capacity right now for UCSD. If I were to do that,
18  then -- then I -- the billing would have to go to UCSD, and they would -- they
    would return it back to me as – I'm not working on behalf of UCSD at this
19  moment.

20  Doc. 63 at 7–8. Immediately following that line of questioning, the defense questioned

21  Badre regarding his title as Director of Forensic Training.

22
23  **Q.** Okay. Now, this letter does not give you the title Director of Forensic
    Training?
24  **A.** Correct.

25  **Q.** Okay. That is a title you've given yourself?
26  **A.** No.

27  **Q.** Okay. UCSD gave you that title?
28  **A.** The program director of UCSD -- the program director of the psychiatry
    residency.

1    After those questions, the defense marked a multi-page email they received 8 minutes

2    before the third day of trial began and had not sent to the government. Doc. 67-8. Badre

3    was shown the first page of the email while being questioned.

4        **Q:** Okay. If we can show the witness Exhibit K16. (Defendant's Exhibit K16

5            marked for identification.)…You're familiar with the Professor – the Vice Chair

6            of Psychiatry Education and Training?
    **A.** I'm familiar with Greg Light.

7

8        Q. Okay. And he is the Vice Chair of Psychiatry Education and Training at the
        University of San Diego?

9        **A.** That is correct.

10        Q. University of California San Diego. Excuse me.

11        **A.** Correct.

12        **Q.** Okay. Now, the University of San Diego – of California -- I'm sorry. UCSD

13            does not have, either, a forensic training program; correct?

14        **A.** So what this is meant to reflect is that we don't have a fellowship in forensic
        psychiatry. That is correct.

15    …

16        **Q.** So you said that there's not a fellowship program?
    **A.** Correct. So to be able -- to become a psychiatrist, you have to do a forensic

17            training. It is part of the requirement of ACGME. By -- to suggest that UCSD

18            does not have a forensic program would suggest that UCSD is not in compliance
        with the requirement to become a psychiatrist.

19    …

20        **Q.** Now, UCSD does not have an ACGME-accredited forensic training program?
    **A.** Correct. Every couple of years, we have a discussion about starting one. We--

21            we have not done so.

22        **Q.** Okay. And it doesn't have a non-ACGME forensic program?

23        **A.** Correct. Some places have such a thing as well.

24        **Q.** Okay.

25        **A.** It is still the requirement for all graduating psychiatry residents to complete a
        course in forensic psychiatry that includes pretty much exactly the 14 lectures I

26            give.

27    Doc. 63 at 8–10. On re-direct, Badre reiterated that he teaches forensic psychiatry at

28    UCSD and had in fact won "Teacher of the Year" in the prior academic year. *Id.* at 44–45.

1    The parties' closing arguments began at the conclusion of Badre's testimony.

2    //

3    **V.   Closing arguments.**

4        The government's closing argument guided the jury through the photographic and

5    recorded evidence of Defendant's assault with a deadly weapon on Aficial. Badre was not

6    mentioned by the government until over one-third (6 of 16 pages) through its closing.

7        The government's mention of Badre's role as Director of Forensic Training during

8    argument and in its PowerPoint was brief, limited to those four words, and was argued in

9    the context of Badre's more relevant professional experience of performing hundreds of

10   forensic evaluations for the San Diego Court system:

11

12       Dr. Badre diagnosed him with substance abuse disorder, and Dr. Badre takes this
         very seriously. You saw how passionate he is. This is a very serious question, to find

13       someone legally insane. You have to look at what was in that person's mind
         at a particular point in time. Dr. Badre is the only person who offered a forensic

14       opinion in this case. He is the Director of Forensic Training at the U- -- at UCSD,
         and he performed hundreds of forensic evaluations, and he told you his preference

15       is to do it for the Court because all he has to do is figure out exactly what's in a
         defendant's mind.

16

17

18   Doc. 64 (government closing argument transcript) at 8. The defense did not object to the

19   government's mention of Badre's title at UCSD during closing. *Id.*

20       Next, the government identified the clear and undisputed distinction between the

21   clinical approach employed by the clinical psychologist and psychiatrist (Victoroff and

22   Griswold) and the forensic approach employed by the only forensic psychiatrist (Badre) to

23   argue that Badre provided the only forensic opinion in the case. Doc. 64 at 8–13.

24       After arguing the competing diagnoses, the government focused on the evidence

25   regarding whether—regardless of the mental defect determined by the jury—the Defendant

26   could appreciate the nature and quality of his acts and the wrongfulness of his acts. Doc.

27   64 at 13–19. That argument was accompanied by several photographs and recordings

28   showing Defendant's full recollection of who he attacked, where and how he stabbed

1    Aficial, what he used to stab Aficial, what he did with the knife after stabbing Aficial, and

2    where he went after stabbing Aficial. *Id.* Those admissions were corroborated by

3    surveillance video also played to the jury during closing. *Id.* The government used that

4    evidence to argue that even if the jury found Defendant suffered a severe mental defect or

5    disease, he could not succeed in proving his insanity defense by clear and convincing

6    evidence because the evidence showed Defendant knew exactly what he was doing (i.e.,

7    understood the nature and quality of his acts) when he stabbed Aficial and knew that

8    stabbing Aficial was wrong. *Id.*

9        The defense argued the government had not proven its assault case because the

10    government had not proven beyond a reasonable doubt that Aficial was engaged in or on

11    account of his official duties when Defendant stabbed him in the head. Doc. 74 (defense

12    closing argument transcript) at 4–7. When discussing Badre's expert testimony, the defense

13    argued Badre was biased, had exaggerated his credentials on direct examination, and was

14    truthful in responding to the defense's questions on cross-examination.

15        And then there's Dr. Badre. I want you to think about Dr. Badre's testimony. I want
16        you to think about whether he has any biases. I want you to think about his
17        credibility. He comes up to you, and he says -- and I don't want to misquote him --
        that originally he was an assistant clinical professor. That's what he says during
18        direct examination. That's what he says to the answer when Ms. Williams asks him
19        the question about his background. Why did he hide -- hide the ball until after that
        examination to tell you that, actually, he's a volunteer? He's a volunteer professor
20        there, and he told you that the title that he was designated was Voluntary Assistant
21        Clinical Professor, not Director of Forensic Training. Why is he exaggerating his
        background? What's the point of that?

22    *Id.* at 11–12. The defense relied on Badre's credentials and professional experience training

23    other mental health professionals to bolster a schizophrenia diagnosis given by one of

24    Badre's former trainees.

25        And then I want you to think about his (Dr. Badre's) testimony in the context of
26        other things you've heard. He says to you that a doctor takes an oath to do no harm.
        A doctor takes an oath to do no harm, and yet he has a student, an apparent student,
27        who's at the MCC, Dr. Shahla, who is giving Mr. Cuadrado medication for
28        psychosis, medication related to schizophrenia? A person he trained is giving
        medication to Mr. Cuadrado for schizophrenia. Would that doctor harm Mr.

1   Cuadrado by giving him medication he immediately doesn't need?

2   *Id.* at 12–13. The defense repeated its support for Badre's training credentials near the very

3   end of its closing argument to the jury.

4       Mr. Cuadrado is on trial. It's his case. It's about his mental state. And you know
5       that at the time of the offense, his symptoms were consistent with schizophrenia,
        his diagnosis from two doctors, that he's being medicated for by a doctor that Dr.
6       Badre apparently trained, that he was delusional, he was paranoid.

7   *Id.* at 17. The defense's closing argument does not suggest that either Victoroff or Griswold

8   offered a forensic opinion. *See* Doc. 74. The word "forensic" appears only once in the

9   defense's closing argument and is used is in reference to Badre's title at UCSD. *Id.* at 12.

10  **VI.    Post-trial communications.**

11      Roughly an hour after the jury began to deliberate, the defense emailed the government

12  copies of exhibits that had been used to question Badre regarding his work at UCSD. Doc.

13  67-1 at 1. Copies of these documents had not previously been sent to the government. *Id.*

14  In its email to the government, the defense argued—for the first time—that Badre's

15  testimony regarding his title at UCSD was false. *Id.* The argument was based on a four-

16  sentence email from Gregory Light and a copy of Badre's appointment letter with UCSD

17  reappointing him has a "Voluntary Assistant Clinical Professor" through June 30, 2027.

18  Docs. 67-1, 67-7, 67-8.

19      After receiving and reviewing the material, the government requested that the defense

20  provide contact information for Mr. Light. Doc. 67-1. Before the government spoke with

21  Mr. Light, the government told the defense they could raise the issue with the Court and

22  that the government did not view Badre's testimony as false. Exhibit 1 The government

23  also explained in its response that the weight of Badre's role at UCSD was fully explored

24  on cross-examination. *Id.*

25      While the jury deliberated, the government was provided additional information

26  strongly supporting Badre's testimony and his title as Director of Forensic Training at

27  UCSD. That material included:

28      • An email from the previous Director of Forensic Training at UCSD explaining that
          Badre replaced him as the Director of Forensic Training at UCSD in 2020:

*"**Dr. Badre is currently the Director of Forensic Psychiatry training for the Psychiatry Residency program at UC San Diego School of Medicine. Dr. Badre replaced me as director in 2020**. His expertise as a teacher and coordinator of teaching is exceptional."* Exhibit 2;

- An email from another UCSD professor stating Dr. Badre "***can absolutely tell the court that you (Dr. Badre) are in charge of forensic training at UCSD and/or director of forensic training***" Exhibit 3;

- The forensic training curriculum at UCSD for the 2023–2024 academic year designed by Dr. Badre and listing Dr. Badre as the sole lecturer for 13 of the 15 forensic psychiatry lectures and, additionally, as a joint-lecturer for 1 of the 15 forensic psychiatry lectures Exhibit 4; and

- And two letters of recommendation in support of Dr. Badre's application for the distinguished fellowship with the APA—including from a UCSD professor. Both letters recommending Dr. Badre identify his director or leadership role in UCSD's forensic psychiatry training for its residents:

   "Additionally, Dr. Badre's demonstrable commitment to education and the value he places on training is evident. In addition to his formal teaching position at University of San Diego, ***Dr. Badre is the director of forensic training and an assistant clinical professor at UC San Diego in the department of psychiatry***." Exhibit 5.

   "***[Dr. Badre] revamped our forensics course in the formalized curriculum***, making it cohesive, engaging, thought-provoking, and informative." *Id.*

The government and Badre then held a joint call with Greg Light who explained, in his view, what Badre's correct title is with respect to his role at the UCSD. During that call, Mr. Light explained that no one at UCSD is employed as the "Director of Forensic Training" and that the use of that title by Badre and Badre's predecessor in that role was inaccurate.

   After speaking with Mr. Light and reviewing the materials in support of Dr. Badre's testimony, the government contacted the defense attorneys to advise that the government was willing to enter a stipulation of fact that Badre's official title at UCSD is "Voluntary Assistant Clinical Professor." At no time did the government state or agree to stipulate that any part of Badre's testimony was false. *See* Exs. 1–5.

## **LEGAL STANDARD**

Under Rule 33 of the Federal Rules of Criminal Procedure, "[u]pon the defendant's motion, the court may vacate any judgment and grant a new trial if the interest of justice so requires." Fed. R. Crim. P. 33. The decision as to whether to grant a new trial is left to the discretion of the district court. The defendant bears the burden of persuasion with respect to a new trial motion, which "should be granted only in exceptional cases in which the evidence preponderates heavily against the verdict." *United States v. Pimentel*, 654 F.2d 538, 545 (9th Cir. 1981); *United States v. Endicott*, 869 F.2d 452, 454 (9th Cir. 1989). When the alleged error concerns the admission of certain evidence, the question is whether, but for that erroneous ruling, the outcome of the trial would have been more favorable to the defendant. *United States v. Butler*, 567 F.2d 885, 891 (9th Cir. 1978).

In deciding a motion under Rule 33, the Court "need not view the evidence in the light most favorable to the verdict; it may weigh the evidence and in doing evaluate for itself the credibility of witnesses." *United States v. Alston*, 974 F.2d 1206, 1211 (9th Cir. 1992). "If the court concludes that, despite the abstract sufficiency of the evidence to sustain the verdict, the evidence preponderates sufficiently heavily against the verdict that a serious miscarriage of justice may have occurred, it may set aside the verdict, grant a new trial, and submit the issues for determination by another jury. *Id*. at 1211–12.

To determine whether a serious miscarriage of justice occurred on the grounds raised by the Defendant in his motion for a new trial, "plain error" review applies because the defendant failed to object on these grounds at trial. *See United States v. Lara-Hernandez*, 588 F.2d 272, 274 (9th Cir. 1978) ("Absent plain error, a conviction will not be reversed on evidentiary grounds not revealed to the trial court at the time of the assertedly erroneous ruling, even though the omitted argument is eventually made at some later stage of the trial."); *see also* Fed. R. Crim. P. 52 (stating any error that is harmless or "does not affect substantial rights must be disregarded" and any "plain error that affects substantial rights may be considered even though it was not brought to the court's attention"). Where an objection was preserved, the "harmless error standard for non-constitutional error" applies.

1    *United States v. Moran*, 493 F.3d 1002, 1014 (9th Cir. 2007).

2                                    <u>**ARGUMENT**</u>

3    **I. There was no due process violation under *Napue*.**

4           A defendant's due process rights are violated when a conviction is obtained through

5    knowing use of false testimony. *See Napue v. Illinois*, 360 U.S. 264, 269 (1959). To prove

6    a due-process violation based on *Napue*, the defendant must show: (1) the testimony was

7    actually false; (2) the prosecution knew or should have known that the testimony was

8    actually false; and (3) the false testimony was material. *United States v. Bingham*, 653 F.3d

9    983, 995 (9th Cir. 2011) A *Napue* claim fails if any of these three elements are not satisfied.

10   *See Towery v. Schriro*, 641 F.3d 300, 308 (9th Cir. 2010) (not reviewing all three

11   requirements because petitioner's "argument fails at the second *Napue* prong").

12          There is no *Napue* violation if there is no "actually false" testimony. *United States v.*

13   *Rodriguez*, 766 F.3d 970, 990 (9th Cir. 2014). "Mere inconsistencies or honestly mistaken

14   witness recollections generally do not satisfy the falsehood requirement." *United States v.*

15   *Renzi*, 769 F.3d 731, 752 (9th Cir. 2014); *see also United States v. Croft*, 124 F.3d 1109,

16   1119 (9th Cir. 1997) (neither earlier inconsistent statements nor conflicting recollections

17   of events establish falsehood). Similarly, testimony that is merely disputed or rebuttable is

18   not false evidence. *United States v. Kabov*, No. 19-50083, 2023 WL 4585957, at *3 (9th

19   Cir. July 18, 2023). *Napue* is violated when, "although not soliciting false evidence, [the

20   prosecutor] allows false evidence to go uncorrected when it appears." *Hayes v. Brown*, 399

21   F.3d 972, 978 (9th Cir. 2005) (*en banc*).

22          For the second prong, a prosecutor does not knowingly introduce false testimony if

23   "the prosecutor did not have knowledge of" the falsity of the "underlying facts." *Towery*,

24   641 F.3d at 309. This prong is violated, for example, where the prosecutor knew its

25   witnesses had received leniency promises and were answering questions in a very specific

26   manner to create the misleading impression that they had not. *Id.* (citing *United States v.*

27   *Barham*, 595 F.2d 231, 239 (5th Cir. 1979)). Without that knowledge, though, there is no

28   *Napue* violation. *Id.*

1    The final prong—materiality—asks "whether there is any reasonable likelihood that
2    the false testimony could have affected the judgment of the jury." *United States v. Houston*,
3    648 F.3d 806, 814 (9th Cir. 2011). Under this standard, "the question is not whether the
4    defendant would more likely than not have received a different verdict with the evidence,
5    but whether in its absence he received a fair trial, understood as a trial resulting in a verdict
6    worthy of confidence." *Id.*

7    **A. Badre did not give false testimony regarding his role at UCSD.**

8    Defendant cannot satisfy any of the *Napue* elements. To be sure, Defendant does not
9    dispute, much less claim as false, the substance of Badre's work at UCSD in the field of
10   forensic psychiatry. Instead, Defendant's *Napue* claim is narrowly focused on the four-
11   word title "Director of Forensic Training." Badre's testimony that he was the Director of
12   Forensic Training at UCSD did not contain an actual falsehood.

13   When asked what he teaches at UCSD, Badre stated he is the "Director of Forensic
14   Training," and explained exactly what that means: "[t]hat means that I teach the physicians
15   who are going to become psychiatrists how to do forensic psychiatry. I teach a whole
16   course…it changes a bit from year to year, but 14 to 16 lectures on how to conduct forensic
17   assessments." Doc. 62 at 4. Defendant does not challenge whether Badre teaches forensic
18   psychiatry course at UCSD about how to conduct forensic assessments, which is what he
19   told the jury the title means to him. There was no false testimony or even a dispute as to
20   the substance or significance of the title on which Defendant's *Napue* claim is based.

21   Badre was then cross-examined in front of the jury about his teaching work at UCSD.
22   When asked whether he was appointed by UCSD as a Voluntary Assistant Clinical
23   Professor, Badre agreed that was the title in his appointment letter and made very clear to
24   the jury that he is not paid for his work at UCSD. Doc. 63 at 4–5. Badre even went so far
25   as to describe his teaching role at UCSD as "less than" part-time. When asked whether he
26   gave himself the title of "Director of Forensic Training," Dr. Badre responded directly by
27   stating he was given the title by "the program director of the psychiatry residency." On re-
28   direct, Badre further solidified his teaching credentials at UCSD by pointing out that not

1    only does he teach at UCSD, he was recognized as "Teacher of the Year" in the last
2    academic period when he lectured on forensic psychiatry. *Id.* at 44–45.

3        The defense did not object to the government's brief reference to Badre's title at UCSD
4    in closing. Doc. 64 at 8. And in its own closing, the defense's did not even argue that Badre
5    testified falsely regarding his role at UCSD. *See* Doc. 74. In fact, the defense argued
6    Badre's testimony that he was a Voluntary Assistant Clinical Professor for forensic
7    psychiatry at UCSD was true and that his prior testimony that he was also the Director of
8    Forensic Training UCSD "exaggerate[ed] his background." *Id.* at 11–12.

9        After trial, the government received even more material supporting Dr. Badre's
10   testimony that he was the Director of Forensic Training at UCSD. Exs. 1–5. Importantly,
11   those materials consisted of emails and letters from other UCSD faculty familiar with Dr.
12   Badre's work teaching forensic psychiatry at UCSD, including the person who had been
13   replaced by Badre as the Director of Forensic Training. Ex. 2. Those materials
14   unequivocally state Dr. Badre can "absolutely" represent to the Court he is the Director of
15   Forensic Training at UCSD and that he is "in charge of" forensic training at UCSD. *E.g.,*
16   Exs. 2–3.

17       Nothing in this record shows Badre gave false testimony, let alone that Badre
18   intentionally misrepresented his role at UCSD. Rather, the defense is arguing—as they did
19   to the jury—that the title Director of Forensic Training exaggerates Badre's role at UCSD,
20   which it does not. If anything, Badre downplayed the significance of his teaching at UCSD
21   in front of the jury by describing it as a "less than" part-time responsibility when, in fact,
22   Badre's lectures almost entirely comprise the forensic psychiatry coursework offered at
23   UCSD. Doc. 63 at 4–5; *see also* Ex. 4.

24       Even if Badre was imperfect in responding to every question, nothing suggests he was
25   being disingenuous in his answers. *See United States v. Oniha*, 570 F. App'x 680, 682 (9th
26   Cir. 2014) (unpublished) (finding "partially conflict[ing]" testimony does not establish
27   false testimony). Badre consistently and repeatedly re-affirmed he worked at UCSD on a
28   volunteer basis and was unpaid, which was consistent with his appointment as a Volunteer

1    Assistant Clinical Professor.

2    And even if Badre's description of his role at UCSD is inconsistent, Defendant has not

3    satisfied the first *Napue* element. "The fact that a witness may have made an earlier

4    inconsistent statement … does not establish that the testimony offered at trial was false."

5    *Croft*, 124 F.3d at 1119. Likewise, "honestly mistaken witness recollections" do not

6    establish the first prong. *Renzi*, 769 F.3d at 752; *see also Towery*, 641 F.3d at 309

7    (ambiguous testimony cannot constitute a *Napue* violation without the prosecutor's

8    subjective understanding of witness's meaning). Testimony is not "actually false" merely

9    because the witness's recollection is "mistaken, inaccurate[,] or rebuttable." *Henry v. Ryan*,

10   720 F.3d 1073, 1084 (9th Cir. 2013). Defendant cannot establish the first prong of a *Napue*

11   violation.

12   **B. The government did not knowingly introduce false testimony nor allow**

13   **false testimony to go uncorrected.**

14   Defendant's claim also fails the second *Napue* prong, as he cannot show that the

15   prosecutor knowingly introduced false testimony. Even if Badre's testimony is false (it is

16   not), "that does not show that the prosecutor knew or should have known of the inaccuracy

17   or falsity." *Oniha*, 570 F. App'x at 682. Instead, if the prosecutor had no knowledge of the

18   underlying facts that made the testimony false, the prosecutor cannot be said to have

19   knowingly introduced false testimony. *Towery*, 641 F.3d at 309.

20   Here, the government produced Badre's resume to the Defendant's attorneys *two-and-*

21   *a-half months* before trial. That resume included Badre's title as Director of Forensic

22   Training at UCSD. Ex. 67-4. As Defendant states in his motion, his own attorneys did not

23   have any information contesting Badre's title at UCSD until *eight minutes* before the

24   *second day* of their cross of Badre. Doc. 67 at 8. Then, when Defendant's attorneys received

25   that information, they did not provide it to the government. Instead, they withheld the

26   information and used it to question Badre on cross in front of the jury. Withholding the

27   documents and using them in this manner at trial prevented the government from

28   understanding the significance Defendant now attributes to them. The documents were

1   only briefly (and partially) displayed on table monitors while Badre was simultaneously
2   questioned about portions of them. Nothing in Badre's responses to the cross on those
3   documents demonstrated that any of his testimony was false.

4   The government then began its closing argument promptly after Badre's testimony.
5   Even after Defendant's attorney concluded cross, and the presentation of evidence
6   concluded, Defendant's attorneys still did not provide the government a copy of the
7   materials they received from UCSD. The government went directly into closing arguments
8   with no further information than what transpired during Badre's testimony. In its closing
9   the government did not focus on Badre's title at UCSD as Defendant argues in his motion.
10  The government simply referred to that title as a credential in the larger and more
11  significant context of Badre working (not teaching) in forensic psychiatry—the
12  professional discipline clearly distinguishing him from Defendant's experts. Doc. 64 at 8.
13  That distinction emphasized the government's argument that Badre offered the only
14  forensic opinion among the three experts that testified at trial. *Id.* at 8–13. The defense did
15  not object to the reference of Badre's role as the Director of Forensic Training nor did the
16  defense object to the argument that Badre provided the only forensic opinion in the case.

17  Again, Defendant's closing argument included its cross of Badre regarding his role at
18  UCSD. In its own argument, the defense only went so far as to argue "Director of Forensic
19  Training" is an exaggeration. Doc. 74 at 11–12. The defense suggested Badre exaggerated
20  due to some bias and the exaggeration should be weighed when determining his credibility.
21  At no point did the defense argue in its closing that Badre testified incorrectly when he
22  explained what Director of Forensic Psychiatry means. *See id.* Nothing in the Defendant's
23  closing argument demonstrated to the government that even the defense believed Badre
24  testified falsely. It was not until *after* trial that the defense called Badre's testimony false
25  and provided the government with copies of the material raising the dispute as to Badre's
26  title at UCSD. Doc. 67-1.

27  The government did not allow false testimony to go uncorrected. While the jury
28  deliberated, the government gathered material to assess the defense's characterization of

1   Badre's testimony. Exs. 1–5. The material the government received firmly supported

2   Badre's testimony, including his role as the Director of Forensic Training. *Id.* When the

3   government called Mr. Light, the government learned for the first time that while Badre

4   does indeed organize and teach forensic psychiatry at UCSD, there is not an employee at

5   UCSD with the title "Director of Forensic Training." It was at that point the government

6   agreed to enter a stipulation reiterating that Badre's title at UCSD was "Volunteer Assistant

7   Clinical Professor" because the government was then aware of Defendant's belief the trial

8   testimony was false and that the government could cure the issue through that stipulation.

9   The government did not agree with the defense's characterization that the testimony was

10   false nor did the government—at any point—characterize Badre's testimony as a

11   misrepresentation. Without evidence that the government knew the statement was false, the

12   second *Napue* prong cannot be satisfied.

13           **C. There is no reasonable likelihood that Badre's title in a voluntary and less**

14                 **than part-time position could have affected the judgment of the jury.**

15      Nor can Defendant prevail on the third prong. Even if this Court were to find fault in

16   Badre's testimony, Defendant cannot establish a "reasonable likelihood that the false

17   testimony could have affected the judgment of the jury." *Houston*, 648 F.3d at 814.

18      It is well established that there is no materiality where the defense is able to deal with

19   purportedly false testimony through effective cross-examination and impeachment. The

20   Ninth Circuit has repeatedly rejected *Napue* claims where, for example, "defense counsel

21   effectively attacked the credibility of [the witnesses purportedly giving false testimony] on

22   cross-examination," *Renzi*, 769 F.3d at 752, and where cross-examination "permitt[ed] the

23   jury to fully evaluate the issue." *United States v. Haines*, 766 F. App'x 443, 448 (9th Cir.

24   2019) (unpublished).[1]

---

25 [1] *See also United States v. Magana-Gonzalez*, 781 F. App'x 615, 617 (9th Cir. 2019)

26 (unpublished) (no materiality where "[d]efense counsel conducted a thorough cross-

27 examination" and "the jury heard those aspects of the post-arrest statement that favored Magana-Gonzalez's defense, irrespective of any asserted gaps in Agent Jones's direct

28 testimony"); *Houston*, 648 F.3d at 814–15 (no materiality because "[d]efense counsel effectively attacked [the] credibility" of the witness); *Oniha*, 570 F. App'x at 682 (no

1    Other Circuits have reached the same conclusion. The Tenth Circuit, for example, has
2    held that cross-examination cures any materiality concerns under *Napue*: "Where evidence
3    refuting a false statement is revealed in cross-examination, the government cannot be said
4    to have relied on the false direct-examination testimony to obtain a guilty verdict." *United*
5    *States v. Crockett*, 435 F.3d 1305, 1317–18 (10th Cir. 2006); *see also United States v.*
6    *Doddles*, 539 F.3d 1291, 1297 (10th Cir. 2008). Likewise, the Fifth Circuit found no
7    materiality where "the defense's devastating cross-examination" and closing argument that
8    featured the falsity as "the centerpiece" of closing arguments ensured "the falsehoods were
9    sufficiently exposed before the jury to enable the jury to weigh those falsehoods in its
10   deliberations." *United States v. O'Keefe*, 128 F.3d 885, 896 (5th Cir. 1997).

11   As in those cases, Defendant made full use of Badre's testimony that he is the Director
12   of Forensic Training while also being appointed by letter as a Voluntary Assistant Clinical
13   Professor so as "to enable the jury to weigh those falsehoods in its deliberations." *Id.* The
14   first segment of the second day of Badre's cross sought to undermine his testimony as to his
15   role at UCSD. Doc. 63 at 4–11. Badre was repeatedly asked whether his position was
16   voluntary and unpaid, to which he responded "[e]xactly" and went on to clarify his UCSD
17   role is less than part time. *Id.* at 4–5. The defense asked him directly where he got the title
18   "Director of Forensic Training" and he responded that the title was from "the program
19   director of the psychiatry residency" at UCSD, which is not Mr. Light. *Id.* Accordingly, any
20   dispute over the significance and source of the Director of Forensic Training title was fully
21   explored on cross and then argued by the defense in closing.

22   There is no reasonable possibility that Badre's purported falsehood could have affected
23   the jury's guilty verdict. Indeed, had the government and defense presented a stipulation to
24   the jury that Badre's title was "Volunteer Assistant Clinical Professor," such a stipulation
25   would have been cumulative and consistent with Badre's trial testimony. Defendant cannot
26   satisfy the third *Napue* prong.

27

28   _____
     materiality based in part on "the vigorous cross-examination and impeachment of the
     witness").

**II. Badre appropriately testified pursuant to the Federal Rules of Evidence, the Court's rulings, and the government's Rule 16 disclosure.**

During his testimony, Badre offered opinion testimony as to whether Defendant suffered from a severe mental disease or defect when he stabbed Aficial. To aid the jury in evaluating his opinion, Badre explained why he concluded Defendant did not suffer from a severe mental disease or defect. His explanation included the fact that he did not find many of the statements Defendant made about the symptoms he was experiencing to be credible. Badre's statements regarding the credibility of the statements Defendant made to Badre and the other practitioners when taken in their intended context, to aid the jury in evaluating his opinion, were permissible under FRE 703, as his statements were probative in helping the jury evaluate the weight they should afford his opinion.

At no time throughout his testimony did the government illicit testimony from Badre as to the ultimate issue in this case, whether Defendant was insane at the time he committed the assault, nor did Badre testify specifically to the ultimate issue, whether on direct examination or on cross examination. At no point during his testimony did Badre state that he found the Defendant to be sane at the time of the incident, nor did he make any statements to compel the jurors to believe Defendant was not insane.

Finally, the United States properly noticed Badre's testimony under Rule 16 (a)(1)(G), including providing a seven-page curriculum vitae, and two reports detailing his analysis of the case and his opinions totaling approximately 32 pages. His report and his curriculum vitae, referenced in the government's Rule 16 notice, adequately covered the testimony elicited by the government, and testified to by Badre.

Nevertheless, even if this Court agreed with Defendant's characterization of Badre's statements, such a finding would not warrant a new trial under Rule 33. Badre's statements must be considered in light of the entire trial, including the testimonies of Victoroff and Griswold. When considered in context of the entire trial, including the statements of Defendant's multiple experts, Rule 33 does not warrant granting Defendant a new trial.

//

**A. Dr. Badre was permitted to discuss his assessment of Defendant's credibility pursuant to Federal Rule of Evidence 703.**

An expert witness in a criminal trial may disclose to a jury otherwise inadmissible facts or data, if the probative value of the information in helping the jury evaluate the expert's opinion substantially outweighs any prejudicial effect. *See* Fed. R. Evid. 703.

On direct examination, Badre confirmed that he diagnosed Defendant with "methamphetamine use disorder." Doc. 62 at 18. Badre's testimony followed testimony by both Victoroff and Griswold that Defendant suffered from schizophrenia. Doc. 66 at 24, Doc. 73 at 11. All three experts testified that methamphetamine use, and schizophrenia may present with similar symptoms. *See* Doc. 66 at 70, Doc. 73 at 15, and Doc. 62 at 20, 21. In explaining why he arrived at a diagnosis of methamphetamine use disorder and not schizophrenia, Badre told the jury that he conducted a review of Defendant's file, including his medical records, and also his in-person evaluation of Defendant.

Badre explained the importance of evaluating an individual's statements for consistency in a forensic examination. Doc. 62 at 15–16. He told the jury how he evaluated the Defendant's responses during the interview, including employing the M-FAST test, to determine if the Defendant was malingering or feigning illness. Doc. 62 at 16–18. He explained that the Defendant's score suggested he was exaggerating his symptoms. *Id.* at 18. In addition to the positive score on the M-FAST, Badre also noted that he noticed other inconsistencies, which impacted his diagnosis, specifically Defendant's self-reported methamphetamine use. *Id.* at 31. With numerous instances of methamphetamine use in the record, including Defendant's report that he used two days before the stabbing, and his statements that he burned his hands trying to make his own methamphetamine, Defendant's representations about the frequency of his drug use were vital to determining whether he had an organic brain defect. *See id.*

Throughout his testimony, Badre only referred to Defendant's credibility as it related to how he arrived at his opinion. *See* Docs. 62–63. For example, when Badre stated "[s]o I already had a credibility problem here," (Doc. 62 at 31), that was in the middle of a

response to the question asking him why he was not able to rule out substance use disorder. Doc. No. 62 at 30–31.

> **Q**. And tell us why you were not able to rule out substance use disorder.
> **A**. Well, there was a lot of evidence that Mr. Cuadrado had a significant use of methamphetamine. There was a report. The first thing he said when he gave -- my understanding, when he went to MCC, the jail, was he said that he was using methamphetamine at work. That's the -- that's -- that's a -- if you use it at work to wake up, that's quite common use.
>
> There is the fact that he told Victoroff that he had used two days prior. There was the fact that he told me that he had only used three times in his life, which is inconsistent with what he told Dr. Coleman and Dr. Victoroff. So I already had a credibility problem here. There was the fact that he had told the police officer that he had burned his hand when he was trying to manufacture methamphetamine.
>
> When I took that information together, with the knowledge I have that such a large number of individuals arrested in San Diego County use methamphetamine and that the common use of methamphetamine is very regular use, I was fairly confident that he had a methamphetamine use disorder.

Doc. 62 at 30–31. Similarly, when he made the statement "I made a long list . . . of things [Defendant] said that I did not think were credible," (*id.* at 82), that was in response to specific questions from defense counsel regarding Defendant's performance on the M-FAST. *Id.* at 81–82. Any statements by Badre regarding Defendant's credibility, including the statements referenced by Defendant on pages 15 and 16 of his motion, were to aid the jury in determining the weight to be placed on his opinion that Defendant suffered from methamphetamine use disorder.

Defendant's reliance on *United States v. Candoli*, 870 F.2d 496, 506 (9th Cir. 1989) is misplaced. In *Candoli*, the Ninth Circuit found error where the government called one expert witness who testified concerning the favorable professional reputation of another government expert who also testified at trial. *Id.* at 505–506. Unlike *Candoli*, Defendant did not testify at trial. By the time Badre testified the defense had already rested their case. Badre did not make any statements about the credibility of any witnesses. He only

1  discussed Defendant's credibility as it related to the formulation of his expert opinion on

2  whether or not Defendant was suffering from a severe mental disease or defect at the time

3  of the assault, which was permissible under Fed. R. Evid. 703.

4  **B. Ultimate Issue**

5  At no time throughout his testimony, whether on direct examination or on cross-

6  examination did Badre testify as to whether Defendant was insane at the time of the

7  incident. *See* Docs 62–63. Defendant contends, that Badre's response to the question "[d]id

8  you find that the defendant possessed a delusion that people were out to kill him?" violated

9  FRE 704, as it compels the conclusion Defendant understood the wrongfulness of his

10  actions. Doc. 67 at 16–17. The question and Badre's response followed statements by

11  Victoroff during his direct examination that someone with schizophrenia under

12  circumstances similar to that which Defendant experienced, might fear that they are going

13  to be killed. Doc. 66 at 39–40. Counsel for Defendant went on to explore Victoroff's

14  opinions further.

15  **Q.** And just finally, speaking generally, based on your experience, based on your

16  training, when someone has delusions that they are going to be killed or harmed,

17  would they think -- would they think that their acts are wrong in defending

   themselves?

18  **A.** Well, I mean, he -- if a person thought that he was about to be seriously physically

19  harmed or killed, then one would expect that person to defend him or herself.

20  Doc. 66 at 40–41. Government counsel objected, and the Court allowed Victoroff to

21  complete his response.

22  **A.** One would expect him to defend him or herself in any way that they thought was

23  appropriate or – you know, to the circumstances. They would think, "I'm right to

24  do this. I'm" – "I'm right. I need to" -- you know, "These guys are surrounding

   me. I'm going to pull out my box cutter and wave it at them, see what happens,"

25  you know?

26  *Id. at* 41. Again, the Government counsel objected as to testimony on the ultimate issue.

27  *Id.* Again the Court overruled the government's objection. *Id.*

28  Following this exchange, during Badre's direct examination, Government counsel

asked Badre to define delusions, (Doc. 62 at 48), and expressly whether he found that Defendant possessed a delusion that people were out to kill him. *Id.* at 51.

> **Q.** I have one final question for you, Mr. Badre. Did you find that the defendant possessed a delusion that people were out to kill him?
> **A.** No.
>
> **Q.** And why didn't you find that to be a delusion?
> **A.** So I did not see a record of that. I did not see a witness saying that. I did not see him before -- can I speak to the videos?
> …
> **A.** At the Shell Gas Station, I don't see him scared. I see him going towards an individual.

*Id.* at 51 – 52. Counsel for Defendant objected as to ultimate issue, but the Court allowed Badre to continue explaining why he did not find that Defendant possessed that specific delusion. *Id.* at 51 – 52.

> **A.** At the storage facility, I don't see him being scared. I don't see him being -- trying, like -- you know, I don't see him calling the cops, saying, "People are trying to get me." He told me he lost the knife. That is not what I expect to see in somebody who thinks what they did is right. I expect them to call the cops and be, like, "Hey, come get me. Something really bad happened."

*Id.* Badre's testimony followed Victoroff's testimony that a person with schizophrenia in a hypothetical but virtually identical situation as the Defendant on the day of the incident may have felt that he was going to be killed, and thus could have been expected to feel they needed to defend themselves. Further, Badre's testimony was not as to the ultimate issue, whether Defendant was insane, but instead was offered only to specifically explain why he did not find that Defendant possessed the specific delusion that someone was trying to kill him.

Nevertheless, even if this Court found that Badre's statements were in fact testimony on the ultimate issue, such a finding would not warrant a new trial under Rule 33. Badre's statements must be considered in light of the entire trial, including the testimony of Dr. Victoroff. When considered in context and alongside the statements of

1   Defendant's multiple experts, Rule 33 does not warrant granting Defendant a new trial.

2   **C. Dr. Badre testified within the bounds of the government's Rule 16 notice.**

3   Finally, Badre testified well within the scope of his Rule 16 notice. The government

4   provided Defense with two reports from Dr. Badre extensively detailing his opinions,

5   including that Defendant suffered from methamphetamine use disorder. Doc. 67-5.

6   Prior to providing Badre's report, resume and curriculum vitae were produced to the

7   defense on December 13, 2023. Doc. 67 at 3; Doc. 67-4. Dr. Badre's resume includes

8   his professional experience working for years in San Diego County's Forensic

9   Evaluation Unit. His statements were foreseeable in light of chi curriculum vitae and

10  extensive report.

11  **III.     Defendant's motion for new trial should be denied because there was no**
12  **error.**

13  Defendant has not shown error, but—even if he had—he cannot meet the other

14  prongs of plain-error review. First, he has not shown the error was plain, that is "clear

15  or obvious under current law." *United States v. Gonzalez-Becerra*, 784 F.3d 514, 518

16  (9th Cir. 2015). No other court has found *Napue* error in similar circumstances—courts

17  instead consistently reject *Napue* claims premised on minor inconsistencies fully

18  explored through vigorous cross-examination—and "[a]n error cannot be plain where

19  there is no controlling authority on point and where the most closely analogous

20  precedent leads to conflicting results." *Id.*

21  The remaining two prongs of plain-error review largely mirror the materiality prong

22  of *Napue*. That is, Defendant was able to dispute the significance of Badre's role at

23  UCSD, including multiple transcript pages on the second day of cross-examination and

24  a closing argument that highlighted the alleged inconsistency for the jury while calling

25  it an exaggeration that should affect their view of Badre's credibility. That the jury may

26  not have fully agreed with Defendant's assessment of the evidence does not make his

27  trial unfair.

28  Similarly, there was no error based on Badre's testimony regarding the credibility

1  assessment performed as part of his forensic examination nor any other expert testimony
2  because the testimony did not exceed the scope of the Rule 16 notice nor address the
3  ultimate issue. Any such error based on the scope of Badre's testimony as allowed by the
4  Court was harmless. *See United States v. Berry*, 683 F.3d 1015, 1021 (9th Cir. 2012)
5  (affirming verdict despite alleged error in the trial court's failing to adequately define *mens*
6  *rea* needed to sustain conviction in the final jury instructions); *see also United States v.*
7  *Stinson*, 647 F.3d 1196, 1212 (9th Cir. 2011) (multiple errors made "in the context of a
8  large trial an strong government case" found to be harmless).

9      Defendant's rights were not seriously affected nor would affirming his conviction
10 seriously undermine "the fairness, integrity, or public reputation of judicial
11 proceedings." *Johnson v. United States*, 520 U.S. 461, 467 (1997). There was no error,
12 plain or otherwise.

**CONCLUSION**

13     For the foregoing reasons, Defendant's motion for new trial should be denied.

14

15

16

17  DATED: April 17, 2024        Respectfully submitted,

18                           TARA K. MCGRATH
19                           Acting United States Attorney

20                           /s/ James Redd
21                           JAMES REDD
22                           Assistant U.S. Attorney

23

24

25

26

27

28

| From: | Williams, Alicia (USACAS) |
|---|---|
| To: | Elizabeth Barros |
| Cc: | Redd, James (USACAS); Payam Fakharara; Kasha Castillo; Sheppard, Fred (USACAS) |
| Subject: | Re: United States v. Cuadrado,23cr1855-LAB - Duty to correct false testimony |
| Date: | Friday, March 1, 2024 1:00:54 PM |

If you would like to put it before the court, that's fine. We should have more information by 1:30.

We can try to have Badre here if the court deems it necessary. Our understanding of your position is inconsistent with how the evidence came out. I don't think he was trying to mislead anyone at the time of his testimony. We also believe you corrected any perception that the Director position had any more weight than it did.

Get Outlook for iOS

---

**From:** Elizabeth Barros ███████████████
**Sent:** Friday, March 1, 2024 12:54:07 PM
**To:** Williams, Alicia (USACAS) ██████████████
**Cc:** Redd, James (USACAS) ████████████ ; Payam Fakharara ████████████████ ; Kasha Castillo ████████████████ ; Sheppard, Fred (USACAS) ████████████████
**Subject:** [EXTERNAL] Re: United States v. Cuadrado,23cr1855-LAB - Duty to correct false testimony

Yes, you can contact him at: ████████████████

> On Mar 1, 2024, at 12:49 PM, Williams, Alicia (USACAS) ████████████████████████ wrote:
>
>
> Do you have a number for light?
>
> Get Outlook for iOS

---

**From:** Elizabeth Barros ████████████████
**Sent:** Friday, March 1, 2024 12:31:17 PM
**To:** Williams, Alicia (USACAS) ████████████████ Redd, James (USACAS) ████████████████
**Cc:** Payam Fakharara ████████████████ Kasha Castillo ████████████████ Sheppard, Fred (USACAS) ████████████████
**Subject:** [EXTERNAL] United States v. Cuadrado,23cr1855-LAB - Duty to correct false testimony

Dear Alicia and Jay,

Attached is an email from the Vice Chair of Education at UCSD, along with Dr. Badre's appointment letter. As you can see in the attached email and letter, his official title is Voluntary Assistant Clinical Professor. UCSD does not have a forensic psychiatry training program or a Director of Forensic Training position.

Given Dr. Badre's testimony and the government's closing argument (and PowerPoint), which referred to Dr. Badre as the Director of Forensic Training, we believe the United States has an obligation to correct this false testimony to the jury under *Napue v. People of State of Ill.*, 360 U.S. 264, 269  (1959) ("The principle that a State may not knowingly use false evidence, including false testimony, to obtain a tainted conviction, implicit in any concept of ordered liberty, does not cease to apply merely because the false testimony goes only to the credibility of the witness. The jury's estimate of the truthfulness and reliability of a given witness may well be determinative of guilt or innocence, and it is upon such subtle factors as the possible interest of the witness in testifying falsely that a defendant's life or liberty may depend.").

We ask that you contact the Court immediately and request that the jury be instructed that Dr. Badre's testimony that he is the Director of Forensic Training at UCSD is false.

Please let us know your response. Since the jury has just retired to deliberate, if we don't hear back in 30 minutes, we will endeavor to contact the Court.

Best,

Elizabeth M. Barros
Supervisory Attorney
Federal Defenders of San Diego, Inc.

| | |
|---|---|
| **From:** | Nicolas Badre |
| **To:** | Williams, Alicia (USACAS) |
| **Subject:** | [EXTERNAL] Fwd: letter |
| **Date:** | Friday, March 1, 2024 1:26:33 PM |

**Nicolas Badre, MD**
**Psychiatry: Forensic, Psychotherapy**

███████████████████████

CONFIDENTIALITY NOTICE: Dr. Badre does not use email for treatment purposes. This email is confidential and for use only by the recipients intended. If you have received this information in error, please notify me immediately and destroy all copies. Unauthorized distribution of this information is prohibited.

---------- Forwarded message ---------
From: **Alan Abrams** ████████████████████
Date: Fri, Mar 1, 2024 at 1:23 PM
Subject: letter
To: Nicolas Badre ████████████████



ALAN A. ABRAMS, M.D., J.D., FCLM

PHYSICIAN AND SURGEON'S LICENSE NO. ███ (CA)
STATE BAR NO. █████ (CA)

March 1, 2024

To Whom It Concerns:

Dr. Badre is currently the Director of Forensic Psychiatry training for the Psychiatry Residency program at UC San Diego School of Medicine. Dr. Badre replaced me as director in 2020. His expertise as a teacher and coordinator of teaching is exceptional.

Thank you.

Sincerely,


Alan A. Abrams, MD JD,
Diplomate, American Board of Psychiatry and Neurology,
Subspecialty Certification in Forensic Psychiatry,
Subspecialty Certification in Addiction Psychiatry.
Diplomate American Board of Preventive Medicine,

Subspecialty Certification in Addiction Medicine

**Friday, March 1, 2024 at 13:10:05 Pacific Standard Time**

---

**Subject:** forensic training

**Date:** Friday, March 1, 2024 at 1:09:47 PM Pacific Standard Time

**From:** David Lehman

**To:** Badre, Nicolas

Hey Nicolas,

I am sorry to hear about your predicament. You can absolutely tell the court that you are in charge of forensic training at UCSD and/or director of forensic training. You are well known to me for teaching forensic lectures. The residents love your lectures and have named you teacher of the year in 2023.

--Dr. Lehman

**From:** Nicolas Badre ████████████████
**Sent:** Friday, March 1, 2024 1:03 PM
**To:** Williams, Alicia (USACAS)
**Subject:** [EXTERNAL] Syllabus

**Forensic didactics schedule 2023-2024**
████████████████

**PGY-3**

|  | Tues 8:00 AM | Teacher |
|---|---|---|
| Aug 15 | 1- Intro CANCELED | Badre |
| Aug 29 | 1 - Intro (malingering) | Badre |
| Sep 12 | 2 - Civil competent CANCELED | |
| Sep 19 | 4- Mitigation & Prosecution | F. Lehman/Badre |
| Oct 3 12P | 12 - Overprescribing | Badre |
| Oct 10 | 5 - Minors | F. Lehman |
| Oct 17 | 2 - Civil competence | Badre |
| Oct 31 | 3 - Civil commitment | Badre |
| Nov 14 | 6 - Criminal Competency | Badre |
| Nov 28 | 7 - Insanity | Badre |
| Dec 12 | 8 - Disability | Badre |
| Jan 16 | 9 - Violence Risk Ax | Badre |
| Jan 23 12P | 10 - Suicide Risk Ax | Badre |
| Jan 30 | 11 - Correctional Psychiatry | Badre |
| Apr 30 | 13 - Psychopathy | Badre |

Option for 12 & 13 - (1) Discussion on law enforcement. (2) Discussion on a case. (3) Invite
Krelstein - medical director for the county. (4) Invite Abrams - SVP. (5) Abrams - anything. (6)
Lipson - Violence risk assessment from another perspective. (7) Journalist or lawyer suing SD jails.
(8) Judge or Attorney. (9) Psychopathy, (10) Barnard conservatorship

**PGY-4**

| Thurs | 9:45 AM - 11:00 AM |
|---|---|
| Mar 28 | 14 - Malpractice |
| Mar 28 | 15 - Impaired physicians |

--
**Nicolas Badre, MD**
**Psychiatry: Forensic, Psychotherapy**
████████████████████
████████    ████

CONFIDENTIALITY NOTICE:  Dr. Badre does not use email for treatment purposes. This email is confidential and for use only by the recipients intended. If you have received this information in error, please notify me immediately and destroy all copies. Unauthorized distribution of this information is prohibited.



# UNIVERSITY OF CALIFORNIA, SAN DIEGO          UCSD

Berkeley· Davis· Irvine· Los Angeles· Merced· Riverside· San Diego· San Francisco· Santa Barbara· Santa Cruz

June 19, 2023

Dear the APA Distinguished Fellow Committee:

As a current Distinguished Fellow of the APA, it is a distinct honor to write this letter of recommendation for Dr. Nico Badre in full support of his application for the distinguished fellowship. I have had the gift of knowing Dr. Badre since he was an intern at the University of California, San Diego (UCSD) in 2011. I have been an Associate Training Director for the past decade plus in the residency program in which Dr. Badre trained. To describe Dr. Badre as exceptional is an understatement. He was noted to be a brilliant clinician, inspiring educator, deep thinker, and superb chief resident during his residency training. These skillsets served as scaffolding for his notable career as a top forensic psychiatrist in the San Diego community, beloved voluntary faculty in the UCSD Department of Psychiatry Residency training program, and thoughtful and frequent contributor to the scholarly efforts in the field of psychiatry. As is no surpise to those of us who were part of his training, his clinical expertise, passion and gifts for teaching, and scholarly activity are in a different league than most "mere mortals".

His phenomenal reputation as a forensic psychiatrist and psychiatrist in private practice practically speaks for itself. I will thus briefly touch upon it in this letter and will then focus the rest of the letter on the aspects of his career that I know best—his teaching and his scholarly work. With his impressive professional skillset, Dr. Badre is an important community leader in San Diego. He has been a valuable role model for local psychiatrists and residents who are interested in forensics work. In addition to his forensic practice, Dr. Badre also has a meaningful and inspiring private practice focused on psychodynamic psychotherapy. Dr. Badre's passion for his work is evident to anyone who gets the privilege of talking with him. He embodies a zest for life and for his work that symbolizes the opposite of burnout.

The UCSD Department of Psychiatry is fortunate to have numerous, talented voluntary faculty. Dr Badre stands out among this illustrious group of individuals. The time, attention, and personalization of his mentorship of UCSD psychiatry residents is truly noteworthy. Dr. Badre dedicates hours of his time to working with and teaching the psychiatry residents at UCSD. In fact, the time and attention he dedicates to our trainees' professional development far surpasses that of many of our salaried faculty. Over the years, he has even taken residents who were struggling in their professional development under his wings, helping them feel connected to him and to the field of psychiatry. He revamped our forensics course in the formalized curriculum, making it cohesive, engaging, thought-provoking, and informative. Additionally, he frequently attends our Resident Rounds series (i.e. the Grand Rounds for our trainees and clinician educators), consistently adding meaningful and insightful comments. Each of the presentations he has provided in this series represents the best of education. In fact, everything he does for residency education—whether it be his lectures, his Resident Rounds presentations, his mentorship of numerous residents, or his hosting of a psychodynamic/forensics night at his house—is in a different league from most faculty. It is no surprise that he has received numerous teaching awards.

Dr. Badre has also published such thoughtful book chapters and peer-reviewed articles in addition to a regular opinion piece in the journal Clinical Psychiatry News. When one steps back and thinks of the thread that unites Dr. Badre's teachings and writings, the thread is that he inspires trainees and his readership to think and to care. He inspires trainees and his readership to think critically about the field of

SER-052

psychiatry. He does not do this for the sake of argument, but rather out of a genuine commitment to bettering—bettering ourselves, our patients, and our field, a field for which he has such passion. He inspires trainees and his readers to think deeply about themselves, their lives, and their work. He inspires them to care about their patients, as the unique human beings that they are.

In light of his remarkable contributions to the field of psychiatry and to the education of future psychiatrists, I cannot think of anyone more worthy of the distinction of the APA Distinguished Fellow.

Sincerely,

Alana Iglewicz, MD
UCSD Department of Psychiatry
Clinical Professor
Associate Residency Training Director
Director of Wellness Initiatives, UCSD School of Medicine
Staff Psychiatrist, SDVAHS
APA Distinguished Fellow

**Francesca Lehman, Psy.D.**
**Licensed Clinical and Forensic Psychologist**

April 3, 2023

To The APA Distinguished Fellow Committee:

I am writing to express my enthusiastic support for the nomination of Dr. Nicolas Badre to be a distinguished fellow of the APA.

I first became acquainted with Dr. Badre in 2017 when we were both asked to serve as board members for the San Diego Psych-Law Society, an organization that focuses on the intersection of psychiatry and the law. Prior to serving together as board members, I was familiar with Dr. Badre by reputation as a highly respected expert witness and forensic psychiatrist for the San Diego County Forensic Evaluation Unit. Since becoming acquainted, Dr. Badre and I have collaborated as educators, presenters, clinicians, as well as board members. I can say with absolute confidence that Dr. Badre is an exceptional clinician, teacher, and scholar who embodies the highest ideals of psychiatry.

As a fellow board member of the San Diego Psych-Law society, I have had the opportunity witness first-hand Dr. Badre's commitment to humanism in psychiatry. For example, in 2018, Dr. Badre personally arranged a Psych-Law community event, entitled "Homeless and Helpless: A Need for Change," which featured a panel, including: a documentary filmmaker who followed the life of a homeless individual, the unsheltered individual who was the subject of the documentary, and a Resident in Family Medicine and Psychiatry at the University of California, San Diego who worked at San Diego's largest homeless shelter. Both educational and evocative, the presentation was among the most well-received events we have had in my experience on the board.

Having collaborated on numerous trainings, curriculums, courses, and presentations, I can attest to Dr. Badre's insightful, critical, yet humble approach to teaching and training. He is well-read, historically informed about both psychiatry and the law, an exceptional diagnostician, and a clear expert in pharmacology. Additionally, Dr. Badre's demonstrable commitment to education and the value he places on training is evident. In addition to his formal teaching position at University of San Diego, Dr. Badre is the director of forensic training and an assistant clinical professor at UC San Diego in the department of psychiatry. Having provided lectures in conjunction with Dr. Badre, I have had the opportunity to directly witness Dr. Badre's gift for conveying complex concepts in ways that are at once thoughtful, engaging, humorous, and accessible. As a result, he consistently receives the highest praise from trainees. In fact, after Dr. Badre took over as director of the forensic program in 2021, the residents explicitly requested that Dr. Badre personally teach the majority of the forensic track courses. I am also aware that psychiatry residents regularly request to work with Dr. Badre on a voluntary basis to receive applied, experiential training and experience in forensic psychiatry.

In so many ways, Dr. Badre motivates others to strive for excellence in their own work. Whether it be by hosting students and residents to his home for psychiatry lectures, discussions or social events; presenting for Grand Rounds; or hosting the "noon-hour" lecture series for the VA, Dr. Badre is constantly serving the community, patients, and students with his time, his vast knowledge of forensic psychiatry, and his clinical acumen.  He exemplifies humanism in medicine, inspires others to excellence, and is a truly gifted clinician, teacher, and scholar.

It is without hesitation that I wholeheartedly endorse Dr. Badre's nomination to be a distinguished fellow of the APA and have no doubt that he will continue to make significant contributions for years to come.

Sincerely,

*Francesca Lehman* (e-signature)

Francesca Lehman, Psy.D.
Clinical and Forensic Psychologist
CA License ██████

UNITED STATES DISTRICT COURT

SOUTHERN DISTRICT OF CALIFORNIA


BEFORE HONORABLE LARRY ALAN BURNS, JUDGE PRESIDING

```
_____
                               )
UNITED STATES OF AMERICA,      )
           PLAINTIFF,          )     CASE NO. 23CR1855-LAB
                               )
                               )     SAN DIEGO, CALIFORNIA
                               )     MONDAY APRIL 29, 2024
                               )      10:00 A.M. CALENDAR
EDWIN CUADRADO JR.,            )
           DEFENDANT.          )
_____)
```

REPORTER'S TRANSCRIPT OF PROCEEDINGS

MOTION FOR NEW TRIAL/SENTENCING HEARING

COUNSEL APPEARING:

FOR PLAINTIFF:          TARA K. MCGRATH
                        UNITED STATES ATTORNEY
                        BY:  ALICIA PHILLIP WILLIAMS
                             JAMES REDD
                        ASSISTANT U.S. ATTORNEYS
                        880 FRONT STREET
                        SAN DIEGO, CALIFORNIA 92101

FOR DEFENDANT:          FEDERAL DEFENDERS OF SAN DIEGO, INC.
                        BY:  PAYAM FAKHARARA
                             ELIZABETH BARROS
                             TRIAL ATTORNEYS
                        225 BROADWAY, SUITE 900
                        SAN DIEGO, CALIFORNIA 92101


REPORTED BY:            LEE ANN PENCE,
                        OFFICIAL COURT REPORTER
                        UNITED STATES COURTHOUSE
                        333 WEST BROADWAY ROOM 1393
                        SAN DIEGO, CALIFORNIA 92101

```
 1    SAN DIEGO, CALIFORNIA – MONDAY, APRIL 29, 2024 – 10:30 A.M.
 2                              *   *   *
 3              THE CLERK:  CALLING NO. 3 ON THE CALENDAR, 23CR1855,
 4   UNITED STATES OF AMERICA VERSUS EDWIN CUADRADO JR.
 5              IF COUNSEL COULD STATE THEIR APPEARANCE, PLEASE.
 6              MR. REDD:  GOOD MORNING, YOUR HONOR.  JAMES REDD
 7   FOR THE UNITED STATES.
 8              THE COURT:  GOOD MORNING.
 9              MS. WILLIAMS:  AND ALICIA WILLIAMS FOR THE UNITED
10   STATES, YOUR HONOR.
11              THE COURT:  GOOD MORNING.
12              MR. FAKHARARA:  GOOD MORNING, YOUR HONOR.  PAYAM
13   FAKHARARA ON BEHALF OF MR. CUADRADO, WHO SHOULD BE PRESENT
14   SHORTLY.
15              THE COURT:  AND MS. BARROS.
16              MS. BARROS:  YES.
17              THE COURT:  GOOD MORNING.
18              MR. FAKHARARA:  YOUR HONOR, WOULD YOU LIKE HIM TO
19   SIT OVER THERE, OR NEXT TO COUNSEL?
20              THE COURT:  WHATEVER YOU PREFER.  WOULD YOU LIKE HIM
21   NEAR YOU?
22              MR. FAKHARARA:  YEAH.  I THINK THIS IS GOING TO BE A
23   LONGER HEARING, SO I WOULD PREFER HIM NEXT TO US.
24              MS. WILLIAMS:  YOUR HONOR, IN HOPES THIS SPEEDS IT
25   UP A BIT I WILL INFORM THE COURT THAT WE HAVE REACHED AN
```

```
 1   AGREED AMOUNT ON THE RESTITUTION.  WE PROVIDED THE PROPOSED
 2   LANGUAGE IN OUR SENTENCING MEMO, BUT WE DIDN'T WANT TO
 3   PRE-FILE THE ORDER UNTIL WE HAD AN AGREEMENT.  SO I CAN UPDATE
 4   THE COURT WHEN WE GET TO THE RESTITUTION AS TO THAT AMOUNT.
 5            THE COURT:  ALL RIGHT.
 6            THEY PREFER TO HAVE THE CLIENT WITH THEM.
 7            MR. FAKHARARA:  I AM JUST GOING TO UPDATE HIM REAL
 8   QUICK ABOUT THE RESTITUTION AGREEMENT, YOUR HONOR.
 9                 (DISCUSSION OFF THE RECORD BETWEEN THE
10                 DEFENDANT AND COUNSEL)
11            THE COURT:  MR. CUADRADO IS PRESENT.
12            GOOD MORNING, MR. CUADRADO.
13            THIS MATTER IS ON FOR SENTENCING TODAY.  THERE IS
14   ALSO A MOTION FOR NEW TRIAL.
15            I HAVE READ AND CONSIDERED THE MOVING PAPERS, THE
16   OPPOSITION PAPERS, THE MOTION FOR NEW TRIAL, WHICH I THINK WE
17   SHOULD TAKE UP FIRST.
18            MR. FAKHARARA:  YES, YOUR HONOR.
19            THE COURT:  IF THE MOTION IS NOT GRANTED THEN WE
20   WOULD PROCEED TO SENTENCING.
21            WITH REGARD TO SENTENCING, I HAVE RECEIVED AND
22   CONSIDERED A PRESENTENCE REPORT.
23            I ASSUME YOU HAVE GONE OVER THAT WITH MR. CUADRADO?
24            MR. FAKHARARA:  YES, YOUR HONOR.  FULLY.
25            THE COURT:  YOU DISCUSSED WITH HIM THE STANDARD
```

1    CONDITIONS OF SUPERVISED RELEASE?

2              **MR. FAKHARARA**:  YES, YOUR HONOR.

3              **THE COURT:**  I HAVE ALSO RECEIVED SENTENCING

4    MEMORANDA FROM BOTH SIDES.  I REVIEWED THAT.

5              THERE WAS A SUPPLEMENTAL SENTENCING DOCUMENT

6    PROVIDED BY THE GOVERNMENT, WHICH I HAVE LOOKED AT.

7              THE GOVERNMENT HAS FILED A SENTENCING SUMMARY CHART,

8    AS HAS THE DEFENSE.  I HAVE LOOKED AT BOTH OF THOSE.

9              THERE IS AN OBJECTION TO THE PRESENTENCE REPORT.

10   THAT HAS BEEN RESPONDED TO BY PROBATION IN AN ADDENDUM.  I

11   HAVE READ BOTH OF THOSE DOCUMENTS, AS WELL.

12             AND I THINK THAT IS IT.  HAVE I NEGLECTED TO MENTION

13   ANYTHING THAT YOU FILED AND I SHOULD HAVE REVIEWED?

14             **MR. FAKHARARA**:  NO, YOUR HONOR.  I THINK THAT

15   ENCOMPASSES ALL OF THE FILINGS.

16             **THE COURT:**  ALL RIGHT.

17             ANYTHING ELSE ON BEHALF OF THE UNITED STATES?

18             **MR. REDD:**  NO, YOUR HONOR.

19             **THE COURT:**  I GOT THE RESTITUTION ORDER, TOO, WHICH

20   YOU SPOKE OF BEFORE.  I HAVE GOT WHAT I ASSUME IS THE

21   AGREED-UPON RESTITUTION AMOUNT.

22             SO I HAVE BEFORE ME A MOTION FOR A NEW TRIAL.  THE

23   BASIS FOR THE MOTION IS THE VIOLATION OF -- ALLEGED VIOLATION

24   OF NAPUE VERSUS ILLINOIS.  DEFENSE CONTENDS THAT DR. BADRE,

25   WHO WAS AN EXPERT WITNESS FOR THE GOVERNMENT, OVERSTATED HIS

1    QUALIFICATIONS, MISSTATED THEM.  DESCRIBED HIMSELF AS THE

2    DIRECTOR OF FORENSIC TRAINING AT UCSD.  AND DEFENSE TAKES THE

3    POSITION THAT THERE IS NO SUCH POSITION, AND HAS BACKED IT UP

4    WITH AN AFFIDAVIT FROM THE CURRENT DIRECTOR OF THE OVERALL

5    PSYCHIATRY PROGRAM.

6            THE GOVERNMENT HAS RESPONDED BY SAYING, LOOK, THERE

7    MAY NOT BE A FORMAL PROGRAM BUT INFORMALLY THERE IS SUCH A

8    PROGRAM.  AND THERE HAVE BEEN PREDECESSORS TO DR. BADRE WHO

9    WERE KNOWN BY THE TITLE OF DIRECTOR OF FORENSIC TRAINING.

10           AND SO, THEY HAVE SAID, REALLY, THIS IS JUST ABOUT

11   NOMENCLATURE AND, YOU KNOW, SOMEBODY USING A TERM THAT

12   EVERYBODY SEEMED TO THINK WAS APPROPRIATE TO USE BUT WAS NOT

13   AN OFFICIAL TERM.

14           I RECEIVED LETTERS FROM HIS PREDECESSOR WHO USED

15   THAT TITLE AND PASSED IT ON TO HIM, AND A PHYSICIAN AND A

16   PSYCHOLOGIST WHO SAID THEY RECOGNIZED HIM AS SUCH.

17           SO THAT'S THE ISSUE, WHETHER THERE WAS FALSE

18   TESTIMONY GIVEN, AND WHETHER IT HAD MATERIAL AFFECT ON THE

19   VERDICT IN THIS CASE.  THAT'S HOW I UNDERSTAND IT.

20           **MR. FAKHARARA:**  YES, YOUR HONOR.  THAT WAS ONE OF

21   THE ISSUES.  WE ALSO ADDRESSED SOME OF THE TESTIMONY GIVEN

22   BY BADRE.

23           **THE COURT:**  YES, THAT'S RIGHT.  AND MAYBE WE SHOULD

24   JUMP TO THAT FIRST.

25           YOU HAVE TAKEN THE POSITION THAT HE WENT OUT OF

1    BOUNDS WHEN HE COMMENTED ON WHETHER HE BELIEVED CERTAIN THINGS

2    THAT THE DEFENDANT SAID.

3              I HAVE TO TELL YOU, I AM LESS SYMPATHETIC TO THAT

4    ARGUMENT.  AS I THINK I MENTIONED DURING THE COURSE OF THE

5    TRIAL, I HAD, AS A LAWYER, HAD HANDLED CASES WITH PSYCHIATRIC

6    DEFENSES QUITE A LOT, BECOME FAMILIAR WITH FORENSIC

7    PSYCHIATRY.  AND I KNOW ONE OF THE THINGS -- FROM THAT

8    EXPERIENCE I KNOW ONE OF THE THINGS FORENSIC PSYCHIATRISTS

9    TRAIN ON AND ARE TRAINED TO DO IS TO LISTEN VERY CAREFULLY AND

10   ASSESS THE CREDIBILITY OF THE DECLARANT, TOO, WHO IS TYPICALLY

11   SOMEBODY WHO IS IN JAIL.

12             AND THEY SAY, LOOK, THIS IS PART OF THE TRAINING

13   THAT WE GET.  WE JUST CAN'T TAKE THINGS AT FACE VALUE BECAUSE

14   THE PERSON OBVIOUSLY HAS A GREAT INTEREST IN CONVINCING US

15   THAT, YOU KNOW, HE IS LABORING UNDER MENTAL DISORDER, MENTAL

16   DISEASE.  AND SO WE GET TRAINING ON THAT.  WE ARE TOLD, YOU

17   KNOW, CONFRONT THEM WITH CONTRARY FACTS, ASK QUESTIONS ABOUT

18   IT.

19             I THINK THAT THE TESTIMONY, AS I READ -- AND I DID

20   READ BACK OVER THE TRANSCRIPT -- WAS COMPLETELY CONSISTENT

21   WITH THE OBLIGATION OF A FORENSIC PSYCHIATRIST TO CHALLENGE

22   THE RESPONDENT, IN THIS CASE MR. CUADRADO, ON SOME OF THE

23   THINGS THAT, YOU KNOW, THAT HE DIDN'T FIND BELIEVABLE OR HE

24   THOUGHT THAT THERE WAS CONTRARY EVIDENCE TO WHAT HE WAS BEING

25   TOLD.

1          YOU HAVE TAKEN THE POSITION THAT, OH, HE CAN'T DO

2   THAT BECAUSE HE IS MAKING CREDIBILITY DETERMINATIONS WHICH

3   SHOULD BE LEFT TO THE JURY.

4          BUT WHAT WAS DIFFERENT HERE IS HE WAS GIVING AN

5   OPINION.  AND I TOLD THE JURY NOT ONCE, NOT TWICE, BUT THREE

6   OR MORE TIMES THAT THEY SHOULD CONSIDER THE INFORMATION ON

7   WHICH THE EXPERT RELIED ONLY INSOFAR AS IT INFORMS THE OPINION

8   HE GIVES, NOT FOR THE TRUTH.

9          YOU WILL REMEMBER THAT, THAT I SAID THAT SEVERAL

10  TIMES TO THE JURY THAT, DON'T ACCEPT THIS AS THAT THIS REALLY

11  HAPPENED, BUT THIS IS WHAT THE EXPERT -- ON BOTH SIDES, THIS

12  IS WHAT THEIR OPINION IS PREDICATED ON.  AND USE IT FOR THAT

13  PURPOSE ONLY.

14         SO THAT WAS SAID.  AND I DON'T THINK ANYBODY SAID,

15  WELL, YOU KNOW, DR. BADRE DOESN'T BELIEVE HIM SO WE SHOULDN'T

16  BELIEVE HIM EITHER.

17         I DON'T THINK THAT HAPPENED.

18         I AM NOT AS -- I AM NOT AS OPEN-MINDED ABOUT THAT

19  ONE AS I AM MAYBE ABOUT THE NAPUE ARGUMENT.

20         I AM HAPPY TO HEAR FROM YOU.

21         **MR. FAKHARARA:**  THANK YOU, YOUR HONOR.

22         YOUR HONOR, THE STATEMENTS I WANT TO MAKE TODAY TO

23  SUPPLEMENT THE NAPUE ISSUE, NOT SO MUCH THE ADDITIONAL THREE

24  ISSUES THAT WE PRESENTED ABOUT DR. BADRE'S TESTIMONY.

25         I WANT TO START FIRST WITH RESPONDING TO THE

1   GOVERNMENT'S ARGUMENTS PRESENTED IN THEIR OPPOSITION.  FIRST I
2   WANT TO TALK ABOUT THE STANDARD OF REVIEW THEY TALK ABOUT.
3   THEY SAY THAT THE STANDARD OF REVIEW SHOULD BE HERE PLAIN
4   ERROR.
5        I THINK IT DOES A DISSERVICE TO NAPUE TO SAY THAT
6   THE STANDARD HERE IS FOR THE DEFENSE TO OBJECT WHEN FALSE
7   TESTIMONY IS PRESENTED.  THE BURDEN IS ALWAYS ON THE UNITED
8   STATES TO RECTIFY, TO MAKE -- TO ADDRESS THE FALSE TESTIMONY.
9        WE TRIED TO IMPEACH DR. BADRE.  THERE WAS AN
10  OBJECTION MADE BY THE UNITED STATES; IT WAS SUSTAINED.  WE
11  WEREN'T ABLE TO FULLY IMPEACH HIM.  AND ULTIMATELY DR. BADRE
12  DOUBLED DOWN AND SAID THAT HE WAS THE DIRECTOR OF FORENSIC
13  TRAINING.
14       THERE IS, IN THEIR OPPOSITION, A STATEMENT MADE THAT
15  I DIDN'T SAY ANYTHING ABOUT IT IN MY CLOSING ARGUMENT.  I
16  THINK IT WOULD HAVE BEEN IMPROPER ARGUMENT FOR ME TO SAY THAT
17  DR. BADRE WAS LYING OR THAT THE TESTIMONY WAS FALSE BECAUSE
18  THE EVIDENCE WAS NOT THERE.  WE WEREN'T ABLE TO FULLY PARSE
19  OUT IN OUR IMPEACHMENT.
20       AT THE END OF THE DAY, EVEN UNDER A PLAIN ERROR
21  STANDARD, THIS IS PLAIN ERROR.  WHEN WE LOOK AT THE CASES
22  INVOLVING NAPUE, EACH OF THE THREE PRONGS ARE MET.  LET'S
23  START FIRST WITH THE STATEMENT BEING FALSE.
24       AND, AGAIN, I AM JUST RESPONDING HERE.  I KNOW YOUR
25  HONOR HAS REVIEWED OUR BRIEFING.

1          THE GOVERNMENT SAYS THAT, ESSENTIALLY, THAT DR.

2     BADRE DIDN'T KNOW THAT HE WAS LYING.  BUT NAPUE DOESN'T

3     ADDRESS THAT.  NAPUE TALKS ABOUT FALSE TESTIMONY, WHETHER THE

4     TESTIMONY ITSELF WAS FALSE.

5          WE HAVE CASE LAW, YOUR HONOR, THAT TALKS ABOUT THIS.

6     HAYES V. BROWN, 399 F.3RD 972.  THIS IS A NINTH CIRCUIT CASE

7     IN 2005.  IT SAYS THAT NAPUE, BY ITS TERMS, ADDRESSES THE

8     PRESENTATION OF FALSE EVIDENCE, NOT JUST SUBORDINATION OF

9     PERJURY.  IT IS NOT ABOUT WHETHER THE WITNESS KNEW THAT WHAT

10    HE WAS SAYING WAS FALSE, IT IS ABOUT WHETHER THE STATEMENT

11    ITSELF WAS FALSE.

12         **THE COURT:**  LET ME STOP YOU THERE.

13         I AM NOT CONVINCED OF THE FALSITY OF THE STATEMENT.

14    AS I SAID, I TAKE YOUR --

15         WHO IS THE FELLOW IN CHARGE AT UCSD WHO WROTE THE

16    DECLARATION?

17         **MR. FAKHARARA:**  YOUR HONOR, IT IS DR. GREGORY LIGHT.

18         **THE COURT:**  SO DR. LIGHT SAYS, LOOK, THERE IS NO

19    SUCH OFFICIAL POSITION.

20         BUT THEN I READ FROM OTHER INFORMED PEOPLE, PEOPLE

21    THAT -- ONE FELLOW WHO WAS IN THE ROLE THAT DR. BADRE HAD, AND

22    DR. BADRE SUCCEEDED HIM, AND THEN OTHERS WHO TAUGHT THERE WHO

23    SAID, WELL, THERE WAS SUCH A POSITION.  IT WASN'T A FORMAL

24    POSITION BUT HE EFFECTIVELY DID THE TRAINING COMPONENT ON

25    FORENSIC PSYCHIATRY FOR ALL OF THE STUDENTS THERE.  HE WAS

1    GOOD AT IT.  HE HAD 14 CLASSES THAT HE TAUGHT.

2              I THINK HE SAID, OH, HE IS DOING A GOOD JOB, AND

3    RECOGNIZED HIM AS, WHAT, TEACHER OF THE YEAR.

4              ONE THING THAT WAS EMPHASIZED, AND HE AGREED WITH IT

5    EVERY TIME IT WAS EMPHASIZED, WAS THAT HE WAS IN A VOLUNTARY

6    POSITION.  HE WASN'T PAID.

7              IN FACT, HE ELABORATED AT ONE POINT WHEN SOMEBODY

8    SAID PART-TIME HE SAID, EVEN LESS THAN PART-TIME.

9              I AM NOT SO SURE THAT THERE WAS FALSITY HERE.  I

10   MEAN, SPECIFICALLY THE -- IT MAY BE TRUE THAT THERE IS NO

11   OFFICIAL POSITION, BUT THERE WAS A POSITION THAT PEOPLE

12   RECOGNIZED AND CALLED DIRECTOR OF FORENSIC PSYCHIATRY,

13   DIRECTOR OF FORENSIC TRAINING, AND USED THAT TERM.

14             I SAW A LETTER THAT WAS WRITTEN IN SUPPORT OF AN

15   AWARD OR SOMETHING FOR HIM OR SOME KIND OF GRANT WHERE THEY

16   USED THAT TERM, HE IS THE DIRECTOR OF FORENSIC TRAINING HERE.

17   AND THAT PRECEDED THE EVENTS OF THIS CASE BY ABOUT A YEAR.

18             YOU SAY IT IS FALSE, AND I THINK IT IS JUST KIND OF

19   A MISUNDERSTANDING OVER NOMENCLATURE, WHICH WAS CLEARED UP

20   WHEN HE NUMEROUS TIMES SAID, I AM JUST ON A VOLUNTARY BASIS

21   THERE.  YOU KNOW, THIS UCSD GIG, THIS IS A SIDE HUSTLE FOR ME.

22   MY MAIN THING IS WITH THE COUNTY DOING FORENSIC WORK.

23             THAT IS ONE OF THE PROBLEMS I AM HAVING GETTING OVER

24   THE FIRST HURDLE, WHICH IS FALSITY.

25             **MR. FAKHARARA:**  I APPRECIATE THE EMAILS AND THE

1   LETTERS THAT THE UNITED STATES PUT INTO THEIR MOTION AS

2   EXHIBITS.

3          AT THE END OF THE DAY WE HAVE ONE DECLARATION THAT

4   WAS PRESENTED TO YOUR HONOR.  UNDER LOCAL RULES, AS YOUR HONOR

5   KNOWS, WHEN A DECLARATION STATES SPECIFIC FACTS AND THE UNITED

6   STATES CONTENDS THAT THOSE FACTS ARE INACCURATE, THEY MUST

7   ALSO FILE A DECLARATION TO SUPPORT THEIR POSITION.

8          **THE COURT:**  DO YOU HAVE ANY DOUBT THAT THE PEOPLE

9   WHO WROTE THE EMAILS BACK TO THE GOVERNMENT WOULD SAY THE SAME

10  THING IF PUT INTO DECLARATION FORM?

11         **MR. FAKHARARA:**  YES, I DO.  I WOULD WANT AN

12  OPPORTUNITY TO BE ABLE TO CROSS-EXAMINE THOSE WITNESSES, TO

13  ASK WHETHER THEY HAD THE AUTHORITY TO GIVE DR. BADRE THE TITLE

14  THAT HE SAYS HE HAS.

15         **THE COURT:**  AND MAYBE THEY DIDN'T, BUT THAT IS

16  ALMOST BESIDE THE POINT BECAUSE THEY CALLED HIM BY THAT.  AND

17  THEY CALLED -- THE ONE FELLOW CALLED HIMSELF BY THAT FOR A

18  PERIOD OF TIME, WITH OR WITHOUT AUTHORITY.

19         SO, YOU KNOW, THIS TITLE GETS MENTIONED AT SOME

20  POINT, YOU KNOW, IN THE COURSE OF THE TRIAL.  THE PROBLEM I AM

21  HAVING IS I JUST DON'T SEE IT AS, LIKE, A PIVOTAL ISSUE HERE.

22         YOU STARTED OFF YOUR BRIEF BY SAYING THIS WAS A

23  BATTLE OF THE EXPERTS.  WELL, I DON'T THINK IT WAS.  I MEAN, I

24  LISTENED AND WATCHED EVERYTHING.  UNLIKE CASES THAT ARE REALLY

25  TIED TO THE -- INEXTRICABLY TIED TO EXPERT OPINION, THIS ONE

1    WASN'T LIKE THAT.  THERE WAS VIDEO OF THE DEFENDANT'S ACTIONS
2    BEFOREHAND AND DURING THE COURSE OF THE THING.  THE JURY GOT
3    TO SEE FOR THEMSELVES HIS ACTIONS.  THEY GOT TO SEE THE
4    INTERACTION, ALBEIT WITH NO SOUND, BETWEEN HIM AND RODRIGUEZ,
5    THE SUPERVISOR AT THE TIME.
6          TO ME -- AND I WASN'T THE TRIER OF FACT BUT TO ME
7    THAT EVIDENCE WAS WAY MORE PROBATIVE OF, YOU KNOW, WHETHER THE
8    DEFENDANT WAS ACTING UNDER A DELUSION OR MENTAL DISORDER THAN
9    ANYTHING THAT THE PSYCHIATRIST SAID, ON BOTH SIDES.
10          THE OTHER THING I WOULD SAY TO YOU, I ACKNOWLEDGE --
11    I WOULD ACKNOWLEDGE THIS, AND MAYBE I AM OUT OF LINE SAYING
12    IT, BUT I DIDN'T THINK DR. BADRE WAS THE BEST WITNESS.  I
13    THOUGHT IT WAS DIFFICULT WHEN YOU CROSS-EXAMINED HIM BECAUSE
14    HE ALWAYS WANTED TO ADD SOME POINT ON THAT SHOULD HAVE BEEN
15    LEFT TO THE ATTORNEYS.  RIGHT?  HE WANTED TO BE ADVERSARIAL.
16    SO YOU WOULD SAY SOMETHING; HE WOULD SAY, YEAH, BUT, YOU KNOW,
17    THIS OR THAT OR THE OTHER THING.
18          AS A GUY THAT USED TO CALL AND CROSS-EXAMINE
19    PSYCHIATRISTS, I WOULD HAVE SAID AT A BREAK, STOP DOING THAT,
20    STOP DOING THAT.  JUST ANSWER THE QUESTION.  I WILL COME BACK
21    IF THERE IS SOME EXPLANATION OR SOME CONTEXT THAT IT NEEDS.
22          HE WAS OVERLY EAGER.  AND, YOU KNOW, HIS BIAS WAS
23    SORT OF MANIFEST.
24          I MENTION THAT BECAUSE, YOU KNOW, THE POINT IS THAT
25    IF THIS IS TRUE, OH, THE JURY HAD A FALSE IMPRESSION OF THIS

```
1   FELLOW AND HOW QUALIFIED HE WAS.
2          I THINK HE DID HIMSELF MORE HARM BY NOT RESPONDING
3   TO YOUR QUESTIONS, JUST ANSWERING THE QUESTION, LEAVING THE
4   LAWYERING TO THE LAWYERS.
5          THAT IS PART OF THE CONSIDERATION HERE, TOO.  DID IT
6   HAVE, YOU KNOW, AN AFFECT -- I KNOW I AM JUMPING AHEAD, BUT
7   DID IT HAVE AN AFFECT ON THE JURY'S VERDICT?  I DON'T THINK IT
8   DID.
9          GO AHEAD.
10          MR. FAKHARARA:  I RESPECTFULLY DISAGREE WITH YOUR
11  HONOR THAT THIS WASN'T A BATTLE OF EXPERTS.  AS YOUR HONOR
12  KNOWS, IT WAS A DIFFICULT TASK, BASED ON THE VIDEO, FOR US TO
13  ATTACK THE ELEMENTS OF THE CASE.
14          THE DEFENSE WAS THE AFFIRMATIVE DEFENSE OF INSANITY,
15  WHICH WAS LITIGATED PRETTY HEAVILY IN THIS CASE.  THE REASON
16  WHY WE DELAYED TRIAL TO BEGIN WITH WAS TO FIND DOCTORS.
17          THE COURT:  RIGHT.
18          MR. FAKHARARA:  THE REASON WHY WE HAD MULTIPLE DAYS
19  OF IN LIMS WAS TO LITIGATE THE TESTIMONY THAT THE DOCTORS
20  WOULD GIVE.  AND, FRANKLY, THE MAJORITY, IF NOT ALMOST ALL OF
21  MY CLOSING, WAS ABOUT WHAT THE TESTIMONY WAS FROM THE DOCTORS
22  AND THE EXPERTS.
23          THE COURT:  I'M NOT SAYING THAT THE PARTIES DIDN'T
24  SEE THE DOCTOR'S TESTIMONY AS IMPORTANT.  I AM JUST SAYING, AS
25  SOMEONE WHO IS OBSERVING IT AND OBSERVING THE WHOLE OF THE
```

1   EVIDENCE, YOU KNOW, THEIR POSTDICTION ANALYSIS OF WHAT WAS HIS
2   FRAME OF MIND AT THE TIME, TO ME, WAS MUCH LESS PROBATIVE THAN
3   SEEING WITH MY OWN EYES, YOU KNOW, WHAT HE DID, HOW HE ACTED.
4   LISTEN TO THE PERCIPIENT WITNESSES THAT WERE INTERACTING WITH
5   HIM AT THE TIME.

6           TO ME, THE FORCE OF THE EVIDENCE WAS WITH THINGS
7   THAT WE, AS LAY PEOPLE, COULD OBSERVE AND MAKE CONCLUSIONS
8   ABOUT.

9           SO, YOU KNOW, WITH ALL RESPECT, BOTH SIDES MAY HAVE
10  SEEN THIS AS A BATTLE OF THE EXPERTS, I THOUGHT THAT TESTIMONY
11  WAS MUCH LESS IMPORTANT THAN THE STUFF THAT, YOU KNOW, WOULD
12  HAVE BEEN RELIED ON HAD THERE NOT BEEN ANY IMPLICATION OF
13  INSANITY.

14          BUT GO AHEAD.

15          **MR. FAKHARARA:**  I APPRECIATE THAT, YOUR HONOR.  I
16  DON'T KNOW IF I AM CONVINCING YOU HERE, BUT I DO WANT TO MAKE
17  JUST SOME FINAL REMARKS.

18          I THINK YOUR HONOR MENTIONED THIS IN THE MOTIONS IN
19  LIMINE AS WELL, YOU TARGETED THE DIFFERENCES BETWEEN OUR
20  EXPERT AND THEIR EXPERT.  IT WAS THE FACT THAT OUR EXPERTS
21  WERE CLINICAL PSYCHOLOGISTS, THEIR EXPERT WAS A FORENSIC
22  PSYCHOLOGIST.

23          THEY EMPHASIZED THIS THROUGHOUT TRIAL, AND THEN ALSO
24  IN THEIR CLOSING.  I THINK THAT HAD A MAJOR IMPACT ON THE
25  JURY'S ABILITY TO UNDERSTAND WHETHER MR. CUADRADO, AT THE TIME

1    HE WAS COMMITTING THE OFFENSE, WHETHER HE APPRECIATED THE

2    NATURE AND QUALITY OF HIS ACTIONS.

3            I THINK THERE WAS A PROFOUND IMPACT ON THEM BEING

4    ABLE TO SAY, HERE IS THE DIRECTOR OF FORENSIC TRAINING AT UCSD

5    WHO IS GIVING A FORENSIC OPINION, THE ONLY FORENSIC OPINION IN

6    THIS CASE, SAYING THAT, YOU KNOW, MR. CUADRADO'S SYMPTOMS WERE

7    NOT THAT CREDIBLE.  AND IN THE MOMENT THAT HE WAS ACTING HE

8    UNDERSTOOD THE NATURE OF HIS ACTIONS.

9            I THINK THAT TYPE OF TESTIMONY HAD A PROFOUND

10   IMPACT, AND THAT IS WHY WE ENDED UP GETTING THE VERDICT WE

11   DID.

12           **THE COURT:**  DO YOU THINK THE JURY COULD HAVE DRAWN

13   THAT CONCLUSION FROM SOME OF THE OTHER EVIDENCE?  FOR EXAMPLE,

14   HE FLED RIGHT AFTER THE STABBING, GOT IN HIS CAR AND FLED THE

15   SCENE.  DIDN'T STICK AROUND.

16           AND THEN, YOU KNOW, HE IS BEING INTERVIEWED BY A

17   DETECTIVE AFTERWARDS, HE SAID, WELL, DO YOU WANT TO APOLOGIZE?

18           HE SAYS, WELL, YOU KNOW, IF THEY WILL DISMISS THE

19   CHARGES AGAINST ME I WILL APOLOGIZE.

20           THOSE ARE THINGS THAT, YOU KNOW, SOMEBODY -- A

21   SOCIOPATH MIGHT SAY, YOU KNOW, NOT WANTING TO TAKE ANY

22   RESPONSIBILITY FOR WHAT HE DID.  BUT FLIGHT FROM THE SCENE IS

23   SOMETHING THAT A RATIONAL NON-IMBALANCED PERSON WOULD DO IN A

24   CASE LIKE THIS.

25           YOU THINK THOSE THINGS WERE PROBATIVE IN THE JURY'S

1  CONSIDERATION OF WHETHER HE WAS IN HIS RIGHT MIND WHEN HE DID

2  WHAT HE WAS ACCUSED OF?

3       **MR. FAKHARARA:**  I WOULD BE LYING NOT TO SAY THAT

4  THOSE WERE PROBATIVE TO ALLOW THE JURY TO MAKE THEIR DECISION.

5       **THE COURT:**  BUT YOU THINK THE PSYCHIATRIC TESTIMONY,

6  THE PEOPLE THAT WEREN'T THERE AND DIDN'T GET INVOLVED UNTIL

7  LATER, AND ON BOTH SIDES WERE BEING PAID; DO YOU THINK THAT

8  THAT WAS MORE IMPORTANT THAN THE TESTIMONY I HAVE JUST GONE

9  OVER?

10       **MR. FAKHARARA:**  I THINK IN A CASE OF INSANITY WHERE

11  THE JURY HAS TO DETERMINE WHAT WAS IN THE MIND OF THE PERSON

12  WHO WAS ACTING, I THINK TESTIMONY FROM EXPERTS WHO CAN TALK

13  ABOUT THAT MAKE A PROFOUND IMPACT ON THEIR ABILITY TO REACH A

14  VERDICT.

15       **THE COURT:**  WHAT ELSE?

16       **MR. FAKHARARA:**  JUST ONE MOMENT, YOUR HONOR.

17       **THE COURT:**  SURE.

18       **MR. FAKHARARA:**  I THINK THE TWO OTHER POINTS THAT I

19  WANT TO MAKE ON THAT IS THAT YOUR HONOR MENTIONED THE FLIGHT

20  AS BEING PROBATIVE.  I THINK IT WAS ALSO CONSISTENT WITH

21  SOMEONE WHO WAS IN FEAR, AND THAT'S WHAT THE EXPERT'S

22  TESTIMONY PROVIDES AS A BACKGROUND FOR THE JURY TO DETERMINE

23  WHAT WAS GOING ON.

24       I ALSO THINK THAT THE STATEMENTS THAT WERE TAKEN OUT

25  OF CONTEXT, ESSENTIALLY, OF HIM SAYING THAT, YOU KNOW, IF I

1    GOT A DEAL OR NOT.

2            WE HEARD TESTIMONY -- WE HEARD THE REMAINDER OF THE

3    POST-ARREST STATEMENT WHERE HE IS CONSISTENTLY APOLOGIZING,

4    CONSISTENTLY DESCRIBING WHAT HAPPENED.

5            AT THE END OF THE DAY, YOUR HONOR, I DO BELIEVE THAT

6    THE DOCTOR'S TESTIMONY HAD A PROFOUND IMPACT ON THE JURY'S

7    VERDICT.  THE UNCONTESTED DECLARATION FROM DR. LIGHT PUTS OUT

8    THE FACTS THAT THERE WAS NO POSITION, THIS TITLE DID NOT

9    EXIST.

10           **THE COURT:**  IT IS CONTESTED.  YOU ARE JUST SAYING

11   THAT THE FORMAT OF THE CONTEST ISN'T WHAT IS REQUIRED, THAT

12   THEY SHOULD HAVE GIVEN ME THOSE EMAILED STATEMENTS AND

13   DECLARATION FROM THE PEOPLE THAT WROTE THE EMAILS.

14           **MR. FAKHARARA:**  OKAY.

15           **THE COURT:**  IT IS CONTESTED.  I MEAN, THESE PEOPLE

16   WHO WERE FAMILIAR WITH THE PROGRAM OVER THERE SAID, YOU KNOW,

17   WE CALLED THE PERSON THAT WAS TRAINING THE RESIDENTS OR THE

18   MED STUDENTS, WE CALLED THAT PERSON, EVEN BEFORE BADRE GOT

19   THERE, THE DIRECTOR.  NOW, MAYBE WE SHOULDN'T HAVE CALLED HIM

20   THAT, BUT THAT WAS -- IT WAS A TERM THAT DESCRIBED THE

21   FUNCTION THE PERSON WAS CARRYING OUT.  HE WAS TRAINING THEM ON

22   A REQUIRED COMPONENT OF THEIR MEDICAL EDUCATION, WHICH WAS

23   FORENSIC PSYCHIATRY.

24           SO WE ARE REALLY HAGGLING OVER WHETHER THIS, YOU

25   KNOW, DIRECTOR WAS, YOU KNOW, THE FALSE STATEMENT TO THE JURY,

1    WOULD HAVE SWAYED THEM TO CONVICT MR. CUADRADO RATHER THAN ANY
2    OF THE OTHER EVIDENCE.
3          **MR. FAKHARARA:**  I SEE THAT I HAVE NOT CONVINCED YOUR
4    HONOR.
5          I THINK WORDS MATTER AT TRIAL, SPECIFICALLY WORDS
6    THAT OFFER CREDENTIALS, THAT OFFER CREDIBILITY TO A WITNESS.
7    AND THESE WERE THE WORDS THAT THE UNITED STATES CHOSE TO
8    EMPHASIZE AT CLOSING.
9          **THE COURT:**  REMIND ME OF THIS.  I THOUGHT WHEN MS.
10   BARROS HAD THE LETTER, WHICH OBVIOUSLY YOU CAN'T PUT THAT
11   HEARSAY IN, YOU CAN CERTAINLY CROSS-EXAMINE HIM WITH IT.
12   THERE WAS A GOOD FAITH BASIS FOR SAYING, HEY, WAIT A MINUTE,
13   YOU ARE SAYING YOU ARE A DIRECTOR AND THIS FELLOW SAYS, WE
14   DON'T HAVE ANY SUCH TITLE.
15         DIDN'T SHE CROSS-EXAMINE HIM ON THAT IN HER CROSS ON
16   THE SECOND DAY.  AND DIDN'T HE RESPOND, WELL, YEAH, OKAY, I
17   MEAN, I AM VOLUNTARY, I AM LESS THAN PART-TIME.
18         YOU KNOW, I WANT TO PUT THIS THING IN THE RIGHT
19   CONTEXT, BUT I THOUGHT HE WAS CONFRONTED WITH THAT AND
20   ACKNOWLEDGED IT MAY NOT BE AN OFFICIAL TITLE.
21         AM I MISRECOLLECTING THAT PORTION OF THE RECORD?
22         **MS. BARROS:**  YOUR HONOR, HE DOUBLED DOWN ON BEING
23   THE DIRECTOR OF FORENSIC TRAINING.  HE DID ADMIT, ON
24   CROSS-EXAMINATION, THAT HE WAS ONLY ASSISTANT IN A VOLUNTARY
25   FACULTY OR VOLUNTARY -- ASSISTANT VOLUNTARY PROFESSOR.  BUT ON

```
 1   DIRECT HE DID NOT DESCRIBE HIMSELF AS VOLUNTARY, HE DID NOT
 2   DESCRIBE HIMSELF AS --
 3          THE COURT:  DO YOU HAVE THAT EXCERPT WITH YOU OF
 4   YOUR CROSS-EXAMINATION ON THE SECOND DAY AFTER YOU RECEIVED
 5   THE LETTER FROM THE --
 6          MS. BARROS:  I CAN PULL IT UP.
 7          THE COURT:  YEAH.  I MAY BE MISRECOLLECTING, AND I
 8   COULDN'T FIND IT IN THE RECORD.  BUT I THOUGHT DR. BADRE CAME
 9   AROUND TO SAYING, YEAH, YOU KNOW, YOU ARE RIGHT, IF THEY WANT
10   TO SAY THERE IS NO OFFICIAL POSITION.
11          MAYBE I AM MISRECOLLECTING, MS. BARROS.  BUT IF YOU
12   HAVE IT THERE, IF YOU COULD READ ME THE QUESTIONS YOU PUT TO
13   DR. BADRE AND HIS ANSWERS REGARDING SPECIFICALLY THE LETTER
14   THAT YOU HAD RECEIVED AND CROSS-EXAMINED HIM ON.
15          MS. BARROS:  I'M SORRY, I THOUGHT I HAD IT ON MY
16   DESKTOP.  I WOULD HAVE TO CONNECT TO OUR NETWORK TO PULL IT
17   UP.
18          THE COURT:  DO YOU HAVE IT?
19          MS. BARROS:  PART OF IT IS EXCERPTED IN THE
20   GOVERNMENT'S RESPONSE.
21          THE COURT:  72, THAT'S -- IS THAT --
22          MS. BARROS:  THEIR RESPONSE IS 75.  THEY HAVE PART
23   OF IT EXCERPTED AT PAGE 9.
24          THE COURT:  DO YOU HAVE THE TRANSCRIPT IN FULL
25   CONTEXT?
```

 1          **MR. REDD:**  I DO, YOUR HONOR.

 2          MS. BARROS IS CORRECT THAT THE PORTION OF HER

 3  CROSS-EXAMINATION RELATING TO DR. BADRE'S TITLE OR HIS ROLE AT

 4  UCSD IS ALSO SET FORTH IN OUR OPPOSITION AT PAGE 9.

 5          **THE COURT:**  CAN YOU READ ME THE QUESTIONS THAT MS.

 6  BARROS PUT TO HIM AND HIS ANSWERS?

 7          **MR. REDD:**  YES, YOUR HONOR.

 8          **THE COURT:**  REFRESH MY MEMORY OF EXACTLY WHAT THE

 9  CONTEXT OF THOSE QUESTIONS AND ANSWERS WAS.

10          **MR. REDD:**  YES.

11          WHILE MS. WILLIAMS IS TURNING TO THE ACTUAL PAGE OF

12  THE TRANSCRIPT, THE BACK AND FORTH OF MS. BARROS'S

13  CROSS-EXAMINATION IS:  QUESTION:  OKAY --

14          **THE COURT:**  WHAT PAGE IS THAT SO SHE CAN --

15          **MR. REDD:**  OH, I'M SORRY.  IT IS THE SECOND DAY OF

16  CROSS-EXAMINATION ON PAGES 4 THROUGH 5.

17          **THE COURT:**  DO YOU HAVE THAT UP, MS. BARROS, OR DO

18  YOU NEED A MINUTE?

19          **MS. BARROS:**  WE CAN'T CONNECT TO THE INTERNET IN

20  HERE.

21          **THE COURT:**  YOU KNOW, I DON'T KNOW WHY THAT IS, OVER

22  THE YEARS.  MOST COURTS HAVE INTERNET CONNECTIVITY, AND I

23  DON'T KNOW WHY WE DON'T.  BUT I WILL LEAVE THAT TO OTHERS,

24  GIVEN MY SHORT STAY HERE.

25          **MR. REDD:**  YOUR HONOR --

```
 1            THE COURT:  DO YOU HAVE A COPY OF IT YOU CAN HAND
 2   HER?
 3            MR. REDD:  YES.  MS. WILLIAMS IS PROVIDING MS.
 4   BARROS A COPY.
 5            THE COURT:  IF YOU WOULD READ THAT EXCHANGE,
 6   QUESTIONS AND ANSWERS, REGARDING, YOU KNOW, WHAT HIS TITLE
 7   WAS.  IF YOU WOULD READ IT TO ME SO THAT I CAN REMEMBER IT,
 8   HAVE IT CLEAR.
 9            MR. REDD:  YES, YOUR HONOR.
10            STARTING WITH MS. BARROS'S QUESTION:  OKAY.  YOU ARE
11   THE DIRECTOR OF FORENSIC TRAINING.  NOW, AS THE DIRECTOR OF --
12   I WOULD LIKE TO TALK TO YOU ABOUT YOUR POSITION AT UCSD.  YOU
13   ARE AN ASSISTANT VOLUNTEER PROFESSOR.
14            RESPONSE FROM DR. BADRE:  EXACTLY.
15            QUESTION FROM MS. BARROS:  AND AS AN ASSISTANT
16   VOLUNTEER PROFESSOR YOU GIVE CLASSES AS -- OR LECTURES, EXCUSE
17   ME -- AS PART OF THEIR VOLUNTARY CLINICAL PROFESSOR SERIES.
18            RESPONSE FROM DR. BADRE:  EXACTLY.  I DON'T GET PAID
19   FOR THAT WORK.
20            QUESTION FROM MS. BARROS:  OKAY.  SO IT IS
21   UNSALARIED?
22            RESPONSE FROM DR. BADRE:  EXACTLY.
23            QUESTION FROM MS. BARROS:  IT IS VOLUNTARY?
24            RESPONSE FROM DR. BADRE:  YEAH.
25            QUESTION FROM MS. BARROS:  IT'S PART-TIME?
```

 1            RESPONSE FROM DR. BADRE:  LESS THAN THAT, YOU WOULD
 2    SAY.
 3            FOLLOW-UP QUESTION MS. BARROS:  LESS THAN THAT?
 4            RESPONSE FROM DR. BADRE:  YEAH.
 5        **THE COURT:**  WASN'T THERE A POINT, THOUGH, WHERE MS.
 6    BARROS ACTUALLY HAD THE LETTER FROM --
 7            FORGIVE ME, THE DOCTOR'S NAME AGAIN?  GLEN OR LATE?
 8        **MS. BARROS:**  DR. LIGHT.
 9        **THE COURT:**  LATE?
10        **MS. BARROS:**  LIGHT.
11        **THE COURT:**  LIGHT.  OKAY.
12            WASN'T THERE A POINT IN TIME WHEN SHE HAD THE LETTER
13    AND SAID, HEY, HOLD ON A SECOND HERE.  WHAT IF SOMEBODY IS
14    TELLING ME THERE IS NO SUCH POSITION THERE.
15            DO YOU HAVE THAT EXCERPT?
16        **MR. REDD:**  I DO, YOUR HONOR.
17        **THE COURT:**  THAT'S THE ONE I'M INTERESTED IN.
18        **MR. REDD:**  ON PAGE 8 OF THIS SAME SERIES OF
19    QUESTIONING MS. BARROS IS SHOWING THE WITNESS THE LETTER,
20    APPARENTLY.
21            AND HER QUESTION IS --
22            AND I WILL SHOW MS. BARROS, IF I COULD.
23                  **(DISCUSSION OFF THE RECORD)**
24        **MR. REDD:**  HER QUESTION BEGINS:  NOW, THIS LETTER
25    DOES NOT GIVE YOU THE TITLE OF FORENSIC TRAINING.

1            HIS RESPONSE IS:  CORRECT.

2            MS. BARROS ASKS:  OKAY.  IS THAT A TITLE YOU HAVE

3    GIVEN YOURSELF?

4            DR. BADRE RESPONDS:  NO.

5            MS. BARROS:  OKAY.  UCSD GAVE YOU THAT TITLE?

6            THE RESPONSE FROM DR. BADRE:  THE PROGRAM DIRECTOR

7    OF UCSD, THE PROGRAM DIRECTOR OF THE PSYCHIATRY RESIDENCY.

8            **THE COURT:**  WHO DO YOU KNOW THAT PERSON TO BE?  IS

9    THAT THE PERSON THAT THE DEFENSE HAS GIVEN ME THE AFFIDAVIT OR

10   THE DECLARATION?

11           **MR. REDD:**  NO, YOUR HONOR.  I BELIEVE DR. BADRE IS

12   REFERRING TO MR. ABRAMS, WHO IS THE INDIVIDUAL WHO REPRESENTED

13   IN THE LETTER THAT HE WAS DR. BADRE'S PREDECESSOR IN THAT

14   ROLE.

15           **MS. BARROS:**  YOUR HONOR, MAYBE THIS IS PART OF WHY

16   THEY SHOULD HAVE SUBMITTED A DECLARATION RESPONDING.  I DON'T

17   BELIEVE THAT THAT IS WHO MR. ABRAMS IS OR WAS.  AND, IN FACT,

18   I BELIEVE THAT ABRAMS IS RETIRED AT THIS POINT.

19           BUT THEY HAVE NOT SUBMITTED A DECLARATION FROM THAT

20   INDIVIDUAL INDICATING THAT HE GAVE HIM THAT TITLE.

21           **THE COURT:**  THERE IS NOT A DECLARATION, THERE IS AN

22   EMAIL.  AND I THINK IT IS FROM DR. ABRAMS.  I DIDN'T REALIZE

23   HE WAS RETIRED.  BUT HIS EMAIL SAYS, LOOK, I WAS THE

24   PREDECESSOR AND I USED THAT TITLE.  AND I THINK IT WAS

25   LEGITIMATE.

1          **MR. FAKHARARA:**  YOUR HONOR --

2          **THE COURT:**  HERE IT IS.  I HAVE IT HERE.  DR. ALAN

3     ABRAMS.  HE SAYS DR. BADRE IS CURRENTLY THE DIRECTOR OF

4     FORENSIC PSYCHIATRY TRAINING FOR THE PSYCHIATRIC RESIDENCY

5     PROGRAM AT UCSD.  DR. BADRE REPLACED ME AS DIRECTOR IN 2020.

6     HIS EXPERTISE AS TEACHER AND COORDINATOR OF TEACHING IS

7     EXCEPTIONAL.

8          SO HE IS USING THIS TERM "DIRECTOR," AND HE USED IT

9     HIMSELF.  MAYBE HE WAS ENTITLED TO USE IT BUT HE SEEMS TO

10    THINK THAT WHEN BADRE SUCCEEDED HIM HE WAS ENTITLED TO USE

11    THAT TITLE TOO, HOWEVER INFORMAL IT MAY HAVE BEEN.

12         **MS. BARROS:**  BUT, YOUR HONOR, SO THE PROGRAM

13    DIRECTOR OF PSYCHIATRY RESIDENCY IS NOT, AND WAS NOT, DR.

14    ABRAMS.

15         **THE COURT:**  RIGHT.

16         **MS. BARROS:**  SO THAT'S THE PERSON WHO HE SAYS, HE

17    GAVE ME THE TITLE.

18         DR. LIGHT IS THE PERSON THAT IS AUTHORIZED TO GIVE

19    TITLES AND HE --

20         **THE COURT:**  WHO IS THE DIRECTOR?  IT IS NEITHER OF

21    THE DOCTORS WE HAVE BEEN TALKING ABOUT, RIGHT?  WASN'T ABRAMS

22    AND IT IS NOT --

23         **MS. BARROS:**  THE PROGRAM DIRECTOR OF PSYCHIATRY

24    RESIDENCY NEITHER -- IS NOT DR. ABRAMS.

25         **THE COURT:**  HAVE EITHER OF YOU TALKED TO THAT PERSON

1  TO SAY, WHAT DO YOU CALL THIS GUY THAT GIVES ALL THE FORENSIC

2  TRAINING TO THE RESIDENTS?

3           **MR. REDD:**  NO, YOUR HONOR, AND THAT IS THE ISSUE

4  HERE.  THERE IS NO DISPUTE THAT THERE IS NO ONE AT UCSD WITH

5  THE TITLE OF DIRECTOR OF FORENSIC TRAINING.

6           **THE COURT:**  NO, NO.  I GET THAT.  BUT THERE IS

7  SOMEBODY HIGHER UP THAN THE TWO PEOPLE WE HAVE BEEN TALKING

8  ABOUT.

9           **MS. BARROS:**  NO.  DR. LIGHT IS HIGHER THAN WHOEVER

10  THE PROGRAM DIRECTOR OF PSYCHIATRY RESIDENTS.

11          **THE COURT:**  WHO IS THAT PERSON, DO YOU KNOW?

12          **MS. BARROS:**  I DON'T KNOW THAT PERSON'S NAME.

13          **THE COURT:**  DO YOU?

14          **MS. WILLIAMS:**  NO, YOUR HONOR, WE DO NOT KNOW THAT

15  PERSON.  DR. BADRE PROVIDED TWO LETTERS.  I THINK THAT THAT IS

16  WHAT THE ISSUE IS COMING DOWN TO IS SHE IS SAYING THIS IS A

17  DIRECT MISREPRESENTATION, A DIRECT CONFLICT WITH A

18  DECLARATION.

19          AND IT IS NOT BECAUSE GREG LIGHT IS NOT THE PROGRAM

20  DIRECTOR OF UCSD.  HE IS NOT THE PROGRAM DIRECTOR OF

21  PSYCHIATRIC RESIDENCY.  SO WHEN DR. BADRE SAYS THAT HE IS NOT

22  MAKING A REPRESENTATION THAT GREG LIGHT GAVE HIM THAT TITLE,

23  IN THE DECLARATION GREG LIGHT SAYS THAT HE DID NOT GIVE HIM

24  THAT TITLE.

25          THERE IS NO DISPUTE THERE IS NOTHING WITH DR. BADRE

1    SAYING THAT HE GAVE HIM THAT TITLE IN THE DECLARATION.  NO
2    DISPUTE WHATSOEVER.
3           THE ISSUE COMES DOWN TO THE FACT THAT HE GOT THIS
4    TITLE FROM TWO OTHER INDIVIDUALS, I BELIEVE DR. LEHMAN AND DR.
5    ABRAMS.
6           I CANNOT REPRESENT TO THE COURT THAT EITHER OF THOSE
7    PEOPLE ARE THE DIRECTOR OF PSYCHIATRIC RESIDENCY AT UCSD.  BUT
8    THAT IS WHY IT DID NOT COME DOWN TO A HUGE ISSUE FOR US,
9    BECAUSE DR. GREG LIGHT IS TALKING ABOUT SOMETHING COMPLETELY
10   DIFFERENT.  HE IS NOT TALKING ABOUT WHETHER OR NOT THESE OTHER
11   TWO INDIVIDUALS GAVE HIM THAT TITLE, HE IS MORE SAYING THAT HE
12   IS THE ONE THAT HAD TO RIGHT TO GIVE THE TITLE AND THAT HE
13   DIDN'T AUTHORIZE HIM TO GIVE THAT TITLE.
14          ALSO NOT IN DISPUTE IN THE DECLARATION IS THERE IS
15   NOTHING IN THAT DECLARATION FROM GREG LIGHT THAT SAYS DR.
16   BADRE DIDN'T TEACH THESE LECTURES AT UCSD.
17          **THE COURT:**  THAT'S A DIFFERENT ISSUE, THOUGH.
18          **MS. WILLIAMS:**  CORRECT.
19          **THE COURT:**  HAVING A TITLE AND USING THE TITLE IS
20   DIFFERENT FROM ACTUALLY PERFORMING THE FUNCTION OF HOLDING
21   THESE CLASSES.  I DON'T THINK THE DEFENSE DISPUTES THAT HE
22   HELD THESE CLASSES.  ONE OF THE EXHIBITS SHOWED THAT, YOU
23   KNOW, HE WAS REGULARLY TEACHING THIS 14-SESSION CLASS.  IT
24   JUST COMES DOWN TO, YOU KNOW, WHAT WE CALLED HIM OR WHAT HE
25   WAS KNOWN BY THERE.

1            TO ME, THE FUNCTION SOUNDS LIKE:  WE HAVE ENTRUSTED
2    YOU TO HANDLE THIS COMPONENT OF THE EDUCATION, INCLUDES
3    TEACHING CLASSES.

4            SO, YOU KNOW, WAS "DIRECTOR" A STRETCH?  MAYBE.  BUT
5    ALSO, YOU KNOW, SEEMS TO ME TO BE A FAIR CHARACTERIZATION OF
6    WHAT HE WAS DOING.

7            BUT HERE IS THE OTHER ISSUE.  THEY HAVE RAISED THE
8    FACT THAT THEY GAVE YOU EMAILS, THEY DIDN'T GIVE YOU
9    DECLARATIONS.

10           WHY DIDN'T YOU GET DECLARATIONS FROM THESE PEOPLE TO
11   THE EFFECT OF WHAT THEY WERE SAYING?

12           **MS. WILLIAMS:**  THAT IS EXACTLY THE POINT, YOUR
13   HONOR.  WHEN THEY FILED THE DECLARATION WE DIDN'T SEE THAT
14   ANYTHING HERE WAS IN DISPUTE WITH WHAT DR. BADRE SAID.

15           DR. GREG LIGHT'S DECLARATION TOUCHES ON WHETHER OR
16   NOT HE WAS A VOLUNTARY ASSISTANT PROFESSOR.  HE SAID THAT HE
17   WAS.  NOTHING IN THAT -- IN GREG LIGHT'S DECLARATION
18   CONTRADICTED ANYTHING THAT DR. BADRE SAID.

19           **THE COURT:**  HE SAYS -- NO, HE DOES SAY SOMETHING
20   THAT IS A LITTLE BIT CONTRADICTORY, I THINK.  HE SAYS THERE IS
21   NO SUCH POSITION AS DIRECTOR OF FORENSIC PSYCHIATRY.

22           **MS. WILLIAMS:**  AND THAT IS CORRECT.  AND, AS THEY
23   POINTED OUT, WE SPOKE WITH DR. GREG LIGHT AND DR. BADRE AND AT
24   THAT POINT, AFTER THE TRIAL, IT CAME TO OUR UNDERSTANDING THAT
25   THERE WAS NO PROGRAM LIKE THAT.

1          **THE COURT:**  YOU MEAN NO TITLE LIKE THAT.

2          **MS. WILLIAMS:**  NO TITLE LIKE THAT.

3          WE DID FEEL THAT THAT WAS SEMANTICS.  WE DON'T ALSO

4   DISPUTE THAT.

5          THE REAL QUESTION HERE IS, I THINK, WHAT BADRE

6   EXPLAINED ON DIRECT, WHAT HE EXPLAINED ON CROSS, AND WHAT HE

7   EXPLAINED ON REDIRECT; WAS THAT HE TAUGHT THESE LECTURES AT

8   UCSD.  THAT SEEMS TO BE THE IMPORTANT THING HERE.

9          **THE COURT:**  IT SEEMS MORE IMPORTANT TO ME THAT HIS

10  PREDECESSOR, WHO WAS A PROFESSOR THERE, IS A CREDENTIALED

11  FELLOW, USED THAT TITLE AND BELIEVED THAT BADRE WAS ENTITLED

12  TO USE THE TITLE WHEN BADRE REPLACED HIM.

13         AND SO IT IS NOT ABOUT WHETHER THIS IS AN OFFICIAL

14  POSITION AT UCSD, IT IS WHETHER IT WAS FALSE FOR BADRE TO SAY,

15  LOOK, THAT'S THE INFORMAL TITLE THAT IS BEING USED.  AND I AM

16  NOT LYING ABOUT IT, THE GUY THAT, YOU KNOW, I REPLACED HAD

17  USED THE TITLE.

18         AND HE ATTESTS IN THIS LETTER, AT LEAST, THAT HE

19  THINKS BADRE WAS FREE TO USE THE TITLE TOO BECAUSE IT

20  DESCRIBES THE FUNCTION THAT HE WAS PERFORMING.

21         THAT'S THE DIFFICULTY I'M HAVING WITH THIS ABOUT THE

22  FALSITY ELEMENT.

23         **MS. BARROS:**  YOUR HONOR, THOUGH, I JUST WANTED TO

24  POINT OUT ONE THING.

25         WHEN THE GOVERNMENT WAS READING THE TRANSCRIPT THEY

SER-083

1    ACTUALLY STARTED, I THINK, ONE LINE BELOW WHERE THEY SHOULD
2    HAVE STARTED BECAUSE --

3         **THE COURT:**  TELL ME WHAT ELSE I SHOULD KNOW.

4         **MS. BARROS:**  HE DOUBLED DOWN ON SAYING, I AM THE
5    DIRECTOR OF FORENSIC TRAINING.

6              WHEN HE WAS CROSS-EXAMINED ABOUT THE FACT THAT, FOR
7    EXAMPLE, HE DOESN'T HAVE A FORENSIC FELLOWSHIP -- WHICH IS
8    REQUIRED TO BE BOARD CERTIFIED IN FORENSIC PSYCHIATRY, WHICH
9    HE ALSO ISN'T.

10        **THE COURT:**  BUT YOU DON'T DISPUTE, MS. BARROS, THAT
11   HE WAS TEACHING THESE -- THESE ARE RESIDENTS, RIGHT?

12        **MS. BARROS:**  HE WAS TEACHING LECTURES, GIVING
13   LECTURES TO RESIDENTS.  THERE IS NO COURSE, IT IS NOT EVEN
14   CONSIDERED A COURSE.  TO HAVE A COURSE THAT HAS TO BE APPROVED
15   BY THE ACADEMIC SENATE AT UCSD, AND THERE IS NOT AN APPROVED
16   COURSE.  BUT THEY DO GIVE LECTURES.

17        **THE COURT:**  MY UNDERSTANDING WAS THAT IT IS A
18   REQUIRED COMPONENT OF GRADUATION THAT THEY GET TRAINING IN
19   FORENSIC PSYCHIATRY, AND BADRE AND ABRAMS WERE THE GUYS THAT
20   FULFILLED THAT PORTION OF THE ACADEMIC REQUIREMENT.

21        **MS. BARROS:**  WE DON'T DISPUTE THAT IT IS A
22   REQUIREMENT AND THAT HE GAVE SOME LECTURES.  BUT I WANTED TO
23   POINT OUT, SO WHEN I SAID TO HIM:  YOU HAVE NOT COMPLETED A
24   FELLOWSHIP IN FORENSIC PSYCHIATRY.

25              HIS ANSWER WAS:  EXACTLY.  I AM THE DIRECTOR OF

```
 1   FORENSIC TRAINING AT UCSD.
 2            THE COURT:  YEAH.
 3            MS. BARROS:  SO HE WAS EMPHASIZING THAT HE HAS THIS
 4   DIRECTOR POSITION AT UCSD.
 5            AND THEN IT WAS ONLY AFTER THAT THAT HE ADMITTED
 6   THAT HE WAS AN ASSISTANT, AND THAT HE WAS VOLUNTARY; ALL
 7   THINGS THAT HE DID NOT TESTIFY TO ON DIRECT EXAMINATION.
 8            AND I THINK, YOU KNOW, AT THE END OF THE DAY WHETHER
 9   HE BELIEVED HE HAD SOME ABILITY TO USE THIS TITLE I DON'T
10   THINK IS DISPOSITIVE BECAUSE IT, IN FACT, WAS NOT TRUE.  AND
11   THE GOVERNMENT ALLOWED THAT FALSITY TO STAND, AND ARGUED IT IN
12   CLOSING ARGUMENT AFTER THEY KNEW THAT IT WASN'T TRUE.
13            AND THEN THEY HAD THE OPPORTUNITY TO ACTUALLY SPEAK
14   WITH DR. LIGHT BEFORE THE VERDICT.  AND WE TRIED TO BRING IT
15   TO THE COURT'S ATTENTION.  WE HAD EMAILED AND WE WERE TOLD --
16   AND THEY WERE STILL OPPOSING AT THAT POINT A --
17            THE COURT:  MY RESPONSE WAS, FILE A MOTION.  WE HAD
18   A JURY DELIBERATING.  I'M NOT GOING TO SAY, OH, STOP
19   DELIBERATING NOW BECAUSE, YOU KNOW, SOMEBODY HAS RAISED AN
20   ISSUE, AND WE MAY NEED TO REOPEN THE TRIAL.
21            THAT WOULD BE AN EXTRAORDINARY THING.
22            NO MOTION WAS FILED, AND THE VERDICT CAME BACK
23   BEFORE THIS THING GOT FLESHED OUT.
24            MS. BARROS:  I THINK THE TIMING ON THAT, WHEN WE GOT
25   THAT MESSAGE WE IMMEDIATELY STARTED WORKING ON A MOTION BUT
```

1    THE VERDICT CAME SHORTLY AFTER.

2            **THE COURT:**  I'M NOT FAULTING YOU, BUT WHAT WAS THE

3    ALTERNATIVE?  TO SAY, OH, STOP THE DELIBERATIONS RIGHT NOW,

4    QUIT TALKING UNTIL I DETERMINE WHETHER THERE SHOULD BE SOME

5    CORRECTION OF SOMETHING.

6            IT WAS A CONTESTED ISSUE AT THAT POINT AS IT WAS

7    PRESENTED TO ME.

8            SO, ANYWAY, I THINK I HAVE IT.

9            ANYTHING ELSE ON BEHALF OF THE DEFENSE IN SUPPORT OF

10   THE NEW TRIAL MOTION?

11           **MR. FAKHARARA:**  NOTHING ELSE, YOUR HONOR.

12           **THE COURT:**  ANYTHING MORE ON BEHALF OF THE UNITED

13   STATES?

14           **MR. REDD:**  NO, YOUR HONOR.

15           **THE COURT:**  OKAY.  SO HERE ARE MY FINDINGS.

16           FIRST, I FIND THAT RATHER THAN BEING AN INTENTIONAL

17   FALSEHOOD, OR EVEN REALLY SOMETHING THAT I CAN SAY IS

18   OBJECTIVELY FALSE, I FIND THAT THIS IS JUST REALLY A

19   DISAGREEMENT ABOUT NOMENCLATURE.  THAT AUTHORIZED PEOPLE AT

20   UCSD THOUGHT THAT THIS TITLE FIT.  BADRE WAS UNDER THAT

21   IMPRESSION THAT THE TITLE FIT.

22           IT IS TRUE, AS DR. LIGHT POINTS OUT, THAT THERE IS

23   NO SUCH OFFICIAL TITLE.  BUT WHAT THIS COMES DOWN TO, REALLY,

24   IS FOR ME TO SAY, OH, HE GETS A NEW TRIAL BECAUSE, YOU KNOW,

25   THIS ONE LITTLE THING ABOUT WHETHER HE HAD THIS TITLE MADE THE

1    DIFFERENCE.

2           I DON'T BELIEVE THAT FOR A SECOND.

3           THE EXPERTS ON BOTH SIDES WERE HIGHLY CREDENTIALED,

4    SMART PEOPLE.  THEY WERE PEOPLE THAT HAD MEDICAL DEGREES,

5    SPECIALTIES IN PSYCHIATRY.  AND THE IDEA THAT, YOU KNOW, THIS

6    TURNED ON WHETHER BADRE WAS OR WAS NOT THE DIRECTOR OF

7    FORENSIC PSYCHIATRY AND THAT MADE ALL THE DIFFERENCE, I DON'T

8    BUY THAT FOR A SECOND.

9           THERE WAS A LOT OF SUBSTANTIVE TESTIMONY.  EVEN THE

10   CHARACTERIZATION THAT YOU HAVE USED TO DESCRIBE THE TRIAL, A

11   BATTLE OF THE EXPERTS, DOESN'T TURN ON ONE PERSON'S OSTENSIBLE

12   TITLE OR HOW PEOPLE REGARDED HIM.

13          WHAT IS SALIENT HERE IS THAT, YOU KNOW, WHEN BADRE

14   WAS ASKED:  HOLD ON A SECOND, YOU ARE NOT A REGULAR PROFESSOR.

15          NO, I AM NOT.

16          VOLUNTARY.

17          YES.

18          NOT PAID.

19          YES.

20          PART-TIME.

21          LESS THAN PART-TIME.

22          ALL OF THOSE THINGS I THINK PUT IN CONTEXT WHAT HIS

23   FUNCTION WAS THERE.  I DON'T FIND, AT ALL, THAT THERE IS ANY

24   PROSPECT THAT THE JURY, YOU KNOW, HAD THE TERM DIRECTOR OF

25   FORENSIC PSYCHIATRY NOT BEEN USED, THAT THAT WOULD HAVE

1    CHANGED THE OUTCOME HERE.

2          FIRST, AS I SAID -- I MAY BE WRONG ABOUT THIS, BUT I

3    AM MORE SKEPTICAL THAN I THINK MOST PEOPLE THAT FORENSIC

4    PSYCHIATRY CARRIES THE DAY, PARTICULARLY WHEN YOU HAVE

5    EVIDENCE FROM PERCIPIENT WITNESSES.  YOU HAVE VIDEOTAPE, YOU

6    HAVE VIDEOTAPE OF THE INCIDENT ITSELF.

7          YOU KNOW, HOWEVER -- THAT WAS A LITTLE BIT FOGGY

8    BECAUSE IT WAS TAKEN AT A DISTANCE, BUT YOU SAW WHAT HAPPENED.

9    YOU HAD A FIRST-PERSON ACCOUNT THAT MATCHED WHAT WAS BEING

10   SHOWN ON THE VIDEOTAPE.

11         BUT MORE THAN THAT, YOU KNEW THAT MR. CUADRADO WAS

12   IRRITATED BEFORE THAT HAPPENED, BECAUSE RODRIGUEZ COMES IN AND

13   SAYS, HEY, YOUR TRUCK IS LEFT UNATTENDED, YOU ARE NOT SUPPOSED

14   TO BE IN HERE AT 7/11 GRABBING A DRINK OR A HOT DOG.  YOU ARE

15   NOT SUPPOSED TO BE DOING THAT.  YOU KNOW, GET BACK.

16         HE WAS IRRITATED ABOUT THAT.  I THINK PEOPLE

17   UNDERSTOOD THAT.  IT IS A MATTER OF HUMAN NATURE.  YOU KNOW,

18   HEY, I AM WORKING A HARD DAY, DON'T I GET A CHANCE TO GET

19   SOMETHING TO EAT AND SOMETHING TO DRINK?

20         WELL, SO -- THEY SAW THAT INTERACTION.  THEY SAW HE

21   WAS ANGRY BECAUSE WHEN HE WALKED OUT OF THE 7/11 HE TOOK HIS

22   DRINK AND HE FLUNG IT BACK AT RODRIGUEZ OR AT HIS VEHICLE.

23         YOU KNOW, THOSE ARE THE THINGS THAT WOULD PERSUADE

24   ME, AS A TRIER OF FACT, AS TO WHAT HIS MENTALITY WAS AT THE

25   TIME.  HE IS ANGRY.  HE IS ANGRY.  HE IS BEING CONFRONTED

1    THERE.

2              IT CARRIES ON TO WHERE HE IS, YOU KNOW, CONFRONTED

3    BY NOW THREE PEOPLE AT THE LOT WHEN HE DRIVES HIS TRUCK UP

4    THERE.  AND IT LEADS TO, YOU KNOW, VIOLENCE BECAUSE HE IS IN A

5    VERY ANGRY STATE.

6              I THINK THAT WAS THE SALIENT EVIDENCE IN THE CASE,

7    NOT WHAT SOME DOCTOR IS SAYING.  YOU KNOW, POSTDICTION A YEAR

8    AFTER THE FACT, LOOKING AT THINGS, HAVING NO HISTORICAL

9    CONNECTION TO THE CASE HIMSELF, OR HERSELF, AS THE CASE MAY

10   BE.

11             NOW, HAVING SAID THAT, I AM NOT TELLING YOU THAT I

12   DISCOUNT THAT TESTIMONY ENTIRELY.  I THINK THAT MR.

13   CUADRADO -- I DON'T THINK THERE IS ANY QUESTION THAT HE WAS

14   SCHIZOPHRENIC.  THAT HE WAS SUFFERING FROM SCHIZOPHRENIA.

15   THERE WAS A HISTORY OF THAT THAT WAS LAID OUT BY THE DEFENSE.

16             IT CONTINUED AT THE MCC.  DR. GRISWOLD CAME IN,

17   SAID, OH, I'M TREATING HIM FOR THAT.

18             I DON'T THINK THAT THERE IS ANY QUESTION.

19             AGAIN, THAT IS NOT THE ISSUE.  THE ISSUE WAS:

20   NOTWITHSTANDING HIS SCHIZOPHRENIA, UNDER LEGAL STANDARDS, DID

21   HE KNOW WHAT HE WAS DOING AND DID HE KNOW IT WAS WRONG.  THAT

22   WAS THE QUESTION THE JURY HAD TO DECIDE.  THAT IS HOW IT WAS

23   FRAMED IN THE JURY INSTRUCTION.

24             IT ADMITS THAT A PERSON MAY HAVE SOME MENTAL DISEASE

25   OR MENTAL DISORDER BUT IS STILL CAPABLE OF KNOWING WHAT THEY

1  ARE DOING AND KNOWING IT WAS WRONG.  THAT WAS THE DECISION THE

2  JURY HAD TO MAKE IN THIS CASE.

3          AND I THINK THEY HAVE MADE IT UNAFFECTED BY, YOU

4  KNOW, WHETHER THIS TITLE OF DIRECTOR OF FORENSIC PSYCHIATRY

5  WAS ACCURATE OR, YOU KNOW, MAYBE A LITTLE BIT INACCURATE.

6          SO, FIRST OF ALL, I HAVE TROUBLE FINDING THAT THIS

7  IS FALSE.  IT REALLY DEPENDS ON WHO ONE TALKS TO WHETHER IT IS

8  FALSE.  YOU KNOW, OBVIOUSLY ANECDOTALLY, THERE WERE PEOPLE

9  THAT THOUGHT THAT THAT TITLE FIT, AND IT HAD BEEN USED BY

10  OTHERS AND BADRE WAS FREE TO USE IT IF HE WANTED.

11          DR. LIGHT SAYS, NO, NO, NO.  IT IS NOT AN OFFICIAL

12  TITLE, HE SHOULDN'T HAVE DONE THAT.  HE SHOULDN'T HAVE SAID

13  THAT.

14          OKAY.  I WILL LEAVE THAT TO UCSD TO RECONCILE IN THE

15  FUTURE.

16          I UNDERSTAND THAT DR. BADRE IS NOT AFFILIATED WITH

17  UCSD ANYMORE?

18          **MS. BARROS:**  THAT IS CORRECT, YOUR HONOR.  THEY

19  TERMINATED THE RELATIONSHIP.

20          **THE COURT:**  YEAH.

21          **MS. BARROS:**  BUT I JUST WANTED TO SAY THAT WE DO

22  DISPUTE THAT ANY OF THOSE INDIVIDUALS WERE AUTHORIZED TO GIVE

23  HIM A TITLE.

24          **THE COURT:**  AGREED.

25          **MS. BARROS:**  AUTHORIZED INDIVIDUALS.

1          **THE COURT:**  I AGREE.  I AM NOT DISPUTING THAT.  IT
2     IS NOT A QUESTION ABOUT, YOU KNOW, OFFICIAL -- I DON'T KNOW
3     THAT DR. LIGHT IS.  I MEAN, I WOULD THINK IT IS PROBABLY UP TO
4     SOME KIND OF FACULTY SENATE OR SOMETHING TO SAY, HERE IS THE
5     CURRICULUM AND HERE ARE TITLES THAT ARE ASSOCIATED WITH DOING
6     CERTAIN THINGS.

7          I ACKNOWLEDGE THAT IT IS UNCONTESTED AT THIS POINT
8     THAT DR. LIGHT SAYS THERE IS NO SUCH OFFICIAL TITLE.  AND I
9     DON'T THINK THERE IS.  BUT IT DOESN'T PROVE THAT HIS USE OF
10    THAT TITLE WAS KNOWINGLY FALSE, OR FALSE IN ANY WAY, WHEN IT
11    WAS A TITLE THAT I ALSO BELIEVE WAS USED BY OTHERS BEFORE AND,
12    YOU KNOW, HE INHERITED IT.

13         NOW, DOES IT SOUND LOFTY TO COME IN AND, YOU KNOW,
14    SAY THAT ABOUT YOURSELF?  YEAH, A LITTLE BIT.  BUT, YOU KNOW,
15    HE GOT PUT IN HIS PLACE BY YOUR CROSS-EXAMINATION.  HEY, WAIT
16    A MINUTE, YOU ARE NOT EVEN GETTING PAID FOR THIS.  YOU ARE NOT
17    EVEN WORKING FULL-TIME, OR NOT EVEN PART-TIME.

18         AND HE ACKNOWLEDGED THOSE THINGS.

19         SO FOR ME THE QUESTION IS:  WAS HE PRESENTED TO THE
20    JURY IN HIS PROPER PERSPECTIVE AND PROPER ROLE?  AND I THINK
21    HE WAS.

22         SO I DON'T FIND THAT THE TRIAL TURNED ON THAT.  YOU
23    KNOW, PUTTING ASIDE THE PROCEDURAL QUESTIONS ABOUT WHETHER IT
24    WAS PLAIN ERROR OR NOT PLAIN ERROR, UNDER EITHER STANDARD I
25    WOULD FIND IT HAD NO AFFECT ON THE JURY VERDICT HERE, NO

1  APPRECIABLE AFFECT.

2          CERTAINLY I CANNOT SAY, ENTERING THE PEW, THAT IT

3  WAS ONE OF THOSE THINGS THAT ARGUABLY AFFECTED HERE.  I DON'T

4  THINK IT DID.  I DON'T THINK IT DID.

5          AGAIN, YOU CAN DISAGREE WITH ME AND SAY, OH, JUDGE,

6  YOU ARE JUST JADED ABOUT PSYCHIATRIC TESTIMONY.

7          MAYBE I AM A LITTLE BIT, BUT AS I LISTENED TO

8  EVERYTHING, AND I HAVE SAID SEVERAL TIMES NOW, I THINK IT WAS

9  THE REAL EVIDENCE THAT CAME IN IN THE FORM OF, YOU KNOW,

10  PERCIPIENT WITNESSES, VIDEOTAPE OF THE EVENTS LEADING TO THIS,

11  VIDEOTAPE OF THE EVENT AS IT WAS OCCURRING, THAT HAD THE

12  PERSUASIVE FORCE WITH THE JURY; AND NOT TESTIMONY OF

13  AFTER-THE-FACT DOCTORS.

14          THE MOTION IS DENIED.

15          I THINK I HAVE SPOKEN ALSO TO YOUR -- THE OTHER

16  PRONGS, HAVE I NOT?

17          I DON'T FIND THAT IT WAS OUT OF LINE FOR -- AS I

18  MENTIONED, FOR DR. BADRE TO SAY, YOU KNOW -- SOME OF THE

19  THINGS HE SAID I JUST DIDN'T BELIEVE.  THAT WAS -- THE JURY

20  WAS TOLD WHETHER HE BELIEVES IT OR NOT DOESN'T CONTROL YOU.

21  YOU MAKE AN INDEPENDENT DETERMINATION ABOUT CREDIBILITY.

22          THIS HAD TO DO WITH WHY HE REACHED THE OPINIONS THAT

23  HE DID THAT WERE IN DIVERGENCE WITH --

24          DR. VICTOROFF'S?

25          **MR. FAKHARARA:**  YES, YOUR HONOR.

1          **THE COURT:**  OPINIONS.

2          SO WAS THERE ONE OTHER PRONG, YOU TOLD ME THERE WAS

3  ONE OTHER PRONG TO THE --

4          **MR. FAKHARARA:**  THERE WAS THREE THINGS, YOUR HONOR.

5  THERE WAS THE RULE 16 VIOLATION OF HIM BEING ABLE TO TESTIFY

6  TO THINGS THAT WEREN'T DISCLOSED TO US.  THERE WAS THE

7  CREDIBILITY.

8          **THE COURT:**  WAIT, WHAT WERE THE -- WAS THERE ANY

9  DIFFERENCE BETWEEN ONE AND TWO YOU JUST TOLD ME?

10          **MR. FAKHARARA:**  SO --

11          **THE COURT:**  RULE 16, I SAID, LOOK, YOU ARE NOT GOING

12  TO BE ABLE TO SAY, YES, HE DID HAVE THE INTENT OR NO HE

13  DIDN'T.  NEITHER SIDE DID THAT.

14          DR. BADRE, AS I SAID, EXPLAINED WHY:  I DON'T ACCEPT

15  SOME OF THE THINGS HE SAID AND WHY MY DIAGNOSIS IS WHAT IT IS,

16  BECAUSE I DON'T FIND HIM TO BE CREDIBLE ON SOME ASPECTS OF IT.

17          I THINK THAT WAS PROPER TESTIMONY.  I DON'T THINK HE

18  -- TO THE EXTENT IT WASN'T IN HIS REPORT, WHICH I THINK IT

19  WAS.

20          **MR. FAKHARARA:**  THAT ADDRESSES THE CREDIBILITY THAT

21  WE PRESENT.

22          WE ALSO PRESENT TWO SEPARATE ISSUES, ONE OF THEM IS

23  HIS ABILITY TO TESTIFY TO THE ULTIMATE ISSUE.

24          **THE COURT:**  WHEN DID HE DO THAT?

25          **MR. FAKHARARA:**  FOR EXAMPLE, HE WOULD TALK ABOUT --

1   HOW HE WAS WATCHING A VIDEO AND HE WOULD SAY, I DON'T SEE ANY

2   FEAR THERE.  I DON'T SEE ANY --

3          **THE COURT:**  HOW IS THAT DIFFERENT FROM THE

4   CREDIBILITY DETERMINATION.  BECAUSE HE DID SEE A VIDEO OF THE

5   DEFENDANT SHORTLY AFTER THE INCIDENT, WHAT, 20 MINUTES LATER

6   AT THE STORAGE FACILITY.

7          **MR. FAKHARARA:**  YES, YOUR HONOR.  I THINK THE

8   DIFFERENCE IS WHEN HE IS MAKING THOSE CREDIBILITY

9   DETERMINATIONS HE IS MAKING IT BASED ON WHAT MR. CUADRADO IS

10  TELLING HIM WHEN HE MET HIM, RIGHT?

11         **THE COURT:**  VERSUS WHAT HE SAW WITH OTHER EVIDENCE

12  OF THE DEFENDANT'S CONDITION A SHORT TIME AFTER THE INCIDENT.

13         **MR. FAKHARARA:**  BUT WHAT HE IS DOING THEN IS KIND OF

14  SAYING WE DON'T -- I DON'T FIND THE DEFENSE CREDIBLE, I DON'T

15  FIND THE INSANITY DEFENSE CREDIBLE.

16         **THE COURT:**  I DISAGREE WITH THAT.  I DON'T THINK YOU

17  CAN TIE THE HANDS OF A FORENSIC PSYCHIATRIST, EITHER WAY, WHO

18  SAYS, I FOUND THIS TO BE BELIEVABLE AND CORROBORATED BECAUSE

19  OF THUS AND SO; AND ONE THAT SAYS, THIS IS NOT CORROBORATED

20  AND I FIND EVIDENCE IT IS INCONSISTENT WITH WHAT I AM BEING

21  TOLD HERE, SO I DON'T THINK THAT IS TRUE.  AND TO THE EXTENT

22  THE OTHER SIDE RELIED ON THAT AND EMPHASIZED THAT, I THINK

23  THEY MADE A MISTAKE WITH THAT.

24         THAT IS ALL FAIR GAME.

25         **MR. FAKHARARA:**  OKAY.  I WAS GOING TO SAY, FINALLY,

1   YOUR HONOR, THERE WERE STATEMENTS MADE DURING HIS TESTIMONY

2   THAT WEREN'T DISCLOSED TO US, INCLUDING, FOR EXAMPLE, THE

3   PERCENTAGES OF PEOPLE WHO ARE AT THE SAN DIEGO JAILS WHO ARE

4   METH USERS.  EMPHASIZED THAT, FOR EXAMPLE, THAT A WHOLE HOST

5   OF PEOPLE WHO COME TO THE JAILS ARE METH USERS.

6           **THE COURT:**  DID YOU MAKE CONTEMPORANEOUS OBJECTIONS?

7   I RECALL --

8           **MR. FAKHARARA:**  WE DID, YOUR HONOR.

9           **THE COURT:**  AND I RECALL SUSTAINING A NUMBER OF THE

10  OBJECTIONS AND TRYING TO, YOU KNOW, GET DR. BADRE BACK ON THE

11  PATH.

12          ARE YOU SAYING THAT THERE WERE OBJECTIONS THAT I

13  WRONGLY OVERRULED, THAT HE WAS ABLE TO SNEAK IN THINGS THAT HE

14  SHOULDN'T HAVE SAID?

15          **MR. FAKHARARA:**  YES, YOUR HONOR.

16          **THE COURT:**  GIVE ME EXAMPLES OF WHEN THAT HAPPENED,

17  WHAT THE QUESTIONS WERE AND WHAT THE COURT'S RULING WAS.

18          **MR. FAKHARARA:**  OF COURSE, YOUR HONOR.

19          SO THE FIRST EXAMPLE THAT I GAVE WAS HIS COMPARISON

20  OF MR. CUADRADO'S CASE TO OTHER METH USERS IN SAN DIEGO JAILS

21  AND HOSPITALS.

22          HE MADE COMPARISONS FOR MR. CUADRADO'S CASE TO OTHER

23  ARRESTEES THAT HE HAS WORKED WITH TO DETERMINE WHETHER MR.

24  CUADRADO WAS STILL INTOXICATED AT THE TIME OF THE OFFENSE.

25          HE ALSO STATED HIS BELIEF ABOUT THE CORRELATION

```
1   BETWEEN SCHIZOPHRENIA AND COGNITIVE IMPAIRMENT THAT WAS NOT
2   DISCLOSED TO US.
3            THE COURT:  YOU OBJECTED TO EACH OF THOSE?
4            MR. FAKHARARA:  I THINK SO.
5            THE COURT:  HOW DID I RULE?
6            MR. FAKHARARA:  I AM PRETTY SURE YOU OVERRULED OUR
7   OBJECTION.  I CAN LOOK AT IT.
8            THE COURT:  I REMEMBER SUSTAINING A NUMBER OF
9   OBJECTIONS.  AS I SAID, DR. BADRE WAS A HARD DOG TO KEEP ON
10  THE PORCH.  YOU KNOW, HE KEPT GOING OFF, AND I HAD TO KEEP
11  SAYING, YOU KNOW, DR. BADRE, DR. BADRE, LISTEN TO THE
12  QUESTION, ANSWER ONLY THE QUESTION.
13           I REMEMBER DOING THAT SEVERAL TIMES, AND IT WAS ALL
14  IN RESPONSE TO OBJECTIONS EITHER YOU OR MS. BARROS MADE.
15           IT HAS BEEN A WHILE, BUT MY PREDOMINANT IMPRESSION
16  IS I SUSTAINED MORE OBJECTIONS THAN I OVERRULED WITH RESPECT
17  TO HIS TESTIMONY ON DIRECT, OBJECTIONS BROUGHT BY THE DEFENSE.
18           MS. BARROS:  I DID FINALLY LOOK AT THE TRANSCRIPT
19  BUT AN EXAMPLE --
20           THE COURT:  FOR WHAT?
21           MS. BARROS:  -- ON PAGE 28 THERE WAS TESTIMONY ABOUT
22  IT.  I DID OBJECT.  MY OBJECTION THERE WAS 403, BUT IT WAS
23  OVERRULED.
24           THE COURT:  I AM SORRY, WHAT WAS THE CONTEXT, MS.
25  BARROS?  WHAT WERE THE QUESTIONS AND WHAT WAS YOUR OBJECTION?
```

 1          **MS. BARROS:**  SO HE HAS AN ANSWER HERE:  I DON'T KNOW

 2  FOR THE GENERAL POPULATION BECAUSE THAT IS VASTLY INCREASING

 3  BY DAY.  WE KNOW FOR THE ARRESTEES, INDIVIDUALS ARRESTED IN

 4  SAN DIEGO COUNTY BY THE SAN DIEGO POLICE DEPARTMENT, THAT WHEN

 5  WE DO STUDIES OF THAT FOR 2022 IT WAS 55 PERCENT.  THAT IS

 6  MORE THAN THE MAJORITY, IT IS MORE THAN CANNABIS, AND PART OF

 7  IT IS BECAUSE METHAMPHETAMINE HAS SUCH A CLOSE LINK TO

 8  VIOLENCE.

 9          **THE COURT:**  YOU OBJECTED.

10          **MS. BARROS:**  I OBJECTED.  YOU OVERRULED THAT

11  OBJECTION.

12          **THE COURT:**  WHAT WAS THE BASIS FOR THE OBJECTION?

13          **MS. BARROS:**  THE BASIS FOR THAT OBJECTION WAS 403.

14          **THE COURT:**  YOU SAID THAT AT THE TIME?

15          **MS. BARROS:**  YES.

16          **THE COURT:**  OKAY.

17          **MS. BARROS:**  AND THAT WAS OVERRULED.

18          THERE ARE, I BELIEVE -- I CAN TRY TO FIND SOME MORE

19  EXAMPLES.

20          AND THEN ON PAGE 38 HE WAS TESTIFYING.  HE SAYS:

21  THE PSYCHIATRIC EFFECTS CAN LAST MUCH LONGER THAN THAT.  IT IS

22  VERY COMMON IN SAN DIEGO JAILS OR IN THE HOSPITALS TO HAVE

23  SOMEBODY WHO IS PSYCHOTIC FROM METH FOR A COUPLE OF WEEKS.

24          HE IS TALKING ABOUT THE PEOPLE HE SEES IN JAILS.

25          **THE COURT:**  RIGHT.

```
 1        MS. BARROS:  AND I OBJECTED.
 2            OBJECTION, YOUR HONOR.  I JUST RENEW MY OBJECTION
 3   THAT THIS IS OUTSIDE OF THE SCOPE OF THE EXPERT DISCLOSURE.
 4            AND YOU SAID:  ALL RIGHT.  OBJECTION OVERRULED.  GO
 5   AHEAD.
 6        THE COURT:  ALL RIGHT.  OKAY.  I HAVE THE GIST OF
 7   IT.
 8            LOOK, CONTEXT IS IMPORTANT.  HE DREW ON EXPERIENCE.
 9            THE 403 OBJECTION WASN'T ANY GOOD BECAUSE THERE
10   WASN'T ANY UNFAIR PREJUDICE TO THE DEFENDANT.  HE WASN'T
11   TALKING ABOUT THE DEFENDANT, HE WAS TALKING ABOUT PEOPLE IN
12   THE JAIL AND THE CHARACTERISTICS OF PEOPLE WHO ARE METH
13   ADDICTED, AND THERE WAS NO CLAIM THAT THE DEFENDANT WAS METH
14   ADDICTED.  BUT HE WAS GIVING CONTEXT TO EARLIER ANSWERS THAT
15   HE HAD GIVEN.
16            RELEVANCE IS A LOW BAR, SOME TENDENCY AND REASON TO
17   PROVE OR DISPROVE A MATERIAL FACT.  THIS CONTEXT WAS IMPORTANT
18   TO THAT, AND IT WASN'T UNFAIRLY PREJUDICIAL TO THE DEFENDANT.
19            SO WE COULD GO THROUGH THESE ONE BY ONE, BUT I THINK
20   THE OBJECTION WAS PROPERLY OVERRULED.
21            ANYWAY, I THINK I HAVE ALL OF THE POINTS.
22            HAVE I NOW ADDRESSED ALL OF THE PRONGS OF THE
23   ARGUMENT FOR A NEW TRIAL?
24        MR. FAKHARARA:  YES, YOUR HONOR.
25        THE COURT:  ANYTHING ELSE FROM THE UNITED STATES?
```

```
1              MR. REDD:  NO, YOUR HONOR.
2              THE COURT:  OKAY.  BASED ON THE LONG DISCUSSION THAT
3    WE HAVE HAD NOW, AND FOR THE REASONS THAT I HAVE SAID AND
4    REPEATED SEVERAL TIMES, THE COURT FINDS THAT THAT MOTION
5    SHOULD BE DENIED.
6              ALL OF THE ARGUMENTS, OF COURSE, ARE PRESERVED AND
7    CAN BE APPEALED.
8              OKAY.  LET'S TURN OUR ATTENTION TO THE SENTENCING
9    PORTION.  I AM HAPPY TO HEAR FROM YOU ON BEHALF OF MR.
10   CUADRADO.
11             MR. FAKHARARA:  THANK YOU, YOUR HONOR.
12             IS IT OKAY IF I USE THE PODIUM?
13             THE COURT:  SURE.  OF COURSE.
14             MR. FAKHARARA:  THANK YOU, YOUR HONOR.
15             I THINK, YOUR HONOR, I WANT TO JUST FIRST ADDRESS
16   THE PSR OBJECTION ON JUST TWO POINTS.
17             I KNOW THE UNITED STATES SAYS THAT THERE WAS A
18   TIMING ISSUE, THAT WE FILED LATE.  I WANT TO POINT THE UNITED
19   STATES TO LOCAL RULE 32.1 WHICH STATES THAT PSR OBJECTIONS
20   SHOULD BE PRESENTED TO THE COURT 14 DAYS BEFORE.
21             THE COURT:  I OVERRULED THEIR OBJECTION TO THE
22   TIMING.  I AM GOING TO ENTERTAIN THAT OBJECTION ON THE
23   SUBSTANCE.
24             MR. FAKHARARA:  THANK YOU, YOUR HONOR.
25             AND THEN JUST SOME CONTEXT ABOUT THE STATEMENT THAT
```

1    THE UNITED STATES HIGHLIGHTS IN THE PSR OBJECTION RESPONSE.

2          TWO WEEKS BEFORE TRIAL MR. CUADRADO IS VISITING WITH

3    HIS CLINICAL PSYCHOLOGIST AND HE IS SPEAKING TO HER ABOUT THE

4    FRUSTRATIONS THAT HE IS HAVING ABOUT HIS CASE.  HE TALKS ABOUT

5    HOW THE UNITED STATES IS SAYING THAT HIS ACTIONS WERE

6    DRUG-INDUCED.  AND HE TELLS HER THAT HE IS FRUSTRATED BECAUSE

7    HE BELIEVED THAT HE ACTED IN SELF-DEFENSE, BASED ON THE

8    RESPONSES THAT HE WAS HAVING TO HIS SYMPTOMS.

9          THE QUOTE ITSELF THAT THEY ARE EMPHASIZING IS NOT A

10   DIRECT QUOTE FROM MR. CUADRADO, IT IS THE DOCTOR'S

11   CHARACTERIZATION OF THE CONVERSATION THAT THEY ARE HAVING.

12         THOSE ARE THE ONLY TWO POINTS THAT I WANT TO MAKE ON

13   THE PSR OBJECTIONS.

14   **THE COURT:**  IS THERE A DIFFERENCE BETWEEN ACCEPTANCE

15   OF RESPONSIBILITY UNDER THE GUIDELINES AND THEN THE CONTRITION

16   THAT IS OFTEN EXPRESSED AT THE TIME OF SENTENCING?  BECAUSE

17   MOST OF THE DEFENDANTS WHO COME IN AND WANT TO EXERCISE THEIR

18   RIGHT OF ALLOCUTION TELL ME, I AM SORRY I DID THIS.  I MADE A

19   MISTAKE.

20         AND SOME DON'T.  SOME POINT TO OTHERS AND SAY, OH,

21   IT IS THIS PERSON'S FAULT.

22         THE PROBLEM I AM HAVING WITH IT, YOU KNOW, IT IS

23   KIND OF ACCEPTANCE OF THE INEVITABLE, NOT ACCEPTANCE OF

24   RESPONSIBILITY.  THAT PRESUPPOSES THAT YOU ATONE IN ADVANCE

25   FOR WHAT YOU DID; NOT ASSERT A DEFENSE THAT, WELL, I REALLY

```
 1    DIDN'T KNOW WHAT I DID BECAUSE I WAS UNDER MENTAL DISORDER AT
 2    THE TIME AND NOT RESPONSIBLE FOR MY ACTIONS.
 3           THAT IS DIFFERENT.  THAT IS A LEGAL DEFENSE.  IT WAS
 4    PURSUED HERE THROUGH A JURY TRIAL.  AND THE SENTENCING
 5    GUIDELINES COMMENTARY SAYS IT IS A RARE CASE WHERE SOMEBODY
 6    CAN GO TO TRIAL AND CONTEST THEIR GUILT.  THAT HAPPENED HERE.
 7    NOT IN THE SENSE THAT, I DIDN'T DO IT; BUT IN THE SENSE THAT,
 8    I AM NOT RESPONSIBLE BECAUSE I DIDN'T KNOW ABOUT WHAT I WAS
 9    DOING BECAUSE OF THIS MENTAL DISORDER.
10           BUT THEY SAY IT IS A RARE CASE WHERE ONE CAN DO THAT
11    AND STILL GET CREDIT FOR ACCEPTANCE OF RESPONSIBILITY.
12           WHAT FACTORS HERE JUSTIFY GIVING ACCEPTANCE?
13    MR. FAKHARARA:  THANK YOU, YOUR HONOR.
14           YOU ARE CORRECT.  THE GUIDELINES DO MENTION THAT IT
15    IS THE RARE CASE THAT POST-TRIAL ACCEPTANCE IS GIVEN.  THE
16    GUIDELINES ALSO TALK ABOUT WHEN WE ARE THINKING ABOUT
17    ACCEPTANCE POST TRIAL WE ARE LOOKING AT PRETRIAL BEHAVIOR.
18           AND I THINK WE CAN LOOK TO THE POST-ARREST STATEMENT
19    THAT MR. CUADRADO MADE JUST DAYS AFTER THE INCIDENT WHERE HE
20    TALKS ABOUT HAVING COMMITTED A CRIME, HE TALKS ABOUT THE
21    EVENT, HE TALKS ABOUT THE DETAILS.  BUT HE ALSO EMPHASIZES
22    THAT, TO BE HONEST, I DO FEEL SORRY.  I WANT TO APOLOGIZE.
23    THE COURT:  WHAT DO I DO ABOUT THE STATEMENT:  AND I
24    WILL IF THEY WILL DROP THE CHARGES.
25           NOW, THAT SOUNDS PRETTY SCHEMING TO ME.  YOU KNOW,
```

1    THAT SOUNDS LIKE A GUY WHO IS WEIGHING RISK AND REWARD AND

2    SAYS, OH, YOU WANT ME TO MAKE AN ADMISSION?  ALL RIGHT.  DROP

3    THE CHARGES AND I WILL SAY WHATEVER YOU WANT.

4            THAT IS WHAT A RATIONAL PERSON WOULD DO, I THINK, IN

5    THAT CIRCUMSTANCE.  AN ANTISOCIAL PERSON MIGHT DO THAT.  YOU

6    KNOW, WHAT'S IN IT FOR ME?  OKAY.  I WILL DO WHATEVER I NEED

7    TO TO GET THE BENEFIT.

8            **MR. FAKHARARA:**  I ASK THE COURT TO LOOK AT THE

9    CONTEXT OF THAT STATEMENT.  CERTAINLY THERE WAS THAT ONE

10   STATEMENT THAT WAS MADE ABOUT HIM APOLOGIZING IF HE GOT A

11   SPECIFIC DEAL AND THE CHARGES WERE DISMISSED.  BUT HE

12   EMPHASIZES OVER AND OVER AGAIN -- AND WE POINT TO THE

13   INSTANCES IN THE TRANSCRIPT WHERE HE DOES SAY HE FEELS SORRY,

14   HE WISHES, YOU KNOW, THE VICTIM, YOU KNOW, HE WANTS TO

15   APOLOGIZE.  HE SAYS THAT OVER AND OVER AGAIN.

16           HE SAYS THAT ONE STATEMENT, BUT HE ALSO EMPHASIZES

17   MULTIPLE TIMES THAT HE IS SORRY.  I THINK HE ALSO EMPHASIZES

18   WHAT WAS GOING ON IN HIS MIND THROUGHOUT THE POST-ARREST

19   STATEMENT.

20           THIS ISN'T A DEFENSE WE CAME UP WITH LAST MINUTE,

21   THIS IS SOMETHING THAT WE NOTIFIED PRETTY EARLY ON TO THE

22   GOVERNMENT, AND MAINTAIN THAT POSITION.

23           **THE COURT:**  DON'T MISUNDERSTAND ME.  I HAVE NO

24   PROBLEM WITH THE WAY THE CASE WAS TRIED.  I UNDERSTAND YOUR

25   THEORY OF DEFENSE AND THE SUPPORT FOR IT.  I'M NOT BEING

1    CRITICAL OF THAT.  I'M JUST SAYING, YOU KNOW, IT IS TRUE HE

2    DID GO TO TRIAL, HE DID ASK THE JURY TO ACQUIT HIM ON A LEGAL

3    BASIS.  THEY WERE INSTRUCTED ON THAT, THEY REJECTED THAT.  AND

4    NOW HE SAYS, WELL, YOU KNOW, FORGET ABOUT ALL OF THAT, GIVE ME

5    CREDIT AS IF I PLED GUILTY AND, YOU KNOW, CAME UP FRONT AND

6    SAID, THERE IS NO EXCUSE FOR THIS.  LEGAL OR INSANITY OR

7    OTHERWISE, NO EXCUSE.  I SHOULDN'T HAVE DONE IT.

8            HE DIDN'T DO THAT, WHICH IS WHAT PEOPLE WHO PLEAD

9    GUILTY -- I UNDERSTAND IT IS NOT LIMITED TO PEOPLE WHO PLEAD

10   GUILTY.  THERE ARE CIRCUMSTANCES WHERE ONE CAN GO TO TRIAL.

11   BUT THE EXAMPLES THEY GIVE DON'T MATCH THIS CASE.  IT IS LIKE

12   TO PRESERVE A LEGAL ISSUE.  I DON'T KNOW WHAT THE OTHERS ARE,

13   BUT NONE OF THE OTHER EXCEPTIONS SEEM TO MATCH THIS CASE.

14           **MR. FAKHARARA:**  YOUR HONOR, RESPECTFULLY, I THINK

15   THE CIRCUMSTANCES DO IN THIS CASE PRESENT -- THE TYPE OF

16   COMMENTARY THAT THE GUIDELINES ARE EMPHASIZING, I THINK IT

17   ENCOMPASSES WHAT'S GOING ON IN THIS CASE, WHAT MR. CUADRADO

18   DID, POST-ARREST, TALK ABOUT.

19           AND THIS IS PRETRIAL WHERE HE TALKS ABOUT HIS

20   REMORSE, HIS WANT TO BE APOLOGETIC TOWARDS THE VICTIM.

21           AND THEN I THINK, YOU KNOW, IN THIS CASE, YOU ARE

22   RIGHT, WE DID GO WITH AN INSANITY DEFENSE WHICH IS INHERENTLY

23   SAYING THAT, I AM GUILTY BUT I AM NOT -- BUT FOR THESE MENTAL

24   ILLNESSES, I DIDN'T UNDERSTAND WHAT WAS GOING ON.

25           **THE COURT:**  OKAY.

1              **MR. FAKHARARA:** ULTIMATELY, YOUR HONOR, I SUBMIT

2       BASED ON THE PAPERS THAT I PUT FORTH.

3              **THE COURT:** HERE IS –– I WANT TO ASSURE YOU OF THIS.

4              FIRST, I ALREADY ACKNOWLEDGED THAT I THINK MR.

5       CUADRADO HAS SUFFERED FROM SCHIZOPHRENIA.  I BELIEVE THAT TO

6       BE SO.  SO, YOU KNOW, HE IS NOT FUNCTIONING AS A PERSON THAT

7       DOES NOT HAVE A MENTAL DISORDER OR MENTAL DISEASE.  HE IS NOT

8       AT THE TIME.  I GET THAT PART.

9              I THINK THAT, YOU KNOW, HE HAS MADE EXPRESSIONS OF

10      CONTRITION, AND I THINK THOSE DESERVE TO BE TAKEN IN

11      CONSIDERATION.

12             THE ONLY ISSUE IS WHETHER, YOU KNOW, HE GETS THIS

13      LEGAL CREDIT THAT SEEMS TO BE VERY CIRCUMSCRIBED.  YOU KNOW,

14      RARE CASE, RIGHT.  AND I AM JUST NOT CONVINCED THIS IS THE

15      RARE CASE.

16             DOESN'T MEAN THAT THOSE THINGS SHOULDN'T BE

17      CONSIDERED, THEY SHOULDN'T BE PART OF THE 3553 ANALYSIS WHERE

18      I AM CONSIDERING HIS HISTORY AND CHARACTERISTICS AND, YOU

19      KNOW, MAYBE THE SCHIZOPHRENIA ENTERED INTO THIS TO SOME

20      EXTENT; NOTWITHSTANDING THE JURY FOUND HE KNEW WHAT HE WAS

21      DOING, HE KNEW IT WAS WRONG.  I AM NOT SAYING THAT, BUT,

22      ANYWAY, I HAVE YOUR POSITION ON IT.

23             **MR. FAKHARARA:** THANK YOU, YOUR HONOR.

24             JUST BRIEFLY ABOUT THE RESTITUTION.  WE DID SPEAK

25      WITH THE UNITED STATES.  WE HAD AN OBJECTION TO ALLOWING

1   RESTITUTION TO ENCOMPASS THE SON'S LOST WAGES, AS WAS
2   DISCUSSED IN THE EXHIBIT SUBMITTED TO THE COURT.

3          WE CAME TO AN AGREEMENT THAT THE RESTITUTION WOULD
4   ONLY ENCOMPASS THE LOST WAGES FOR THE VICTIM, $10,000.  $300
5   FOR THE TRANSPORTATION.

6          **THE COURT:**  I AM PREPARED TO FOLLOW THE AGREEMENT OF
7   THE PARTIES ON THE RESTITUTION AMOUNT.

8          **MR. FAKHARARA:**  THANK YOU, YOUR HONOR.

9          AND THEN, FINALLY, JUST TOWARDS SENTENCING, I KNOW
10  THAT THE GOVERNMENT AND THE PROBATION OFFICER ARE ASKING FOR
11  78 MONTHS, WHICH IS THE HIGH END OF THE GUIDELINES WHEN
12  INCORPORATING THE PLUS 5 FOR SERIOUS BODILY INJURY.

13         WE ARE ASKING FOR 36 MONTHS IN THIS CASE.  WE HAVE
14  MADE IT IN LIGHT OF SEVERAL, I THINK, REASONABLE DEPARTURES
15  THAT WE ARE ASKING FOR.

16         OBVIOUSLY, ONE OF THEM WAS ACCEPTANCE OF
17  RESPONSIBILITY.  IF YOUR HONOR IS GOING TO REJECT THAT, I ASK
18  YOU TO CONSIDER THAT UNDER 3553(A).

19         WE ARE ASKING FOR A DEPARTURE BASED ON HIS SERIOUS
20  MENTAL ILLNESS, WHICH I DON'T THINK IS IN DISPUTE.  AND YOUR
21  HONOR HAS TALKED ABOUT THAT AS WELL.

22         AND WE ARE ASKING FOR A DEPARTURE BASED ON THE
23  SIGNIFICANT ABUSE AND TRAUMA THAT HE HAS FACED IN HIS PAST.

24         WE TALKED ABOUT THIS EXTENSIVELY IN THE SENTENCING
25  DOCUMENTS THAT WE SUBMITTED.  WE HAD THE OPPORTUNITY TO ASK

1    OUR SUPERVISORY MITIGATION SPECIALIST AT OUR OFFICE TO DO A

2    SOCIAL HISTORY ON MR. CUADRADO.  AND THROUGH THAT WE LEARNED

3    ABOUT THE ABUSE THAT HE HAS FACED IN HIS PAST.  WE HAVE

4    LEARNED ABOUT --

5            **THE COURT:**  THIS IS HIS SISTER MOSTLY?

6            **MR. FAKHARARA:**  YES, YOUR HONOR.  SO THE PHYSICAL

7    ABUSE COMES FROM HIS SISTER.  AND THE TYPE OF ABUSE THAT HE

8    SAW WHEN HE WAS YOUNGER COMES FROM HIS DAD.

9            AS WE TALKED ABOUT HIS DAD, YOU KNOW, THERE WAS

10   EXPERIENCES OF SEEING HIS DAD VIOLENTLY ATTACK HIS MOM.

11           **THE COURT:**  HOW OLD WAS MR. CUADRADO?  HIS DAD

12   PASSED AWAY.

13           **MR. FAKHARARA:**  SO HIS DAD PASSED AWAY VERY

14   RECENTLY.

15           **THE COURT:**  OKAY.

16           **MR. FAKHARARA:**  MR. CUADRADO WAS A CHILD BEFORE HE

17   MOVED TO SAN DIEGO, AND THEN WENT TO MIDDLE SCHOOL AND HIGH

18   SCHOOL HERE IN SAN DIEGO.

19           BUT THERE ARE INSTANCES OF SEEING HIS MOM BEING HELD

20   AT KNIFEPOINT BY HIS DAD.  INSTANCES OF HIS DAD HOLDING THEIR

21   PUPPY OUT OF A WINDOW, DANGLING HIM, JUST TO EVOKE SOME SORT

22   OF FEELING FROM THE FAMILY.

23           AND THEN, YOU KNOW, TO HIS MOM'S CREDIT, SHE TOOK

24   CARE OF THE CHILDREN AS BEST AS SHE COULD.  SHE WORKED

25   MULTIPLE JOBS.  BUT WHAT THAT MEANT WAS THAT MR. CUADRADO WAS

1    LEFT WITH HIS SISTER.

2            AT A VERY EARLY AGE MR. CUADRADO WAS DIFFERENT.  HE

3    WAS -- YOU KNOW, HE WOULD SIT AND REMAIN SILENT FOR A LONG

4    TIME IN A CORNER.  AND HIS SISTER, YOU KNOW, SHE DIDN'T KNOW

5    HOW TO HANDLE THIS.  SHE DIDN'T KNOW HOW TO HANDLE HAVING TO

6    RAISE A CHILD THAT SHE MAYBE DIDN'T WANT TO BE AROUND.  AND,

7    UNFORTUNATELY, THAT LED TO A LOT OF PHYSICAL ABUSE.

8            I AM NOT SAYING THAT THAT EXCUSES THE BEHAVIOR AT

9    THE DAY OF THE OFFENSE, I THINK I AM JUST PROVIDING SOME

10   CONTEXT ABOUT WHAT TYPE OF CHILDHOOD MR. CUADRADO HAD.

11           OVER TIME, AS YOUR HONOR KNOWS, HE HAS DEVELOPED

12   INCREDIBLE SYMPTOMS OF PSYCHOSIS THAT HAS PERSISTED INTO HIS

13   ADULTHOOD.  AND THAT PERSISTED, YOU KNOW, THROUGH HIS WORK, AS

14   WELL, AT THE POSTAL SERVICE.

15           WE HAD TESTIMONY, AS YOUR HONOR REMEMBERS, ABOUT MR.

16   CUADRADO BEING POINTED AT, BEING LAUGHED AT BECAUSE OF HIS

17   PSYCHOSIS, BECAUSE OF WHAT HE WAS EXHIBITING AT WORK.

18           THESE ARE JUST BACKGROUND INFORMATION THAT I WANT TO

19   PROVIDE TO THE COURT ABOUT THE EXPERIENCES THAT HE WAS HAVING

20   AT THE POSTAL SERVICE.

21           ULTIMATELY, AS YOUR HONOR IS AWARE, POST-ARREST HE

22   SAID THAT HE THOUGHT THAT HE WAS GOING TO DIE, AND THAT IS WHY

23   HE ACTED IN THE WAY THAT HE DID.

24           I WANT TO JUST TALK ABOUT THE PROGRESS THAT MR.

25   CUADRADO HAS MADE WHILE AT THE MCC.  THIS IS THE FIRST TIME

1    THAT HE HAS EVER RECEIVED TREATMENT FOR HIS SCHIZOPHRENIA.

2          I HAVE SPOKEN WITH DR. GRISWOLD.  SHE HAS SEEN

3    IMMENSE IMPROVEMENT FROM MR. CUADRADO SINCE HE HAS BEEN

4    INCARCERATED.

5          I CAN TALK ABOUT THAT AS WELL.  WHEN I FIRST MET MR.

6    CUADRADO HE WAS ALL OVER THE PLACE.

7          **THE COURT:**  HE IS ON MEDICATIONS NOW?

8          **MR. FAKHARARA:**  HE IS STILL ON MEDICATION, YOUR

9    HONOR, YES.  AND THIS IS THE FIRST TIME IN HIS LIFE HE HAS

10   EVER TAKEN MEDICATION FOR HIS SCHIZOPHRENIA.

11         I CAN ATTEST TO WHEN -- MR. CUADRADO, WHEN I FIRST

12   MET HIM HE WAS ALL OVER THE PLACE.  AND THERE WAS AN INCIDENT

13   AT THE MCC JUST DAYS AFTER HIS ARREST WHERE HE BELIEVED THAT

14   SOMEONE WHOSE -- THAT HIS BUNKMATE WAS READING HIS MIND,

15   ESSENTIALLY, AND KNEW INTIMATE DETAILS ABOUT HIS CHILDHOOD.

16         AND THEN HE WENT TO A SEGREGATED HOUSING UNIT

17   BECAUSE OF THAT INCIDENT.  AND I COULD JUST SEE HIM

18   DETERIORATING IN FRONT OF ME.  HE WOULD, YOU KNOW, PHYSICALLY

19   SWAT AWAY AUDITORY HALLUCINATIONS THAT I COULD SEE IN FRONT OF

20   ME.

21         AND OVER TIME THE MEDICATION HELPED HIM, AND I SAW

22   THIS.  NOW WHEN I MEET WITH MR. CUADRADO I HAVE GREAT

23   CONVERSATIONS WITH HIM ABOUT HIS LIFE, ABOUT HIS PAST, ABOUT

24   THIS CASE.  AND I THINK THAT SHOWS THE TYPE OF IMPROVEMENT HE

25   CAN HAVE WITH CONTINUED MEDICATION.

 1          WHILE HE HAS BEEN AT MCC HE HAS ALSO COMPLETED THEIR
 2   VERSION OF A DRUG PROGRAM.  HE HAS EXCELLED IN IT.  THE PSR
 3   NOTES THIS AS WELL WITH HIS CLINICIAN IN THAT PROGRAM TALKING
 4   ABOUT HOW HE IS DOING REALLY WELL, HE IS THINKING ABOUT
 5   CRIMINAL BEHAVIOR AND THINKING ABOUT PROSOCIAL BEHAVIOR THAT
 6   HE CAN CONTINUE ON.
 7          MY CONCERN, YOUR HONOR, WITH HIS PROLONGED CUSTODY
 8   IS THAT MR. CUADRADO RIGHT NOW IS -- HIS DAYS ARE BASICALLY
 9   JUST PLOTTED OUT FOR HIM.  YOU KNOW, HE WAKES UP IN THE
10   MORNING WHEN THEY TELL HIM TO WAKE UP, HE GOES TO PROGRAMS
11   WHEN HE IS TOLD TO GO TO PROGRAMS.  HE IS WORKING.  HE IS
12   GOING TO RELIGIOUS SERVICES.
13          **THE COURT:**  DO YOU THINK HE WOULD BENEFIT FROM A
14   RECOMMENDATION OF PLACEMENT AT A BUREAU OF PRISONS MEDICAL
15   FACILITY, BUTNER OR ONE OF THE OTHER PLACES WHERE HE CAN
16   CONTINUE TO GET PSYCHIATRIC ASSISTANCE?
17          **MR. FAKHARARA:**  YOUR HONOR, MY CONCERN WITH THAT IS
18   THAT IT WILL MAKE IT SO THAT HIS FAMILY, HIS MOM, CAN NEVER
19   VISIT WITH HIM.  HIS MOM HAS ISSUES WITH WALKING AROUND.  SHE
20   HAS HAD -- SHE HAS LEG PROBLEMS, AND SHE LIVES IN SOUTHERN
21   CALIFORNIA.
22          **THE COURT:**  THERE IS NO GUARANTEE, THOUGH, THAT HE
23   WOULD BE DESIGNATED TO LOMPOC OR -- WHAT'S THE PLACE IN LONG
24   BEACH?
25          **MR. FAKHARARA:**  TERMINAL ISLAND.

1       **THE COURT:**  TERMINAL ISLAND.  YEAH.  THERE IS NO

2   GUARANTEE.  AND I WOULD THINK, YOU KNOW, IF IT IS GOING TO BE

3   UP IN THE AIR, AT LEAST THE BUREAU OF PRISONS OUGHT TO KNOW

4   THAT THE JUDGE THINKS THAT HE WOULD BENEFIT FROM A PLACE THAT

5   CAN CONTINUE HIS -- NOT ONLY HIS MEDICATION BUT, YOU KNOW,

6   SOME COUNSELING AND THINGS LIKE THAT.

7       **MR. FAKHARARA:**  COULD I HAVE ONE MOMENT?

8       **THE COURT:**  SURE.  SURE.

9       **MS. BARROS:**  YOUR HONOR, I BELIEVE WHENEVER THERE

10  ARE MEDICAL ISSUES OR PSYCHIATRIC ISSUES LIKE THIS THAT THE

11  DESIGNATION GOES THROUGH THEIR MEDICAL DESIGNATION UNIT.

12      **THE COURT:**  OKAY.

13      **MS. BARROS:**  I THINK THAT THEY WILL CONSIDER THAT IN

14  DETERMINING WHETHER HE NEEDS TO BE AT SOMEWHERE LIKE BUTNER OR

15  SPRINGFIELD, OR WHETHER SOMEWHERE LOCAL.

16      **THE COURT:**  OKAY.  I WILL LEAVE THAT TO YOU.  IF YOU

17  DON'T WANT ME TO MAKE A RECOMMENDATION, I WON'T.  BUT I HAD

18  ANOTHER CASE WITH A FELLOW WHO WAS PROFOUNDLY SCHIZOPHRENIC

19  THAT KILLED A BUNCH OF PEOPLE AND HE IS STILL AT SPRINGFIELD.

20  AND I DON'T GET, YOU KNOW, REGULAR REPORTS BUT I UNDERSTAND

21  THAT HE HAS BENEFITED FROM BEING THERE, AND THINGS ARE UNDER

22  CONTROL.  HE IS NOT HARMING HIMSELF OR ANY OF THAT.

23      NOT THAT MR. CUADRADO WOULD DO THAT.

24      BUT I JUST THOUGHT SPRINGFIELD MIGHT BE A PLACE

25  WHERE HE WOULD BENEFIT FROM THE MEDICAL TREATMENT AVAILABLE.

1          YOU DECIDE.  IF YOU DON'T WANT ME TO RECOMMEND THAT,
2     THEN I WON'T.

3          **MR. FAKHARARA:**  MAYBE I COULD THROW THAT IN AT THE
4     END JUST TO WRAP UP, YOUR HONOR.

5          THE DECISION TO DO AN INSANITY DEFENSE WAS A HARD
6     DECISION.  AS YOUR HONOR KNOWS, THE CONSEQUENCES WERE
7     ESSENTIALLY YOU EITHER WIN AN INSANITY DEFENSE AND YOU ARE
8     INSTITUTIONALIZED FOR A NUMBER OF YEARS, MAYBE INDEFINITELY,
9     IN THE HOPES THAT A DOCTOR FINDS YOU ABLE TO GO OUT INTO THE
10    COMMUNITY.

11         **THE COURT:**  YEAH.

12         **MR. FAKHARARA:**  OR YOU LOSE AND YOU END UP HAVING AN
13    INCREDIBLE TIME IN CUSTODY BECAUSE OF THE OFFENSE.  SO IT WAS
14    AN INCREDIBLE DECISION THAT MR. CUADRADO AND OUR TEAM WAS ABLE
15    TO MAKE.  SO WE DIDN'T TAKE GOING TO TRIAL LIGHTLY.

16         **THE COURT:**  YOU KNOW, I THINK YOUR OFFICE KNOWS I
17    DON'T PUNISH PEOPLE FOR GOING TO TRIAL.

18         **MR. FAKHARARA:**  YES, YOUR HONOR.

19         ULTIMATELY, YOUR HONOR, THE INJURIES THE VICTIM
20    FACED WERE HORRENDOUS, AND WE DIDN'T DISPUTE THAT AT TRIAL.

21         MR. CUADRADO TALKED ABOUT WHAT HE DID POST-ARREST.
22    AND WE HOPE THAT THE VICTIM CAN MAKE A SPEEDY RECOVERY.

23         BUT MR. CUADRADO, I WORRY THAT THE DAYS OF AN
24    OFFICER JUST PLANNING HIS DAYS OUT FOR HIM EVERY SINGLE DAY
25    AND NOT -- HIM NOT BEING ABLE TO MAKE SOME CRITICAL DECISIONS

1   ABOUT HIS LIFE WITH THE ASSISTANCE OF MEDICATION, I DON'T KNOW

2   IF HE WOULD BE ABLE TO RESTORE HIMSELF OR GET TO THE POSITION

3   WHERE HE IS A CONTRIBUTING COMMUNITY MEMBER WITHOUT THE

4   OPPORTUNITIES TO MAKE SURE THAT, YOU KNOW, WHEN HE IS TAKING

5   THE MEDICATION IT IS ALSO ALLOWING HIM TO MAKE GOOD DECISIONS

6   IN THE REAL WORLD.

7           WE OFFER SOME SOLUTIONS.  OUR SOCIAL WORKER OFFERED

8   SOME SOLUTIONS ABOUT INTENSIVE OUTPATIENT PROGRAMS THAT MR.

9   CUADRADO CAN DO WHILE HE IS OUT OF CUSTODY.  THESE ARE

10  PROGRAMS THAT WOULD MEET WITH HIM WHEREVER HE IS AT AND MAKE

11  SURE THAT HE IS TAKING THE MEDICATION THAT HE NEEDS WHILE HE

12  IS OUT IN THE COMMUNITY.

13          THIS GIVES HIM A CHANCE TO CONTINUE TO BE THE

14  PRODUCTIVE COMMUNITY MEMBER THAT WE WANT HIM TO BE WITHOUT AN

15  INCIDENT LIKE THIS EVER HAPPENING AGAIN.

16          ULTIMATELY, YOUR HONOR, WE ARE ASKING FOR 36 MONTHS.

17  WE MAKE THAT IN LIGHT OF SPECIFIC AND REASONABLE DEPARTURES.

18          AND I THINK, SPEAKING TO MR. CUADRADO, HIS

19  PREFERENCE WOULD BE TO BE AT A PLACEMENT AS CLOSE TO SOUTHERN

20  CALIFORNIA.

21          **THE COURT:**  ALL RIGHT.  I WILL MAKE THAT

22  RECOMMENDATION.

23          ANYTHING ELSE?

24          **MR. FAKHARARA:**  NO, YOUR HONOR.  THANK YOU.

25          **THE COURT:**  MR. CUADRADO, WE HAVE BEEN TALKING ABOUT

1    YOU.  YOU HAVE AN OPPORTUNITY TO SPEAK AND TELL ME ANYTHING

2    YOU WANT ME TO KNOW.  YOU DON'T HAVE TO TALK, BUT IF THERE IS

3    SOMETHING YOU WANT TO SAY I AM HAPPY TO HEAR FROM YOU.

4         **DEFENDANT CUADRADO:**  I AM UNSURE WHAT TO SAY.  YOU

5    KNOW, I HAVE, YOU KNOW, LIKE, SINCE I GOT INTO PRISON I HAVE

6    BEEN TRYING MY BEST TO, YOU KNOW, BETTER MYSELF AND TO STAY IN

7    THE PROGRAMS.  AND I HAVE BEEN HONEST ABOUT, YOU KNOW, WHAT

8    HAPPENED.  AND, YOU KNOW, I LOST MY CAREER.

9         **THE COURT:**  REMIND ME.  HOW LONG HAD YOU BEEN WITH

10   THE POSTAL SERVICE?

11        **DEFENDANT CUADRADO:**  SEVEN AND A HALF YEARS.

12        THEY ACTUALLY JUST SENT ME A LETTER RECENTLY ASKING

13   ME TO COME TO AN INVESTIGATIVE INTERVIEW, BUT IT HAD MY INMATE

14   NUMBER ON IT, SO HOW CAN I COME.

15        YOU KNOW, I LOST THAT CAREER.  I TRIED REALLY -- I

16   WORKED REALLY HARD AT THAT.

17        AND, YOU KNOW, I UNDERSTAND I AM GOING TO DO PRISON

18   TIME, TIME IN PRISON.  AND, YOU KNOW, THROUGHOUT THAT I JUST

19   WANT TO MAKE SURE THAT I DON'T DO SOMETHING LIKE THIS -- THAT

20   SOMETHING LIKE THIS NEVER HAPPENS AGAIN.

21        THANK YOU.

22        **THE COURT:**  OKAY.

23        ON BEHALF OF THE UNITED STATES.

24        **MS. WILLIAMS:**  YES, YOUR HONOR.  I WILL BE BRIEF.

25        WE DO HAVE A BIT OF A DIFFERENT CALCULATION IN OUR

1   GUIDELINES BASED ON HOW OUR INTERPRETATION IS OF THE VICTIM'S
2   INJURIES IN THIS CASE.  WE DO BELIEVE THAT THE PLUS SIX MORE
3   ACCURATELY ACCOUNTS FOR THE INJURIES THAT THE VICTIM SUSTAINED
4   IN THIS CASE.  THEY WERE MORE SERIOUS THAN JUST GOING TO THE
5   HOSPITAL.  AND, IN FACT, HE HAS HAD LINGERING IMPACT FROM
6   THIS.
7         THE COURT:  DID PROBATION GET A COPY OF THE PHOTOS
8   THAT WERE TAKEN OF THE VICTIM AT THE HOSPITAL, AND THE
9   INJURIES IN PARTICULAR?  WAS THAT PART OF -- DID YOU SEE
10  THOSE?
11        THE PROBATION OFFICER:  GOOD MORNING, YOUR HONOR.
12  LAUREN ESPOSITO ON BEHALF OF U.S. PROBATION.
13        YES, WE REVIEWED THOSE PHOTOS.
14        THE COURT:  OKAY.
15        MS. WILLIAMS:  SO, IN ADDITION TO THE PHOTOS, IT WAS
16  THE LINGERING IMPACT AND THE LINGERING AFFECT THAT THE VICTIM
17  ALSO TESTIFIED TO.
18        WITH THAT, HOWEVER, WE DO AGREE THAT 78 MONTHS IS
19  THE SENTENCE THAT IS SUFFICIENT, NOT GREATER THAN NECESSARY IN
20  THIS CASE.
21        AND I KNOW THAT DEFENSE HAS DISCUSSED A LOT ABOUT
22  THE DEFENDANT'S PERSONAL HISTORY, BUT IN LOOKING AT ALL OF THE
23  3553(A) FACTORS, THE SERIOUSNESS OF THIS OFFENSE, THE NEED TO
24  PROMOTE DETERRENCE, AND I THINK SPECIFIC AND GENERAL IS AT
25  PLAY HERE.

1          WHEN YOU LOOK AT THE PSR IT WAS CONCERNING TO THE

2    UNITED STATES THAT IT DOESN'T SEEM THAT THE DEFENDANT HAS

3    TAKEN A FULL RESPONSIBILITY FOR HIS METHAMPHETAMINE USE HERE.

4    HE REPORTED DAILY USE TO PRETRIAL.  THE INCONSISTENCIES, AS

5    THE COURT IS WELL AWARE OF AND THAT WE HAVE ALL DISCUSSED, IT

6    IS CONCERNING THAT HE STILL -- THE ONE THING THAT HE WANTED TO

7    DISCUSS WITH PROBATION IS THE FACT THAT HE HAS ONLY USED THREE

8    TO FIVE TIMES.

9          WITH THE RECORD, THAT IS CONCERNING BECAUSE IF HE

10   HAS ONE ISSUE HERE WITH SCHIZOPHRENIA WHAT WE HEARD FROM MR.

11   VICTOROFF, DR. GRISWOLD, AND DR. BADRE IS WHEN YOU GET THE TWO

12   OF THOSE TOGETHER, THAT IS WHEN WE SEE THINGS LIKE THIS.  SO

13   THAT IS VERY CONCERNING TO THE UNITED STATES.

14         WITH THAT, THE UNITED STATES WOULD SUBMIT.

15         WE DO HAVE MR. AFICIAL HERE, AND HE WOULD LIKE TO

16   MAKE A STATEMENT IF THE COURT WOULD ALLOW.

17         **THE COURT:**  SURE.  HE ABSOLUTELY HAS A RIGHT TO DO

18   THAT.

19         COME FORWARD, IF YOU WOULD, SIR.

20         GOOD MORNING.

21         WOULD YOU STATE YOUR FULL NAME AGAIN FOR THE RECORD.

22         **MR. AFICIAL:**  YES.  GOOD MORNING, JUDGE.  MY NAME IS

23   BENJAMIN AFICIAL.

24         **THE COURT:**  SPELL YOUR LAST NAME FOR THE REPORTER.

25         **DEFENDANT CUADRADO:**

1              **MR. AFICIAL:** A-F-I-C-I-A-L.

2              **THE COURT:** THANK YOU, MR. AFICIAL. HAPPY TO HEAR

3    FROM YOU.

4              **MR. AFICIAL:** GOOD MORNING JUDGE BURNS, AND

5    CONGRATULATIONS. THE U.S. ATTORNEYS, MS. WILLIAMS AND MR.

6    REDD, SUSIE, THE DEFENSE TEAM, TEAMS THAT ARE HERE, MY FAMILY.

7              AGAIN MY NAME IS BENJAMIN AFICIAL, AND I HAVE BEEN

8    EMPLOYED WITH THE USPS FOR ALMOST 36 YEARS. I HAVE DEDICATED

9    MORE THAN HALF OF MY LIFE TO THE USPS. THOUGH THERE ARE MANY

10   NEGATIVE THINGS, COMMENTS ABOUT THE USPS, THE FEDERAL AGENCY I

11   WORK FOR, THE USPS HAS DONE ME GOOD. I CANNOT COMPLAIN.

12             I STARTED AS A DISTRIBUTION CLERK IN THE OLD MID-WAY

13   POST OFFICE, THE POST OFFICE IN THE MID-WAY DISTRICT, BACK IN

14   OCTOBER OF 1988. THE BUILDING CLOSED DUE TO GROWTH AND MAIL

15   VOLUME. I WAS AN ACTIVE SUPERVISOR AT FIRST. I WORKED HARD

16   AT MY CRAFT, AND I WAS PROMOTED TO A REGULAR SUPERVISOR BACK

17   IN 2013. AND I WAS PROMOTED TO A MANAGER, TO WHICH I STILL

18   HOLD NOW.

19             TODAY IS A BEAUTIFUL, BEAUTIFUL DAY TO BE ALIVE,

20   JUDGE. BACK ON AUGUST 25, 2023, DEFENDANT, CUADRADO ALMOST

21   TOOK MY LIFE WHEN HE STABBED ME IN THE HEAD. HE ALMOST TOOK

22   ME AWAY FROM MY SON, MY DAUGHTER, MY DAUGHTER-IN-LAW, MY

23   GIRLFRIEND, MY FAMILY, AND MOST ESPECIALLY FROM MY

24   THREE-YEAR-OLD GRANDDAUGHTER, WHO I LOVE SO MUCH.

25             I AM HERE TODAY BECAUSE OF DEFENDANT CUADRADO'S

 1   VICIOUS ACTIONS AND HIS STUPIDITY.  IN FACT, I SHOULD BE AT
 2   WORK TODAY; BUT HERE I AM.  I AM HERE TODAY TO ASK THE COURT
 3   AND YOU, JUDGE BURNS, TO IMPOSE A MAXIMUM SENTENCE AND
 4   PENALTIES ALLOWED.
 5        AS I WAS ABOUT TO END MY DAY BACK ON AUGUST 25, 2023
 6   I RECEIVED A PHONE CALL FROM DEFENDANT CUADRADO'S MANAGER AND
 7   ASKED TO ASSIST IN THE ESCALATED SITUATION BETWEEN HIM AND A
 8   SUPERVISOR.
 9        I AM NOT GOING TO GO INTO DETAILS REGARDING THAT
10   SITUATION THAT DAY, OTHER THAN THE FACT THAT MR. CUADRADO
11   TRIED TO END MY LIFE BY STABBING ME IN THE HEAD.  I ENDED UP
12   IN E.R. PALOMAR HOSPITAL WITH 12 STITCHES, OR SUTURES.
13        HE WAS ENRAGED AND ANGRY AND HE COULD HAVE KILLED ME
14   IF I HAD NOT -- IF HE HAD STABBED ME IN MY NECK OR CHEST.
15        DEFENDANT CUADRADO, YOU WENT FOR MY READ.  ACTUALLY
16   PINNED ME AGAINST A TRACTOR TRAILER.  I HAD BRUISES.  HAD I
17   NOT BLOCKED YOUR RIGHT ARM WITH THE KNIFE THAT YOU STABBED ME,
18   BUT WITH MY LEFT ARM, AND WHO KNOWS WHAT COULD HAVE HAPPENED.
19   DEFENDANT CUADRADO COULD HAVE PUNCTURED MY SKULL AND LEFT ME
20   UNCONSCIOUS, WOULD HAVE STABBED ME REPEATEDLY AND PROBABLY
21   LEFT ME FOR DEAD.
22        I FELT NUMB AND HELPLESS WHEN YOU PINNED ME AGAINST
23   THE TRACTOR TRAILER.  I TRIED LOOKING AT YOU IN THE EYE TO BEG
24   FOR MERCY, BUT ALL I SAW WAS MY OWN REFLECTION FROM YOUR DARK
25   SHADES YOU WORE THAT AFTERNOON.

 1          DURING THE TRIAL THE JURY SAW AND HEARD THE

 2    EVIDENCE, BUT NO ONE HEARD ME CRY AND NO ONE SAW MY TEARS AT

 3    NIGHT WHEN I LAY IN MY BED WITH PAIN, SORROW, SELF PITY, AND

 4    HEADACHES.  MY FAMILY FELT THE PAIN, THE PAIN THAT NO ONE

 5    COULD EVER IMAGINE.

 6          DEFENDANT CUADRADO, I NOW LIVE WITH PERMANENT MENTAL

 7    IMPAIRMENT, PTSD, ANXIETY, AND SEVERE DEPRESSION.  I HAVE HAD

 8    NIGHTMARES OF YOU MANY TIMES SINCE THE INCIDENT.  I SEE YOU IN

 9    MY DREAMS.  I SEE YOU WHAT YOU DID TO ME IN MY DREAMS, DREAMS

10    THAT SEEM SO REAL.

11          THAT LAST NIGHTMARE I HAD WAS ABOUT A MONTH AGO BUT

12    THIS TIME IT WASN'T ABOUT YOU.  THERE WAS THIS COUPLE, A MALE

13    AND A FEMALE, ENTERED MY ROOM WHILE I WAS SLEEPING.  THE MAN

14    LAID NEXT TO ME AND PUT A KNIFE IN MY NECK AND SAID, DO NOT

15    MOVE.  GIVE ME ALL YOUR MONEY OR I AM GOING TO CUT YOU UP.

16          IN MY DREAM I REFUSED, AND STARTED -- AND HE STARTED

17    STABBING ME, MY LEGS.  I WAS YELLING FOR HELP, AND LUCKILY MY

18    GRANDDAUGHTER KNOCKED AT MY DOOR, LIKE SHE DOES EVERY MORNING,

19    THEN I WOKE UP.

20          I REMEMBER ASKING MY DAUGHTER-IN-LAW IF SHE HEARD ME

21    YELLING OR SCREAMING FOR HELP.  SHE SAYS NO.  MY CRY FOR HELP

22    WAS ONLY PART OF MY NIGHTMARE.

23          I NOW SEE A PSYCHIATRIST, A PSYCHOLOGIST, AND ATTEND

24    THERAPY FOR MENTAL HEALTH ON A REGULAR BASIS.

25          SADLY, I HAVEN'T BEEN BACK TO WORK.  I AM NOT ABLE

1    TO DEAL WITH PEOPLE RIGHT NOW, LIKE I USED TO, OR PERFORM MY

2    DUTIES AS A MANAGER BECAUSE OF WHAT DEFENDANT CUADRADO DID.

3            MR. CUADRADO, IF YOU WOULD JUST HAVE LISTENED AND

4    OBEYED YOUR SUPERVISOR'S INSTRUCTIONS THAT DAY, WE WOULDN'T BE

5    IN THIS COURTROOM TODAY.

6            NO ONE TRIED TO PULL YOU OUT OF THE TRUCK.  WE

7    DIDN'T CALL YOU NAMES, AND WE CERTAINLY DIDN'T THREATEN YOU.

8    YOU WERE THE AGGRESSOR.  YOU ARE RESPONSIBLE FOR YOUR ACTIONS.

9            DURING THE CLOSING ARGUMENTS ATTORNEY REDD PLAYED A

10    RECORDED CONVERSATION BETWEEN EDWIN AND A SOME LADY, I DON'T

11    KNOW WHO IT WAS.

12            MR. CUADRADO, YOU WERE ASKED IF YOU REGRET WHAT YOU

13    DID TO ME, AND IF YOU WERE READY TO APOLOGIZE.  IT TOOK ABOUT

14    A MINUTE TO ANSWER THE QUESTION.  AND YOU SAID, I WILL

15    APOLOGIZE IF THEY DROP THE CHARGES.

16            MR. CUADRADO, HOW DARE YOU.  YOU ARE NOT REMORSEFUL

17    AT ALL.  YOU ARE SELFISH.

18            ALSO DURING THE TRIAL I WAS ASKED BY THE DEFENSE IF

19    I THOUGHT THAT HE IS CRAZY.  I RESPECTFULLY SAID NO, HE IS NOT

20    CRAZY.

21            THE JURY DIDN'T BELIEVE YOU.  YOU ARE JUST A DRUG

22    ADDICT AND HAVE NO RESPECT FOR PEOPLE YOU WORKED WITH, OR NO

23    ONE, AND NO ONE FOR THAT MATTER.

24            AFTER SOME RESEARCH YOU WERE DISCIPLINED, SUSPENDED

25    MANY TIMES, MULTIPLE TIMES.  AND I MAY ADD, PROBABLY

```
 1   TERMINATED AT LEAST ONE TIME FOR YOUR BEHAVIOR AND YOUR
 2   ACTIONS.
 3           YOU AND YOUR CORRUPT UNION FILED MULTIPLE
 4   GRIEVANCES.  I SAID IT, CORRUPT UNION.
 5           YOU WON YOUR GRIEVANCES AND YOU WERE ALLOWED TO
 6   RETURN TO WORK ONLY BECAUSE OF TECHNICALITIES, AND SOMEONE ON
 7   THE OTHER SIDE DID NOT DO THEIR HOMEWORK AND THEIR JOB, AND
 8   THAT IS WHY YOU ARE HERE TODAY.
 9           YOUR UNION REPRESENTS THE LAZIEST EMPLOYEES AND
10   MAKES THEMSELVES THE VICTIMS.  YOUR UNION REPS ARE THEMSELVES
11   LAZY.  THEY ARE BULLIES AND VERY ANTI-MANAGEMENT.  YOUR UNION
12   CONDONED YOUR ACTIONS THEN, AND STILL CONDONE YOUR ACTIONS
13   NOW.
14           THEY ARE NOT CONCERNED ABOUT YOU.  IF THEY WERE
15   CONCERNED ABOUT YOU THEY WOULD HAVE TOLD YOU TO GET
16   PROFESSIONAL HELP WITH YOUR DRUG ADDICTION, YOUR ANGER; BUT
17   THEY DID NOT.  THEIR ONLY INTEREST IN COLLECTING THE MONTHLY
18   DUES.
19           YOUR FRIENDS WHO TESTIFIED AREN'T YOUR FRIENDS.  IF
20   THEY WERE YOUR FRIENDS THEY WOULD HAVE TOLD YOU THAT -- THEY
21   WOULD HAVE TOLD THE JURY THE TRUTH.  ONE PERSON WHO WAS IN
22   MANAGEMENT CURRENTLY BUT IS VERY ANTI-MANAGEMENT SAT IN THAT
23   CHAIR AND TESTIFIED FOR YOU IN THIS COURTROOM AND MADE IT SEEM
24   LIKE, AND DESCRIBED IT LIKE, A SAINT.  A SAINT YOU ARE NOT.
25   YOU ARE EVIL IN MY EYES, MR. CUADRADO.
```

1          FOR THE PAST SEVEN MONTHS I HAVE SUFFERED AND
2    ENDURED UNIMAGINABLE PAIN AND SUFFERING, PHYSICALLY AND
3    EMOTIONALLY.

4          WHERE IS MY JUSTICE?  WHO WILL PROTECT ME WHEN HE
5    HAPPENS TO BE RELEASED FROM PRISON?  I DESERVE THE REST OF MY
6    LIFE WITHOUT FEAR AND NOT LOOKING OVER MY SHOULDERS.  MY
7    FAMILY DESERVES THE SAME.

8          MR. CUADRADO, YOU DO NOT DESERVE SYMPATHY OR EMPATHY
9    BECAUSE OF WHAT YOU DID TO ME.  YOU DON'T DESERVE -- YOU DON'T
10   DESERVE TO REPRESENT AND WEAR THAT USPS BADGE AS A TRUCK
11   DRIVER.  I AM PROUD TO WEAR MY USPS BADGE.  IT MEANS A LOT TO
12   ME.

13         YOU TOOK ADVANTAGE OF THE SYSTEM AND YOU ONLY HAVE
14   YOURSELF TO BLAME -- CORRECTION -- YOU AND YOUR UNION ARE TO
15   BLAME, FOR THEY DID NOT REPRESENT YOU IN THE RIGHT WAY.

16         DEFENDANT CUADRADO, I WILL PRAY FOR YOU, BUT I CAN
17   NEVER, AND WILL NOT, FORGIVE YOU.  I HOPE THAT YOUR TIME IN
18   PRISON WILL BRING LIGHT AND CHANGE THE WAY YOU VIEW THE WORLD.
19   THE WORLD HAS A LOT TO OFFER, EVEN FOR INDIVIDUALS LIKE YOU.

20         JUDGE BURNS, I CONSIDER MYSELF AND MY FAMILY, MY
21   POSTAL FAMILY, GOOD PEOPLE, AND TRIED TO MAKE A POSITIVE
22   CONTRIBUTION TO THIS SOCIETY AND THE WORLD.

23         I AM REQUESTING THE MAXIMUM SENTENCE FOR MR.
24   CUADRADO FOR HIS MONSTROUS AND EVIL ACTS.  HE IS A DANGER TO
25   SOCIETY, AND IF SENTENCED TO MINIMUM HE WILL HARM SOMEONE

```
 1   ELSE.
 2            THANK YOU, SIR.
 3            THE COURT:  THANK YOU, MR. AFICIAL.
 4            ANYONE ELSE WANT TO MAKE A STATEMENT, OR IS THAT IT,
 5   MS. WILLIAMS?
 6            MS. WILLIAMS:  THAT'S ALL FOR THE UNITED STATES,
 7   YOUR HONOR.
 8            THE COURT:  ANYTHING ELSE FROM THE UNITED STATES,
 9   THEN?
10            MS. WILLIAMS:  NOTHING FURTHER FROM THE UNITED
11   STATES.
12            THE COURT:  ALL RIGHT.
13            FROM PROBATION, ANYTHING YOU WANT TO ADD?
14            THE PROBATION OFFICER:  UNLESS YOUR HONOR HAS ANY
15   SPECIFIC QUESTIONS, WE SUBMIT ON THE PRESENTENCE REPORT AND
16   RECOMMENDATION.
17            THE COURT:  ALL RIGHT.
18            THE SENTENCING PROCESS, IN FEDERAL COURT, BEGINS
19   WITH A CORRECT CALCULATION OF THE SENTENCING GUIDELINES.
20            THE COURT HAS HEARD OBJECTIONS TO THE GUIDELINE
21   CALCULATIONS.  I HAVE RULED ON THOSE.  AND LET ME RECITE FOR
22   THE RECORD WHAT I FIND THE CORRECT GUIDELINES TO BE.
23            GIVE ME JUST A SECOND TO FIND MY PROPER PLACE HERE.
24            THE BASE OFFENSE LEVEL FOR THIS OFFENSE OF WHICH THE
25   DEFENDANT WAS CONVICTED OF ASSAULTING A FEDERAL EMPLOYEE IS A
```

1  14.  IN THIS CASE THERE WAS UNDISPUTED EVIDENCE THAT THE
2  DEFENDANT USED A KNIFE, WHICH IS CATEGORIZED UNDER A 2A2.2B AS
3  A DANGEROUS WEAPON, THAT ADDS FOUR.

4          I AGREE WITH THE GOVERNMENT THAT THE EXTENT OF THE
5  BODILY INJURY MERITS A SIX-LEVEL INCREASE UNDER THE
6  DEFINITIONS OF BODILY INJURY.  MR. AFICIAL WAS INJURED QUITE
7  BADLY.  IT WAS A HORRIFIC INJURY TO LOOK AT IN THE
8  PHOTOGRAPHS.  HE MENTIONED 12 STITCHES, BUT REALLY THAT --
9  WHEN YOU JUST HEAR THAT IT KIND OF MINIMIZES WHAT ACTUALLY
10 HAPPENED TO HIM.  HE TOOK A BLOW DIRECTLY TO THE HEAD WITH A
11 SHARP KNIFE.  IN ALL EVENTS, THE COURT FINDS THAT THE
12 SIX-LEVEL INCREASE FOR BODILY INJURY IS SUPPORTED BY THE
13 EVIDENCE AND SHOULD BE APPLIED.

14         AND THEN THE CONVICTION UNDER 111(B), WHICH HAPPENS
15 TO BE --

16         THE FACT THAT HE IS A FEDERAL EMPLOYEE, IS THAT THE
17 111(B).

18         **MR. REDD:**  NO, YOUR HONOR.  THAT IS A USE OF A
19 DEADLY, DANGEROUS WEAPON IN THE OFFENSE.

20         **THE COURT:**  I THINK THAT WAS THE FOUR-LEVEL
21 INCREASE.  THIS IS 2A2.2.

22         **MR. REDD:**  ONE MOMENT, YOUR HONOR.

23         **THE PROBATION OFFICER:**  YOUR HONOR, IF I MAY.  THE
24 PLUS TWO IS 2A2.2B7 FOR THE DEFENDANT BEING CONVICTED UNDER 18
25 USC 111(B).

1    **THE COURT:**  IT GOES BACK TO THE QUESTION, BECAUSE OF
2    THE STATUS OF THE VICTIM?
3    **MR. REDD:**  NO, YOUR HONOR.  IT IS THAT WHOEVER IN
4    THE COMMISSION OF ANY ACT DESCRIBED IN SUBSECTION (A) USES A
5    DEADLY OR DANGEROUS WEAPON.  SO THE FACT THAT HE WAS CONVICTED
6    UNDER THAT SUBSECTION.
7    **THE COURT:**  HOW DOES IT DIFFER, THEN, FROM 2A2.2B2,
8    BECAUSE THAT SAYS USE OF A DANGEROUS WEAPON, PLUS FOUR.
9    **MR. REDD:**  I BELIEVE, YOUR HONOR -- AND WE TALKED
10   ABOUT THIS AT THE TIME THE VERDICT FORM WAS BEING PREPARED --
11   IS THAT THERE IS A THEORY THAT YOU CAN ALSO JUST SUFFER BODILY
12   INJURY.  AND SO IT IS NOT A SIMPLE ASSAULT IT IS AN AGGRAVATED
13   ASSAULT, SO BEING CONVICTED OF AN AGGRAVATED ASSAULT, TWO
14   LEVELS ARE ADDED UNDER THE GUIDELINES.
15   **THE COURT:**  ALL RIGHT.
16   WELL, I NOTE THAT THE DEFENSE ALSO INCLUDES THAT
17   ADJUSTMENT IN ITS SENTENCING SUMMARY CHART.  SO THE COURT
18   APPLIES THAT.
19   THE ADJUSTED OFFENSE LEVEL UPWARDS OF 26.  THE
20   DEFENDANT IS IN CRIMINAL HISTORY CATEGORY II.  THE GUIDELINE
21   RANGE I FIND APPLICABLE TO HIM IN THIS OFFENSE IS 70 TO 87
22   MONTHS.
23   THE GOVERNMENT HAS RECOMMENDED 78 MONTHS, THE
24   DEFENSE HAS RECOMMENDED 36 MONTHS.  I HAVE THOSE
25   RECOMMENDATIONS AS WELL AS THE GUIDELINE RANGE IN MIND.  I

 1  WILL KEEP THE GUIDELINES IN MIND AS I TURN TO THE 3553

 2  FACTORS.

 3          FIRST, YOU KNOW, WE HAVE TALKED A LOT ALREADY ABOUT

 4  THE NATURE AND CIRCUMSTANCES OF THE OFFENSE AND THE HISTORY

 5  AND CHARACTERISTICS OF THE DEFENDANT.

 6          THIS WAS AN UNPROVOKED ATTACK ON MR. AFICIAL, MORE

 7  SO THAN THE OTHER PARTICIPANTS INVOLVED.  I MEAN, THE

 8  PARAMOUNT CHARACTERISTIC OF WHAT HAPPENED HERE IS THAT, I

 9  THINK MR. AFICIAL SAID, WELL, I KNEW OF MR. CUADRADO, BUT I

10  HAD NEVER MET HIM IN PERSON BEFORE THIS.

11          AND HE WAS SORT OF CONSCRIPTED INTO THIS BECAUSE, AS

12  HE MENTIONED IN HIS STATEMENT TO THE COURT, HE GOT A CALL FROM

13  A SUPERVISOR SAYING, LOOK, THERE IS SOME KIND OF PROBLEM WITH

14  MR. CUADRADO AND HIS DIRECT SUPERVISOR, MR. RODRIGUEZ, AND YOU

15  NEED TO GO POUR COLD WATER ON EVERYBODY AND CALM THE SITUATION

16  DOWN.

17          SO HE WENT OUT, VERY INNOCENTLY, TO DO THAT.  I

18  REMEMBER HIM TESTIFYING THAT HE WAS ACTUALLY OFF WORK AND GOT

19  CALLED AT THE LAST SECOND TO DO THIS.  SO HE IS ALMOST LIKE AN

20  INNOCENT BYSTANDER IN THE WHOLE THING.

21          AND SO THE NATURE OF THE ATTACK ON HIM JUST DOESN'T

22  MAKE ANY SENSE.  MR. CUADRADO DIDN'T HAVE ANYTHING AGAINST HIM

23  OTHER THAN, AS MR. AFICIAL POINTS OUT, HE WAS A SUPERVISORY --

24  HE WAS SUPERVISORY PERSONNEL AT THE POSTAL SERVICE AND MR.

25  CUADRADO SEEMED, YOU KNOW, VERY, VERY UPSET AT THE WAY HE WAS

1   BEING SUPERVISED.

2           NOW, I SAY NONE OF THIS IN DEFENSE OF MR. CUADRADO'S

3   ACTION.  I DON'T SAY ANY OF IT TO SAY THAT HE WAS RIGHT TO DO

4   THIS.  BUT, AS I MENTIONED DURING THE MOTION ON THE NEW TRIAL,

5   I THINK WHAT ANIMATED THIS THING WAS HIS ANGER OVER, YOU KNOW,

6   MR. RODRIGUEZ SHOWING UP.

7           AND, AGAIN, I KNOW MR. RODRIGUEZ IS HERE, I AM NOT

8   FAULTING YOU AT ALL.  YOU HAVE A JOB TO DO.  AND THE RULE IS

9   YOU DON'T LEAVE AN UNATTENDED POSTAL TRUCK IN FRONT OF A

10  BUILDING AND GO IN.  AND THAT'S THE RULE, AND EMPLOYEES HAVE

11  TO FOLLOW THAT RULE.  SO I DON'T FAULT YOU AT ALL FOR GOING IN

12  AND TELLING MR. CUADRADO, GET BACK OUT TO THE TRUCK, PARK IT

13  IN THE RIGHT PLACE, AND THEN GO GET YOUR HOT DOG AND DRINK.

14          I DON'T FAULT YOU.  BUT IT SORT OF -- TO ANYONE, IT

15  KINDA SHAPES THE CONTEXT OF THIS THING AND SHOWS YOU WHY MR.

16  CUADRADO WAS AGGRAVATED.

17          WAS HE RIGHT TO BE AGGRAVATED?  NO, WASN'T.

18          WAS IT A RATIONAL RESPONSE FOR HIM TO BE AGGRAVATED?

19  YEAH.

20          BUT WAS HE GENUINELY AGGRAVATED ABOUT THIS?  YEAH,

21  HE WAS.

22          THERE WAS SOME TESTIMONY THAT MR. RODRIGUEZ

23  CONFRONTED HIM IN AN ANGRY MANNER.  I DON'T THINK THAT

24  HAPPENED, I THINK THAT WAS THE OBSERVATION OF THE CLERK FROM

25  BEHIND THE COUNTER.  SHE KNEW MR. CUADRADO COMING IN, HE

1    SEEMED LIKE A NICE FELLOW.  SO I AM SURE WHATEVER CONFLICT

2    OCCURRED THAT DAY SHE WOULD HAVE NATURALLY THOUGHT, WELL, THIS

3    ISN'T MR. CUADRADO'S DOING.  HE IS HERE TO PATRONIZE THE

4    STORE, BUY A DRINK, BUY SOMETHING TO EAT.  AND THIS FELLOW

5    COMES AND JUMPS ON HIM.

6              NOT LITERALLY SPEAKING.

7              BUT I THINK THAT'S THE CONTEXT OF THIS CASE.  I

8    THINK MR. CUADRADO WAS ANGRY ABOUT BEING CONFRONTED IN THE

9    STORE.  I THINK HIS ATTITUDE WAS, LOOK, CAN'T A GUY GET

10   SOMETHING TO EAT AND DRINK?

11             AND THEN HE OVERREACTED.  AND I THINK IT CONTINUED

12   TO FESTER, BECAUSE HE DRIVES -- LEAVES HIS TRUCK IN THE WRONG

13   PLACE AND THEN, AS I SAID, INEXPLICABLY HE COMES OUT AND HE

14   ATTACKS A THIRD PARTY THAT MAYBE HE KNOWS, MAYBE HE DOESN'T

15   KNOW, BUT CERTAINLY IS NOT THE PERSON WHO HE BELIEVES HAS

16   ANTAGONIZED HIM.

17             I MENTION THAT BECAUSE IT KIND OF UNDERSCORES THE

18   RANDOMNESS OF THIS THING.  AND THAT MR. CUADRADO WAS ACTING

19   OUT OF ANGER.

20             YOU KNOW, I THINK IT WOULD BE A DIFFERENT STORY IF

21   HE HAD GONE AFTER MR. RODRIGUEZ.  I AM NOT SAYING THAT WOULD

22   BE JUSTIFIED, BUT IT WOULD BE A LITTLE MORE UNDERSTANDABLE TO

23   ME.  YOU KNOW, HERE IS THE OBJECT OF HIS FRUSTRATION IS THIS

24   SUPERVISOR THAT, YOU KNOW, IS TELLING HIM HE CAN'T PARK THE

25   TRUCK AND GO AND GET SOMETHING TO EAT.

 1          AGAIN, MR. RODRIGUEZ, I KNOW YOU ARE HERE.  I AM NOT
 2   FAULTING YOU AT ALL FOR THAT, I AM JUST SAYING THAT THESE ARE
 3   THE CIRCUMSTANCES.  AND IT IS KIND OF BIZARRE THAT MR. AFICIAL
 4   WOULD BE THE GUY THAT ENDS UP GETTING STABBED IN ALL OF THIS.
 5          I MEAN, IF I HAD TO SAY HOW THIS PLAYED OUT, YOU
 6   KNOW, HE WOULD HAVE GONE AFTER YOU.  AND I KNOW YOU WERE
 7   RUNNING, I SAW THE FILM, BUT I WOULD HAVE THOUGHT, YOU KNOW,
 8   THAT SOMEBODY ACTING COMPLETELY RATIONALLY IS GOING TO COME
 9   AFTER YOU RATHER THAN THE OTHER TWO PEOPLE THAT WERE JUST KIND
10   OF COLLATERAL TO THE WHOLE THING.
11          I MENTION THAT BECAUSE, IN MY MIND, AT LEAST, THE
12   RANDOMNESS OF THIS KIND OF UNDERSCORES, YOU KNOW, A POINT THAT
13   NOW DRIFTS INTO THE HISTORY AND CHARACTERISTICS OF MR.
14   CUADRADO.
15          THERE IS NO QUESTION IN MY MIND -- AND I DON'T EVEN
16   THINK THE GOVERNMENT CONTESTS -- THAT HE WAS, AND IS,
17   SUFFERING FROM SCHIZOPHRENIA.  THIS ISN'T A MADE-UP MENTAL
18   DISORDER.  SOMETIMES -- YOU KNOW, SOMETIMES MENTAL DISORDERS
19   ARE MADE UP.  THEY ARE KIND OF THE LAST REFUGE OF SOMEBODY
20   THAT HAS NOTHING ELSE TO DEFEND AGAINST THE CHARGE.  BUT IN
21   THIS CASE THERE IS PLENTY OF EVIDENCE THAT PREDATES THIS
22   INCIDENT WHERE THIS FELLOW WAS HAVING TROUBLES.  HE WAS
23   HEARING VOICES.  HE MADE COMPLAINTS TO THE SUPERVISORS AT THE
24   U.S. POSTAL SERVICE THAT, YOU KNOW, PEOPLE WERE WATCHING HIM
25   OR TALKING ABOUT HIM.  BIZARRE -- BIZARRE IDEATIONS THAT, YOU

1  KNOW, WERE NOT TRUE, WERE OBVIOUSLY NOT TRUE.

2          AND, YOU KNOW, I THINK, TO SOME EXTENT, THAT

3  DESERVES ATTENTION IN THIS CASE, BECAUSE IT SHOWS MIXED-UP

4  PERCEPTIONS AND A FELLOW WHO IS NOT PERCEIVING THE WORLD THE

5  WAY THINGS ARE REALLY HAPPENING.  SO I HAVE THAT IN MIND.

6          THIS IS DIFFERENT, I WANT TO SAY, FROM, YOU KNOW,

7  SOMEBODY THAT OUT OF SPITE OR HATE OR WHATEVER GOES AFTER

8  SOMEBODY INTENTIONALLY.  THIS IS DIFFERENT FROM THAT.  THIS

9  IS, LIKE, RANDOM.

10          I MEAN, YOU ARE LEFT SAYING WAIT, WAIT, WHY IS HE

11  ATTACKING MR. AFICIAL?  ONLY BECAUSE, YOU KNOW, HE IS IN A

12  RAGE AND IT IS RANDOM VIOLENCE.

13          IT DOESN'T EXCUSE IT, AND I AM NOT MAKING EXCUSES

14  FOR IT, BUT ALONG THE SPECTRUM OF VIOLENT ACTS, YOU KNOW,

15  SOMEBODY THAT THINKS ABOUT, I'M GOING TO GET MR. RODRIGUEZ,

16  I'M GOING TO GO AFTER HIM.

17          THAT, TO MY MIND, IS MUCH MORE MORALLY CULPABLE THAN

18  SOMEBODY THAT GETS OUT AND JUST STARTS FLAILING WITH A KNIFE,

19  AS MR. CUADRADO DID THAT DAY.

20          SO I WANT TO SAY THAT I HAVE TAKEN INTO ACCOUNT, YOU

21  KNOW, WHAT I THINK IS UNCONTESTED EVIDENCE THAT HE WAS

22  SUFFERING FROM MENTAL DISEASE AT THE TIME.

23          HAVING SAID THAT, I AGREE WITH THE JURY VERDICT.

24  EVERYTHING THAT HAPPENED HERE WERE THINGS THAT A RATIONAL

25  ACTOR WOULD DO.  HE KNEW WHAT HE WAS DOING, AND HE KNEW THE

1    WRONGFULNESS OF IT.  THAT WAS MADE APPARENT, I THINK, BY HIS
2    ACTIONS AFTER THE FACT, AND THINGS THAT HE SAID.
3             SO HE WAS NOT -- YOU KNOW, HE WAS NOT IN THE THROES
4    OF A MENTAL DISORDER THAT CONFUSED HIM OR CHANGED HIS REALITY.
5    HE KNEW WHAT HE WAS DOING.  HE JUST HAD BAD IMPULSE CONTROL
6    AND SOME OF THAT, I THINK, WAS THE RESULT OF HIS MENTAL
7    ILLNESS.  I THINK THE IMPULSE CONTROL WAS A RESULT OF HIS
8    SCHIZOPHRENIA AND THE FEELING THAT, YOU KNOW, NO ONE IS
9    LISTENING TO ME.  I AM TELLING YOU THAT I AM HAVING THESE
10   PROBLEMS, I AM HAVING THESE AUDITORY HALLUCINATIONS.  AND IT
11   IS REAL TO ME, BUT NOBODY SEEMS -- DOESN'T STICK WITH ANYBODY
12   ELSE.
13             SO I THINK THAT IS THE TRUE AND THE FAIR CONTEXT OF
14   THIS CASE.
15             NOW, HAVING SAID THAT, MR. CUADRADO, THERE IS NO
16   EXCUSE.  I MEAN, I FOCUSED ON MR. -- EVEN IF IT WAS MR.
17   RODRIGUEZ, YOU KNEW THAT IS NOT THE WAY TO SETTLE A SCORE WITH
18   HIM.
19             MR. AFICIAL SAID, OH, YOU KNOW, YOU HAD PROBLEMS IN
20   THE PAST AND THE UNION HAS BACKED YOU ON THOSE THINGS.
21             I LISTENED TO YOUR ALLOCUTION TODAY.  YOU ARE A
22   WELL-SPOKEN GUY, YOU CAN ARTICULATE WHAT YOUR CONCERNS ARE.
23   THAT IS THE WAY TO HAVE HANDLED THIS.
24             IF YOU THOUGHT HE WAS WRONG FOR JUMPING, YOU KNOW,
25   INTO YOU BECAUSE YOU WERE TEMPORARILY AT THE 7/11 TRYING TO

1   GET A BITE TO EAT AND A COKE, THEN, YOU KNOW, TAKE IT UP WITH

2   THE UNION AND SAY, HEY, DON'T I GET A LUNCH BREAK?  DON'T I

3   GET A TIME OUT TO GET SOMETHING?

4           BUT, YOU KNOW, YOU DIDN'T REACT THAT WAY.  YOU

5   REACTED OUT OF ANGER.

6           I DID NOT FIND THAT HE IS ENTITLED TO ACCEPTANCE OF

7   RESPONSIBILITY BUT, AS I MENTIONED, I DON'T THINK THAT THAT

8   MEANS THAT HE IS NOT CONTRITE.  I THINK HE IS CONTRITE.  I

9   THINK PART OF THIS WAS THE PRODUCT OF THE SCHIZOPHRENIA.

10          AND, YOU KNOW, AS I SAID, I THINK NOW AND ON

11  REFLECTION AND WITH MEDICATION HE REALIZES THAT WHAT HE DID

12  WAS PROFOUNDLY WRONG.

13          IT HAS LEFT A TERRIBLE IMPACT ON MR. AFICIAL.  YOU

14  LISTENED VERY CAREFULLY AS HE WAS TALKING, YOU KNOW, AND HE IS

15  GOING TO LIVE WITH THIS.  AND IT HAD A TERRIBLE IMPACT.  HE

16  CAN'T EVEN GO BACK TO WORK, AND HERE IS A GUY THAT HAS GIVEN

17  HIS LIFE TO THE POSTAL SERVICE.  HE REALLY IS LOYAL TO THE

18  POSTAL SERVICE.  HE APPRECIATES WHAT THE GOVERNMENT HAS DONE

19  FOR HIM, GIVING HIM THAT JOB.  AND I THINK IT REALLY IS

20  TEARING AT HIM BECAUSE HE CAN'T GO BACK.

21          THEN HE IS HAVING THESE NIGHTMARES OF PEOPLE

22  STABBING HIM.  AND NONE OF THAT WAS IN LIFE BEFORE THAT DAY

23  WHEN YOU OVERREACTED TO THIS PROVOCATION.

24          AND FOR THAT YOU ARE RESPONSIBLE.  AND I HOPE YOU

25  ARE CONTRITE AND I HOPE YOU FEEL SORRY ABOUT THAT, MR.

1   CUADRADO.  I REALLY DO.  I HOPE NOW THAT -- YOUR LAWYER SAYS,

2   OH, YOU ARE MUCH BETTER OFF, YOU ARE UNDERSTANDING THINGS MUCH

3   BETTER BECAUSE OF THE MEDICATION AND ALL THAT YOU ARE GETTING

4   AT THE MCC.

5            I HOPE YOU HAVE AN APPRECIATION OF THAT.

6            NEED FOR DETERRENCE.

7            LET ME MENTION ONE OTHER THING.

8            I AM NOT UNMINDFUL, EITHER, IN FACT I HAVE IT IN THE

9   FOREFRONT OF MY MIND, THAT MR. CUADRADO HASN'T HAD AN EASY

10  LIFE, INDEPENDENT OF THESE AUDITORY HALLUCINATIONS AND

11  SCHIZOPHRENIA.  IT HAS BEEN TOUGH.  AND OBVIOUSLY THE

12  RELATIONSHIP WITH HIS SISTER WAS A DIFFICULT ONE.  THE

13  RELATIONSHIP WATCHING HIS PARENTS AND DOMESTIC VIOLENCE WAS

14  TOUGH ON HIM.  WE ARE SHAPED BY OUR EXPERIENCES, AND THAT WAS

15  HIS.  THAT WAS HIS.

16           NOW, YOU KNOW, CONNECTING THAT TO WHAT HAPPENED

17  HERE, A LITTLE MORE DIFFICULT.  BUT I HAVE SOME SYMPATHY FOR

18  HIS UPBRINGING AND THE FACT THAT THERE WEREN'T STANDARDS THAT

19  DE-EMPHASIZED VIOLENCE.  FOR EXAMPLE, YOU KNOW, WITH HIS

20  FATHER BEING VIOLENT AGAINST HIS MOTHER AND THEN THREATENING,

21  AS YOU MENTIONED, WITH THE PUPPY OUT THE WINDOW AND THAT TYPE

22  OF THING.  THAT IS HIS BACKGROUND AND HIS ORIENTATION FROM A

23  PARENT.  FROM A PARENT.

24           SO I HAVE ALL OF THAT IN MIND, AS WELL.

25           NEED FOR DETERRENCE.

1        MR. CUADRADO NEEDS TO BE ON MEDICATION TO CONTROL

2   THE HALLUCINATIONS, TO CONTROL HIS SCHIZOPHRENIA.  THAT'S

3   GOING TO BE AN IMPORTANT PART OF DETERRING HIM FROM DOING

4   ANYTHING LIKE THIS, LOSING HIS TEMPER, USING A WEAPON LIKE

5   THIS.  SO I THINK THOSE THINGS CAN BE ADDRESSED THROUGH

6   SUPERVISED RELEASE.

7        JUST PUNISHMENT.

8        THE REASON I SPENT SO MUCH TIME GOING OVER WHAT I

9   BELIEVE TO BE THE TRUE CONTEXT OF THIS CASE IS, YOU KNOW, IF I

10  THOUGHT, MR. AFICIAL, THAT HE WAS IN FULL CONTROL OF HIS

11  EMOTIONS AND THAT, YOU KNOW, HE WAS TRYING TO MAKE A POINT TO

12  EVERYBODY ELSE BY STABBING YOU, THEN THIS WOULD BE A VERY

13  DIFFERENT CASE.  I DON'T THINK HE WAS IN FULL CONTROL.  I

14  THINK HE WAS OUT OF CONTROL.

15       THERE IS AN OLD SAYING, EVEN A DOG KNOWS THE

16  DIFFERENCE BEING KICKED AND STUMBLED OVER.  AND I AM NOT

17  SAYING THIS WAS THE EQUIVALENT OF A STUMBLED OVER, BUT IT

18  WASN'T A PREMEDITATED ATTACK AGAINST YOU.

19       AS I UNDERSTOOD, HE HAD NEVER EVEN MET YOU IN

20  PERSON.  MAYBE YOU KNEW OF EACH OTHER, BUT HE HAD NO REASON TO

21  ATTACK YOU.  AND THAT IS WHY I MENTIONED THE RANDOMNESS OF

22  THIS THING.  AND KIND OF PUTS IT IN A DIFFERENCE CONTEXT FOR

23  ME THAN SOMEBODY THAT SETS OUT TO GET SOMEBODY ELSE AND THEN,

24  YOU KNOW, ACHIEVES THAT.

25       SO, YOU KNOW, JUST PUNISHMENT.  THE GOVERNMENT IS

1    ASKING FOR 78 MONTHS, WHICH IS THE MID-RANGE HERE.  AND I

2    THINK, YOU KNOW, IN LIGHT OF THE DEFENDANT'S MENTAL HISTORY,

3    WHICH IS DOCUMENTED, AND NO ONE DISPUTES THAT HERE.  THE

4    GOVERNMENT DOESN'T DISPUTE IT THAT FOR YEARS, YOU KNOW, HE WAS

5    HAVING A REACTION TO SCHIZOPHRENIA.  BUT I THINK THAT HAS TO

6    BE TAKEN INTO CONSIDERATION AND THE EXTENT OF THE PUNISHMENT

7    HAS TO BE MEASURED, I THINK, BY HIS -- WELL, PUT IT THIS WAY.

8    I DON'T MEAN IT IN THE LEGAL SENSE BUT HIS DIMINISHED

9    CAPACITY, HIS DIMINISHED UNDERSTANDING OF WHAT HE WAS DOING

10   AND HIS ABILITY TO CONTROL HIMSELF.

11          I THINK HE NEEDS CONTINUING TREATMENT FOR HIS

12   SCHIZOPHRENIA.  I WAS INCLINED, IF HE AGREED, TO RECOMMEND A

13   PLACEMENT IN A MEDICAL FACILITY.  HE DOESN'T WANT THAT, HE

14   WANTS TO HAVE VISITATION AND BE CLOSER TO WHERE RELATIVES ARE.

15   I WILL HONOR THAT REQUEST.

16          BUT GOING BACK TO THE GUIDELINES, WHICH I SAID I

17   WILL KEEP IN MIND, THEY ARE 70 TO 87 MONTHS.

18          THE COURT FINDS HERE THAT THE LOW END WOULD BE

19   APPROPRIATE.  THE QUESTION IS, SHOULD THERE BE A VARIANCE FROM

20   THE LOW END.

21          THE DEFENSE HAS RECOMMENDED A SUBSTANTIAL VARIANCE,

22   DOWN TO 36 MONTHS.  I FIND THAT IS TOO MUCH.  I FIND TO GO

23   DOWN TO 36 MONTHS WOULD NOT ACCOUNT FOR THE VIOLENCE THAT

24   OCCURRED HERE.  IT WOULDN'T ACCOUNT FOR THE AFTER-AFFECT THAT

25   MR. AFICIAL CONTINUES TO SUFFER FROM.

1          I HAVEN'T HEARD FROM THE OTHERS, BUT IT IS PROBABLY

2     A PRETTY TRAUMATIC THING FOR THE OTHERS THAT WERE INVOLVED IN

3     THIS, TOO, TO TRY TO ESCAPE A GUY WHO IS OUT OF CONTROL AND

4     WIELDING A KNIFE.

5          I AM NOT UNSYMPATHETIC TO MR. RODRIGUEZ AND THE

6     OTHER GENTLEMAN WHO TESTIFIED AND HAD TO, YOU KNOW, FLEE TO

7     SAVE HIMSELF FROM BEING STABBED.  SO I AM NOT SOFT ON THAT.

8     THAT GUIDES MY THINKING, BUT IT ALSO LEADS ME TO BELIEVE THAT

9     THE VARIANCE THAT THE DEFENSE SUGGESTED DOWN TO 36 MONTHS IS

10    TOO MUCH.

11         WHAT I DO FIND IS THAT A TEN-MONTH VARIANCE FROM THE

12    LOW END IS WARRANTED HERE.  AND THIS TAKES INTO ACCOUNT THE

13    CONTRITION THAT THE DEFENDANT HAS SHOWN.  EVEN THOUGH IT

14    DOESN'T AMOUNT TO ACCEPTANCE OF RESPONSIBILITY, IT ACCOUNTS

15    FOR MY RECOGNITION OF HIS PREEXISTING SCHIZOPHRENIA.  THE FACT

16    THAT THAT PLAYED A MAJOR PART, I THINK, IN WHAT HAPPENED HERE.

17         SO I FIND THAT THAT IS A RIGHT, JUST, PROPER

18    SENTENCE.  IT IS A REASONABLE SENTENCE, NOT GREATER THAN

19    NECESSARY BUT LONG ENOUGH THAT THE CONSEQUENCE IS APPROPRIATE

20    UNDER THE CIRCUMSTANCES.

21         AND I AM HOPING THAT MR. CUADRADO WILL BENEFIT FROM

22    SUPERVISED RELEASE AND THE CONDITIONS THAT I AM GOING TO SET

23    ON THAT.

24         SO 60 MONTHS IS THE SENTENCE.  I VARY TEN MONTHS

25    DOWN TO 60 MONTHS WHICH IS -- WE TALK ABOUT SENTENCES IN TERMS

1    OF MONTHS HERE, THAT IS FIVE YEARS.  THAT IS FIVE YEARS IN
2    CUSTODY FOR THIS OFFENSE.
3          NOW TURNING TO THE CONDITIONS OF SUPERVISED RELEASE.
4    THE COURT FIRST SETS THE TERM OF SUPERVISED RELEASE AT THREE
5    YEARS, WHICH IS THE MAXIMUM TERM UNDER LAW FOR THIS OFFENSE,
6    AND HERE ARE THE CONDITIONS.
7          MR. CUADRADO, THESE ARE THINGS YOU MUST DO WHILE YOU
8    ARE ON SUPERVISED RELEASE AND YOU MUST REFRAIN FROM DOING.
9          FIRST, REPORT TO PROBATION WITHIN THREE DAYS OF
10   BEING RELEASED FROM PHYSICAL CUSTODY.  YOU GOT TO CALL THE
11   PROBATION OFFICER WHEREVER YOU ARE -- I ASSUME YOU WILL BE
12   BACK IN SAN DIEGO -- AND SAY, THIS IS MR. CUADRADO, I AM
13   REPORTING.
14         THEY WILL HAVE YOU COME IN AND TALK TO YOU.
15         YOU WILL HAVE RESTRICTIONS ON LEAVING THE JUDICIAL
16   DISTRICT.  YOU WILL HAVE TO GET PERMISSION FROM THE PROBATION
17   OFFICER.  IT WON'T BE ARBITRARILY WITHHELD IF YOU HAVE SOME
18   GOOD REASON TO BE SOMEWHERE ELSE, IF A JOB TAKES YOU SOMEWHERE
19   ELSE.  THE POINT IS, ON EACH OF THESE THINGS YOU CALL THE
20   PROBATION OFFICER AND DISCUSS IT WITH THE PROBATION OFFICER
21   FIRST.  THEY ARE REASONABLE.  THEY AREN'T GOING TO ARBITRARILY
22   SAY YOU CAN'T DO THIS, YOU CAN'T DO THAT.
23         YOUR PLACE OF RESIDENCE.
24         WOULD YOU HAVE A PLACE WHERE YOU PLAN TO GO WHEN YOU
25   GET OUT?  ARE YOU GOING TO GO TO YOUR MOTHER'S HOME, OR WHERE?

1    DO YOU KNOW NOW?  DO YOU HAVE ANY IDEA?

2              **MR. FAKHARARA:**  YOUR HONOR, UNFORTUNATELY, WE DIDN'T

3    HAVE AN IDEA OF WHERE HE COULD GO.  HIS MOM AND HIS SISTER ARE

4    LIVING TOGETHER AND HE WAS NOT ABLE TO GO BACK TO HIS SISTER'S

5    HOME.  I KNOW THAT PROBATION RECOMMENDED NONPUNITIVE.

6              **THE COURT:**  YEAH, AND I WILL DO THAT.

7              HERE IS THE POINT.  AGAIN, MR. CUADRADO --

8                   **(DISCUSSION OFF THE RECORD BETWEEN THE**

9                   **DEFENDANT AND COUNSEL)**

10             **MR. FAKHARARA:**  HE IS MENTIONING THAT HE HOPES TO

11   EVENTUALLY GO BACK TO DRIVING TRUCKS.

12             **THE COURT:**  OKAY.  HERE IS THE POINT.  I AM NOT

13   GOING TO SET RESTRICTIONS OF WHERE YOU CAN GO, WHERE YOU CAN

14   LIVE, BUT IT WILL BE UP TO THE PROBATION OFFICER -- WHO,

15   AGAIN, WON'T BE ARBITRARY ABOUT THIS.  BUT YOU NEED TO CALL

16   AND SAY, LOOK, I'M PLANNING TO GO HERE, YOU KNOW, CHECK THE

17   PLACE OUT, IT IS GOING TO BE SAFE, AND NOT GOING TO GET ME IN

18   ANY TROUBLE.

19             I AM GOING TO SET, AS A NONPUNITIVE CONDITION, THAT

20   YOU CAN STAY IN A RESIDENTIAL REENTRY CENTER FOR UP TO 120

21   DAYS.  SO THAT WILL ALLOW YOU TO GET YOUR FEET BACK ON THE

22   GROUND, GET A JOB.  MAYBE GET YOUR OWN APARTMENT OR, YOU KNOW,

23   WORK OUT YOUR LIVING ARRANGEMENTS.

24             I WANT YOU TO SEEK AND MAINTAIN FULL-TIME EMPLOYMENT

25   OR SCHOOLING OR SOME COMBINATION OF THOSE THINGS.

Case: 24-2937, 06/30/2025, DktEntry: 27.1, Page 138 of 147
Case 3:23-cr-01855-TWR    Document 101    Filed 06/07/24    PageID.2213    Page 83 of
92

83

```
 1              THE PROBATION OFFICER WILL VISIT YOU AT YOUR
 2   RESIDENCE WHEREVER THAT ENDS UP BEING.  YOU ARE TO COOPERATE
 3   WITH THE PROBATION OFFICER DURING THE VISIT, AND ANSWER
 4   QUESTIONS.
 5              YOU ARE NOT TO HAVE ANY CONTACT GOING FORWARD WITH
 6   MR. AFICIAL.  NO CONTACT AT ALL.  I DON'T THINK YOU ARE
 7   INCLINED TO ANYWAY, BUT DON'T CONTACT HIM IN ANY WAY.
 8   WRITING, PHONE, IN PERSON, DON'T DO THAT.
 9              YOU HEARD HIS CONCERN.  I MEAN, HE HAS AN
10   UNDERSTANDABLE CONCERN THAT, YOU KNOW, YOU MIGHT LASH OUT AT
11   HIM.
12              I DON'T KNOW WHY YOU WOULD.  AS I SAID, I THINK THAT
13   THIS WAS SUFFICIENTLY RANDOM.  YOU DIDN'T KNOW HIM AT THE
14   POINT YOU SLASHED HIM.  BUT DON'T HAVE ANY CONTACT WITH HIM.
15              YOU HAVE TO TELL THE PROBATION OFFICER IF YOU ARE
16   CONTACTED BY LAW ENFORCEMENT.  OBVIOUSLY, YOU ARE NOT TO
17   COMMIT ANY NEW CRIMINAL OFFENSES.  I'M NOT TALKING ABOUT
18   SOMETHING TRIVIAL BUT NOT TO COMMIT ANY NEW CRIMINAL OFFENSES
19   OR THAT WOULD BE A VIOLATION OF SUPERVISED RELEASE.
20              IN PARTICULAR, YOU ARE NOT TO POSSESS WEAPONS,
21   ANYTHING MORE THAN A POCKETKNIFE.  AND I DON'T MEAN A BIG
22   POCKETKNIFE, I MEAN A REGULAR POCKETKNIFE, WOULD BE A
23   VIOLATION.  IN PARTICULAR, NO FIREARMS, NO AMMUNITION, NOTHING
24   LIKE THAT.
25              THAT IS NOT ONLY A VIOLATION OF SUPERVISED RELEASE,
```

1    IT IS A NEW OFFENSE IF YOU GET CAUGHT WITH A GUN NOW THAT YOU

2    ARE A CONVICTED FELON, OR AMMUNITION.  SO YOU DON'T DO THAT.

3            I AM GOING TO GIVE THE PROBATION OFFICER AUTHORITY

4    TO SEARCH MR. CUADRADO.  HE HAS GOT THE RIGHT TO SEARCH HIS

5    HOUSE, OR SHE DOES, THE PERSON, PROPERTY, HOUSE, VEHICLE,

6    PAPERS, ELECTRONIC DEVICES.  THIS, WITH OR WITHOUT PROBABLE

7    CAUSE.  AND THE RIGHT TO SEARCH WILL EXTEND ALSO TO PEACE

8    OFFICERS.

9            I FIND THE NATURE OF THIS OFFENSE JUSTIFIES THE MOST

10   RESTRICTIVE SEARCH CONDITIONS.

11           NO ONE IS GOING TO HARASS YOU, I WON'T ALLOW THAT, A

12   JUDGE WON'T ALLOW THAT.  SO IF YOU THINK YOU ARE BEING

13   HARASSED OR THEY ARE SEARCHING YOU FOR NO GOOD REASON YOU CALL

14   THE LAWYER AND SAY, I WANT TO PUT THIS BACK IN FRONT OF A

15   JUDGE BECAUSE I THINK I AM GETTING HARASSED.

16           SO THAT IS NOT GOING TO HAPPEN.

17           BUT, ON THE OTHER HAND, IF A PROBATION OFFICER SHOWS

18   UP OR A COP ENCOUNTERS YOU ON THE STREET AND SAYS, HEY, COME

19   OVER HERE FOR A SECOND, I WANT TO TALK TO YOU, I WANT TO

20   SEARCH YOU.

21           YOU HAVE TO GO ALONG WITH THAT.  IF YOU RESIST THAT,

22   IF YOU DON'T GO ALONG WITH IT, YOU WILL BE IN VIOLATION OF

23   THIS CONDITION.

24           **MR. FAKHARARA:**  YOUR HONOR, CAN I MAKE ONE POINT ON

25   THIS?

```
 1          THE COURT:  SURE.  OF COURSE.
 2          MR. FAKHARARA:  MY CONCERN WITH THE SEARCHES OF
 3   ELECTRONIC ITEMS IS I THINK THAT PLAYS INTO HIS MENTAL
 4   ILLNESS, THE PARANOIA.
 5          THE COURT:  WHAT WOULD YOU SUGGEST, THEN?
 6          MR. FAKHARARA:  SO I THINK I AM OKAY WITH THE
 7   SEARCHES OF HIS PERSON, OF HIS HOUSE FOR WEAPONS, THINGS OF
 8   THAT NATURE THAT MIGHT INTERACT WITH THE OFFENSE, BUT GOING
 9   FURTHER AND SEARCHING HIS ELECTRONICS, WHERE THERE IS NO
10   RELATIONSHIP WITH THE OFFENSE.
11          THE COURT:  I THINK THAT IS PROBABLY A GOOD
12   OBJECTION.  I WILL ELIMINATE THAT.  THERE IS NO SPECTER OF HIM
13   IN THIS CASE CONSPIRING WITH ANYBODY BY TELEPHONE OR INTERNET,
14   AND GIVEN THE ACKNOWLEDGED SCHIZOPHRENIA AND HIS CONCERN THAT
15   HE IS BEING LISTENED TO AND PEOPLE ARE MONITORING WHAT HE
16   THINKS AND SAYS.
17          YOU KNOW, UNLESS THERE IS REASONABLE CAUSE TO LOOK
18   AT HIS ELECTRONIC DEVICES, HIS COMPUTER AND PHONE, THEN
19   PROBATION SHOULD NOT DO THAT.  YOU MAY IF THERE IS REASONABLE
20   CAUSE TO BELIEVE THAT THEY CONTAIN EVIDENCE OF A NEW CRIME OR
21   A VIOLATION OF SUPERVISED RELEASE.
22          I WILL EXEMPT ELECTRONIC DEVICES FROM THE OTHERWISE
23   COMPREHENSIVE SEARCH CONDITION THAT I HAVE SET.
24          THE COURT ALSO WILL SET --
25          MR. FAKHARARA:  YOUR HONOR, I AM SORRY TO INTERRUPT.
```

1           **THE COURT:**  THAT'S ALL RIGHT.

2           **MR. FAKHARARA:**  IS THE CONDITION PREMISED THERE IS

3   REASONABLE SUSPICION.

4           **THE COURT:**  NO, EXCEPT INSOFAR AS TELEPHONES AND

5   ELECTRONIC MEDIA DEVICES ARE CONCERNED.

6           YOU KNOW, I THINK HE SHOULD BE SUBJECT TO SEARCH.

7   THIS IS A VERY VIOLENT OFFENSE, AND I NOTE THAT THERE WAS

8   ANOTHER, YOU KNOW, IN HIS BACKGROUND.  I REMEMBER THERE WAS

9   ANOTHER WEAPONS TYPE OFFENSE, AS I RECALL.

10          YEAH.  MAKING A CRIMINAL THREAT, HAVING A CONCEALED

11  FIREARM IN A VEHICLE.  SO HE IS NOT TO HAVE THOSE THINGS.

12          AND IF THE PROBATION OFFICER WANTS TO SEARCH AND

13  MAKE SURE THAT -- I'M NOT TALKING ABOUT KITCHEN KNIVES, BUT

14  THE THINGS THAT I DESCRIBED.  ANYTHING, YOU KNOW, BIGGER THAN

15  A POCKETKNIFE, ORDINARY POCKETKNIFE.  CERTAINLY NO FIREARMS,

16  AS IMPLICATED IN THE EARLIER ARREST AND CHARGE AGAINST HIM.

17          **MR. FAKHARARA:**  YOUR HONOR, WE WOULD OBJECT TO THE

18  SETTING OF THAT BROADER CONDITION.

19          **THE COURT:**  THE OBJECTION IS NOTED.  AGAIN, I FIND

20  IT JUSTIFIED.  I FIND IT JUSTIFIED UNDER THE CIRCUMSTANCES OF

21  THE CASE AND THE HISTORY AND BACKGROUND OF THE DEFENDANT.

22          **MS. BARROS:**  YOUR HONOR, IN TERMS OF THE OBJECTION,

23  BOTH THAT IT IS OVERBROAD AND UNNECESSARY, AND ALSO THAT THERE

24  WAS A LACK OF NOTICE.  MS. ESPOSITO DID SUGGEST THE SEARCH

25  CONDITION BUT IT WAS PREMISED ON -- IT STATED SPECIFICALLY AN

1    OFFICER MAY CONDUCT A SEARCH PURSUANT TO THIS CONDITION --

2         **THE COURT:**  THAT MAY BE, BUT THAT DOESN'T BIND THE

3    SENTENCING JUDGE, MS. BARROS.  AND YOU KNOW THAT THERE ARE

4    THREE DIFFERENT SEARCH CONDITIONS THAT A JUDGE CAN CHOOSE

5    FROM.  SO THE FACT THAT IT IS THERE DOESN'T FORECLOSE THAT THE

6    OTHER TWO ARE OUT, IT IS JUST A RECOMMENDATION FROM PROBATION,

7    ONE IN THIS CASE THAT I DON'T CHOOSE TO FOLLOW.

8         THE FINAL CONDITION, HE IS TO PARTICIPATE IN A

9    PROGRAM OF MENTAL HEALTH TREATMENT AS DIRECTED BY THE

10   PROBATION OFFICER.  TAKE MEDICATIONS THAT ARE PRESCRIBED BY A

11   PSYCHIATRIST OR PHYSICIAN.  NOT DISCONTINUE MEDICATION.

12        CONCOMITANT WITH THIS, HE IS NOT TO USE ANY FORM OF

13   NON-PRESCRIBED DRUGS, PARTICULARLY ELICIT DRUGS.

14        NO METHAMPHETAMINE, NO MARIJUANA STUFF LIKE THAT,

15   MR. CUADRADO.  I THINK THAT JUST AGGRAVATES THE CIRCUMSTANCES

16   OF THE SITUATION.  YOU KNOW, IF YOU ARE ON STABILIZING DRUGS

17   THAT HELP YOU NOW WITH THE SCHIZOPHRENIA, THE LAST THING YOU

18   WANT TO DO IS MIX OTHER STUFF INTO IT.  SO DON'T DO ANY OF

19   THAT.

20        THE PROBATION OFFICER WILL HAVE AUTHORITY TO

21   RANDOMLY CHECK HIM FOR USE OF OTHER DRUGS IN HIS SYSTEM, TWICE

22   A MONTH FOR THE FIRST YEAR.  IF THERE IS NO PROBLEMS THEN THE

23   PROBATION OFFICER WILL HAVE DISCRETION TO RELAX OR ELIMINATE

24   ALTOGETHER THE DRUG TESTING CONDITION.

25        ANY OTHER CONDITIONS THAT ARE RECOMMENDED BY EITHER

```
 1   SIDE?

 2            ANY BY THE DEFENSE?

 3            MR. FAKHARARA:  NO, YOUR HONOR.

 4            THE COURT:  ANY OTHER BY THE GOVERNMENT?

 5            MS. WILLIAMS:  NO, YOUR HONOR.

 6            THE COURT:  ANYTHING ELSE FROM PROBATION?

 7            THE PROBATION OFFICER:  NO, YOUR HONOR.

 8            JUST FOR CLARIFICATION ON THE RECORD, IS THE NO

 9   VICTIM CONTACT CONDITION BEING ADOPTED AS NOTED AT PARAGRAPH

10   158 OF THE PRESENTENCE REPORT?

11            THE COURT:  DOES IT MENTION THE OTHER VICTIMS, MR.

12   RODRIGUEZ AND -- I CAN'T REMEMBER.  WHAT WAS THE THIRD

13   FELLOW'S NAME?

14            THE PROBATION OFFICER:  ONLY WITH THE VICTIM OR

15   VICTIM'S FAMILY.  THAT SHOULD HAVE BEEN INTERPRETED AS SOLELY

16   MR. AFICIAL AND HIS FAMILY.

17            THE COURT:  YES.

18            THE PROBATION OFFICER:  BUT THE COURT DID NOT NOTE

19   HIS FAMILY, SO I JUST WANTED TO CLARIFY.

20            MS. WILLIAMS:  THE THIRD VICTIM WAS CHESTER PERKINS.

21            THE COURT:  HE IS NOT TO HAVE ANY CONTACT WITH

22   CHESTER PERKINS OR MR. RODRIGUEZ, WHO IS HERE TODAY, OR MR.

23   AFICIAL, OR ANY OF THEIR FAMILY MEMBERS.  WHICH I DON'T THINK

24   HE IS INCLINED TO DO ANYWAY, BUT JUST NO CONTACT WITH THEM.

25   NO DELIBERATE CONTACT.
```

SER-143

1          DO YOU UNDERSTAND?

2          **DEFENDANT CUADRADO:**  YEAH.

3          **THE COURT:**  SO THAT'S THAT.

4          THE COURT IMPOSES NO FINE.  I DO IMPOSE $100 PENALTY

5    ASSESSMENT.

6          THE PARTIES HAVE AGREED ON RESTITUTION.  I

7    INCORPORATE THE RESTITUTION ORDER THAT HAS BEEN PRODUCED AND

8    AGREED UPON.

9          THE TOTAL AMOUNT OF RESTITUTION IS $12,400, AND

10   THAT'S TO BE PAID TO MR. AFICIAL THROUGH THE PROBATION

11   DEPARTMENT.

12         DEFENDANT'S PAYMENT SHALL BE $150 A MONTH ONCE HE IS

13   RELEASED FROM CUSTODY, IF HE IS ABLE TO DO THAT.  OTHERWISE,

14   IF HE IS WORKING AND EARNING MONEY WHILE IN CUSTODY HE IS TO

15   PAY $25 PER QUARTER.

16         **MR. FAKHARARA:**  YOUR HONOR.  AFTER SPEAKING WITH THE

17   UNITED STATES THE AGREEMENT WE CAME OUT TO WAS $10,300 WHICH

18   SUBTRACTED --

19         **THE COURT:**  OKAY.  I MAY HAVE LOOKED AT THE WRONG

20   RESTITUTION ORDER, THEN.

21         **MS. WILLIAMS:**  AND, YOUR HONOR, THE UNITED STATES

22   CAN PROVIDE A MODIFIED COPY OF THAT, IF WE NEED TO, FOLLOWING

23   COURT.

24         **THE COURT:**  I WILL INTERLINEATE IT HERE.

25         WHAT WAS THE AMOUNT, 10,000 --

1          **MR. FAKHARARA:**  $10,300.

2          **THE COURT:**  AND THAT IS TO BE PAID TO MR. AFICIAL?

3          **MR. FAKHARARA:**  YES, YOUR HONOR.

4          **THE COURT:**  SO THE COURT MODIFIES THAT, THEN.

5          AND I HAVE INTERLINEATED IT AND DATED IT, OR PUT MY

6    INITIALS ON IT.  SO THAT IS INCORPORATED AS PART OF THE

7    JUDGMENT IN THIS CASE.

8          **MS. WILLIAMS:**  THANK YOU, YOUR HONOR.

9          **THE COURT:**  MR. CUADRADO, YOU HAVE A RIGHT TO

10   APPEAL.  YOU HAVE TO MAKE UP YOUR MIND IN THE NEXT 14 DAYS IF

11   YOU WANT TO APPEAL.  IF YOU THINK THE SENTENCE IS TOO LONG, IF

12   YOU THINK I MADE ERRORS DURING THE TRIAL AND YOU THINK I

13   SHOULD HAVE GRANTED THE MOTION FOR A NEW TRIAL AFTER THE LONG

14   DISCUSSION YOU HEARD, WHATEVER YOUR REASONS ARE, YOU CAN ASK

15   YOUR LAWYERS TO FILE A NOTICE FOR YOU.  IT HAS TO BE DONE

16   WITHIN THE NEXT 14 DAYS, SO I AM SURE THEY ARE GOING TO HAVE

17   THAT DISCUSSION WITH YOU.

18         ONCE IT IS DONE A HIGHER COURT WILL LOOK AT

19   EVERYTHING THAT HAS BEEN SAID AND DONE HERE.  AND IF MISTAKES

20   WERE MADE THEY WILL SEND IT BACK FOR THE MISTAKES TO BE FIXED.

21         I WISH YOU GOOD LUCK.

22         I RECOMMEND TWO THINGS FOR MR. CUADRADO.

23         ONE, THAT HE BE PLACED SOMEWHERE CLOSER TO SOUTHERN

24   CALIFORNIA, EITHER TERMINAL ISLAND OR LOMPOC.

25         AND, TWO, THAT HE BE ABLE TO PARTICIPATE IN THE RDAP

1    PROGRAM WHILE HE IS IN THERE.  HE DOES HAVE A HISTORY OF DRUG

2    USE, AND I THINK THAT PROGRAM IS APPROPRIATE.

3          GOOD LUCK TO YOU, MR. CUADRADO.

4          MR. AFICIAL, I WISH YOU GOOD LUCK AS WELL.  I, YOU

5    KNOW, HOPE THESE NIGHTMARES AND THE THOUGHT OF THIS WHOLE

6    THING FADES INTO THE BACKGROUND, AND YOU GET BACK TO YOUR

7    USUAL HAPPY LIFE.  I WISH YOU WELL.

8          **MR. FAKHARARA:**  YOUR HONOR, I WOULD LIKE TO MAKE

9    JUST ONE OBJECTION TO THE SENTENCING, IF I MAY.

10          **THE COURT:**  SURE.

11          **MR. FAKHARARA:**  YOUR HONOR CALCULATED THE GUIDELINES

12    WITH A PLUS SIX INSTEAD OF A PLUS FIVE.

13          THE MAIN OBJECTION HERE IS THAT THE PSR NOTED PLUS

14    FIVE.  THE UNITED STATES HAD AN OPPORTUNITY TO OBJECT, IT

15    DIDN'T, TO THE PSR.  AND PROBATION'S REVIEW WAS WITH THE

16    DISCOVERY, INCLUDING THE INJURIES.

17          ULTIMATELY, THE SERIOUS BODILY INJURY ENCOMPASSES

18    LIFE-THREATENING INJURIES, PEOPLE WHO ARE HOSPITALIZED, PEOPLE

19    WHO ARE INJURED.

20          I AM NOT MINIMIZING THE INJURIES OF THE VICTIM WHO

21    IS HERE IN COURT, I JUST THINK THAT LEGALLY THEY HAVE NOT MET

22    THEIR BURDEN TO ENHANCE THE SENTENCE.

23          **THE COURT:**  ISN'T ALL OF THIS SUBSUMED BY THE

24    VARIANCE THAT THE COURT ORDERED?

25          I HAVE TO TELL YOU THAT EVEN IF I HAD GONE WITH PLUS

1   FIVE THAN PLUS SIX, I WOULD HAVE REACHED THE SAME RESULT AS TO

2   WHAT THE ULTIMATE PROPER SENTENCE, REASONABLE SENTENCE WAS.

3           SO MAYBE IT IS NOT SUBSUMED LEGALLY SPEAKING, BUT

4   THAT WOULD BE MY ANSWER TO THE OBJECTION.  YOUR OBJECTION IS

5   NOTED.

6           **MR. FAKHARARA:**  THANK YOU, YOUR HONOR.

7           **THE COURT:**  WE ARE IN RECESS.

8           **MS. WILLIAMS:**  YOUR HONOR, JUST ONE FINAL THING JUST

9   TO PERFECT THE RECORD.  NOT TO DELAY YOUR RETIREMENT.

10          BUT, FOR THE RECORD, THE COURT IS ADOPTING THE TERMS

11  OF THE RESTITUTION THAT THE UNITED STATES PLACED IN ITS

12  SENTENCING MEMORANDUM, CORRECT?

13          **THE COURT:**  YES.  I THINK I RECITED THOSE.  THE ONLY

14  THING I HAD WRONG WAS THE TOTAL AMOUNT, RIGHT?

15          **MS. WILLIAMS:**  CORRECT, YOUR HONOR.

16          **THE COURT:**  OKAY.  ALL RIGHT.

17          **MS. WILLIAMS:**  THANK YOU, YOUR HONOR.

18

19                      *   *   *

20          I CERTIFY THAT THE FOREGOING IS A CORRECT
            TRANSCRIPT FROM THE RECORD OF PROCEEDINGS
21          IN THE ABOVE-ENTITLED MATTER.

22          S/LEEANN PENCE                    6/6/2024
            LEEANN PENCE, OFFICIAL COURT REPORTER   DATE
23

24

25