No. 24-2937

# United States Court of Appeals
## FOR THE NINTH CIRCUIT

UNITED STATES OF AMERICA,
PLAINTIFF-APPELLEE

*v.*

EDWIN CUADRADO, JR.,
DEFENDANT-APPELLANT

*On Appeal from the United States District Court*
*for the Southern District of California*
*23CR1855-TWR*

**ANSWERING BRIEF FOR THE UNITED STATES**

ADAM GORDON
  *United States Attorney*

DANIEL E. ZIPP
  *Assistant U.S. Attorney*
  *Chief, Appellate Section*
  *Criminal Division*

  *880 Front St., Rm. 6293*
  *San Diego, CA 92101*
  *(619) 546-8463*

**TABLE OF CONTENTS**

Page

Jurisdiction and Bail Status ....................................................1

Questions Presented ..............................................................1

Statutory Provisions...............................................................3

Statement ...............................................................................3

Summary of Argument...........................................................12

Argument ...............................................................................15

A. The District Court Properly Denied Cuadrado's Motion
for New Trial Because the United States Did Not
Present Knowingly False Testimony ...............................15

   1. Standard of Review......................................................15

   2. Issue-Specific Facts.....................................................16

      i.   Trial Proceedings.............................................16

      ii.  Testimony of Dr. Badre.................................18

      iii.  Dispute over Title at UCSD...........................21

      iv.  Post-trial proceedings ...................................25

      v.   Motion for new trial .....................................27

   3. Argument .....................................................................31

      i.   The testimony was not actually false.................31

      ii.  The United States did not know the testimony
was false.......................................................34

i

iii.    There is not a reasonable likelihood of a different result at trial…………………………36

B.    The District Court Was Within its Discretion in Allowing Testimony about Cuadrado's Credibility as a Basis for Dr. Badre's Expert Opinion Under Rule 703……………………………………………41

    1.  Standard of Review ...............................41

    2.  Issue-Specific Facts ...............................41

        i.   Pre-trial proceedings………….………………41

        ii.  Trial testimony…………………………………43

    3.  Argument………………………………………45

C.    Dr. Badre Properly Testified About the Video from the Storage Facility When Describing the Bases for His Opinion…………………………………………53

    1.  Standard of Review ...............................53

    2.  Issue-Specific Facts ...............................53

    3.  Argument….…………………………………56

D.    The District Court Did Not Plainly Err in Designating Dr. Badre an Expert Without Making an Explicit Reliability Finding………………58

    1.  Standard of Review ...............................58

    2.  Issue-Specific Facts ...............................59

    3.  Argument……………………………….………61

Conclusion ....................................................................65

Certificate of Compliance

Addendum ......................................................... A1

ii

**TABLE OF AUTHORITIES**

Cases:

*Alcorta v. State of Tex.*,
   355 U.S. 28 (1957) ...................................................33, 34

*Daubert v. Merrell Dow Pharmaceuticals, Inc.*,
   43 F.3d 1311 (9th Cir. 1995)......................... 47, 51, 59, 62

*Dickey v. Davis*,
   69 F.4th 624 (9th Cir. 2023) ............................................36

*Hayes v. Brown*,
   399 F.3d 972 (9th Cir. 2005)............................................33

*In re Perez*,
   30 F.3d 1209 (9th Cir. 1994)............................................65

*Kumho Tire Co., Let. v. Carmichael*,
   526 U.S. 137 (1999)...................................................61, 63

*Luce v. United States*,
   469 U.S. 38 (1984) ...........................................................49

*Morris v. Ylst*,
   447 F.3d 735 (9th Cir. 2006)............................................35

*Napue v. Illinois*,
   360 U.S. 264 (1959)................................................. passim

*Nichols v. Am. Nat. Ins. Co.*,
   154 F.3d 875 (8th Cir. 1998)...............................50, 51, 52

*Panah v. Chappell*,
   935 F.3d 657 (9th Cir. 2019)............................................33

*Phillips v. Ornoski*,
   673 F.3d 1168, (9th Cir. 2012)........................................33

*Reed v. Lieurance*,
   863 F.3d 1196 (9th Cir. 2017).........................................47

*Sardis v. Overhead Door Corp.*,
    10 F.4th 268 (4th Cir. 2021) ................................................62

*Towery v. Schriro*,
    641 F.3d 300 (9th Cir. 2010).......................................31, 34

*United States v. 0.59 Acres of Land*,
    109 F.3d 1493 (9th Cir. 1997)....................................45, 48

*United States v. Baird*,
    414 F.2d 700 (2d Cir. 1969) ............................................46

*United States v. Binder*,
    769 F.2d 595 (9th Cir. 1985)...........................................47

*United States v. Bingham*,
    653 F.3d 983 (9th Cir. 2011) ..........................................31

*United States v. Calderon-Segura*,
    512 F.3d 1104 (9th Cir. 2008)....................................41, 53

*United States v. Candoli*,
    870 F.2d 496 (9th Cir. 1989).....................................46, 47

*United States v. Croft*,
    124 F.3d 1109 (9th Cir. 1997)..........................................31

*United States v. Espino*,
    892 F.3d 1048 (9th Cir. 2018).........................................59

*United States v. Finley*,
    301 F.3d 1000 (9th Cir. 2002).........................................63

*United States v. Gonzalez-Aguilar*,
    718 F.3d 1185 (9th Cir. 2013)....................................64-65

*United States v. Gonzalez-Becerra*,
    784 F.3d 514 (9th Cir. 2015)..........................................63

*United States v. Graf*,
    610 F.3d 1148 (9th Cir. 2010)....................................15, 33

*United States v. Haines,*
766 F. App'x 443 (9th Cir. 2019) ....................................38

*United States v. Holguin,*
51 F.4th 841 (9th Cir. 2022) ....................................61, 62

*United States v. Houston,*
648 F.3d 806 (9th Cir. 2011)....................................36, 38

*United States v. Jawara,*
474 F.3d 565 (9th Cir. 2007)........................................64

*United States v. Jimenez-Chaidez,*
96 F.4th 1257 (9th Cir. 2024) ..............................61, 63, 64

*United States v. Komisaruk,*
885 F.2d 490 (9th Cir. 1989)........................................47

*United States v. Leon,*
No. 23-1025, 2025 WL 415723 (9th Cir. Feb. 6, 2025)....58

*United States v. Morales,*
108 F.3d 1031 (9th Cir. 1997)........................ 47, 51, 52, 57

*United States v. Myers,*
804 F.3d 1246 (9th Cir. 2015)........................................59

*United States v. Oniha,*
570 F. App'x 680 (9th Cir. 2014) ........................33, 34, 38

*United States v. Renzi,*
769 F.3d 731 (9th Cir. 2014)........................ 15, 31, 35, 38

*United States v. Rodriguez,*
766 F.3d 970 (9th Cir. 2014)........................................31

*United States v. Ruvalcaba- Garcia,*
923 F.3d 1183 (9th Cir. 2019)........................................64

*United States v. Smith,*
444 F. App'x 160 (9th Cir. 2011) ....................................50

v

*United States v. Tillisy,*
  697 F. App'x 910 (9th Cir. 2017) ....................................64

*United States v. Velazquez,*
  125 F.4th 1290 (9th Cir. 2025) .......................................41

*United States v. Young,*
  470 U.S. 1 (1985) ...............................................................65

*United States v. Zuno-Arce,*
  339 F.3d 886 (9th Cir. 2003) ...........................................31

Statutes:

18 U.S.C. § 111(a)(1) ...............................................................9

18 U.S.C. § 3231 .......................................................................1

28 U.S.C. § 1291 .......................................................................1

Rules:

Fed. R. App. P. 4(b)(1) .............................................................1

Fed. R. Evid. 702 .................................... 45, 48, 56, 61, 62

Fed. R. Evid. 703 .................................................... passim

Fed. R. Evid. 806 .......................................................48, 49

No. 24-2937

# United States Court of Appeals
## FOR THE NINTH CIRCUIT

————————

UNITED STATES OF AMERICA,
PLAINTIFF-APPELLEE

*v.*

EDWIN CUADRADO, JR.,
DEFENDANT-APPELLANT

————————

*On Appeal from the United States District Court
for the Southern District of California
23CR1855-TWR*

————————

### JURISDICTION AND BAIL STATUS

The district court had jurisdiction under 18 U.S.C. § 3231, as Edwin Cuadrado, Jr. (Cuadrado) stood charged with an offense against the United States. 2-Excerpts of Record (ER)-263. On April 29, 2024, the court entered final judgment. 2-ER-32. Cuadrado timely noticed his appeal on May 8, 2024. Fed. R. App. P. 4(b)(1); 2-ER-264. This Court has jurisdiction under 28 U.S.C. § 1291. Cuadrado is scheduled to be released from custody on December 2, 2027.

### QUESTIONS PRESENTED

1.    The government called Dr. Nicholas Badre, a forensic psychiatrist, who outlined his credentials and testified that he was

1

the "director of forensic training" at the University of California San Diego. Later, defense counsel obtained emails stating that no such "director" position existed, while Dr. Badre provided other emails supporting his use of that title. Did the district court properly deny Cuadrado's motion for new trial based on the knowing presentation of false testimony, after finding that Dr. Badre did not give objectively false testimony about his title—there was "just kind of a misunderstanding over nomenclature"—and the testimony about his title would not have affected the outcome of trial in any event?

2.    Rule 703 allows an expert witness to offer testimony based on inadmissible evidence if "experts in the particular field would reasonably rely on those kinds of facts or data in forming an opinion on the subject." Dr. Badre testified, as a forensic psychologist, that he based his opinion about Cuadrado's substance abuse disorder in part on the answers about drug use, which he found to be not credible. Was this testimony an improper comment on witness credibility—when Cuadrado never testified at trial—and was any error in its admission harmless?

3.    Dr. Badre also testified that one of the reasons he did not find Cuadrado's statements about his drug use to be credible, was because he watched a video showing Cuadrado smoking from a

glass pipe shortly after the assault occurred. Dr. Badre testified that he could not say for certain that Cuadrado was smoking methamphetamine in the video, but Cuadrado claimed he did not use any other type of drugs. Did this testimony fall outside the bounds of rule 703 as a basis for Dr. Badre's expert opinion, and if so, was any error in its admission harmless?

4.    The government elicited testimony about Dr. Badre's extensive qualifications as a forensic psychiatrist, and he explained the process he used to conduct his psychiatric examination. Cuadrado made no objection when the court certified him as an expert. Was the court required to *sua sponte* make an explicit finding of reliability, and if so, was the failure to make such a finding harmless?

## STATUTORY PROVISIONS

The relevant statutes are set forth in the addendum to this brief.

## STATEMENT

On August 25, 2023, Cuadrado was working as a truck driver for the U.S. Postal Service. 3-Excerpts of Record (ER)-482. When Cuadrado arrived at work that afternoon, his supervisor, Jose Rodriguez, told him that his route was changing, because one of the

customers had complained of Cuadrado "getting aggressive to the security employees." 3-ER-484-85.

A few hours later, when the supervisor Rodriguez finished his workday around 5:30 p.m., he went to a nearby Shell gas station, as was his routine, to "get [a] lotto ticket and something to drink." 3-ER-488. When he approached, he saw that Cuadrado's semitruck was parked on a side street "blocking traffic." 3-ER-490. Rodriguez then walked into the gas station to talk to Cuadrado, who responded by "going off on [Rodriguez]" cursing and saying things like "you motherfucker. You followed me.'" 3-ER-492.



Exhibit 15B.[1] Rodriguez asked Cuadrado if he had "mail in the truck," and he responded, "it's none of your fucking business." 3-

---

[1]    The United States has filed a motion to transmit video clips introduced into evidence at trial.

ER-493. Cuadrado then walked out of the store, carrying two bottles of soda, with Rodriguez following behind. 3-ER-494.

When they got outside, Cuadrado threw the sodas he was holding at the windshield of Rodriguez's car as he walked past. 3-ER-494. He then turned around, came back and "got in [Rodriguez's] face," and "pushed [him] between the car … and the fuel pump." *Id*. All the while, Rodriguez kept telling him to "go back to the plant." *Id*. A clerk at the 7-11 rushed outside, picked up the sodas, and told Rodriguez to call the police. 3-ER-445.

Cuadrado left the gas station in his semi-truck "driving erratically" almost hitting another vehicle as he returned to the postal facility. 3-ER-496. Meanwhile, Rodriguez called his supervisor and reported that he had been "assaulted at the gas station" by Cuadrado. 3-ER-496. He also spoke with the shift supervisor, Chester Perkins, who agreed to meet him when he got back to the facility. 4-ER-571. Rodriguez's supervisor then called a third manager, Benjamin Aficial, and asked him to help "deescalate a situation in the parking lot." 4-ER-605.

When Cuadrado returned to the postal facility, he parked his truck in the employee parking lot, walked to his personal vehicle, and appeared to search for something in the rear of his van. 3-ER-499; Ex. 16-C. He then returned to his semitruck and got back into

5

the cab. 3-ER-499. As he started to pull away, Perkins and Aficial approached and said, "we need to talk to you." 3-ER-502. Cuadrado responded "fuck you motherfuckers. I don't want to talk to you guys." 3-ER-503. When Perkins told him he needed to collect Cuadrado's badge, he "started cursing, saying he's not going to give [them] his damn badge." 4-ER-584.

Meanwhile, Rodriguez arrived from the Shell Station and joined the other two managers standing about five or six feet from the truck door. 4-ER-505. Aficial, who had never met Cuadrado before, tried to defuse the situation and kept saying "everybody calm down." 4-ER-613. Cuadrado eventually opened the door and stepped down from the truck, but he jumped from the second step, "charging" towards Rodriguez and shoving him back about 8 feet. 3-ER-506. Rodriguez managed to stay on his feet but injured his leg as he stumbled backward. 3-ER-506, 587. Cuadrado then pulled out a four-inch knife, saying "Y'all keep bugging my phone, and [Rodriguez] keep messing with me." 4-ER-587. As he started swinging the knife around, Perkins ran around the front of the truck "fear[ing] for [his] life," while Rodriguez retreated further. 4-ER-588. Aficial, unfortunately, tripped and fell to the ground near the side of the truck. 4-ER-541, 613. Cuadrado then "grabbed [Aficial] by the arm" and "threw [him] against the truck." 4-ER-613.

6

He sliced the back of Aficial's head with the knife starting at the "top of his left ear." 4-ER-507. Afterwards, he reached down and sliced him a second time. 4-ER-507, 544.

Cuadrado then threw down his truck keys and walked quickly back to his personal vehicle. 4-ER-508. He drove to the exit gate of the parking lot, backing up slightly so he could squeeze through the gate faster as it was opening. Ex. 16-H. As he pulled out, Cuadrado made what appeared to be an obscene hand gesture out the side of his car.



Ex. 16-H. After leaving the postal facility, Cuadrado drove about 20 minutes away to a storage unit he rented. 3-ER-429. On the way, he tossed the knife out the window on the side of the freeway. 3-ER-373. When Cuadrado appeared at the facility, surveillance footage showed him "socializing and hanging out" with two men and a woman, who were at one point playing with a toy water gun. 3-ER-

432-33. At another point in the video, Cuadrado appeared to be smoking from a glass pipe. 2-ER-235.

Meanwhile at the postal facility, Aficial realized he had been cut when he "felt warm blood coming down [his] neck." 4-ER-613. Rodriguez tried to apply pressure to the wound, but he could not stop the bleeding. 3--ER-510. Eventually police and paramedics arrived and took Aficial to a nearby hospital, and he received 12 stiches on the top of his head. 3-ER-325; 4-ER-614.



Supplemental Excerpts of Record (SER)-11.

Five days later, Cuadrado was arrested, and he agreed to waive his *Miranda* rights and talk with law enforcement. 3-ER-367. Throughout the interview, which lasted about an hour, Cuadrado was coherent and "able to recall events" of the day of the attack. He identified the people outside his truck and admitted that he took out a "blade" and "stabbed the person whose name that he didn't know" 3-ER-370. "He said that he cut the person twice on the side

8

of the head." 3-ER-371. He also said that he threw the knife away "on the side of the road on the 15 freeway." 3-ER-372. When officers asked if Cuadrado wanted to "offer a written apology" to Aficial, he responded "not unless they drop the charges." 3-ER-374. After the interview, Cuadrado was charged with one count of assault on a federal employee, in violation of 18 U.S.C. §111(a)(1). 2-ER-263.

Cuadrado's trial commenced on February 28, 2024. 3-ER-276. In its case-in-chief, the United States called the San Diego Police officer who responded to the scene and rode with Aficial to the hospital. 3-ER-316-330. It then called the officer who arrested Cuadrado and the officer who interviewed him at the station. 3-ER-333-338, 359. The United States played clips of the interview where Cuadrado admitted to the stabbing and admitted to discarding the knife along the side of the freeway. 3-ER-370-73. Prosecutors also played the clip where Cuadrado declined to write an apology to Aficial unless all charges were dropped. 3-ER-375. Afterwards, the court also allowed defense counsel to introduce other sections of the interview, where Cuadrado said he felt "attacked" and "felt like he was going to be killed" and was "trying to push his way out to escape." 3-ER-380-81.

Next, the United States introduced numerous video clips from the Shell Station and the postal facility, showing the initial

9

encounter with Rodriguez and Cuadrado's later movements at the postal facility. 3-ER-353-59, 393-408. The United States also offered testimony that, after the stabbing, Cuadrado drove to a storage facility where video surveillance showed him to be "socializing and hanging out" with a group of people. 3-ER-433. The United States then called the clerk who worked at the Shell Station who described what she saw of the interaction between Rodriguez and Cuadrado in the store and in the parking lot. 3-ER-343-450. Finally, on the second day of trial, the United States called Rodriguez and Perkins, who testified about the attack in the parking lot, and Aficial, who gave emotional testimony about being stabbed. 4-ER-571-600, 4-ER-613-14. The United States then rested its case without putting on any expert testimony.

Cuadrado called five witnesses in his defense, starting with a defense expert psychiatrist, who testified that Cuadrado was schizophrenic. 4-ER-662. He admitted, however, that someone with that illness could still commit violence with conventional motives, and it was impossible to tell methamphetamine-induced psychosis from schizophrenia psychosis. 4-ER-720. Cuadrado then called a psychologist who worked at the jail facility where Cuadrado was housed. She also diagnosed Cuadrado with schizophrenia, but noted that even when he was reporting hallucinations, he remained

10

oriented to what was going on around him and could respond to commands. 4-ER-722, 737.

Next, Cuadrado called two former co-workers who testified that Cuadrado had a reputation as "the crazy guy, the lunatic" and was sometimes seen talking to himself. 4-ER-754. Finally, the defense called another truck driver, who testified that he thought the hand gesture Cuadrado made out the window as he was leaving was just a "wave" directed at him. 4-ER-760. In rebuttal, United States called Dr. Nicholas Badre, who testified that based on his "forensic" review of the case, he concluded that Cuadrado was suffering from "substance-induced psychosis," or "methamphetamine use disorder," not schizophrenia. 4-ER-775, 809.[2]

After closing argument, the jury retired to deliberate at 11:46 a.m. 5-ER-988. Two hours later, at 2:34 p.m., they returned a verdict of guilty. 5-ER-998-90. At sentencing, Cuadrado's attorney recommended the court impose a below-guidelines sentence of 36 months. SER-110. Cuadrado address the court and said he had been "honest about…what happened" and lamented that he "lost his career" at the postal service. SER-111. The United States noted

---

[2] Additional facts about his testimony, and other issue-specific facts are included in the argument sections of the brief below.

that Cuadrado still was not accepting responsibility for his methamphetamine use, as he told probation he had only used the drug three to five times in his entire life. SER-113. The court then heard testimony from Aficial, who described the attack, outlined the impact it had on his physical and mental health, and asked for the court to impose the maximum penalty. SER-114-17. After hearing from the parties, the court calculated the applicable guidelines and imposed a sentence of 60 months' custody. 2-ER-96. This appeal followed.

SUMMARY OF ARGUMENT

This Court should affirm Cuadrado's conviction. First, the district court properly denied Cuadrado's motion for a new trial. To prove a violation of due process under *Napue*, a defendant must show (1) testimony that is "actually false," (2) the prosecution knew or should have known it was false, and (3) the "false testimony was material." Cuadrado did not make any of those three showings. As the district court found, the dispute over Dr. Badre's title at UCSD was the result of a "disagreement about nomenclature" and not "objectively false" testimony. In addition, the government did not *know* the testimony about Dr. Badre's title was false. And, even if it was, Dr. Badre testified consistently as to what his actual role was at the university, he had extensive experience and credentials,

12

and Cuadrado had the opportunity to cross-examine him on the issue extensively. Moreover, as the district court found, this case was not a "battle of the experts" and the direct evidence of video surveillance, witness testimony, and Cuadrado's own post-arrest statements showed clearly that he was able to "appreciate the nature and quality or the wrongfulness of his acts." Any dispute about Dr. Badre's title would not have affected the outcome of trial.

The district court was also within its discretion in allowing Dr. Badre to testify that he found some of Cuadrado's answers in his forensic interview to be not credible. Rule 703 allows expert witnesses to testify based on otherwise inadmissible evidence, so long as experts in that field reasonably rely on that type of information in forming an opinion on the subject. Here, Dr. Badre testified how forensic psychiatry works; explained that part of the process involved considering the defendant's statements in the psychiatric interview and comparing them to other evidence to gauge credibility; and discussed the process he used to conduct his evaluation of Cuadrado. The fact that this process involved some weighing Cuadrado's credibility did not take it outside of the realm of Rule 703. Cuadrado did not testify at trial, and Dr. Badre's testimony did not encroach on the role of the jury. Furthermore, even if it was an error to allow Dr. Badre's testimony on that

13

subject, any error would have been harmless since that constituted only a small part of his overall testimony, and the non-expert evidence thoroughly undercut any insanity defense regardless of what the experts said.

The district court was also within its discretion in allowing Dr. Badre to refer to a video in which Cuadrado appeared to be smoking from a glass pipe 30 minutes after the attack. Once again, Rule 703 allows an expert to testify about inadmissible evidence if experts in the field reasonably rely on such information. Dr. Badre testified that he could not say for certain what Cuadrado was smoking in the video, but that it raised questions as to his credibility in the interview and helped support his ultimate opinion. It was not an abuse of discretion for the court to allow such testimony, and even if it was, any error would have been harmless given the weight of non-expert testimony outlined above.

Finally, the district court did not plainly err by failing to make an explicit reliability finding before allowing Dr. Badre to testify as an expert. It was not "plain," under this Court's caselaw, that, absent any challenge, courts are required to make a *sua sponte* reliability finding in every case. Here, Cuadrado raised no objection when the court designated Dr. Badre as an expert and declined an explicit offer to conduct voir dire. But even if the court should have

14

made an explicit reliability finding, on the record, the failure to do so did not affect Cuadrado's substantial rights. Dr. Badre was plainly qualified to offer expert testimony on forensic psychiatry; this court affirmed the reliability of such testimony; and he conducted a straightforward examination and evaluation of Cuadrado. There is nothing in the record to suggest the court would have found him so unreliable as to exercise its gatekeeping authority if it been asked to make a more explicit reliability finding.

**ARGUMENT**

A.   The District Court Properly Denied Cuadrado's Motion for New Trial Because the United States Did Not Present Knowingly False Testimony

   1.   *Standard of Review*

When a defendant files a motion for new trial based on a *Napue* violation, this Court reviews *de novo* the denial of that motion and reviews the "factual determinations underlying [that] ruling" for clear error. *United States v. Renzi*, 769 F.3d 731, 751 (9th Cir. 2014). "A finding is clearly erroneous if it is illogical, implausible, or without support in the record." U*nited States v. Graf*, 610 F.3d 1148, 1157 (9th Cir. 2010).

2. *Issue-Specific Facts*

    i. Trial Proceedings

Prior to trial, the United States provided Cuadrado with written notice, pursuant to Rule 16, that it intended to call Dr. Badre to testify as an expert witness about Cuadrado's mental state. 2-ER-131. They provided a seven-page, single-spaced curriculum vitae, in which Dr. Badre outlined his extensive professional experience, training, education, research, and publications. 2-ER-155-162. On one line, under "Academic Experience," he listed "Director of forensic training & Assistant Clinical Professor – UC San Diego, psychiatry." 2-ER-156.

At trial, Cuadrado called an expert witness, Dr. Jeff Victoroff, a neurologist and psychiatrist, who testified that Cuadrado was suffering from schizophrenia, a "lifelong psychotic condition." 4-ER-662. As to the possibility that Cuadrado's psychosis was affected by methamphetamine use, Dr. Victoroff explained that Cuadrado claimed he last used methamphetamine "two days before the incident," which meant it could not have possibly affected his behavior during the attack. 4-ER-678. On cross-examination, Dr. Victoroff admitted that even someone with a serious mental illness like schizophrenia could still commit violence with conventional motives," and could "just be upset with someone." 4-ER-691. He also

16

admitted that the symptoms of methamphetamine psychosis and schizophrenia psychosis are impossible to tell apart, and although it was his opinion that Cuadrado was suffering from schizophrenia, "[w]hether or not he was also acutely intoxicated with methamphetamine," at the time of the incident "we'll never know." 4-ER-720.

Next, the defense called Shannon Griswold, a psychologist who worked at the local jail where Cuadrado was being held. 4-ER-722. She testified that she had been caring for Cuadrado at her facility for about six months, meeting with him "at least monthly," and based on those interactions she had determined that he was suffering from schizophrenia. 4-ER-730. She explained that he told her he used methamphetamine one day prior to his arrest, and he was initially "having a lot of hallucinations, of hearing things that weren't there," when he was booked in, but his thoughts eventually became more organized. 4-ER-731. On cross-examination, she admitted that Cuadrado's symptoms could be the result of schizophrenia or methamphetamine use, and his symptoms improved after he was in custody and stopped using the drug. 4-ER-739.

ii.    Testimony of Dr. Badre

In its rebuttal case, the United States called Dr. Badre. 4-ER-775. He started by outlining his experience and qualifications, explaining that he had "several … occupations," working for San Diego County doing "forensic evaluations on behalf of the court," maintaining a "private forensic practice," and working as a "professor at [University of California San Diego] UCSD and [University of San Diego] USD." 4-ER-775. When the prosecutor asked "what do you teach at UCSD and USD?" Dr. Badre responded:

> At UCSD, I am a Director of Forensic Training. That means that I teach the physicians who are going to become psychiatrists how to do forensic psychiatry.
>
> I teach a whole course. I'm the Director of Forensic Training. I believe it's -- it changes a bit from year to year, but 14 to 16 lectures on how to conduct forensic assessments.

4-ER-776.

Next, when the prosecutor asked what training Dr. Badre received "to become a forensic psychiatrist" he responded that he "did his residency in psychiatry" at UCSD where he was "chief resident." 4-ER-776. After that, he went to work "in the San Diego jails, first as a clinician and later as a "medical director" for the jail hospital and eventually the "medical director for the whole jail system for mental health." 4-ER-777.

18

Dr. Badre then explained the difference between "forensic medicine" and "clinical medicine." 4-ER-778. He testified that unlike clinical medicine, where the "pillars of ethics" include, obviously, "helping your patient," in forensic psychology the "goal is not to help the patient" but to "provide the most accurate answer for the Court." 4-ER-778. He explained that he does "about 200 forensic evaluations a year" most of them to determine whether an individual is competent to stand trial. 4-ER-778. After outlining some of his publications, Dr. Badre explained that in the last 10 years he has testified in approximately 40 criminal trials, mostly in the "forensic psychiatry capacity." 4-ER-780. Based on this background, the court found that Dr. Badre had the "background, experience, and training that will allow him to opine on the subject matter at issue in this case." 4-ER-780.

Dr. Badre then explained how he reviewed the investigative reports, videos of the incident, "interviews of individuals that saw him right after the incident, as well as [an] interview of the defendant himself." 4-ER-786. All of those "inform[ed] his opinion." *Id*. As he explained, the "difference between a … forensic interview – versus just sort of a clinical interview is, in forensic, we don't take –the individual's word for it." 4-ER-787. If there are "things in the record" that are inconsistent "we try to address that." *Id*. "That's

really the big difference between clinical care and forensic care." 4-ER-787.

Dr. Badre then explained that methamphetamine use disorder is "widespread" in the San Diego jails, in fact "the majority of individuals that come in ... test positive for methamphetamine." 4-ER-792. He explained that after interviewing Cuadrado and reviewing the record, he concluded that Cuadrado suffered only from "methamphetamine use disorder" not a "serious mental disease or defect." 4-ER-793. He noted that Cuadrado told him he "had only used [methamphetamine] three times in his life," when the records showed he told the jail officials he used methamphetamine to stay awake at work; he had used it just two days prior to his arrest; and he had burns on his hands from trying to manufacture methamphetamine. 4-ER-802.

Dr. Badre testified that it is "extremely common" for people using methamphetamine to "get psychotic at times." 4-ER-809. As to why he did not agree with the defense experts, he explained that "schizophrenia is very rarely diagnosed after age 30 in males," and "only 10 percent of individuals are not diagnosed" before then. 4-ER-811. He also noted that the "majority of individuals with schizophrenia are receiving treatment," and only a small percentage can keep a job. So Cuadrado would have to have "a

20

disorder that is in 1 percent of the population. He has it after 90 percent of people are already diagnosed. He's employed, despite the fact that 90 percent of them are not employed," and he has a "credibility problem" at the interview. The "better explanation," Dr. Badre concluded, was methamphetamine use. 4-ER-813.

Defense counsel then conducted a lengthy cross-examination, before the court adjourned for the night and ordered Dr. Badre to come back the following morning. 4-ER-856. After the jury left, the court complained that "the psychiatric testimony has gone way too long, and the questions haven't been focused and succinct on either side," and the parties should "tighten up the questioning and finish up." 4-ER-860.

### iii. Dispute over Title at UCSD

The next morning, at 8:12 A.M., Gregory Light, the Vice Chair for Psychiatry Education and Training at UCSD, sent an email to defense counsel, entitled "RE: Nico Badre faculty letter, rank, current appointment date," with a forwarded email and a copy of Dr. Badre's appointment letter. 2-ER-170-71. Apparently referring to an earlier conversation, Light confirmed that UCSD does "not have either a Forensic Training Program or a 'Director of Forensic Training' position." 2-ER-170. He noted that if "Dr. Badre is misrepresenting his status or affiliation within our Department, we

21

will terminate his affiliation immediately," and the matter had been referred to legal counsel and the department chair for "follow-up." 2-ER-170.

A few minutes later, trial recommenced and defense counsel continued her cross-examination of Dr. Badre. 5-ER-865, 878. Defense counsel began by asking Dr. Badre where he "completed [his] fellowship in forensic psychiatry?" 5-ER-878. He responded that he did not complete a fellowship but was the "Director of Forensic Training at UCSD." 5-ER-878. Defense counsel then asked if Dr. Badre was "an assistant voluntary professor" and he responded "[e]xactly," and agreed that he did not get paid, the position was voluntary, and he worked "less than" part-time, estimating he gave "about 30 lectures" throughout the year, "ranging from an hour or two." 5-ER-879. When asked about his "employment relationship" with the university, he explained that he "[had] to be part of their employee system" to "become a volunteer faculty." 5-ER-879.

Next, defense counsel showed Dr. Badre a copy of his appointment letter and pointed out where it said that his volunteer professor title "should not be used to suggest that [his] practice is affiliated with the University of California." 5-ER-882. Defense counsel also noted that "this letter does not give you the title

22

Director of Forensic Training." 5-ER-882. Dr. Badre agreed, and when counsel asked. "is that a title you've given yourself," he responded that the "program director of UCSD – the program director of the psychiatry residency" gave him that title. 5-ER-882.

Defense counsel then showed Dr. Badre a copy of the email from Gregory Light and asked whether it confirmed that there was neither a forensic training program nor a director of forensic training at UCSD. 5-ER-883. Defense counsel did not provide the prosecutors with a copy of the email, and it only appeared on a screen at counsel table while the cross-examination was going on. 2-ER-136. Dr. Badre explained that while UCSD did not have a forensic fellowship, every school has some kind of forensic program since it is a graduation requirement that residents "complete a course in forensic psychiatry that includes pretty much exactly the 14 lectures I give." 5-ER-885. In response to further cross-examination, Dr. Badre agreed that he was not on the "permanent faculty" at UCSD, and he was not "tenured faculty." 5-ER-885-86. On redirect the prosecutor asked whether Dr. Badre was "teaching at UCSD" and he responded that he was "[i]t takes a lot of time, and I'm glad to do it." 5-ER-919. He explained that he teaches classes on forensic psychiatry and even "got the Teacher of the Year Award last year." 5-ER-919.

23

In the government's closing argument, the prosecutor argued that it was Cuadrado's burden to show, by clear and convincing evidence, that he was "insane at the time of the crime." 5-ER-945. The prosecutor noted that Dr. Badre was the "only person who offered a forensic opinion in this case," and described his position as "Director of Forensic Training at … UCSD." 5-ER-947. He summarized Dr. Badre's experience performing "hundreds of forensic evaluations" and explained that he "reviewed more information" than the experts for the defense and did not rely solely on what Cuadrado told him. 5-ER-947-98. The prosecutor also argued that even if Cuadrado was suffering from schizophrenia, he could have been simultaneously suffering from substance abuse disorder, and even the defense expert testified that "we'll never know." *Id*. Finally, the prosecutor outlined all the reasons why, even if Cuadrado was suffering from a mental disease or defect, the evidence did not show that he was "unable to appreciate the nature and quality or the wrongfulness of his acts." 5-ER-953. This included video evidence showing his actions, his own admissions in his post-arrest statement, and his actions immediately after the stabbing. 5-ER-955-58.

In the defense closing, counsel highlighted the fact that Dr. Badre originally identified himself as an assistant clinical

professor, but then "hid[ ] the ball" and only later admitted that he was just a volunteer. 5-ER-969. Defense counsel asked the jury "Why is he exaggerating his background? What is the point of that?" *Id.* In rebuttal, the prosecutor again stressed that regardless of what Cuadrado's mental disease or defect was, there was nothing to suggest that it caused him to not "know what he was doing" when he stabbed Aficial and fled the scene. 5-ER-977-79.

   iv. Post-trial proceedings

  After the jury retired to start deliberations, defense counsel emailed the prosecutors a copy of the email from UCSD that she had used that morning in cross-examination. 2-ER-147. She explained that based on the emails, Dr. Badre's official title was "Voluntary Assistant Clinical Professor" not "Director of Forensic Training" and argued the government knowingly presented the jury with false testimony. 2-ER-147. She asked that the prosecutors "contact the Court immediately and request that the jury be instructed that Dr. Badre's testimony that he is the Director of Forensic Training at UCSD is false." 2-ER-148. If they did not take such action in 30 minutes, the defense said they would "endeavor to contact the court." 2-ER-148.

  The assigned prosecutor responded and asked for a phone number for Gregory Light. 2-ER-115. About 10 minutes later, she

responded "if you would like to put it before the court, that's fine. We should have more information by 1:30." *Id*. Defense counsel then emailed the courtroom deputy and requested that the "the jury be instructed that Dr. Badre does not hold a position as Director of Forensic Training at UCSD." 2-ER-172.

Around the same time, Dr. Badre provided prosecutors with an email from Dr. Alan Abrams, who said "Dr. Badre is currently the Director of Forensic Psychiatry training for the Psychiatry Residency program at UC San Diego School of Medicine." 2-ER-117; SER-28. He explained that Dr. Badre replaced him "as director in 2020," and his "expertise as a teacher and coordinator of teaching is exceptional." 2-ER-117. Shortly thereafter, prosecutors received another email, from a psychiatrist, telling Dr. Badre he could "absolutely tell the court that you are in charge of forensic training at UCSD and/or director of forensic training. You are well known to me for teaching forensic lectures." 2-ER-119. In addition, the United States received a copy of Dr. Badre's 2023-24 teaching schedule for forensic psychology, 2-ER-120, and two letters of recommendation for Dr. Badre's application for a distinguished fellowship with the American Psychiatric Association, both of which mentioned his leadership role in the forensic psychiatry training

26

program at UCSD, and one of which described him as the "director of forensic training." 2-ER-121-124.

After a phone call with Gregory Light, who confirmed that no one at UCSD is employed as the "Director of Forensic Training" and the use of that term by Dr. Badre and his predecessor was incorrect, the prosecutors contacted the defense and agreed to enter a stipulation of fact that "Dr. Badre's official title at UCSD is "Voluntary Assistant Clinical Professor." SER-28. At 2:15pm, the courtroom deputy responded that the court did not want to "disturb the jury" and the defense should "kindly submit a motion." 2-ER-172. At 2:34 p.m., after deliberating for less than three hours, the jury came back with a guilty verdict. 5-ER-988-90.

v.     Motion for new trial

Prior to sentencing, Cuadrado filed a motion for new trial, arguing the United States knowingly presented false evidence about Dr Badre's position at UCSD. 2-ER-128. At a hearing on the motion, the court said it was "not convinced of the falsity of the statement," because while Gregory Light said there was no position of Director of Forensic Psychiatry at UCSD, the person who held the role previously used that term, and Dr. Badre was clear that he worked on a volunteer basis for "less than part-time." 2-ER-50. The court acknowledged that Dr. Badre had now been terminated from

27

his affiliation with the university for using the title, 2-ER-35, but found that even if there was not a formal position, if "there was a position that people recognized and called director of forensic psychiatry" it is "just kind of a misunderstanding over nomenclature, which was cleared up." 2-ER-50.

Next, the court noted that "this title gets mentioned at some point … in the course of trial" but the court did not "see it as, like, a pivotal issue." 2-ER-51. The court explained that while Cuadrado tried to portray the case as "a battle of experts" the court did not see it that way, as the jury was able to watch video of the defendant's actions before and during the incident. 2-ER-52. To the court, "that evidence was way more probative of … whether the defendant was acting under a delusion or mental disorder than anything that the psychiatrist said, on both sides." 2-ER-52. The court also noted that Dr. Badre was not the "best witness" as "he always wanted to add some point on that should have been left to the attorneys" and "wanted to be adversarial." *Id*. He was, the court described, "a hard dog to keep on the porch." 2-ER-81. The court noted that if he were trying the case, he would have pulled Dr. Badre aside at the break and said "stop doing that. Just answer the question. I will come back if there is some explanation or some

context that it needs." 2-ER-52. Instead, Dr. Badre appeared "overly eager. And, you know, his bias sort of manifest." 2-ER-52.

As to the impact that any false testimony had on the case, the court again noted that the jury could have drawn the conclusion that Cuadrado understood the nature of his actions because he fled the scene after the stabbing, and when asked if he wanted to apologize said "if they dismiss the charges against me I will." 2-ER-55. Those are the type of things "a sociopath might say … not wanting to take any responsibility for what he did. But flight from the scene is something that a rational non-imbalanced person would do in a case like this." 2-ER-55.

After hearing additional argument, the court said "okay. So here are my findings." First, "rather than being an intentional falsehood, or even really something that I can say is objectively false, I find that this is just really a disagreement about nomenclature. That authorized people at UCSD thought that this title fit. Badre was under that impression that the title fit." 2-ER-71. But even if it is true that the position of director of forensic psychiatry did not exist as an "official title" that "one little thing" would not have "made the difference" in the outcome of trial. 2-ER-71. The court noted that "the experts on both sides were highly credentialed, smart people. They were people that had medical

degrees, specialties in psychiatry." *Id*. The idea that the case "turned on whether Badre was or was not the director of forensic psychiatry and that made all the difference, I don't buy that for a second." 2-ER-72.

Next, the court noted the video evidence and testimony from percipient witnesses was far more probative that the expert testimony, when the jury could see video of the incident and hear from the witnesses. 2-ER-72. Recognizing that Cuadrado was schizophrenic, the court explained that the issue for the jury to decide was "notwithstanding his schizophrenia … did he know what he was doing and did he know it was wrong." *Id*. As to that question, the jury would have reached its conclusion "unaffected by … whether this title of director of forensic psychiatry was accurate or … maybe a little bit inaccurate." 2-ER-75. The court reiterated that it had trouble finding that Dr. Badre's testimony about his position was "knowingly false, or false in any way, when it was a title that … was used by others before, and … he inherited it," and in any event, it did change the outcome of trial. 2-ER-77. The court acknowledged it was maybe, personally, a little "jaded about psychiatric testimony," but "it was the real evidence that came in the form of … percipient witnesses, videotape of the events leading to this, videotape of the event as it was occurring, that had the

30

persuasive force with the jury; and not testimony of after-the-fact doctors." 2-ER-77.

    3.   *Argument*

A defendant's due process rights are violated when a conviction is obtained through knowing use of false testimony. *Napue v. Illinois*, 360 U.S. 264, 269 (1959). To prove a due-process violation based on *Napue*, "the defendant must show that '(1) the testimony … was actually false, (2) the prosecution knew or should have known that the testimony was actually false, and (3) … the false testimony was material.'" *United States v. Bingham*, 653 F.3d 983, 995 (9th Cir. 2011) (citing *United States v. Zuno-Arce*, 339 F.3d 886, 889 (9th Cir. 2003)). A *Napue* claim fails if any of these three elements are not satisfied. *Towery v. Schriro*, 641 F.3d 300, 308 (9th Cir. 2010). Here, Cuadrado has not met any of the three *Napue* elements.

        i.    The testimony was not actually false

As to the first element, this Court has made clear that there is no *Napue* violation if there is no "actually false" testimony. *United States v. Rodriguez*, 766 F.3d 970, 990 (9th Cir. 2014). "Mere inconsistencies or honestly mistaken witness recollections generally do not satisfy the falsehood requirement." *Renzi*, 769 F.3d at 752; *United States v. Croft*, 124 F.3d 1109, 1119 (9th Cir. 1997)

31

(neither earlier inconsistent statements nor conflicting recollections of events establish falsehood).

Here, as the district court found, Dr. Badre's testimony was not "objectively false" but rather the result of "a disagreement about nomenclature." 2-ER-71. In one email, Gregory Light explained that there was no position of "Director of Forensic Training," but Dr. Alan Abrams, who previously taught in the same position, said it was the appropriate title for Dr. Badre to use. 2-ER-117. Another psychiatrist likewise confirmed that Dr. Badre was "in charge of forensic training" and could "absolutely tell the court" that he was the "director of forensic training." 2-ER-119.[3] And the course records showed that Dr. Badre did, as he testified, provide all the lectures on forensic psychiatry at the school. 2-ER-120, 5-ER-885, As the court noted, Dr. Badre was clear about what his role was—serving as a volunteer lecturer without pay—and the dispute about his precise title did not show "an intentional falsehood, or even

---

[3]     Cuadrado describes these as "two random people" in contrast to the "five top tier faculty members" who "foreful[ly] repudiat[ed]" Dr. Badre's claims. AOB-37. But Dr. Abrams made clear that he previously served in the same role as Dr. Badre and understood the title to be correct. And the "five top tier faculty members" were unnamed and referenced only by title in a single line on Dr. Light's email from the morning of trial. 2-ER-170. All of which is to say the question of the appropriate title, or at least what Dr. Badre understood the appropriate title to be, was far from clear.

really something … [that] is objectively false." 2-ER-71. This was not a clearly erroneous finding. See U*nited States v. Graf*, 610 F.3d 1148, 1157 (9th Cir. 2010) ("A finding is clearly erroneous if it is illogical, implausible, or without support in the record."); *United States v. Oniha*, 570 F. App'x 680, 682 (9th Cir. 2014) ("partially conflict[ing]" testimony does not establish false testimony).

Cuadrado argues that "misleading" testimony can violate *Napue*, even if it is not technically false. AOB-34. But the cases he cites for that proposition involved willful efforts to present misleading but technically true testimony. In *Hayes v. Brown*, 399 F.3d 972, 981 (9th Cir. 2005), for example, the prosecutor and witness's attorney agreed to a transactional-immunity deal, but kept the agreement secret from the witness so that he could (falsely, but unknowingly) testify he had no agreement with the prosecution. *Id.* at 981. The same was true in *Phillips v. Ornoski*, 673 F.3d 1168, (9th Cir. 2012), where the court found a *Napue* violation on "virtually identical" facts to those in *Hayes*. *Id.* at 1184. And in *Panah v. Chappell*, 935 F.3d 657, 664 (9th Cir. 2019), this Court noted that a *Napue* claim requires "false or misleading" testimony, but then quoted *Alcorta v. State of Tex.*, 355 U.S. 28, 31 (1957), which involved a prosecutor who knew a key witness had intercourse with the petitioners wife, but asked questions in such a

33

way to give "the jury the false impression that his relationship with petitioner's wife was nothing more than that of casual friendship." *Id.* at 31. As outlined below, the prosecutors here had no way of knowing that there was disagreement as to Dr. Badre's title at UCSD, and they certainly did not purposefully elicit testimony in a way intended to "mislead" the jury with technically true testimony.

> ii.    The United States did not know the testimony was false

As to the second *Napue* prong, the law is clear that no violation occurs if "the prosecutor did not have knowledge of" the falsity of the "underlying facts." *Towery*, 641 F.3d at 309. Even if Dr. Badre's testimony about his position at UCSD was false, "that does not show that the prosecutor knew or should have known of the inaccuracy or falsity." *Oniha*, 570 F. App'x at 682. Here, the United States provided defense counsel with a copy of Dr. Badre's curriculum vitae, which included seven pages and over 100 individual single-spaced lines outlining his training, professional accomplishments, and publications. 2-ER-155-162. The prosecutors had no reason to doubt the accuracy of the title he listed when they asked him "what do you teach at UCSD?" 4-ER-775.

Cuadrado argues the prosecutors were on notice of the falsity "as soon as they saw" the email from Gregory Light, AOB-36. But the defense never provided prosecutors with a copy of the email

during trial—and they only showed it, on a computer screen, while their cross-examination of Dr. Badre was ongoing. 2-ER-136. The prosecutors had no opportunity to evaluate the substance or accuracy of the email in that brief period, and as later events showed, there was substantial nuance about what Dr. Badre's actual title was, and whether he was entitled to use it. This was not a simple, unambiguous factual matter—like the existence of a cooperation agreement—that the prosecutors would have been aware of. Cf. *Renzi*, 769 F.3d at 752 ("although the … records allow for the possibility that the prosecutors knew, or should have known, that [the witnesses] might testify falsely, there is no evidence that the prosecutors actually knew they would.").

Cuadrado argues that if the prosecutors did not know about the false testimony, it was because they failed to conduct any investigation, citing *Morris v. Ylst*, 447 F.3d 735, 743 (9th Cir. 2006). AOB-37. In that case, which involved what the Court described as an "atypical" *Napue* claim, the court held that when "a prosecutor suspects perjury, the prosecutor must at least investigate." *Id*. Here the prosecutors had no reason to "suspect" perjury when Dr. Badre testified on direct about his position at UCSD. By the time defense counsel put the email up on the screen, the United States had already concluded its direct examination,

35

and defense counsel was in the middle of a lengthy cross-examination that, as the court found, "put [Dr. Badre] in his place," with respect to his role at the university. 1-ER-7. On re-direct, the prosecutor briefly touched on the issue again, confirming that Dr. Badre taught "classes in forensic psychiatry" at UCSD. 5-ER-918-19. It was only after trial that defense counsel provided the email from Gregory Light, at which point the prosecutors *did* investigate, and even agreed to instruct the jury that "Dr. Badre's official title at UCSD is "Voluntary Assistant Clinical Professor." SER-28. Nothing about this exchange supports a finding that the United States "knowingly" elicited false testimony to the jury.

       iii.    There is not a reasonable likelihood of a different result at trial

Finally, even if Dr. Badre testified falsely and the prosecution knew about it, Cuadrado would still need to show a "reasonable likelihood that the false testimony could have affected the judgment of the jury." *United States v. Houston*, 648 F.3d 806, 814 (9th Cir. 2011). Although that standard is "considerably less demanding" than other materiality standards, *Dickey v. Davis*, 69 F.4th 624, 637 (9th Cir. 2023), it is not a standard that Cuadrado has met here. Dr. Badre presented the jury with an accurate account of the substance of his job at UCSD. He explained he was a "less than part time" volunteer lecturer who did not receive payment from the

36

university but gave "about 30 lectures" throughout the year. 5-ER-879. He also outlined his extensive qualifications as an expert on forensic psychiatry, including his academic background, professional experience, including serving as medical director for the entire jail system, and his prior experience with conducting hundreds of forensic evaluations every year. 4-ER-777-78. As the district court found, "the experts on both sides were highly credentialed, smart people," and there was no reason to think the outcome of the case "turned on whether Badre was or was not the director of forensic psychiatry." 2-ER-72 ("I don't buy that for a second").

Cuadrado argues that the title was important because it was the "big difference" between the testimony of Dr. Badre and the defense expert, Dr. Victoroff. AOB-39. But the main difference between the testimony of Dr. Victoroff and Dr. Badre was that Dr. Victoroff took Cuadrado at his word when he said he did not use methamphetamine within 48 hours of the offense—and he did not use any screening tests for malingering. 4-ER-678, 697. 713-16. Moreover, although Dr. Victoroff testified that he did a forensic examination "by virtue of the fact that [he] was hired in a forensic case," 4-ER-709, he testified that he has not had forensic training in decades, he only conducts about two forensic psychiatric

37

evaluations per year, had never been "tendered as an expert witness in a criminal case in the field of forensic psychiatry." 4-ER-709-711.

Furthermore, to the extent the title implicated Dr. Badre's credibility, Cuadrado had a full opportunity to cross-examine him about the issue and "put [him] in his place." 1-ER-7. This Court has repeatedly rejected *Napue* claims where, for example, "defense counsel effectively attacked the credibility of [the witnesses purportedly giving false testimony] on cross-examination," *Renzi*, 769 F.3d at 752, and where cross-examination "permitt[ed] the jury to fully evaluate the issue." *United States v. Haines*, 766 F. App'x 443, 448 (9th Cir. 2019); *Houston*, 648 F.3d at 814–15 (no materiality because "[d]efense counsel effectively attacked [the] credibility" of the witness); *Oniha*, 570 F. App'x at 682 (no materiality based in part on "the vigorous cross-examination and impeachment of the witness"). Here, the defense information about Dr. Badre's title, effectively cross-examined him on the issue—over the course of eight transcript pages—and then highlighted the issue in closing. 5-ER-969 (""Why is he exaggerating his background?

38

What is the point of that?"). This significantly reduced the impact his testimony may have had on the outcome of trial.[4]

Finally, even if the jury concluded that Dr. Badre was exaggerating his title and discounted his testimony as a result, there is still not a "reasonable likelihood" that the jury would have acquitted as a result. As the district court found, this case was simply not a "battle of experts" as Cuadrado tries to make it out to be. The United States presented its case-in-chief without calling any experts. The jury saw video evidence of the events leading up to the attack; heard witness testimony about what Cuadrado said and did during the attack; and watched video of Cuadrado hurriedly leaving the facility—backing up to allow the gate to open more quickly—and then driving away to his storage facility. They also received Cuadrado's own post-arrest statement in which he admitted to disposing of the weapon and refused to offer an apology unless charges against him were dropped. As the district court

---

[4]     Cuadrado discounts the efficacy of this cross-examination and argues the prosecutors should have been the ones to step in and correct the record. AOB-42. But defense counsel was the only party with the information from Gregory Light at trial. They made the strategic decision not to provide the email to the government, and to instead conduct a lengthy and effective cross-examination of Dr. Badre. It is not clear what additional "steps" Cuadrado is arguing the government should have taken in the waning minutes of trial, given the information they had. AOB-42.

found, this evidence was "way more probative" than "anything that the psychiatrist said, on both sides." 2-ER-52.

In response to the substantial direct evidence, Cuadrado offered expert testimony to establish that he was suffering from a mental disease or defect. But that is only half of the insanity equation. Nothing in the record showed Cuadrado was "unable to appreciate the nature and quality or the wrongfulness of his conduct." 5-ER-938. Indeed, Cuadrado's own expert witness acknowledged that people suffering from schizophrenia could still be motivated to commit violence for "conventional motives." 4-ER-720. Nor did his experts rebut the evidence that Cuadrado's mental disease or defect was caused at least in part by voluntary intoxication. In fact, his own expert testified "we'll never know" whether he was under the influence at the time of the attack. 4-ER-720. This hardly provides "clear and convincing" evidence to support an affirmative defense. Given the weight of the direct evidence undercutting any claim of insanity, the district court properly found that the discrete issue of Dr. Badre's title could not have reasonably changed the outcome of trial. 1-ER-72.

40

B.   The District Court Was Within its Discretion in Allowing
     Testimony about Cuadrado's Credibility as a Basis for Dr.
     Badre's Expert Opinion Under Rule 703

     1.   *Standard of Review*

This Court reviews the admission of expert testimony for
abuse of discretion. *United States v. Calderon-Segura*, 512 F.3d
1104, 1109 (9th Cir. 2008). A district court abuses it discretion if its
decision is "illogical" "implausible" or "without support in
inferences that may be drawn from the facts in the record." *United
States v. Velazquez*, 125 F.4th 1290, 1295 (9th Cir. 2025) (citation
omitted).

     2.   *Issue-Specific Facts*

          i.   Pre-trial proceedings

At a motions in limine hearing, the court told the parties that
the mental health experts could not testify about the "ultimate
issue" of Cuadrado's sanity. 2-ER-193. The court also ruled that the
government's expert could offer his opinion about whether
Cuadrado was "malingering about his mental state," but should not
offer an opinion on "statements where he's in a position that a judge
or a jury might be in, to evaluate the credibility of a witness and
determine what's truthful, what's not." 2-ER-205. After some back
and forth about the exact parameters of what questioning was
appropriate, the court ordered the parties to "get together today"

41

and resolve any issues "regarding the scope of the testimony or the basis for either expert's opinion." 2-ER-207.

At a second day of hearings, the court summarized its ruling as to Dr. Badre's ability to comment on credibility. The court explained that he was free to testify that "he thinks [Cuadrado] was malingering during the interview," but "he's otherwise not to characterize his version as credible or not credible." 2-ER-176. The court clarified that this could include testimony about why Dr. Badre did not believe Cuadrado's claim that he was experiencing auditory hallucinations. 2-ER-178-79. The court also gave a lengthy explanation for the type of testimony typically seen in these situations and noted that forensic psychiatrists often confront witnesses with information contrary to what they are claiming. 2-ER-179-81. Defense counsel responded that her concern was that Dr. Badre would testify that "the witnesses of the Government that he was reading about in the discovery, they're more credible to what Mr. Cuadrado is remembering." 2-ER-183. The court responded "I've got you. I would not allow him to say that." 2-ER-183. Dr. Badre, could, however confront Cuadrado "things that [he] read in a report" and testify that he did not find Cuadrado's "answers were persuasive." 2-ER-183. That type of testimony "helps prove the point and backs up the doctor's opinion that the defendant wasn't

being honest with him, and in that respect, it's absolutely relevant." 2-ER-184. Finally, the court asked the government to instruct Dr. Badre that his "opinion about who's telling the truth," was not relevant in general, and he should limit his testimony to the opinion that Cuadrado is "malingering or not telling the truth or faking a mental disease" after confronting him with contrary information. 2-ER-185.

ii.    Trial Testimony

At trial, the defense expert testified that he ruled out a diagnosis of drug-induced psychosis based on Cuadrado's claim that he last used methamphetamine "two days before the incident." 4-ER-678, 696. In rebuttal, Dr. Badre noted the difference between "forensic medicine" and "clinical medicine," and explained that in a forensic interview he would not just "take … the individual's word for it," but would evaluate the entire record and administer tests to determine credibility. 4-ER-787-88. When the prosecutor asked if there were any tests Dr. Badre would use to determine credibility, he responded that his "clinical experience" in treating "thousands of people who are intoxicated on methamphetamine" was the best way to test credibility. 4-ER-788. He also testified that he administered an "M-Fast" test, which showed that Cuadrado was exaggerating his symptoms of mental illness, based on some of the

43

answers he gave describing his symptoms. 4-ER-788-90. When the prosecutor then asked "you didn't diagnose him with malingering, correct?" Dr. Badre responded "I diagnosed [him] with methamphetamine use disorder. .... As far as when he exaggerated, I'm telling you now I wrote in my report there were some things that he did that were not credible. Those were some of them." 4-ER-790. Defense counsel objected "vouching" and "403" and the court overruled the objection. *Id*.

Turning to the defense expert's opinion that Cuadrado was not suffering from substance use disorder, Dr. Badre explained why he did not take Cuadrado's claims about his methamphetamine use at face value. He outlined the different accounts Cuadrado gave (1) to the officials at the jail facility, when he said he used methamphetamine at work to stay awake, (2) to the defense expert, when he claimed to have last used the drug two days before the attack, and (3) to Dr. Badre when he claimed to have "only used three times in his life." 4-ER-803. Dr. Badre also noted the burns on Cuadrado's hand from trying to manufacture methamphetamine, and explained that based on all of this, he "already had a credibility problem here." *Id*. Taking this information, along with his general knowledge that "very regular use" of methamphetamine was common, Dr. Badre said he was

fairly confident that Cuadrado "had a methamphetamine use disorder." 4-ER-803.

    3.   *Argument*

Under the Federal Rules of Evidence, a qualified expert may provide opinion testimony if the expert's "scientific, technical, or other specialized knowledge will help the trier of fact to understand the evidence or to determine a fact in issue," the testimony "is based on sufficient facts or data" and "is the product of reliable principles and methods," and "the expert has reliably applied the principles and methods to the facts of the case." Fed. R. Evid. 702(a)-(d). An expert witness may offer opinions based on inadmissible evidence, so long as "experts in the particular field would reasonably rely on those kinds of facts or data in forming an opinion on the subject." Fed. R. Evid. 703. Moreover, the expert may disclose to the jury the inadmissible evidence relied on in forming his opinion "if [its] probative value in helping the jury evaluate the opinion substantially outweighs [its] prejudicial effect." *Id.*; see *United States v. 0.59 Acres of Land*, 109 F.3d 1493, 1496 (9th Cir. 1997) (noting that an expert must be allowed to "illustrate and explain" his opinion).

Here, the district court was within its discretion in allowing Dr. Badre to offer his opinion about Cuadrado's methamphetamine

use disorder and to testify about the "credibility concerns" that, in part, formed the basis for that opinion. As a forensic psychiatrist, he interviewed Cuadrado, evaluated his answers by comparing them to other known data, and formed an opinion about whether Cuadrado was exaggerating or malingering. 4-ER-786. This is precisely the type of information that "experts in the particular field" of forensic psychology "would reasonably rely on … in forming an opinion on the subject." Fed. R. Evid. 703; 4-ER-778 (describing the difference between forensic and clinical medicine). The fact that this information touched on the question of Cuadrado's credibility— whether he was exaggerating his auditory hallucinations or lying about the number of times he used methamphetamine in his life— does not take it outside of Rule 703. See *United States v. Baird*, 414 F.2d 700, 709 (2d Cir. 1969) ("The statements which the defendant makes to the psychiatrist may be as vital for diagnosis as an x-ray or a blood test may be to a physician in another context.").

Cuadrado argues that Dr. Badre's testimony violated the rule that "[a]n expert witness is not permitted to testify specifically to a witness' credibility." AOB-44. The cases he cites for that proposition, however, all involved expert witnesses called to opine on the credibility of another witness who testified *at trial*. In *United States v. Candoli*, 870 F.2d 496 (9th Cir. 1989), for instance, the

46

government called a fire expert, who was "subjected … to vigorous cross-examination." It then it followed up with a second expert witness to testify that the first expert's reputation in the field was "excellent." *Id*. at 505. This Court held that the first expert's character for truthfulness had never been attacked, and it was improper to call a second witness to bolster the first's credibility. *Id*. Likewise in *United States v. Binder*, 769 F.2d 595, 602 (9th Cir. 1985), overruled on other grounds by *United States v. Morales*, 108 F.3d 1031 (9th Cir. 1997), three child witnesses testified about their abuse, and the government called an expert to testify that the children "were able to distinguish reality from fantasy and truth from falsehood," thereby bolstering "the children's story and … usurp[ing] the jury's fact-finding function." *Id*. at 602. Nothing like that occurred here. Cuadrado never testified at trial, and Dr. Badre made no comment on the credibility of any witness.[5]

---

[5] The other cases cited by Cuadrado are even more far afield. In *Reed v. Lieurance*, 863 F.3d 1196, 1209 (9th Cir. 2017), this Court held the government is "permitted to present expert testimony" that conflicts the testimony of others, "as long as the expert's testimony complies with *Daubert*." *Id*. And in *United States v. Komisaruk*, 885 F.2d 490, 494 (9th Cir. 1989), when the defendant, charged with damaging government property sought to introduce evidence "of her subjective beliefs concerning her responsibility under international law," this Court affirmed the exclusion of a defense witness to "verify the reasonableness of her beliefs," noting "expert testimony cannot be offered to buttress credibility." *Id*.

There is also no merit to Cuadrado's argument that Dr. Badre's testimony should have been excluded under Rule 702(a), because it would not "assist the trier of fact in understanding the evidence or determining a fact in issue." AOB-44. The jury was not "perfectly capable of judging [Cuadrado's] statements' credibility without Dr. Badre's help." AOB-45. Cuadrado never testified at trial and the jury had no way of evaluating the statements he made to Dr. Badre about his drug use and symptoms. It was still "helpful to the trier of fact" to hear what statements Cuadrado made, why Dr. Badre did not find them credible, and how that informed his ultimate opinion. Fed. R. Evid. 702(a).

Likewise, Rule 806 did not prevent Dr. Badre from testifying about how he formed his opinion. AOB-45. That rule provides that when hearsay statements are "admitted in evidence, the declarant's credibility may be attacked, and then supported, by any evidence that would be admissible for those purposes if the declarant had testified as a witness." Fed. R. Evid. 806. But Cuadrado's statement about his drug use was only "admitted to illustrate and explain the expert's opinion" and "not as substantive evidence." *0.59 Acres of Land*, 109 F.3d at 1496. 2-ER-189 ("the statements that the doctor

---

Neither case supports the conclusion that Dr. Badre's testimony was improper here in the Rule 703 context.

relies on are not offered for the truth of whatever the people are saying."). Rule 806 did not prevent Dr. Badre from explaining the basis for his expert opinion.

Nor is there any merit to Cuadrado's argument that Dr. Badre violated the court's pre-trial instructions "not to comment on Mr. Cuadrado's credibility." AOB-45. At the motions in limine hearing, the court had a lengthy discussion with the parties regarding the contours of Dr. Badre's testimony—most of it focused on the risk he would be comparing the truth of *other* parties to those of Cuadrado. 2-ER-183. At one point, the court said Dr. Badre should not "characterize [Cuadrado's] version as credible or not credible," but after more discussion, the court clarified that Dr. Badre could testify as to whether he thought Cuadrado was "malingering or not telling the truth," and describe the things in the reports that led him to find his "answers were [not] persuasive." 2-ER-185. That is precisely what Dr. Badre did at trial—comparing Cuadrado's claims about his drug use and mental health symptoms to the other contradictory evidence that made those claims incredible. 4-ER-803. This was not a violation of the court's pretrial ruling.[6]

---

[6]    In any event, the law is clear that a court's *in limine* rulings are always "subject to change when the case unfolds." *Luce v. United States*, 469 U.S. 38, 41 (1984). Whatever the court had in mind when it discussed the abstract possibility of Dr. Badre's credibility testimony before trial, when Dr. Badre took the stand

Cuadrado points to one portion of Dr. Badre's testimony when he said he "wrote down in my report there were some things that he did that were not credible. Those were some of them." 4-ER-790. This came after he testified that Cuadrado failed the M-Fast test by exaggerating the symptoms of mental illness. 4-ER-788. This exchange was not an effort to introduce "unreliable evidence through the back door," or an invitation to the jury to "blindly trust Dr. Badre." AOB-47. He was simply describing how he arrived at his opinion. As the district court noted, the jury was repeatedly instructed "that the things that the doctors rely on are not to be accepted for their truth or that they actually happened … they just explain the basis for the doctors' opinions." 4-ER-858. Dr. Badre's ambiguous reference to "some things" that informed his opinion did not run afoul of Rule 703. See, e.g. *United States v. Smith*, 444 F. App'x 160, 162 (9th Cir. 2011) (expert witness could testify about otherwise inadmissible criminal history, under Rule 703, when it informed the expert opinion and "the ultimate issue at trial was Smith's mental condition").

Cuadrado argues that this case was "highly analogous" to the Eight Circuit opinion in *Nichols v. Am. Nat. Ins. Co.*, 154 F.3d

---

and testified about the credibility of Cuadrado's claims, the court repeatedly overruled the defense objections. 4-ER-790, 806. This was a correct application of Rule 703.

875, 883 (8th Cir. 1998). But that case is clearly distinguishable. In *Nichols*, the plaintiff sued her employee alleging sexual harassment and called an expert witness to support damages for emotional distress. The company called a psychiatrist in rebuttal who "conducted an independent evaluation and interview" and then testified the plaintiff "had poor psychiatric credibility," had "recall bias" and some of her claims were "affected by secondary gain and malingering." *Id*. at 882. The Court held that these theories did not meet "the *Daubert* criteria" and created "a serious danger of confusing or misleading the jury" under Rule 403. The testimony "went beyond the permissible areas of [the expert's] testimony" and was used to indicate that the plaintiff's version of the facts was "tainted by bias and desire for financial gain." *Id*. This testimony was therefore offered to "answer the very question at the heart of the jury's task—could [the plaintiff] be believed." *Id*. at 883. The same is not true here. Dr. Badre's testimony was not offered to answer the "very question at the heart of the jury's task," it was offered to answer the discrete questions of (1) whether Cuadrado was suffering from a mental disease or defect, and (2) whether that was the result of voluntary intoxication. His expert opinion as to both—informed in part by the credibility of Cuadrado's statements

at the interview—fell squarely within his expertise and did not raise the same concerns as *Nichols*.

Finally, even if the court erred by allowing Dr. Badre to offer testimony about Cuadrado's credibility at the forensic interview, it is not "more probable than not" that any error materially affected the outcome of trial. *United States v. Morales*, 108 F.3d 1031, 1040 (9th Cir. 1997). The comments about Cuadrado's drug use and auditory hallucinations formed only a small part of Dr. Badre's overall testimony. He explained why it was extremely unlikely that Cuadrado would be first diagnosed with schizophrenia in middle age, and why it was much more likely he was suffering from methamphetamine use disorder at the time of the attack. 4-ER-809-11. That testimony would have been the same regardless of credibility of Cuadrado's answers to his questions.

Moreover, even if Dr. Badre had not testified at all, Cuadrado would still not have established a legal insanity defense. 5-ER-938. As the district court found, this case was not a "battle of experts" and the video, witness testimony, and post-arrest admissions were "way more probative of … whether the defendant was acting under a delusion or mental disorder than anything that the psychiatrist said, on both sides." 2-ER-52. Cuadrado's own experts acknowledged that even someone suffering from schizophrenia

could still take actions based on conventional motives, and "we'll never know" whether he was also suffering from methamphetamine-induced psychosis. 4-ER-691. In short, the jury received evidence that showed Cuadrado got into an angry confrontation with his supervisors, purposefully stabbed Aficial in the head, hurriedly drove away, disposed of the weapon, and then refused to offer an apology unless charges were dropped. None of this suggests he was "unable to appreciate the nature and quality or the wrongfulness of his conduct." 5-ER-938. With or without Dr. Badre's limited testimony about Cuadrado's credibility in the interview, the outcome of trial would have been the same.

C.  **Dr. Badre Properly Testified About the Video from the Storage Facility When Describing the Bases for His Opinion**

1.  *Standard of Review*

This Court reviews the admission of expert testimony for abuse of discretion. *United States v. Calderon-Segura*, 512 F.3d 1104, 1109 (9th Cir. 2008).

2.  *Issue-Specific Facts*

Prior to trial, the United States provided Cuadrado with an expert report, which outlined all the bases for Dr. Badre's opinions. 6-ER-1011-42. In a section entitled "review of records," Dr. Badre noted that he reviewed video taken 30 minutes after the assault, which showed Cuadrado playing with a "toy gun" and "holding a

53

glass pipe, which was bulbous at one end, and a butane torch style lighter." 6-ER-1015.

At a hearing before trial, defense counsel said she was "worried about lay witnesses [or] officers reviewing surveillance footage, seeing Mr. Cuadrado smoke something," and then testifying it was "consistent with methamphetamine." 2-ER-233. When the court asked the prosecutor "you're not going to offer anything like that, are you?" she responded they did not intend to call any lay witness but "Dr. Badre believes that what he saw on the video appeared to look like someone smoking methamphetamine." *Id*. The court responded, "how can he tell," and asked for more information about the video, "is it a long-range video of the defendant smoking, what, a cigarette of some type?" 2-ER-233. The court concluded it was "too tenuous" and an expert could not testify "the substance he was smoking was methamphetamine as opposed to a regular cigarette or something like that." 2-ER-234. The court concluded "absent some greater foundation that supports, you know, the reliability of an opinion that this happened to be a controlled substance that he was smoking as opposed to a cigarette or something else, I won't allow him to testify to that." *Id*. After more discussion, the court said unless there was "some kind of evidence that reliably demonstrate that it was a pipe or that what

was in it was methamphetamine," Dr. Badre could not testify "that that was methamphetamine ingestion." *Id*.

At trial, when Dr. Badre was explaining why he did not find Cuadrado's claims about his infrequent methamphetamine use to be credible, he noted that Cuadrado gave a different account to the defense expert and admitted he "had used two days prior." 4-ER-805. He also mentioned a video from shortly after the incident that showed Cuadrado "smoking" from a "glass pipe" in "a place where I know that he has used drugs." 4-ER-806-807. Dr. Badre clarified that he did not "know for a fact that what [Cuadrado] was smoking was methamphetamine," but he "told me he doesn't use other drugs" besides methamphetamine, so "either he was not being sort of forthright there or he was not being forthright about his use of other drugs." 4-ER-807. Cuadrado objected and moved to strike, but the court overruled the objection. 4-ER-807.

After Dr. Badre testified, prosecutors asked if they could introduce the video of Cuadrado from the storage unit, with the section showing him smoking the pipe removed. 4-ER-857. The court denied the request, noting there was "no credible evidence" that the substance he was smoking was methamphetamine, and the rest of the video showing his casual demeanor after the attack was "really incidental." *Id*.

3.    *Argument*

The district court did not abuse its discretion by allowing Dr. Badre to briefly testify about what he observed on the storage facility video when explaining the reasons for his opinion. As outlined above, an expert witness can offer opinions based on inadmissible evidence, under Rule 703, so long as "experts in the particular field would reasonably rely on those kinds of facts or data in forming an opinion on the subject." Fed. R. Evid. 703. Dr. Badre testified as to the difference between clinical and forensic psychiatry and explained that he did not just "take the individual's word for it," but instead looked for "things in the record" that might be inconsistent with the individual's account. 4-ER-787. The storage facility video was one of those "things in the record" that Dr. Badre used as part of his forensic evaluation to gauge Cuadrado's claim that he had only used methamphetamine "three times in his life." 4-ER-803.

Cuadrado argues that this testimony should have been excluded under Rule 702 as insufficiently reliable, since the court had earlier ruled that there would be no way for someone to testify what substance he was smoking in the video. AOB-51. But Dr. Badre never made that assertion. He made clear that he could not tell *what* the substance was in the glass pipe, he just tied his observation to Cuadrado's credibility about his drug use and

56

explained why it showed he was "not being forthright." 4-ER-807. Likewise, the fact that the court did not allow prosecutors to actually play the video for the jury, does not mean it found it unreliable. Rule 703 allows admission of evidence relied on by the expert if its "probative value in helping the jury evaluate the opinion substantially outweighs [its] prejudicial effect."). Here, the court weighed the probative value of the video, found it to be "really incidental" and declined to allow it into evidence. This does not mean it was an abuse of discretion for the court to allow Dr. Badre to talk about the video to explain how it informed his opinion.

Finally, for many of the same reasons outlined above, even if the court erred by allowing reference to the video, it is not "more probable than not" that the error would have affected the outcome of trial. *Morales*, 108 F.3d at 1040. Contrary to Cuadrado's argument, Dr. Badre never testified that Cuadrado "likely used meth immediately after the incident." AOB-53. He made clear that he did not know *what* Cuadrado was smoking in the video, and the question went solely to the issue of credibility. And, even without mention of the storage facility video, there was substantial evidence of Cuadrado's methamphetamine use around the time of the offense that would have also undercut his claim of having only used the drug three times. See, e.g. 4-ER-677 (admission to defense expert

that he used methamphetamine two days earlier); 4-ER-689 (admission that he used methamphetamine to stay awake at work); ER-700 (fact that he was found in possession of methamphetamine on the day of his arrest); 4-ER-704 (burns on his hands from manufacturing methamphetamine). All of this supported a finding that methamphetamine use contributed to any mental disease or defect he may have been suffering from on the day of the attack. Moreover, for all the reasons outlined above, it was always Cuadrado's burden to show he was "unable to appreciate the nature and quality or the wrongfulness of his conduct." The evidence he introduced did not come close to supporting that finding—even without the question of voluntary intoxication. 5-ER-938.

D.   **The District Court Did Not Plainly Err in Designating Dr. Badre an Expert Without Making an Explicit Reliability Finding**

1.   *Standard of Review*

Cuadrado did not object when the court designated Dr. Badre as an expert witness. This court should review his claim that the court erred by failing to make an explicit reliability finding only for plain error. *United States v. Leon*, No. 23-1025, 2025 WL 415723, at *1 (9th Cir. Feb. 6, 2025) ("Leon contends that the district court erred by admitting the expert testimony … without making a specific reliability finding," because he "did not object below, we

58

review his claim for plain error") (citing *United States v. Myers*, 804 F.3d 1246, 1257 (9th Cir. 2015). To meet this standard, the burden is on Cuadrado to show (1) error, that is (2) "clear or obvious," and that (3) "affected the appellant's substantial rights." *United States v. Espino*, 892 F.3d 1048, 1052 (9th Cir. 2018) (citation omitted). If those three are met, the Court "has the *discretion* to remedy the error … which ought to be exercised only if the error seriously affect[s] the fairness, integrity or public reputation of judicial proceedings." *Id*. "Meeting all four prongs is difficult, as it should be." *Id*.

2. *Issue-Specific Facts*

Before trial, the United States provided Cuadrado with notice that it intended to call Dr. Badre and included a curriculum vitae outlining his extensive training and experience, as well as a summary of his opinions. 2-ER-155-162. Cuadrado filed a motion arguing that Dr. Badre's opinions did not appear to be "the product of reliable principles and methods" and requested a pretrial hearing under *Daubert*. At a motion hearing, the court said it was not inclined to order a *Daubert* hearing, and Cuadrado responded that he had concerns about the "reliability of the information that Dr. Badre used to reach his conclusions." 2-ER-209. In response, the court asked defense counsel to meet and confer with the

government and then "come back if there's any disagreement about, you know, the basis for his opinion." 2-ER-209-10.

At trial, Dr. Badre began his testimony by outlining his extensive academic and professional qualifications. 4-ER-777-79. He also discussed his prior work as the medical director for the jail system, explained that he conducts approximately 200 forensic evaluations per year, and noted that he has testified as an expert approximately 40 times. 4-ER-779-80. The United States then offered Dr. Badre as an expert witness, and the court asked Cuadrado "[d]o you want to voire dire Dr. Badre at all?" to which defense counsel responded "I can voir dire him during my cross-examination." 4-ER-780. The court found that "Dr. Badre has [the] background, experience, and training that will allow him to opine on the subject matter at issue in this case." 4-ER-780. Afterwards, Dr. Badre testified that he reviewed Cuadrado's medical history and various reports associated with the case; reviewed the report of the defense psychiatrist; and then conducted a "psychiatric interview" with Cuadrado. 4-ER-784-86. Based on all this information, he reached the conclusion that Cuadrado was suffering from methamphetamine use disorder. 4-ER-790. Cuadrado did not object when the court recognized Dr. Badre as an expert, nor did he request an explicit reliability finding.

3.  *Argument*

The district court has the discretion to allow a qualified expert to testify, if the testimony: (1) will assist the trier of fact; (2) "is based on sufficient facts or data;" (3) "is the product of reliable principles and methods;" and (4) is based on a reliable application of "the principles and methods to the facts of the case." Fed. R. Evid. 702. An expert may be qualified "by knowledge, skill, experience, training, or education." *Id*. The "test of reliability is 'flexible,'" and "the law grants a district court the same broad latitude when it decides how to determine reliability as it enjoys in respect to its ultimate reliability determination." *Kumho Tire Co., Ltd. V. Carmichael*, 526 U.S. 137, 141 (1997). Nevertheless, a "district court cannot be silent about reliability when challenged." *United States v. Jimenez-Chaidez*, 96 F.4th 1257, 1269 (9th Cir. 2024) (citing *United States v. Holguin*, 51 F.4th 841, 854 (9th Cir. 2022)).

Here, the district court did not plainly err when it declined to make an explicit reliability finding on the record. In *United States v. Holguin*, 51 F.4th 841, 855 (9th Cir. 2022), this Court held that when "appellants challenged the reliability of the government's expert testimony," the district court was required to make "explicit reliability findings" before letting that testimony before the jury. *Id*. at 853. But this Court did not hold that absent any objection or challenge, courts always have an independent duty to make explicit

61

reliability findings *sua sponte*. Indeed the Court recognized that numerous other Circuits have held that "explicit findings" should be required "only when the reliability of an expert's testimony has been challenged." 51 F.4th at 854 & n.6 (citing *Sardis v. Overhead Door Corp.*, 10 F.4th 268, 283 (4th Cir. 2021)).

Here, Cuadrado initially raised a concern over the reliability of Dr. Badre's testimony before trial, but at a motions in limine hearing he made clear that his concerns were with the reliability of the *materials* upon which Dr. Badre was relying. 2-ER-209. The court then asked defense counsel to meet and confer with the government "come back if there's any disagreement about … the basis for his opinion." 2-ER-209-10. Cuadrado did not raise the issue again, and at trial he made no objection and declined an affirmative offer to conduct voir dire before the court certified Dr. Badre as an expert. Under these circumstances, given the district court's "'broad latitude' to structure proceedings concerning expert testimony," and the "flexible" nature of the "Rule 702 inquiry," the district court satisfied its obligations by simply designating him as an expert. See *Daubert v. Merrell Dow Pharmaceuticals*, Inc., 43 F.3d 1311, 1318 n.10 (9th Cir. 1995) (the need to "make findings about the soundness and reliability of the methodology employed by the scientific experts" is triggered only "[w]here the opposing

62

party . . . raises a material dispute as to the admissibility of expert scientific evidence."). At the very least, it was not "plain" error for the court to decline to make a *sua sponte* finding of reliability on these facts. See *United States v. Gonzalez-Becerra*, 784 F.3d 514, 518 (9th Cir. 2015) (plain error must be "clear or obvious under current law.").

Moreover, even if the district court did err by not making sufficiently explicit reliability findings, Cuadrado has not shown that it affected his substantial rights. First, the record is clear that Dr. Badre's testimony was, in fact, reliable "based on the record established by the district court." See *United States v. Jimenez-Chaidez*, 96 F.4th 1257, 1269 (9th Cir. 2024). Dr. Badre had extensive education, training, and experience in the field of psychiatry, and he offered a straightforward diagnosis of Cuadrado's methamphetamine use disorder based on his psychiatric interview and his review of the case records. There was nothing about his testimony that would have qualified as "junk science" the court should have exercised its gatekeeping power to exclude. *Kumho Tire l*, 526 U.S. at 147-48; see, e.g. *United States v. Finley*, 301 F.3d 1000, 1009 (9th Cir. 2002) (psychological testimony sufficiently reliable when the expert "relied on accepted psychological tests, from which he drew sound inferences.").

63

Any error in failing to make an explicit reliability finding, therefore, would not have affected Cuadrado's substantial rights. See *United States v. Ruvalcaba- Garcia*, 923 F.3d 1183, 1191 (9th Cir. 2019) (failure to make reliability finding harmless when the record on appeal "is sufficient for us to determine that [the] testimony had "a reliable basis in the knowledge and experience of the relevant discipline"); *United States v. Jawara*, 474 F.3d 565, 583 (9th Cir. 2007) (finding "lack of an explicit finding of reliability was harmless," based on the "extensive academic qualifications and experience" of the witness "and the relevance and value of her testimony to the jury."). Furthermore, for all the reasons outlined above, the jury would have "reached the same verdict even without the expert testimony." *Jimenez-Chaidez*, 96 F.4th at 1269; *United States v. Tillisy*, 697 F. App'x 910, 914 (9th Cir. 2017) (failure to make explicit reliability finding harmless "given the strength of the evidence of guilt and the weakness of Tillisy's insanity defense," including the "strong evidence that [he] was aware of the wrongfulness of his acts," including that he "took steps to conceal his crimes.").

Finally, any error in failing to make an explicit reliability finding is not the type that would "seriously affect[ ] the fairness, integrity, or public reputation of the judicial proceedings." *United*

64

*States v. Gonzalez-Aguilar*, 718 F.3d 1185, 1187 (9th Cir. 2013). If Cuadrado had concerns about Dr. Badre's reliability, he could have raised those concerns at trial at a time when the record could have easily been supplemented. See *In re Perez*, 30 F.3d 1209, 1213 (9th Cir. 1994) ("The principal reason [this Court] require[s] parties to raise an issue in the trial court is to give that court an opportunity to resolve the matter and, hopefully, avoid error. Also, when matters are first raised in the trial court, it's possible to develop the record as needed to present the issue properly on appeal."). Having chosen to make no objection when the court designated Dr. Badre, he cannot show that the court's failure to make an explicit reliability finding, on the record, rose to the level of a "miscarriage of justice" warranting the "extravagant protection" of discretionary correction on plain error. *United States v. Young*, 470 U.S. 1, 16 (1985) (citations omitted).

## CONCLUSION

Cuadrado's conviction should be affirmed.

Respectfully submitted,

ADAM GORDON
*United States Attorney*

s/DANIEL E. ZIPP
*Assistant U.S. Attorney*
*Chief, Appellate Section*
*Criminal Division*

JUNE 30, 2025.

65

# UNITED STATES COURT OF APPEALS
# FOR THE NINTH CIRCUIT

### Form 8. Certificate of Compliance for Briefs

*Instructions for this form:* http://www.ca9.uscourts.gov/forms/form08instructions.pdf

**9th Cir. Case Number(s)** 24-2937

I am the attorney or self-represented party.

**This brief contains** 13,980 **words,** including 7 words

manually counted in any visual images, and excluding the items exempted by FRAP

32(f). The brief's type size and typeface comply with FRAP 32(a)(5) and (6).

I certify that this brief *(select only one)*:

◉ complies with the word limit of Cir. R. 32-1.

◯ is a **cross-appeal** brief and complies with the word limit of Cir. R. 28.1-1.

◯ is an **amicus** brief and complies with the word limit of FRAP 29(a)(5), Cir. R. 29-2(c)(2), or Cir. R. 29-2(c)(3).

◯ is for a **death penalty** case and complies with the word limit of Cir. R. 32-4.

◯ complies with the longer length limit permitted by Cir. R. 32-2(b) because *(select only one)*:

☐ it is a joint brief submitted by separately represented parties.
☐ a party or parties are filing a single brief in response to multiple briefs.
☐ a party or parties are filing a single brief in response to a longer joint brief.

◯ complies with the length limit designated by court order dated _____.

◯ is accompanied by a motion to file a longer brief pursuant to Cir. R. 32-2(a).

**Signature** s/Daniel E. Zipp **Date** 6/30/2025

*(use "s/[typed name]" to sign electronically-filed documents)*

*Feedback or questions about this form? Email us at* forms@ca9.uscourts.gov

**Form 8** *Rev. 12/01/22*

# Addendum

## Federal Rules of Evidence Rule 702

### Rule 702. Testimony by Expert Witnesses

A witness who is qualified as an expert by knowledge, skill, experience, training, or education may testify in the form of an opinion or otherwise if the proponent demonstrates to the court that it is more likely than not that:

> (a) the expert's scientific, technical, or other specialized knowledge will help the trier of fact to understand the evidence or to determine a fact in issue;

> (b) the testimony is based on sufficient facts or data;

> (c) the testimony is the product of reliable principles and methods; and

> (d) the expert's opinion reflects a reliable application of the principles and methods to the facts of the case.

## Federal Rules of Evidence Rule 703

### Rule 703. Bases of an Expert's Opinion Testimony

An expert may base an opinion on facts or data in the case that the expert has been made aware of or personally observed. If experts in the particular field would reasonably rely on those kinds of facts or data in forming an opinion on the subject, they need not be admissible for the opinion to be admitted. But if the facts or data would otherwise be inadmissible, the proponent of the opinion may disclose them to the jury only if their probative value in helping the jury evaluate the opinion substantially outweighs their prejudicial effect.